### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

In re:

REED AND BARTON CORPORATION,

Debtor.

Chapter 11

Case No. _____ (___)

## MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014:  (1) AUTHORIZING POST-PETITION FINANCING, (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (3) AUTHORIZING USE OF CASH COLLATERAL AND PROVIDING FOR ADEQUATE PROTECTION, (4) MODIFYING THE AUTOMATIC STAY AND (5) SCHEDULING A FINAL HEARING (EMERGENCY DETERMINATION REQUESTED)

Reed and Barton Corporation, as debtor and debtor in possession (the "Debtor" or "Reed and Barton" or the "Company"),[1] hereby moves this Court pursuant to sections 105(a), 362, 363, and 364(c), (d), and (e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for the entry and approval of the interim order attached hereto as **Exhibit A** (the "Interim Order"), for the scheduling of a final hearing regarding this Motion (the "Final Hearing"), and for the entry of a final order, substantially in the form of the Interim Order (the "Final Order").  The Interim Order, among other things, **(1)** authorizes the Debtor to borrow up to $1,500,000 from Rockland Trust Company ("Rockland Trust") as post-petition lender (the "DIP Lender") through March 7, 2015, pursuant to that certain *Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement* (as may be

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Interim Order attached hereto as Exhibit "C."

amended, modified, or supplemented, the "DIP Credit Agreement"), substantially in the form

attached here to as **Exhibit B** by and between the Debtor and the DIP Lender, to be used for

funding the Debtor's day-to-day operations and working capital needs; **(2)** authorizes the roll-up

(the "Roll-Up") of all outstanding Prepetition Debt (as defined below) upon entry of the Final

Order; **(3)** approves the DIP Credit Agreement and all other agreements, documents, notes,

certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lender,

including, without limitation, security agreements, pledge agreements, notes, guaranties,

mortgages, and Uniform Commercial Code financing statements, and all other related

agreements, documents, notes, certificates, and instruments executed and/or delivered in

connection therewith or related thereto (collectively, as may be amended, modified, or

supplemented the "DIP Financing Agreements"); **(4)** as security for the Debtor's repayment

obligations, grants the DIP Lender first priority priming, valid, perfected, and enforceable liens,

subject only to the Professional Expense Carve Out (as defined below) and the Permitted Prior

Liens (as defined below), upon substantially all of the Debtor's real and personal property, and a

superpriority administrative claim in respect of all obligations under the DIP Financing

Agreements (collectively, the "DIP Obligations"), subject to the Professional Expense Carve

Out; **(5)** authorizes the Debtor's use of "cash collateral," as such term is defined in section 363 of

the Bankruptcy Code ("Cash Collateral"), in which the Prepetition Lender (as defined below) has

an interest; **(6)** grants the Prepetition Lender certain adequate protection, including, among other

things, Adequate Protection Replacement Liens and Adequate Protection Superpriority Claims

(each as defined below), to the extent of any diminution in the value of the Prepetition Lender's

interest in the Prepetition Collateral (as defined below) having the priority set forth below, as

adequate protection for the granting of the DIP Liens to the DIP Lender, the Debtor's use of

Cash Collateral, and for the imposition of the automatic stay; and **(7)** modifies the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and the Interim Order.

**The Debtor respectfully requests that the Court considers this Motion on an emergency basis, pursuant to a separately and contemporaneously filed Motion for Emergency Hearing, to enable the Debtor to obtain access to critically needed funding for its post-petition operations.**

In support of this Motion, the Debtor states the following:

## I.    JURISDICTION

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code.

## II.    INTRODUCTION

2.    As more fully described in this Motion and in the Declaration of Timothy K. Riddle, the Debtor's C.E.O., in Support of First Day Pleadings (the "Riddle Declaration"), several factors have severely impacted the Debtor's financial condition and near-term liquidity, precipitating the Debtor's need for access to the debtor-in-possession financing under the DIP Credit Agreement (the "DIP Facility").

3.    The proposed post-petition financing will, among other things, permit the Debtor to bridge its working capital needs pending a sale of assets to a stalking horse bidder (or successful overbidder) in respect of which a sale motion has been concurrently filed herewith, and thereby maximize the value of its estate for the benefit of creditors.  Accordingly, the Debtor requests that this Court enter Interim and Final Orders approving the terms of the DIP Facility

and authorizing the Debtor to obtain post-petition financing from the DIP Lender on the conditions described herein, the DIP Credit Agreement and such orders, as necessary and in the best interests of the estate.

### III.    GENERAL BACKGROUND

4.    On the date hereof ("Petition Date"), Reed and Barton filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this case, and no committee has yet been formed.

