**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | |
| REED AND BARTON CORPORATION, | Chapter 11 |
| Debtor. | Case No. _____ (___) |

**DEBTOR'S MOTION FOR (I) AN ORDER (A) APPROVING SALE PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING THE BREAK-UP FEE, (C) SCHEDULING AN AUCTION AND HEARING TO APPROVE THE TRANSACTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (D) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

Reed and Barton Corporation ("Reed and Barton" or the "Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case, hereby moves pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of (I) an order (a) approving sale procedures in connection with sale of substantially all of the Debtor's assets (the "Bidding Procedures"), (b) approving the break-up fee, (c) scheduling an auction and hearing to approve the transaction and the form and manner of notice thereof, and (d) establishing procedures relating to the assumption and assignment of executory contracts; and (II) an order (a) approving the proposed sale, (b) authorizing the assumption and assignment of certain executory contacts and unexpired leases, and (c) granting certain related relief (the "Motion").  In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O). Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363(b), 363(f), 365, 503 and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2), 6003, 6004, 6006(a), 9007 and 9014.

## BACKGROUND

3.      On the date hereof ("Petition Date"), Reed and Barton filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this case, and no committee has yet been formed.

4.      Founded in approximately 1824, Reed and Barton is one of the nation's foremost designers and distributors of high quality silverware and tableware, along with flatware, crystal drinkware, picture frames, ornaments, and baby giftware.  Reed and Barton's operations are based in Taunton, Massachusetts.  Its products are sold primarily through business-to-business channels for re-sale in department stores, specialty gift shops, and more recently, membership warehouse clubs and television shopping networks.   In addition, the Debtor sells directly to the consumer through its on-site factory store in Taunton and a showroom in Atlanta, Georgia; Reed and Barton has also operated retail showrooms and outlet stores in Maine, New York, and Texas in the year leading up to the bankruptcy filing.

5.      Additional information regarding the Debtor's operations, business relationships, assets and liabilities, as well as the circumstances surrounding the filing of this case, is set forth

in the Declaration of Timothy K. Riddle (the "Riddle Declaration"), filed contemporaneously

herewith and incorporated herein by reference.

### RELIEF REQUESTED

6.      By this Motion, the Debtor seeks entry of an order (a) approving sale procedures

in connection with the sale of substantially all of the Debtor's assets, subject to higher or better

offers, (b) approving a break-up fee for the Proposed Purchaser (defined below), (c) approving

the advancement by the Proposed Purchaser of funds to cover costs of maintaining the Debtor's

New York showroom and the staffing and stocking of that showroom for a "tabletop show,"

which costs will be added to the Purchase Price (defined below) if the Proposed Purchaser is the

successful bidder or reimbursed in an amount of up to $150,000 from sale proceeds if the Debtor

closes a transaction with a different purchaser;  (d) authorizing the Debtor to receive from the

Proposed Purchaser certain wind down and transition services at no cost; (e) scheduling an

auction and hearing to approve the transaction and approving the form and manner of notice

thereof, and (f) establishing procedures relating to the assumption and assignment of executory

contracts and unexpired leases (such order is referred to as the "Bid Procedures Order").  In

addition, the Debtor also seeks, at the conclusion of the Sale Hearing (defined below), entry of

an order (a) authorizing the sale of substantially all of the Debtor's assets to the Proposed

Purchaser, in accordance with the terms of the Asset Purchase Agreement attached hereto as

Exhibit A (the "Asset Purchase Agreement"), or such other person or entity who is the Prevailing

Bidder (defined below), (b) authorizing the assumption and assignment of certain executory

contracts and unexpired leases, and (c) granting certain related relief (such order is referred to as

the "Sale Order").

**PROPOSED SALE AND PROPOSED PURCHASER**

7.      Under the terms of the Asset Purchase Agreement and subject to solicitation of higher and better offers and entry of an order of this court approving the transaction, Lifetime Brands, Inc. or its nominee ("Lifetime Brands," or the "Proposed Purchaser") will purchase all assets of Reed and Barton other than those expressly excluded.  The assets to be purchased include, but are not limited to, accounts receivable, inventory, intellectual property, and certain tooling and equipment (the "Included Assets").  The Proposed Purchaser also has required that Reed and Barton assume and assign to Proposed Purchaser certain executory contracts and unexpired leases (the "Assigned Contracts" and together with the Included Assets, the "Purchased Assets").  Items excluded from the sale include cash and cash equivalents, real property, life insurance policies owned by Reed and Barton or for which it is the beneficiary, and all Chapter 5 avoidance actions (the "Excluded Assets").

8.      Due to liquidity constraints facing the Debtor, even after consideration of a generous, well-priced and beneficial post-petition financing package provided by the Debtor's prepetition lender for which approval has been sought, the Proposed Purchaser has agreed to provide, and the Debtor seeks authority for, two additional aspects of the transaction.  First, the Proposed Purchaser has agreed to pay all costs associated with the Debtor's retaining its showroom in New York through April, 2015, and of participation in the April 2015 NY Tabletop Show (the "Show Costs"), with those costs being added to the Purchase Price if the transaction closes with the Proposed Purchaser, or reimbursed in an amount of up to $150,000 if a transaction closes with a purchaser other than the Proposed Purchaser. Second, the Proposed Purchaser has agreed to provide, at its sole cost and expense, certain wind down and transition

services that will enable any purchaser to integrate the Included Assets promptly after entry of the Sale Order with an associated ability of the Debtor to cease most of its operations.