5.    Founded in approximately 1824, Reed and Barton is one of the nation's foremost designers and distributors of high quality silverware and tableware, along with flatware, crystal drinkware, picture frames, ornaments, and baby giftware. Reed and Barton's operations are based in Taunton, Massachusetts. Its products are sold primarily through business-to-business channels for re-sale in department stores, specialty gift shops, and more recently, membership warehouse clubs and television shopping networks. In addition, the Debtor sells directly to the consumer through its on-site factory store in Taunton and a showroom in Atlanta, Georgia; Reed and Barton also has operated retail showrooms and outlet stores in Maine, New York, and Texas in the year leading up to the bankruptcy filing. Consumers are also able to purchase Reed and Barton's products through its award winning website, using credit cards or other electronic payment methods.

6.    Additional information regarding the Debtor's operations, business relationships, assets and liabilities, as well as the circumstances surrounding the filing of this case, is set forth in the Riddle Declaration.

## IV.    BACKGROUND RELATING TO RELIEF REQUESTED

### A.    Prepetition Debt Structure

7.    During the prepetition period, Rockland Trust, as prepetition lender (the "Prepetition Lender"), provided funding to the Debtor under a revolving line of credit facility. An affiliate of Rockland Trust also provided a separate term loan to the Company, which recently was paid in full.

8.    Pursuant to a Revolving Credit Agreement dated as of July 3, 2012 between Reed and Barton and the Prepetition Lender (as amended, "Prepetition Credit Agreement"), the Debtor obtained financing from the Prepetition Lender of initially up to the lesser of $12 million (increasing to $15 million from October 1 through November 30 of each year) or a borrowing base comprised of eligible inventory and receivables, less reserves established by Rockland Trust (the "Prepetition Facility").    The lending cap under the Prepetition Credit Agreement was subsequently reduced to $5 million in accordance with the terms and conditions of the Prepetition Credit Agreement and in light of the facts that the outstanding balance was below that amount and the projected borrowing needs at the time were less than the reduced lending cap.  The outstanding advances under the Prepetition Facility accrue interest at a rate per annum equal to the prime rate plus .50%. The Debtor's obligations to the Prepetition Lender under the Prepetition Facility are secured by substantially all non-real estate assets of the Debtor (the "Prepetition Collateral").

9.    The Debtor's obligations to the Prepetition Lender equal approximately $4,600,000 as of the Petition Date, plus interest, costs, expenses, fees and other charges to the extent provided under the Prepetition Credit Agreement (the "Prepetition Debt").

10.    The Debtor has no other secured indebtedness for borrowed money.  As set forth in the Riddle Declaration, the Debtor's accounts payable are largely current, with approximately

$1.7 million owed to trade creditors as of the Petition Date. Additional claims may be asserted on account of rejection of prepetition contracts, and from the termination of executive employment agreements that may give rise to rejection damages being asserted in the amount of approximately $2.5 million. The Debtor's largest unsecured creditor by far will likely be the Pension Benefit Guaranty Corporation, on account of an unliquidated (and possibly disputed) underfunding liability in connection with the Debtor's defined benefit pension plan. The Debtor intends to effect a voluntary distress termination of that plan during the pendency of this proceeding.

**B.    The Events Precipitating Bankruptcy**

11.    Like many suppliers to, and participants in, the retail sector and relying ultimately on consumers' confidence and disposable income, Reed and Barton's sales were hit hard by the 2009 recession and also by increased foreign competition. The Debtor's management, and ultimately, the Debtor, were resilient and reactive, implementing a series of actions designed to enable the company to reverse the trend of significant losses leading up to fiscal year ending February 1, 2014. Among other changes, Reed and Barton outsourced its manufacturing, developed a new, more contemporary line of tableware, changed its product mix to meet contemporary demand, acquired the assets of Lunt Silversmith in 2010 through a section 363 bankruptcy sale, and expanded its traditional customer base from department stores and gift stores to warehouse clubs and internet retailers.

12.    Despite the stabilization of Reed and Barton's operations, in late 2014 the Debtor's management became aware that the Debtor lacked the financial resources to satisfy the liability associated with its underfunded pension plan. When this was coupled with a decline in sales volume to one of its largest customers, management ultimately concluded that long-term viability of the Company was in jeopardy, and that the Company should explore options for its

sale, or alternatively, for debt or equity financing.

13.     In the fall of 2014, it engaged Financo, LLC ("Financo"), an investment banker experienced in the wholesale and retail industries, to conduct that process.  Through its effort, six bids were presented by Financo to the Debtor's board of directors in October, 2014.  Ultimately, the board determined that a bid submitted by Lifetime Brands, Inc. ("Lifetime") was the most advantageous to the Company and its creditors. As part of its bid, Lifetime had agreed to assume the liabilities of the Company pertaining to the pension plan.  After a period of diligence regarding the cost attendant upon such assumption, however, Lifetime informed the Debtor that it was not willing to proceed with the transaction.