9.        In consideration of the acquisition of the Purchased Assets, the Proposed Purchaser has agreed to the following consideration:  (a) $10 million in cash, consisting of release to the Debtor of the $250,000 deposit made by the Purchaser upon execution of the Asset Purchase Agreement and an additional cash payment of $9.75 million payable on the date the transaction closes (the "Closing Date"); (b) a $5.0 million promissory note, issued on the Closing Date (the "Note"); (c) the Show Costs, paid as and when incurred prior to the Closing Date.  The Proposed Purchaser also will assume certain liabilities of the Debtor related to the purchase of Inventory and occupancy of Reed and Barton's Atlanta Showroom ("Included Payables").  The Purchaser will also pay amounts required to cure any monetary defaults arising out of the Assigned Contracts (the "Cure Payments"), but those Cure Payments will result in a dollar for dollar reduction of the Note.

10.        The principal amount of the Note is subject to adjustment up or down as described below, will bear interest at a fixed rate of 4.25% and will mature seven years from the Closing Date.  The Note will provide for the payment of interest only on a quarterly basis during the first two years of the term of the Note and then equal quarterly payments of principal and interest in an amount sufficient to fully amortize the Note by its maturity date.

11.        To the extent that the actual level of accounts receivable (net of all sales related allowances and reserves) plus inventory (net of all inventory related reserves except LIFO reserves) less Included Payables actually transferred to, or assumed by, the Proposed Purchaser ("Working Capital") at Closing is less than $10.0 million, the principal amount of the Note will be reduced by the amount of such short-fall on a dollar-for-dollar basis. To the extent that the actual level of

Working Capital at Closing exceeds $10.0 million, the principal amount of the Note will be increased

by the amount of such excess (the "Excess") on a dollar-for-dollar basis, *provided however*, except as

described in the next following sentence, such upward adjustment (the "Upward Adjustment") shall

not exceed $1 million.  If the Proposed Purchaser does not assume the Included Payables (the "Non-

Assumed Payables"), then to the extent that the Excess exceeds $1 million, the limit on the Upward

Adjustment described in the preceding sentence shall be increased from $1 million to the sum of

(i) $1 million plus (ii) the amount of the Non-Assumed Payables.  The amount of Inventory included

in the calculation of Working Capital shall be at least $7.5 million but not more than $9.0 million.

The parties will cooperate to determine the calculations set forth above.

12.     Reed and Barton anticipates that, if Proposed Purchaser ultimately is determined

to be the winning bidder, it will enter into a short term (90 day) transition services contract (the

"TSA") with Reed and Barton, by which Debtor's employees will assist with operating and

transitioning the business post-closing.  Proposed Purchaser will pay Debtor the "fully burdened"

cost of providing such services, including all salary, benefits, insurance, stay put incentives for

Debtor's work force, and overhead.  The expected consideration for the first 4 weeks of the TSA is

expected to be $460,206.56.  A copy of the proposed TSA is attached as an exhibit to the Asset

Purchase Agreement.

13.     The Proposed Purchaser also has made it a condition to closing that Debtor's

president, Timothy Riddle, and its chief financial officer, Charles Daly, enter into consulting

agreements with it to provide services to the Proposed Purchaser following the closing.  The

proposed agreement with Timothy Riddle is for a term of three years unless terminated earlier for

cause, and Mr. Riddle will be paid $50,000 quarterly over the life of the agreement.  The proposed

agreement with Mr. Daly is for a term of two years unless terminated earlier, and Mr. Daly will be

6

paid $25,000 quarterly over the life of the agreement.  The term of each of these agreements may be renewed upon the written agreement of the parties thereto before the conclusion of the then existing term.  Forms of the proposed consulting agreements with Messrs. Riddle and Daly are attached as Exhibits to the Asset Purchase Agreement.

14.     Lifetime Brands, the Proposed Purchaser, operates certain lines of business that are parallel to Reed and Barton's.  It is a publicly traded Delaware corporation that distributes food preparation, tabletop, home décor and lifestyle products under such well-known brand names as Farberware, KitchenAid, Mikasa, Pfaltzgraff and Cuisinart.  It distributes its products to leading specialty stores, department stores, national chains, mass merchants, warehouse clubs, home centers, supermarkets and off-price retailers as well as directly to consumers through the internet.  Reed and Barton is informed that Lifetime Brands has material prior experience with the bankruptcy sale process, and strong track record of timely acquisition transaction execution.

## BASIS FOR RELIEF

### A.     Approval Of Bid Procedures

15.     The Motion seeks, among other things, approval of the Bidding Procedures to be used in connection with soliciting higher and better offers for the sale of all or substantially all of the Debtor's assets, to establish procedures for the assumption and assignment of executory contacts and unexpired leases, to approve the Proposed Purchaser's advancement of the Show Costs with those costs to be one aspect of the minimum overbid requirements imposed on any overbidder to be a Qualified Bidder (defined below) and to approve certain "stalking horse" protections to the Proposed Purchaser.   In connection with the approval of the Bidding Procedures, the Debtor also seeks authority for the Proposed Purchaser to render, at its own cost, certain wind down and transition services.