14.     A period of negotiation with Lifetime subsequently ensued and Lifetime presented a revised offer that did not provide for the assumption of the underfunded pension plan liabilities, but which required an asset sale pursuant to section 363 of the Bankruptcy Code.

15.     The board of directors of the Company voted to approve the sale to Lifetime, through a chapter 11 case, and the parties signed an Asset Purchase Agreement ("APA") on or about February 17, 2015.  Under the APA, Reed and Barton has agreed to sell, and Lifetime has agreed to buy, substantially all non-real estate assets of the Company.  The sale price for the assets is $15 million, consisting of cash of $10 million, a promissory note of $5 million, subject to a working capital adjustment.

## C.    Efforts to Obtain Financing

16.     The Debtor has been supplementing its liquidity needs with borrowings under the Prepetition Facility, and requires uninterrupted access to similar financing to meet its working capital needs.  Prior to the Petition Date, the Debtor, through Financo, sought a variety of potential transaction types, including debt based funding.  As stated in the Riddle Declaration, Financo was tasked with locating any available transaction, including an equity sale, equity

investment, asset sale or a debt financing. No party approached by Financo agreed to provide

post-petition financing on terms more favorable than those provided by Rockland Trust.

17.     The Debtor has been unable to obtain any of the following:

i.      unsecured credit allowable under section 503(b)(1) of the Bankruptcy
        Code as an administrative expense,

ii.     credit for money borrowed with priority over any or all administrative
        expenses of the kind specified in sections 503(b) or 507(b) of the
        Bankruptcy Code,

iii.    credit for money borrowed secured solely by a Lien on property of the
        estate that is not otherwise subject to a Lien, or

iv.     credit for money borrowed secured by a junior Lien on property of the
        estates which is subject to a Lien, in each case, on more favorable terms
        and conditions than those provided in the DIP Financing Agreements and
        this Interim Order.

The Debtor also was unable to borrow funds from the DIP Lender without granting the various

DIP protections described below.

## V.     **RELIEF REQUESTED**

### A.     **DIP Financing Terms**

18.     Through this Motion, Reed and Barton respectfully requests authority to obtain

senior secured, super-priority postpetition financing with the DIP Lender not to exceed $7

million and, in connection therewith, further requests that, among other things, it be permitted to

enter into the DIP Credit Agreement and grant the DIP Lender the liens and superpriority claims

described therein, and that it be authorized to use cash collateral and grant adequate protection on

the terms of the Interim Order.

19.     On an interim basis, the Debtor requests entry of the Interim Order:

(I)     INTERIM DIP FINANCING:

(a)     Scheduling an emergency interim hearing (the "Interim Hearing") on this
        Motion for this Court to consider entry of the Interim Order;

(b)   At the Interim Hearing, entering the Interim Order authorizing the Debtor to borrow up to $1.5 million (including through the issuance of letters of credit) pursuant to the DIP Credit Agreement and Interim Order, to fund the Debtor's immediate day-to-day operations and working capital needs, on the terms set forth in the DIP Credit Agreement and such order;

(c)   Scheduling the Final Hearing on or before March 20, 2015, to consider entry of a Final Order authorizing the Debtor to (i) enter into the DIP Facility on a final basis and (ii) borrow up to $7 million on the terms in the DIP Credit Agreement and in such order, including the Roll-Up; *This provision varies from the requirements of MLBR 4001-2(c).*

(d)   Approving the DIP Credit Agreement and all other aspects of the DIP Facility;

(e)   Granting the DIP Lender the following liens and claims:

    (1)   First priority priming, valid, perfected, and enforceable liens, subject and subordinate only to the Professional Expense Carve Out (as defined below) and the Permitted Prior Liens (as defined below), upon substantially all of the Debtor's real and personal property as provided in and as contemplated by this Interim Order and the DIP Financing Agreements; *This provision varies from the requirements of MLBR 4001-2(c).*

    (2)   A superpriority administrative claim in respect of all obligations under the DIP Financing Agreements (collectively, the "DIP Obligations"), subject and subordinate to the Professional Expense Carve Out. *This provision varies from the requirements of MLBR 4001-2(c).*

(II)   INTERIM USE OF CASH COLLATERAL

(a)   Authorizing the Debtor's use of Cash Collateral in which the Prepetition Lender has an interest; and