16.    The Bidding Procedures are designed to maximize value for the Debtor's estate and ensure that a marketing and sales process is undertaken by the Debtor in accordance with the timeline required by the Proposed Purchaser and to afford the maximum possible return to creditors, by providing for a closing before the Debtor's projected performance depletes its cash position.   The Bidding Procedures are the result of negotiations between the Debtor and the Proposed Purchaser and are summarized as follows:

- Assets to be Sold: The Debtor shall offer for sale (the "Asset Sale") the Purchased Assets, which consist of all or substantially all of the property and assets of the Debtor's business as identified in further detail in the Asset Purchase Agreement.

- Purchase Price:  The consideration to be paid by the Proposed Purchaser for the Purchased Assets under the Asset Purchase Agreement is $10 million in cash, the $5 million adjustable Note, assumption of certain liabilities as set forth in the Asset Purchase Agreement and satisfaction of any Cure Payments due upon assumption and assignment of executory contracts, which Cure Payments shall reduce the Note dollar for dollar.

- Show Cost:  The Proposed Purchaser will advance the Show Costs, which Show Costs will be an addition to the Purchase Price in the event the transaction closes with the Proposed Purchaser.

- Participation Requirements: Any person who wishes to participate in the bidding process (each, a "Potential Bidder") must become a "Qualifying Bidder."  As a prerequisite to becoming a Qualifying Bidder (and, thus, being able to conduct due diligence), a Potential Bidder: (a) must deliver to Debtor an executed confidentiality agreement in form and substance acceptable to the Debtor; and (b) must be able, as determined by the Debtor, to consummate a transaction based upon the Asset Sale.

- Due Diligence:  The Debtor shall afford to any Qualifying Bidder the time and opportunity to conduct reasonable due diligence. The due diligence period shall extend through and include the Bid Deadline (defined below).

- Bid Requirements: To be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder by a date no later than the Bid Deadline that:

    (a)    states such Qualifying Bidder offers to purchase all or substantially all of the Purchased Assets upon the terms and conditions substantially as set forth in the Asset Purchase Agreement or pursuant to an alternative structure that the Debtor determines is no less favorable than the terms and conditions of the  Asset Purchase Agreement;

(b)     is accompanied by a clean and duly executed asset purchase agreement (the "<u>Modified Asset Purchase Agreement</u>") and a marked Modified Asset Purchase Agreement reflecting any variations from the Asset Purchase Agreement executed by the Proposed Purchaser;

(c)     states such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement and provides written evidence in support thereof;

(d)     states such Qualifying Bidder's offer is irrevocable until the closing of the Asset Sale if such Qualifying Bidder is the Prevailing Bidder;

(e)     contains such financial and other information to allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Asset Purchase Agreement, including, without limitation, such financial and other information setting forth adequate assurance of future performance under contracts and leases to be assumed pursuant to section 365 of the Bankruptcy Code in a form requested by the Debtor to allow the Debtor to serve, within one (1) business day after such receipt, such information on counterparties to any contracts or leases being assumed and assigned in connection with the proposed sale that have requested, in writing, such information;

(f)     identifies with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing;

(g)     does not request or entitle such Qualifying Bidder to any break-up fee, expense reimbursement or similar type of payment;

(h)     fully discloses the identity of each entity that will be bidding in the Asset Sale or otherwise participating in connection with such bid, and the complete terms of any such participation;

(i)     is likely to result in a value to the Debtor's estate, in the Debtor's reasonable judgment, that is more than the aggregate of the value of the sum of: (i) the Purchase Price; **plus** (ii) the Show Costs up to the amount of $150,000; **plus** (iii) the assumed liabilities, as identified in the Asset Purchase Agreement; **plus** (iv) the amount of the Break Up Fee (as defined in the Asset Purchase Agreement); **plus** (v) $50,000;

(j)     does not contain any financing contingencies of any kind; provides for expiration of any due diligence contingency on or before the Auction Date; and contains evidence that the Qualifying Bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to consummate the Sale Transaction, which evidence is reasonably satisfactory to the Debtor;

(k)     includes evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified Asset Purchase Agreement; and

(l)     provides a good faith cash purchase deposit of $250,000.

A competing bid satisfying all the above requirements shall constitute a Qualifying Bid.

- Bid Deadline: A Qualifying Bidder that desires to make a bid shall deliver a written or electronic copy of its bid by a date no later than thirty-five (35) calendar days subsequent to the entry of the Bid Procedures Order.

- Evaluation of Qualifying Bids:  The Debtor must determine whether a bid is a Qualifying Bid and notify bidders of same by a date that is no later two (2) days before the Auction Date (defined below).  Before the Auction, the Debtor also must determine, in its reasonable judgment, which of the Qualifying Bids is the highest or best value to the Debtor.  If no timely, conforming Qualifying Bids other than the Asset Purchase Agreement submitted by the Proposed Purchaser are submitted by the Bid Deadline, then Debtor will not hold an Auction and instead will request at the Sale Hearing that this Court approve the Asset Sale to the Proposed Purchaser.

- Auction:  In the event that the Debtor timely receives one or more Qualifying Bids other than the Asset Purchase Agreement, the Debtor shall, on a date to be determined by the Debtor, conduct the Auction no later than the date that is three (3) business days after the Bid Deadline (the "Auction Date").