(b)   Granting the Prepetition Lender certain adequate protection, including, among other things, Adequate Protection Replacement Liens and an Adequate Protection Superpriority Claim (each as defined below) and certain other adequate protection as described in the Interim Order, subject and subordinate only to the Professional Expense Carve Out, the DIP Protections (as defined below), and the Permitted Prior Liens, as adequate protection for the granting of the DIP Liens to the DIP Lender, the Debtor's use of Cash Collateral, and for the imposition of the automatic stay. *This provision varies from the requirements of MLBR 4001-2(c).*

(III)   MODIFYING THE AUTOMATIC STAY – Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the

terms and provisions of the DIP Financing Agreements and the Interim Order; and

## VI.   BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 REQUIREMENTS

20.   Pursuant to Fed. R. Bank. P. 4001, the material provisions of the DIP Facility and the Interim Order relating to the DIP Facility, including those regarding which specific reference is required by Bankruptcy Rule 4001(c)(l)(B)(i)-(xi), are identified below, and those terms of the DIP Facility that are included in the Interim Order and DIP Credit Agreement that vary from the restrictions of MLBR 4001-2 also are set forth as below:

(a)   ***Maximum Borrowing Available Under Facility***.   The maximum amount available to Debtor under the credit facility is the lesser of $7,000,000 or the borrowing base described in the Credit Agreement (the "Loan Cap"); DIP Credit Agreement, ¶ 2.01.

(b)   ***Advances***.   During the interim term of the DIP Facility, the DIP Lender agrees to advance up to $1,500,000 subject to the budget (as may be amended, modified, or supplemented, the "Budget") attached as **Exhibit C** and the terms and conditions of the DIP Credit Agreement and the Interim Order and, after the Final Hearing, to make advances to the Debtor in an amount not to exceed the Loan Cap.   The Budget is a 13-week cash flow projection.   Under Section 7.17 of the DIP Credit Agreement, (i) the Debtor is required not to exceed 110% of the aggregate expenses incurred and disbursements projected, (ii) any line item may not exceed 125% of what is projected, and (iii) the Debtor's receivables collections must not be less than 70% of what is projected in the Budget.   The above is tested weekly on a two week cumulative basis.   Subject to the terms and conditions of the DIP Credit Agreement, the Interim Order and subject to the Budget, proceeds of advances may be used;

(i)   to pay costs, expenses, and fees in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(ii)   for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Case, and other general corporate purposes; and

(iii)   upon entry of a Final Order, to refinance the Roll-Up.

***This provision varies from the requirements of MLBR 4001-2(c).***

(c)   ***Letter of Credit***.   As a sublimit under the DIP Facility, the Debtor may request the issuance of letters of credit in an amount not to exceed $1,000,000.   DIP Credit Agreement, ¶ 2.03.

(d) **Interest Rate**.  Advances under the DIP Credit Agreement shall bear interest at a rate per annum equal to the Prime Rate <u>plus</u> .5%.  During the existence of an Event of Default, the DIP Lender may increase the interest rate by 2%. DIP Credit Agreement, ¶ 2.07.

(e) **Bank Fees**.  Upon the closing of the DIP Facility, the Debtor shall pay the DIP Lender a closing fee of $50,000.  Additionally, the Debtor shall pay the DIP Lender an unused line fee of .375%.  DIP Credit Agreement, ¶ 2.08.

(f) **Maturity Date**.  The date on which the DIP Credit Agreement matures is March 22, 2015, unless the Final Order shall have been entered on or before such date, in which case the maturity date shall be May 15, 2015.  DIP Credit Agreement, ¶ 1.01

(g) **Covenants**.  The DIP Credit Agreement contains customary affirmative and negative covenants for an asset based credit facility, and also includes bankruptcy specific covenants such as (i) an obligation to maintain Verdolino & Lowey, P.C. as a consultant, (ii) the restrictions with respect to the Budget described above, and (iii) an obligation not to consent to superpriority administrative expense claims or liens <u>parri passu</u> with, or superior to, those of the DIP Lender.  DIP Credit Agreement, Article VI.

(h) **Events of Default**.  Events of Default under the DIP Facility include non-bankruptcy and bankruptcy defaults, including (i) the failure to pay amounts to the DIP Lender when due, (ii) modification of the Interim or Final Order without the consent of the DIP Lender, (iii) entry of an order appointing a trustee or examiner, (iv) entry of an order granting a third-party creditor relief from stay on property, which would reasonably be likely to have Material Adverse Effect (as defined in the DIP Credit Agreement), and (v) the failure to comply with the Interim or Final Orders.  DIP Credit Agreement, ¶ 8.01.