- Auction Procedures:  The Auction shall be governed by the following procedures:

(a)     only the Proposed Purchaser, which is deemed to be a Qualifying Bidder, and the other Qualifying Bidders shall be entitled to submit bids at the Auction;

(b)     Qualifying Bidders must appear in person at the Auction or through a duly authorized representative with binding authority to bid;

(c)     bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders before the Auction;

(d)     Qualifying Bidders may submit successive bids in increments of at least $50,000 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $50,000 higher than the previous bid, provided that Debtor retains the right to modify the bid increment requirements at the Auction;

(e)     the Proposed Purchaser shall be entitled to include as part of any and all of its subsequent bids a credit for the Break Up Fee;

(f)    all Qualifying Bidders have the right to submit additional bids and make additional modifications to the Asset Purchase Agreement or Modified Asset Purchase Agreement at the Auction, provided that any such modifications to the Asset Purchase Agreement or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not be less favorable to the Debtor than the terms of the Asset Purchase Agreement;

(g)    the Auction shall continue until there is only one offer that the Debtor determines, subject to this Court's approval, is the highest and best from among the Qualifying Bids submitted at the Auction (the "Prevailing Bid").   In making this decision, the Debtor shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Asset Purchase Agreement requested by each bidder, and the net benefit to the Debtor's estate.   The bidder submitting such Prevailing Bid shall become the "Prevailing Bidder," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Asset Purchase Agreement or Modified Asset Purchase Agreement; and

(h)    within two (2) business day(s) after adjournment of the Auction, the Prevailing Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made.

- Sale Hearing:   The Prevailing Bid (or the Asset Purchase Agreement if no Qualifying Bid other than that of the Proposed Purchaser is received) will be subject to approval by this Court.   The hearing to approve the Prevailing Bid (or the Asset Purchase Agreement if no Qualifying Bid other than that of the Proposed Purchaser is received) (the "Sale Hearing") shall take place no later than three (3) business days following the conclusion of the Auction.   The Debtor will seek the entry of an order of this Court at the Sale Hearing approving and authorizing the Asset Sale to the Proposed Purchaser or to the Qualified Bidder Submitting the highest and best offer at the Auction, as applicable, on terms and conditions consistent with the Asset Purchase Agreement, as may be amended and modified.

## B.   Approval of Notice Procedures

17.    Not later than two (2) business days after entry of the Bid Procedures Order, the

Debtor will serve a copy of the Notice of Auction and Sale Hearing, substantially in the form

attached hereto as Exhibit B (the "Sale Notice"), as well as a copy of this Motion and the Bid

Procedures Order by first-class mail postage prepaid upon (i) counsel to all parties holding liens

of record in the Purchased Assets, if known, and otherwise, directly upon such lienholders; (iii) the United States Trustee for the District of Massachusetts; (iv) the Internal Revenue Service; (v) the Massachusetts Department of Revenue; (vi) the counterparties to each of the Assigned Contracts; (vii) the Debtor's twenty (20) largest unsecured creditors; (viii) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; and (ix) all other entities known to have expressed an interest in a transaction with respect to all or part of the Purchased Assets.  A copy of the Notice of Auction and Sale Hearing will also be served on all other creditors.

**C.      Approval of Procedures for Assumption and
        <u>Assignment of Executory Contracts and Unexpired Leases</u>**

18.      To facilitate and effect an Asset Sale, the Debtor will be required to assume and assign to the Prevailing Bidder certain executory contracts and unexpired leases (the "<u>Assumed and Assigned Contracts</u>").  No later than twenty (20) days prior to the Sale Hearing, the Debtor shall cause notice to be provided to all counterparties to executory contracts and unexpired leases that may be Assumed and Assigned Contracts, substantially in the form attached hereto as Exhibit C (the "<u>Cure Notice</u>").  The Cure Notice shall provide the counterparties to the possible Assumed and Assigned Contracts notice of the amount that the Debtor believes must be cured upon the assumption and assignment as required under section 365 of the Bankruptcy Code (the "<u>Cure Amount</u>").

19.      Except as may otherwise be agreed to by the parties to an Assumed and Assigned Contract (with the consent of the Prevailing Bidder), on the Effective Date, the Prevailing Bidder shall cure those defaults under the Assumed and Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code by (a) payment of the undisputed Cure Amounts, and/or (b) reserving amounts with respect to the disputed Cure Amounts.  In the event

of a dispute regarding the Cure Amount, any payments required, following entry of a Final Order

resolving such dispute, shall be made as soon as practicable thereafter.

      20.     Objections, if any, to the proposed assumption and assignment of the Assumed

Contracts, including, but not limited to, objections relating to the Cure Amount and/or adequate

assurances of future performance, must be filed on or before 4:00 p.m. (prevailing Eastern Time)

at least five (5) business days prior to the Sale Hearing (the "<u>Objection Deadline</u>").  If no

objection is timely received by the Objection Deadline, the Cure Amount set forth in the Cure

Notice shall be controlling notwithstanding anything to the contrary in any Assumed Contract or

other documents as of the date of the Cure Notice or otherwise asserted by the nondebtor party

thereto.

**D.**      <u>**Approval of Buyer Protections**</u>

      21.     To induce the Proposed Purchaser to expend the time, energy and resources

necessary to submit a stalking horse bid, the Debtor has agreed to provide the Proposed

Purchaser, and seek this Court's approval of, certain bid protections to the Proposed Purchaser

pursuant to the terms of the Asset Purchase Agreement.  As set forth more specifically below, the

Debtor has agreed to provide the Proposed Purchaser with a break-up fee of $750,000 (the

"<u>Break-Up Fee</u>").