(i) **Indemnity**.  The DIP Credit Agreement in Section 9.04 contains customary indemnity provisions.

(j) **Liens, Perfection and Priming**.  The DIP Lender is to be granted a valid, binding, enforceable, nonavoidable, and automatically perfected security interests and liens on all prepetition and post-petition personal and real property that is the DIP Collateral (as defined below).  Specifically, the DIP Lender is to receive security interests and liens (the "<u>DIP Liens</u>") senior and superior in priority to all other secured and unsecured creditors of the Debtor's upon and to all of the following (collectively, the "<u>DIP Collateral</u>"):

    (i) The Collateral, as defined in the DIP Financing Documents, including:

        (a) all Accounts;

        (b) all Goods, including Equipment, Inventory and Fixtures;

(c)    all Documents, Instruments and Chattel Paper;

(d)    all Letters of Credit and Letter-of-Credit Rights;

(e)    all Securities Collateral;

(f)    all Investment Property;

(g)    all Intellectual Property Collateral;

(h)    all Commercial Tort Claims (including any causes of action against the Debtor's officers and directors);

(i)    all General Intangibles (including all amounts payable to the Debtor under the "Asset Purchase Agreement" as contemplated in the Sale Motion (as defined in the DIP Credit Agreement));

(j)    all Deposit Accounts;

(k)    all Supporting Obligations;

(l)    all books and records relating to the Collateral; and

(i)    to the extent not covered by clauses (i) through (xii), all other personal property of the Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

(ii)    Bankruptcy Recoveries, but only: (1) the full amount of any such recovery or settlement thereof to the extent arising under section 549 of the Bankruptcy Code and (2) subject to entry of the Final Order, all amounts necessary to reimburse the DIP Lender for the amount of the Professional Expense Carve Out, if any, actually funded or used in this Chapter 11 proceeding with respect to all other Bankruptcy Recoveries (the foregoing Bankruptcy Recoveries in (1) and (2) being referred to collectively as the "Specified Bankruptcy Recoveries").    "Bankruptcy Recoveries" are defined as any claims and causes of action to which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtor or the estate of the Debtor under chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof. ***This provision varies from the requirements of MLBR 4001-2(c).***

(iii)    All owned real estate of the Debtor, all proceeds from the disposition of real estate, and all proceeds from the disposition of real estate leases; provided that, with respect to the Debtor's non-residential real property

leases, and notwithstanding anything to the contrary in this Interim Order or any financing agreements or documents, no liens or encumbrances shall be granted on or extend to the Debtor's real property leases themselves, but rather, any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such real property lease(s).   Interim Order, ¶ I(E). *This provision varies from the requirements of MLBR 4001-2(c).*

(k)     ***Claim Priority.***   The DIP Lender's claim arising from advances under the DIP Credit Agreement is entitled to administrative claim status.   Subject and subordinate to the Professional Expense Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Superpriority Claim" and, together with the DIP Liens, collectively, the "DIP Protections") with priority in the Chapter 11 Case (and any Successor Case, as defined in the Interim Order) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of a Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; provided, however, that the DIP Protections shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries.   Interim Order, ¶ I(I). *This provision varies from the requirements of MLBR 4001-2(c).*

(l)     ***Binding the Estate to Validity, Perfection, or Amount of Secured Creditor's Prepetition Lien.***   The Interim Order serves as acknowledgement by the Debtor of the validity, perfection, extent and amount of the Prepetition Lenders' claims and liens and that no portion of the Prepetition Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and serves as a waiver by the Debtor of the right to challenge or object to any of the Prepetition Debt, to challenge or object to the security for the Prepetition Debt, to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Agreements or otherwise (each, a "Challenge Proceeding"); subject to the right of a statutory committee or party in interest to commence a proceeding challenging the claims and liens of the DIP Lender within sixty (60) days from the date a statutory committee is formed or, if no committee is formed, seventy-five days following entry of the Interim Order.   Interim Order, ¶ IV.

(m)     ***Waiver of Rights of Estate Under Section 506(c) as to the Final DIP Order.***   As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Financing Agreements, upon entry of the Final Order, the Debtor (and any successor thereto or any representative

thereof, including any trustees appointed in the Chapter 11 Case or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code.  Interim Order ¶ VII (A).  ***This provision varies from the requirements of MLBR 4001-2(c).***

(n)  ***Priming Liens***.  The DIP Liens to be granted to the DIP Lender as provided herein, are:

    (i)  created pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, and subject only to the Professional Expense Carve Out and liens which are valid, properly perfected, unavoidable and senior to the Prepetition Liens or set forth in Section 7.01 of the DIP Credit Agreement (the "Permitted Prior Liens"); and