      22.     By this Motion, the Debtor seeks authorization to pay the Proposed Purchaser the

Break-Up Fee in the amount of $750,000 if the Debtor accepts an alternative transaction for the

sale of all or substantially all of the assets of the Debtor to any party other than the Proposed

Purchaser, to be paid exclusively from sale proceeds.

      23.     The Debtor understands and acknowledges that, in entering into the Asset

Purchase Agreement, the Proposed Purchaser has provided a material benefit to the Debtor and

its creditors by increasing the likelihood that the best possible price for the Debtor's assets will be received. The Break-Up Fee induced the Proposed Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtor, its creditors and other bidders may rely. The Break-Up Fee is equal to 5% of the cash portion of the Proposed Purchaser's bid. Accordingly, the Debtor submits that the Break Up Fee is reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estate.

24.    The Break-Up Fee is also warranted because the Proposed Purchaser has agreed, and the Debtor seeks authority in connection with approval of the Bid Procedures to authorize the Proposed Purchaser, to render certain transition services at the Proposed Purchaser's sole cost and expense, which services will enable any purchaser to assimilate the Included Assets post-closing quickly and efficiently. More specifically, the Debtor's assets, although comprised in part of the sort of traditional assets, such as inventory and receivables, found in all manufacturing companies, are also comprised of extensive intellectual property interests. There are dozens if not hundreds of designs for dozens on product types. There are longstanding customer relationships. There are longstanding vendor relationships. There are inventory control systems that track inventory that originates in numerous countries and is shipped internationally. There is an e-commerce platform.

25.    While all of the information is available in some form to all potential purchasers because it is in the already established virtual diligence room, none of it is in a format that would enable an easy transition to a purchaser.

26.    The Proposed Purchaser, which has integrated a number of acquired companies, has the staff and capacity to prepare the information for integration. It has agreed to prepare the information for integration at its own cost, not to integrate the information to its own systems

unless it is the purchaser, and to provide the results of its efforts to any party that is the purchaser.

27.     Because the Proposed Purchaser has already executed a nondisclosure agreement, and has had access during its due diligence process to all of the information that it will be preparing for integration, its providing the integration services neither affords it an advantage in the process, nor puts other potential bidders at a disadvantage.  It only assists the Debtor and facilitates the post-closing transition of assets to any purchaser.

### E.     **The Show Costs**

28.     As previously stated, the Proposed Purchaser has agreed, in addition to its Purchase Price, to pay the costs associated with the Debtor's maintenance of its leased showroom in New York and the Debtor's staffing and stocking that showroom for participation in the April, 2015, NY Tabletop Show.  Those costs include up to three months' rent, travel, lodging for staff, freight and merchandising and prep costs.

29.     The show is a prestigious annual industry event that many consider an integral part of the marketing and sales strategy of companies in the Debtor's industry.

30.     Due to liquidity constraints, the Debtor had initially planned to reject its showroom lease and to not participate in the show.

31.     The Proposed Purchaser believes that the Debtor's brand value would best be maintained for any purchaser by the Debtor's participation in the show and has, therefore, agreed to advance to costs of that participation.  Those costs will be added to its Purchase Price if it is the successful bidder.  The Debtor seeks, as part of the bid procedures, authority to require an bidders to pay an amount over the Purchase Price sufficient to reimburse the Potential Purchaser for the Show Costs, and to reimburse the Potential Purchaser for those Show Costs from the sale proceeds in the event a transaction closes with somebody other that the Potential Purchaser.

**F.**      **Disposition of Proceeds**

32.      Finally, the Debtor seeks authority to disburse at the closing of the sale such amounts of the sale proceeds as are necessary to pay, in full, any and all secured claims of Rockland Trust, whether arising under the debtor-in-possession financing provided by Rockland Trust, or arising from the prepetition credit facilities provided to the Debtor by Rockland Trust, as more fully described in the Riddle Declaration.

## APPLICABLE AUTHORITY

**A.**      **Bidding Procedures**

      **(i)**      **The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Assets Given the Financial Exigencies Facing The Debtor**

33.      The Bidding Procedures proposed herein are designed to maximize the value received for the Debtor's business by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing bids, taking into account the financial exigencies facing the Debtor.

34.      The Bidding Procedures provide Potential Bidders with more than the twenty-one day notice envisioned by Rule 2002 of the Federal Rules of Bankruptcy Procedures.  The Debtor's ability to continue its operations is wholly dependent on the willingness of Rockland Trust to extend credit to the Debtor.  Rockland Trust has afforded the Debtor a post-petition working capital line of credit of up to $7 million.  As demonstrated by the Budget attached to the Riddle Declaration, the Debtor projects that its total borrowings will be near that limit in early May, 2015. Given the time constraints facing the Debtor, realistically having to either close a sale or cease operations in early May, 2015, the Debtor submits that the proposed notice is sufficient notice and opportunity to acquire the information necessary to submit a timely and informed bid.

35.     This is particularly true given that the Debtor has already undertaken substantial marketing efforts prepetition.  As indicated in the Riddle Declaration, the Debtor's investment banker, Financo, LLC ("Financo"), conducted an extensive prepetition marketing process including contacting ninety-one (91) potentially interested parties, consisting of approximately fifty potential financial investors and forty-one potential strategic investors. Forty-two (42) of the contacted  parties, consisting of eighteen (18) strategic investors and twenty-four (24) financial investors, responded and were sent teasers.  Twenty-five (25) of those parties--nine (9) strategic and sixteen (16) financial investors-- executed non-disclosure agreements and undertook due diligence.  Six bids for various forms of potential transactions were received. The six bids were presented to the board of directors by Financo in October, 2014, and ultimately the Board determined that a bid submitted by Lifetime Brands was the most advantageous to the company and its creditors. The Debtor thus believes that the proposed period between entry of an order allowing this motion and the deadline for submission of bids provides a reasonable and fully appropriate time period for maximizing the return from sale of the Debtor's assets within the financial constraints faced.