    (ii)  have priority over all other liens, and subordinate only to liens which are valid, properly perfected, and unavoidable and subject and subordinate to the Professional Expense Carve Out (collectively, the "Permitted Prior Liens").  Other than the Permitted Prepetition Liens, the Debtor does not believe such liens exist.  Interim Order, ¶ I (F). ***This provision varies from the requirements of MLBR 4001-2(c).***

(o)  ***Cash Collateral***.  Pursuant to the terms and conditions of the Interim Order, the DIP Credit Agreement, and in accordance with and as may be limited by the Budget, Debtor is authorized to use Cash Collateral and to use the advances under the DIP Facility during the period commencing immediately after the entry of the Interim Order and terminating upon the occurrence of the Commitment Termination Date (as defined below).  Interim Order, ¶ II.

(p)  ***Adequate Protection***.  As adequate protection for the interest of the Prepetition Lender in the Prepetition Collateral on account of the granting of the DIP Liens, subordination to the Professional Expense Carve Out, the Debtor's use of Cash Collateral, and other decline in value arising out of the automatic stay or the Debtor's use, sale, depreciation, or disposition of the Prepetition Collateral, the Prepetition Lender shall receive adequate protection as follows:

    (i)  Solely to the extent of the diminution in the value of the interest of the Prepetition Lender in the Prepetition Collateral, the Prepetition Lender shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code additional and replacement security interests and Liens in the DIP Collateral (the "Adequate Protection Replacement Liens") which shall be subject and subordinate only to the Professional Expense Carve Out, the DIP Liens securing the DIP Facility, and Permitted Prior Liens.

    (ii)  Solely to the extent of the diminution in the value of the interests of the

14

Prepetition Lender in the Prepetition Collateral, the Prepetition Lender shall have an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claim") which shall have priority (except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Professional Expense Carve Out, in respect of which it shall be subject and subordinate), in the Chapter 11 Case under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; provided, however, that the Adequate Protection Superpriority Claim shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries. Other than the DIP Liens, the DIP Superpriority Claim, and the Professional Expense Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claim.

(iii)    The Prepetition Lender shall receive additional adequate protection in the form of the following:

(a)    subject to the provisions of the Interim Order, the current payment of the reasonable documented out-of-pocket costs and expenses of its financial advisors and attorneys,

(b)    on the first day of each calendar month, commencing March 1, 2015, cash interest at the rates as provided in the Prepetition Credit Agreement,

(c)    all products and proceeds of the Prepetition Collateral and the DIP Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions thereof, whether or not in the ordinary course, including all proceeds incidental to the Debtor's sale motion) regardless of whether such collateral came into existence prior to the Petition Date, shall be applied as follows: (x) first, to reduce the Roll-Up until paid in full, and (y) second, to reduce the DIP Obligations until paid in full, and

(d)    upon entry of the Final Order, payment in full of the remaining

15

Roll-Up, if any. Upon the disposition of Prepetition Collateral as contemplated in the Debtor's sale motion, any such Prepetition Collateral shall be sold free and clear of the Prepetition Liens, the Adequate Protection Replacement Liens, and the DIP Liens; provided that, that (x) such Prepetition Liens, Adequate Protection Replacement Liens, and DIP Liens shall attach to the proceeds of any such sale, and (y) those proceeds shall be paid to the Prepetition Lender and the DIP Lender at the closing on such sale in the order and priority set forth in the Interim Order without the necessity of further order of the Court. Interim Order, ¶ II (B).

***Portions of these provisions vary from the requirements of MLBR 4001-2(c).***

(q)    ***Funded Indemnity.***  Upon the closing of the transaction contemplated in the Section 363 sale motion, in the event and to the extent that either (i) a Challenge Proceeding has been commenced, or (ii) the Challenge Period Termination Date (as defined in the Interim Order) has not yet occurred, the Debtor shall establish an account with the proceeds of such sale in the control of the Prepetition Lender, into which the sum of $50,000 of the sale proceeds shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtor in favor of the Prepetition Lender under the prepetition financing agreements with the Prepetition Lender. Interim Order, ¶ II (B).