36.     At the same time, the Bidding Procedures provide the Debtor with the opportunity to consider all competing offers and to select the highest or best offer for the completion of an Asset Sale.  Entering into the Sale Term Sheet and the Asset Purchase Agreement with the Proposed Purchaser ensures fair value by setting a minimum purchase price and testing the price in the marketplace.  Accordingly, the Debtor and all parties in interest can be assured that, taking into account the financial condition of the Debtor,  the consideration paid for the Debtor's business will be fair, reasonable, and in the best interest of the Debtor's estate and creditors, and there are sound business reasons to approve the Bidding Procedures.

(ii)    **The Breakup Fee and Show Cost Reimbursement are Reasonable and Appropriate**

37.    Rule 6004-1(a)(1)(B)(1) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Massachusetts (the "Local Rules") provides that prior approval of a breakup or similar fee is only required if the proposed bid protection exceeds five percent (5%) of the initial purchase price.

38.    Here, the primary bid protection being provided to the Proposed Purchaser is a $750,000 Break-Up Fee.  The amount of the proposed Break-Up Fee is five percent (5%) of the total consideration (cash at closing plus the face amount of the Note).

39.    After considering the reasonableness of the bidding incentives being offered, other courts have approved a range of break-up fees calculated as a percentage of the purchase price that are similar to the percentage being provided here as being appropriate under the facts and circumstances of the case.  *See In re Chi-Chi's Inc.*, Case No. 03-13063 (Bankr. D. Del. Nov. 4, 2003) (fee of 5.1% permitted); *In re Great Northern Paper. Inc.*, Case No. 03-10048 (Bankr. D. Me. Feb. 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); *In re FSC Corp.*, Case No. 00-b-04659 (Bankr. N.D. Ill. Feb. 28, 2000) (break-up fee of 3.4% plus reimbursement of expenses is reasonable).

40.    As in the cited cases, the Break-Up Fee proposed here should be approved because it is reasonable, will not chill bidding, and is necessary to further the process of selecting additional bids.  The Proposed Purchaser has made it clear that it will not proceed as a stalking horse without the protection of ensuring that its expenses are reimbursed if this process, which its significant time, energy, and expenses served to put into motion, results in some other party owning the Debtor's assets.  The Debtor's ability to continue to shop its business for a higher or

better offer, or even to market test the Proposed Purchaser's offer, would be eliminated if the Debtor could not secure the Asset Purchase Agreement, inclusive of the Break-Up Fee provision.

41.     The Asset Purchase Agreement will form the basis upon which other bids will be submitted and evaluated.   The minimum-required overbid exceeds the Break-Up Fee, and, therefore, the Break-Up Fee both establishes a threshold for overbids and will not result in a less beneficial net return from the sale.   Under the circumstances, the $750,000 Break-Up Fee is reasonable.

42.     In addition, in exchange for that Break-Up Fee, the Potential Purchaser has agreed to provide to the Debtor substantial transition services that will enable any purchaser, whether the Potential Purchaser or another bidder, to more quickly and efficiently integrate the Included Assets after entry of the Sale Order.

43.     The Show Cost reimbursement is also reasonable and will not chill bidding. Absent the Potential Purchaser's advancing the costs associated with participating in the NY Tabletop Show, the Debtor would be unable to do so, potentially resulting in a diminution of the Reed and Barton name and its brands. Value maintenance justifies the expenditure, and reimbursing the Potential Purchaser for the funds it expends if it does not acquire the very assets it is paying to preserve the value of, capped at $150,000, is warranted.

44.     Payment of the Break-Up Fee and reimbursement of the Show Costs also will not harm creditors.  Pursuant to the Asset Purchase Agreement, the Debtor will incur the obligation to pay the Break-Up Fee and reimburse the Show Costs only if the Debtor accepts an alternative transaction for the sale of all or substantially all of the assets of the Debtor to any party other than the Proposed Purchaser and that sale closes.   The Break-Up Fee and Show Cost reimbursement will be paid from the proceeds of an alternative transaction in which the

Prevailing Bidder is not the Proposed Purchaser, and the minimum overbid must exceed the
Break-Up Fee, plus the Show Costs, plus $50,000.  Having an agreed-upon Asset Purchase
Agreement that establishes a minimum price for the Debtor's assets, the provision of transition
services that will facilitate a closing with and transition to any purchaser and the funded ability to
participate in the NY Tabletop Show benefits the Debtor's estate by enabling Debtor to preserve
the value of its estate while still promoting competitive bidding.  Under the circumstances,
approval of the Break-Up Fee, to the extent necessary in light of Local Rule 6004-1(a)(1)(B)(1),
is warranted.

**B.      The Assumption, Assignment and Cure Procedures Provide Adequate Notice and
Opportunity to Object and Should be Approved**

45.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in
possession "subject to the court's approval, may assume or reject any executory contract or
unexpired lease of the Debtor."  11 U.S.C. § 365(a).