***This provision varies from the requirements of MLBR 4001-2(c).***

(r)    ***Treatment of Professionals.***  The DIP Financing provides for earmarked carve-outs for estate professionals. The DIP Protections are subject and subordinate to the Professional Expense Carve Out, which is defined in the DIP Credit Agreement as follows:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); (iii) all accrued and unpaid fees, disbursements, costs and expenses incurred by Case Professionals (as defined in the DIP Credit Agreement) to the extent allowed at any time, through the date of service by the Lender of a Carve Out Trigger Notice (written notice of the occurrence and continuance of an Event of Default under the DIP Credit Agreement) as limited by the respective Budget amounts for each Case Professional or category of Case Professional through the date of service of the Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice less the amount of pre-petition retainers received by such Case Professionals; and (iv) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount of $50,000 less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (iii) above.  The Professional Expense Carve Out shall exclude and shall not be used to pay any fees and expenses (i) incurred in connection with any Challenge Proceeding or the assertion or joinder

in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (1) the DIP Obligations, (2) the DIP Liens in the DIP Collateral, (3) the Prepetition Debt, (4) the Prepetition Lender's Liens in the Prepetition Collateral, (5) the Adequate Protection Replacement Liens, or (B) preventing, hindering, or delaying, whether directly or indirectly, the DIP Lender's or the Prepetition Lender's assertion or enforcement of their liens and security interests, or their efforts to realize upon any DIP Collateral, Prepetition Collateral, or the Adequate Protection Replacement Liens, provided, however, that such exclusion does not encompass any investigative work conducted by the Case Professionals retained by the Committee. Interim Order, ¶ V. *This provision varies from the requirements of MLBR 4001-2(c).*

(s)     *Fees and expenses*. As provided in the Prepetition Credit Agreement and the DIP Credit Agreement, all reasonable out-of-pocket costs and expenses of the Prepetition Lender and the DIP Lender, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses will be paid by the Debtor, whether or not the transactions contemplated hereby are consummated. Payment of such fees shall not be subject to allowance by the Court but shall be subject to the Debtor's receipt of reasonably detailed invoices; provided, however, the Debtor may seek a determination by the Court whether such fees and expenses are reasonable. Under no circumstances shall professionals for the Prepetition Lender or the DIP Lender be required to comply with the U.S. Trustee fee guidelines; provided, however, the Debtor shall provide to the Office of the United States Trustee a copy of any invoices for professional fees and expenses provided to the Debtor during the pendency of the Chapter 11 Case; and shall reimburse the Prepetition Lender and the DIP Lender for all such fees in expenses within ten (10) days of receipt of a copy of each invoice, in the absence of a specific written objection as to the reasonableness of the amounts contained in the subject invoice. Interim Order, ¶ VIII (B). *This provision varies from the requirements of MLBR 4001-2(c).*

(t)     *Commitment Termination Date*. All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (the "Commitment Termination Date"):

(i)      May 15, 2015;

(ii)     the date on which the maturity of the DIP Obligations is accelerated and the commitments under the DIP Facility have been terminated as a result of the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement and notice

thereof has been given to certain parties;

    (iii)    the failure of the Debtor to obtain entry of the Final Order on or before March 22, 2015; or

    (iv)    the closing date of a sale of all or substantially all of the assets of the Debtor as contemplated in the sale motion following entry of an order by the Bankruptcy Court authorizing the sale of all or substantially all of the assets of the Debtor pursuant to the provisions of section 363 of the Bankruptcy Code. Interim Order, ¶ VI.

(u)    ***Rights and Remedies Upon a DIP Order Event of Default.***  Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that (i) after the occurrence of any DIP Order Event of Default (which is defined under the Interim Order as the occurrence of the Commitment Termination Date), the DIP Lender may accelerate the DIP Obligations without further order of the Court, and (ii) upon five (5) days' prior written notice of the occurrence of such DIP Order Event of Default given to each of (i) the Debtor, (ii) counsel to the Debtor, (iii) counsel for any Committee(s) (or if no Committee has been appointed, the Debtor's thirty (30) largest unsecured creditors), and (iv) the Office of the United States Trustee, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Agreements.  ***This provision varies from the requirements of MLBR 4001-2(c).***

## B.    The DIP Facility Should Be Authorized

21.    Approval of the DIP Facility will provide the Debtor with immediate and ongoing access to borrowing availability to pay its operating expenses, including post-petition wages and benefits, utilities, costs of manufacturing and outsourcing, and other trade payables incurred in the ordinary course, as well as to satisfy the costs of administration of this case.

22.    Reed and Barton has no other source of funds available to meet these obligations. An immediate need exists for the Debtor to obtain funds from the DIP Facility to continue operations and to administer and preserve the value of its estate.  The ability of the Debtor to finance its operations, to preserve and maintain the value of its assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, creditors, equity holders, and the possibility for a successful reorganization or sale of the Debtor's assets.

23.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. The Debtor proposes to obtain the financing set forth in the DIP Financing Agreement by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to section 364(c)(l), (2), (3) and section 364(d) of the Bankruptcy Code.