46.      The standard governing bankruptcy court approval of a debtor's decision to
assume or reject an executory contract or unexpired lease is whether the debtor's reasonable
business judgment supports assumption or rejection.  *See, e.g., In re Stable Mews Assoc., Inc..* 41
B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably
exercised, a court should approve the assumption or rejection of an unexpired lease or executory
contract.  *See In re BankVest Capital Corp.*, 360 F.3d 291, 301 (1st Cir. 2004) (quoting *In re
BankVest Capital Corp.*, 290 B.R. 443, 448 (1st Cir. B.A.P. 2003).  *See also, Group of
Institutional Investors v. Chicago M. St. P. & P.R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel
Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  The business
judgment test "requires only that the trustee [or debtor in possession] demonstrate that
[assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel*

*Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr.

W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596).   Any more exacting scrutiny

would slow the administration of a debtor's estate and increase costs, interfere with the

Bankruptcy Code's provision for private control of administration of the estate, and threaten the

court's ability to control a case impartially.   *See Richmond Leasing Co. v. Capital Bank. N.A.*,

762 F.2d 1303, 1311 (5th Cir. 1985).

47.    Two conditions are imposed upon a debtor's ability to assume and assign an

executory contract.  First,  in order to assume an agreement, pursuant to section 365(b)(1) of the

Bankruptcy Code, a debtor must "cure, or provide adequate assurance that the Debtor will

promptly cure," any default, including compensation for any "actual pecuniary loss" relating to

such default. 11 U.S.C. § 365(b)(1).

48.    Once an executory contract is assumed, the trustee or debtor in possession may

elect to assign such contract. *See In re Rickel Home Ctrs., Inc.,* 209 F.3d 291, 299 (3d Cir. 2000)

("[t]he code generally favors free assignability as a means to maximize the value of the Debtor's

estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting

purpose of section 365(f) is to assist trustee in realizing the full value of the Debtor's assets).

49.    Pursuant to section 365(a) of the Bankruptcy Code, assignment is conditioned on

"adequate assurance of future performance [being] provided." 11 U.S.C. § 365(f)(2). The

meaning of "adequate assurance of future performance" depends on the facts and circumstances

of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc.*

*v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re*

*Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future

performance does not mean absolute assurance that the debtor will thrive and pay rent).  Among

other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

50.    Here, the Proposed Purchaser is a publicly traded corporation reported in the press to have a $216.89 million market capitalization. It is a leading global provider of kitchenware, tableware and other products used in the home. Its brands include Farberware, KitchenAid, Mikasa, Towle and other marquee, well-known household product brands. Lifetime Brands has committed to funding cures, with an equal reduction in the Note. It has made its obligation to close conditional on obtaining sufficient Reed and Barton employee support to integrate the assets and brands it is acquiring from the Debtor, thereby providing more than adequate assurances of future performance.

51.    Finally, the mechanism for establishing the amount of the cure obligations is reasonable and appropriate. The requirement of notice of a proposed assumption and assignment and cure established in the Bid Procedures of ten (10) days prior to the Sale Hearing comports with Rule 2002(a) of the Federal Rules of Bankruptcy Procedure.

52.    Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under chapter 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [chapter 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the

exercise of its section 105(a) power is proper.  *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

53.     The Debtor respectfully submits that the proposed cure procedures for the identification and payment of Cure Amounts (the "Cure Procedures") are appropriate and reasonably tailored to provide non-Debtor counter-parties to potential Assumed and Assigned Contracts with adequate notice of the proposed assumption and assignment of their applicable contract, as well as the proposed Cure Amounts related thereto, if any.  Such non-Debtor parties to the potential Assumed and Assigned Contracts will then be given an opportunity to object to such notice.  The Cure Procedures further provide that, in the event an objection is not resolved, this Court will determine related disputed issues, including any adequate assurance of future performance issues.   Accordingly, the Debtor submits that implementation of the proposed Cure Procedures is appropriate in these cases.

C.     **The Sale of Assets Is Authorized under Bankruptcy Code Section 363(b)**

54.     At the conclusion of the Sale Hearing, the Debtor will also request that the Court approve the sale of the Purchased Assets to the Proposed Purchaser or such other Qualifying Bidder who submits the Prevailing Bid.[1]  The Debtor submits that the sale of the Purchased Assets to the Proposed Purchaser pursuant to the Asset Purchase Agreement, or such as the agreement as the Debtor may reach with the party submitting the Prevailing Bid, is in the best interest of the Debtor's estate and its creditors.

55.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon a debtor's sound business judgment.  *See, e.g., In re Decora Indus., Inc.*, 2002 WL 32332749, *2 (D. Del. 2002); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Eagle Picher Holdings, Inc.*, 2005 Bankr. LEXIS 2894, at ¶ 3 (Bankr. S.D. Ohio 2005); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

56.     The business judgment rule shields a debtor's management from judicial second-guessing.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").  Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good

---

[1] To be clear, this portion of the relief is requested to be entered after the Sale Hearing in the form of the Sale Order. The Debtor hereby reserves the right to file supplemental pleadings in support of its request for entry of the Sale Order and to modify the Sale Order prior to its submission to the Court.

faith and in the honest belief that the action was in the best interests of the company.'" *In re*

*Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van*

*Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

57.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction

in question should be approved under section 363(b)(1).   When applying the "business

judgment" standard, courts show great deference to a debtor's business decisions.   *See In re*

*Trans World Airlines.*, 2001 Bankr. LEXIS 267 at *45-50 (Bankr. D. Del. 2001) (describing

business judgment rule as "very deferential standard"); *In re First Wellington Canyon Assocs.*,

1989 U.S. Dist. LEXIS 10687 at *8-9 (N.D. Ill. 1989) ("Under this test, the debtor's business

judgment . . . must be accorded deference unless shown that the bankruptcy's decision was taken

in bad faith or in gross abuse of the bankrupt's retained discretion.").