24.    The Debtor's liquidity needs can be satisfied only if the Debtor is immediately authorized to borrow under the DIP Facility and to use such proceeds to fund its operations. The Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(l), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(l) of the Bankruptcy Code. The Debtor has not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

25.    Bankruptcy courts grant a debtor considerable deference as to post-petition financing in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep 7 Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage

the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

26.    Although, section 364(d) mandates that the Debtor seek unsecured and subordinated secured financing before it may receive authority to grant priming liens or super priority claim status, it does not require that a debtor seek alternative financing from every possible lender.  Rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  *In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding).

27.    Substantially all of the Debtor's personal property assets are encumbered and the Debtor has been unable to procure the required funding absent granting the proposed superpriority claims and liens.  The Debtor submits that the circumstances of this case require the Debtor to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and, accordingly, the DIP Financing Agreement reflects the exercise of its sound business judgment.

28.    The terms and conditions of the DIP Financing Agreement are fair and

reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the Debtor submits that the Court should enter the Interim Order, and after the Final Hearing, enter the Final Order.

### C.  The Use of Cash Collateral Should Be Approved

29.    As set forth above, the Prepetition Lender holds a valid, first priority lien as to the Debtor's accounts receivable, which, pursuant to section 552, extends to the cash proceeds of those receivables. Through this Motion, the Debtor also seeks authority to use the use Cash Collateral of the Prepetition Lender pursuant to the terms and conditions of the Interim Order, the DIP Facility, the DIP Credit Agreement and the Budget (subject to any variances permitted under the terms and conditions of the DIP Credit Agreement).

30.    Bankruptcy Code section 363(c)(2) provides that a debtor may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

31.    By virtue of the DIP Credit Agreement and the negotiated Interim Order, Rockland Trust has consented to the use of its Cash Collateral on the terms set forth in such order. Given this, the Debtor respectfully requests that the Court authorize the Debtor to use the Cash Collateral in accordance with the terms set forth in the Interim Order and, ultimately the Final Order, to ensure that the Debtor sustain operations through the closing of the sale discussed above.

32.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used ..., the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code sets forth the forms of

adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

33.     As adequate protection of the interests of the Prepetition Lender's interest in its Collateral, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Prepetition Lender shall be granted, pursuant to sections 361, 363(e), and 364(c) of the Bankruptcy Code, additional and replacement security interests and liens in the and upon substantially all of the post-petition real and personal, tangible and intangible, assets of the Debtor, to the extent of any diminution in the value of the Prepetition Lender's interest in the Prepetition Collateral, which shall be subject and subordinate only to the Professional Expense Carve Out, the DIP Liens and the Permitted Prior Liens. As additional adequate protection, the Prepetition Lender shall have the Adequate Protection Superpriority Claim with the priority discussed above.

34.     The Prepetition Lender has agreed to the Debtor's use of Cash Collateral and the Debtor's entry into the DIP Financing Agreement in consideration for the adequate protection provided under the Interim Order. Accordingly, the Debtor believes that the adequate protection proposed herein to protect the Prepetition Lender's interest in the Prepetition Collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the

irreparable harm and prejudice to the Debtor's estate and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

39.     The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate its business on an ongoing basis.  Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the motion, the Debtor will be immediately and irreparably harmed.  The availability of interim loans under the DIP Facility is the sole means available to the Debtor to meet operating expenses, including wage obligations for 75 employees, and operating expenses necessary to preserve its estate.

40.     The Debtor further submits that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Rule 6003 of the Federal Rules of Bankruptcy Procedure has been satisfied.

41.     To implement the foregoing and to the extent applicable, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h).

## VII.   NOTICE

42.     No trustee, examiner, or statutory creditors' committee has been appointed in this chapter 11 case. Notice of this Motion has been provided to (i) the United States Trustee for the District of Massachusetts; (ii) the Internal Revenue Service and all other taxing jurisdictions with respect to the Debtor's nationwide operations; (iii) the creditors holding the twenty largest unsecured claims against the Debtor's estate; (iv) counsel to Rockland Trust; (v) Rockland Trust; and (vi) all secured creditors of record.  In light of the nature of the relief requested, the Debtor submits that no other or further notice need be provided.

WHEREFORE the Debtor respectfully requests entry of an order granting the relief requested herein in the form of the Interim Order, and such other and further relief as is just.

Respectfully submitted,

REED AND BARTON CORPORATION

By its proposed counsel,

HOLLAND & KNIGHT LLP


/s/ John J. Monaghan
John J. Monaghan (Mass Bar #546454)
Lynne B. Xerras (Mass Bar #632441)
Kathleen St. John (Mass Bar #681565)
10 St. James Avenue
Boston, MA  02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850

Dated:  February 17, 2015