58.     In this case, the Debtor believes that a sale pursuant to section 363 represents the

best opportunity for it to maximize the value of its assets for the benefit of creditors in light of

the Debtor's significant unfunded liabilities while at the same time ensuring the continuation of

the Debtor's business operations, which will benefit trade creditors, customers, employees and

contract counterparties.

59.     Particularly in light of the financial exigencies facing the Debtor and the proposed

process of subjecting the stalking horse bid to higher and better offers, the Debtor's decision to

proceed with the sale process is consistent with sound business judgment.    Under the

circumstances, the Bidding Procedures and Auction process represent the best way to achieve

substantial consideration for the Debtor's businesses, and offer the best resolution to the Debtor's

current financial situation in the manner that will maximize the value available to the Debtor's

estate and its creditors.

60.    The decision to sell all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code is an exercise of sound business judgment under the circumstances.  Courts repeatedly have concluded that the sale of a debtor's assets is appropriate where there are sound business reasons and no evidence of fraud or collusion.  *See In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (sale of all assets appropriate where purchaser acted in good faith, and there was no fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 178-79 (D. Del. 1991); *Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"); *In re Coastal Indus., Inc.*, 63 B.R. 361 (Bankr. N.D. Ohio 1986).  As discussed, there is business justification for the proposed transaction, evidence that the Bidding Procedures have been pursued in good faith, and there is no fraud or collusion between the Debtor and any Potential Bidder.

**D.    The Sale of Assets Free and Clear of Liens, Claims, and Interests Is Authorized Under Bankruptcy Code Section 363(f).**

61.    The Debtor respectfully submits that it is appropriate to sell the Purchased Assets free and clear of all interests, pursuant to section 363(f) of the Bankruptcy Code, with all such interests attaching to the net sale proceeds of the Purchased Assets to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

1.    applicable non-bankruptcy law permits sale of such property free and clear of such interests;

2.    such entity consents;

3.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

4.      such interest is in bona fide dispute; or

5.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

62.      Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets free and clear of the interests.  *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, *12 (Bankr. S.D.N.Y. 1992) ("Section 363(f) is in the disjunctive, such that the sale free of interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n. 24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale 'free and clear' provided at least one of the subsections of section 363(f) is met).

63.      The Debtor submits that here, at least one if not several of the tests under section 363(f) will be satisfied with respect to the transfer of the Purchased Assets pursuant to a Sale Order.  In particular, the Debtor believes that any parties with liens on the Purchased Assets will consent to the sale, and that the proposed sale price is more than sufficient to cover the total amount secured by any such liens.  Therefore, section 363(f)(3) will be satisfied.

## NOTICE

64.      Notice of this Motion has been given to (i) the United States Trustee for the District of Massachusetts; (ii) the Internal Revenue Service; (iii) the Massachusetts Department of Revenue; (iv) the counterparties to each of the Assumed and Assigned Contracts; (v) all lienholders of record in the Debtor's assets; (vi)  the Debtor's twenty (20) largest unsecured

creditors; (vii) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; and (viii) all other entities known to have expressed an interest in a transaction with respect to all or part of the Purchased Assets.  The Debtor submits that no further notice is required.

### NO PRIOR REQUEST

65.     No previous motion for the relief requested herein has been made to this or any other court.

[remainder of page intentionally left blank]

## CONCLUSION

Wherefore, the Debtor respectfully requests that the Court enter orders as follows:

1.      Approving the Bid Procedures, including, but not limited to, approval and payment of the Break-Up Fee and the Show Cost reimbursement as a super-priority administrative claim free and clear of all liens, claims and encumbrances from the sale proceeds, the receipt of the transition services, the notice procedures, the contract assumption and cure provisions and such other relief as is set forth in the Bid Procedures Order attached hereto as **Exhibit D.**

2.      At the conclusion of the sale process as set forth in the Bid Procedures Order, conduct a final hearing regarding the proposed sale, and, at the conclusion of that hearing, enter an order approving the sale of substantially all assets of the Debtor, other than the Excluded Assets, free and clear of all liens, claims and encumbrances with such liens claims and encumbrances to attach to the proceeds of sale, determining the purchaser to be a good faith purchaser entitled to the protections of § 363(m) of the Bankruptcy Code, authorizing the assumption and assignment of the Assigned Contracts and authorizing the provisions for determining and resolving cure claims arising upon such assumption and assignment and containing such other provisions as the Court deems appropriate and as may be reasonably required by the purchaser; and

3.    Granting the relief requested herein and such other and further relief as the Court deems just and proper.

Respectfully submitted,

REED AND BARTON CORPORATION

By its proposed counsel,

HOLLAND & KNIGHT LLP


/s/ John J. Monaghan
John J. Monaghan (Mass Bar #546454)
Lynne B. Xerras (Mass Bar #632441)
Kathleen St. John (Mass Bar #681565)
10 St. James Avenue
Boston, MA  02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850

Dated:  February 17, 2015

#34503413_v7