**Exhibit A**

**Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

by and among

Reed and Barton Corporation

("Seller"),

Lifetime Brands, Inc.

("Parent")

and

Francis I Acquisition Corp.
a Delaware corporation

("Purchaser")

DATED AS OF FEBRUARY 16, 2015

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (collectively with the Exhibits and Schedules referred to herein, this "Agreement") is made as of the 16th day of February, 2015, by and among (i) Reed and Barton Corporation, a Massachusetts corporation ("Seller"), (ii) Lifetime Brands, Inc., a Delaware corporation ("Parent"), and (iii) Francis I Acquisition Corp., a Delaware corporation ("Purchaser").

Seller is in the business of designing, outsource manufacturing, distributing and selling Products to retailers and consumers in the United States (collectively referred to as the "Business"); and

Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of the non-real property assets used in the conduct of the Business in exchange for cash, a promissory note and Purchaser's assumption of certain of Seller's liabilities and obligations on the terms and subject to the conditions set forth in this Agreement.

In consideration of the premises and of the respective representations, warranties, covenants, agreements, and conditions contained herein, and intending to be legally bound hereby, Seller, Parent and Purchaser agree as follows:

ARTICLE 1

Definitions

1.1    Certain Definitions.  In this Agreement and any Exhibit or Schedule hereto, the following capitalized terms have the following respective meanings:

"Acquired Assets" means all of the properties, rights, interests and other tangible and intangible assets that Seller owns or possesses (other than the Excluded Assets) existing at the Effective Time (wherever located and whether or not required to be reflected on a balance sheet) used by Seller in connection with, or necessary for, the conduct of the Business as conducted by Seller including, without limitation, all of Seller's right, title and interest in and to the following:

(a)    the Inventory (including all of the UPC product codes associated with each Product included therein);

(b)    the Receivables;

(c)    the Acquired Tangible Personal Property;

(d)    the Purchased Intellectual Property;

(e)    all intangible assets that are not Intellectual Property, including goodwill and going-concern value;

(f)    subject to Section 7.4, Seller's rights under the Transferred Contracts, including a leasehold interest in the Atlanta Showroom Lease;

(g)    all sales order files, purchase order files, manufacturing records, test specifications and validation procedures, client and customer lists, supplier lists, pricing information, sales and promotional literature and paper work and business files of Seller and books and records pertaining to the Business and the Hired Employees (the "Business Books and Records");

(h)    subject to Section 7.4, all claims and counterclaims by Seller against any other Person as to express and implied warranties from manufacturers, vendors and suppliers;

(i)    to the extent their transfer is permitted under applicable Laws and subject to Section 7.4, all Permits utilized by Seller in the conduct of the Business (except those relating to the Retained Real Property or the operation thereof), including the Permits listed on Section 5.1(l) of the Disclosure Schedule;

(j)    all claims, deposits, refunds, rebates and prepaid items of Seller paid prior to the Closing, except (i) those solely related to the Excluded Assets, Excluded Liabilities or Retained Real Property, and (ii) those deposits related to the NY NOW gift show;

(k)    all supplies used in the Business; and

(l)    all rights of Seller to collect damages claims for past, present or future misappropriation, infringement, or other violation of Purchased Intellectual Property.

"Acquired Tangible Personal Property" means tooling and other Tangible Personal Property listed on Schedule 1-A.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with that Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person or group of Persons, means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person, whether through the ownership of voting securities or by contract.

"Agreement" has the meaning set forth in the preamble.

"Assumed Liabilities" means all liabilities and obligations of Seller and the Business arising under:  (a) the Transferred Contracts after the Closing Date unless and to the extent that any such obligation relates to or arises out of a violation of such Transferred Contracts prior to the Closing Date; (b) all Payables (other than Payables owing to any Affiliate of Seller and Payables that are unrecorded on the Closing Date and are, as a result thereof, not taken into consideration in the calculation of Working Capital) that remain unpaid in whole or in part as of the Closing Date, but only to the extent that such Payables relate to the purchase by Seller of Inventory or occupancy of the Atlanta Showroom; (c) all Product warranty obligations; and (d) those liabilities set forth on Schedule 1-B.

4815-5486-2370.2

"<u>Assumption Agreement</u>" means the Assumption Agreement in the form attached hereto as <u>Exhibit A</u>.

"<u>Atlanta Showroom</u>" means the showroom leased by Seller pursuant to the Atlanta Showroom Lease.

"<u>Atlanta Showroom Lease</u>" means the Lease Agreement dated October 15, 2014 between AmericasMart Real Estate, LLC and Seller, as amended.

"<u>Auction</u>" has the meaning set forth in <u>Section 11.2(c)</u>.

"<u>Bankruptcy Case</u>" has the meaning set forth in <u>Section 11.1</u>.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" has the meaning set forth in <u>Section 11.1</u>.

"<u>Best Efforts</u>" means the commercially reasonable efforts that a reasonable Person wanting to achieve the result in question would take under similar circumstances to achieve that result as expeditiously as possible.

"<u>Bid Procedures</u>" has the meaning set forth in <u>Section 11.2(c)</u>.

"<u>Bidding Procedures Order</u>" has the meaning set forth in <u>Section 11.2(c)</u>.

"<u>Break-Up Fee</u>" has the meaning set forth in <u>Section 11.3(a)</u>.

"<u>Business</u>" has the meaning set forth in the recitals.  Notwithstanding anything to the contrary in this Agreement, "Business" does not include Seller's retail business conducted through its retail stores located in Kittery, Maine and Taunton, Massachusetts.

"<u>Business Books and Records</u>" has the meaning set forth in the definition of Acquired Assets.

"<u>Business Day</u>" means a day other than a Saturday, Sunday or national holiday on which commercial banks in the State of New York and the Commonwealth of Massachusetts are open for the transaction of commercial banking business.

"<u>Business Material Adverse Effect</u>" means any event, change or effect that, individually or with all related events, changes or effects, will or would reasonably be expected to have a material adverse effect on the Business, the Acquired Assets or the Condition of the Business, taken as a whole; provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Business Material Adverse Effect: (a) any adverse change, event, development or effect (whether short-term or long-term) arising from or relating to (1) general business or economic conditions, (2) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its

territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (3) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (4) changes in GAAP, or (5) changes in laws, rules, regulations, orders or other binding directives issued by any governmental entity, except to the extent, in the case of the foregoing clauses (1) through (5), any such change, event, development or effect has a materially disproportionate impact on the Business relative to the industry in which the Business competes, (b) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby, (c) any failure to meet a forecast (whether internal or published) of revenue, earnings, cash flow or other data for any period or any change in such a forecast, and (d) any adverse change in or effect on the Business that, if curable, is cured by Seller before the earlier of (1) the Closing Date and (2) the date on which this Agreement is terminated pursuant to Article 10 below.

"Closing" means the consummation of the transactions contemplated in this Agreement.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Date Cash Consideration" has the meaning set forth in Section 3.1.

"Closing Date Working Capital" has the meaning set forth in Section 3.3(a).

"Closing Date Working Capital Schedule" has the meaning set forth in Section 3.3(a).

"COBRA" has the meaning set forth in Section 8.3.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Competing Bid" has the meaning set forth in Section 11.2(c).

"Condition of the Business" means the condition of the business, operations, properties, Acquired Assets, prospects, financial condition and results of operations of the Business.

"Confidential Information" means any and all of the following information of Seller or Purchaser that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically, visually or otherwise, or otherwise made available by observation, inspection, or otherwise by either party or its directors, officers, employees, agents or advisors (each a "Representative") (collectively, a "Disclosing Party") to the other party or its Representatives (collectively, a "Receiving Party"):

(i)     all information that is a trade secret under applicable trade secret or other law, including, without limitation, trade secrets as defined under the Uniform Trade Secrets Act.

(ii)     all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and

4

development, current and planned manufacturing or distribution methods and processes, customer lists or identities, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware and software and database technologies, systems, structures and architectures;

(iii)    all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, customer lists and files, contracts, the names and backgrounds of key personnel and personnel training techniques and materials, however, documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication;

(iv)    any documents or materials marked "confidential" or "proprietary"; and

(v)    all notes, analyses, compilations, studies, summaries and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, upon any information included in the foregoing.

Any Trade Secrets of a Disclosing Party will also be entitled to all of the protections and benefits under applicable Trade Secret law and any other applicable Law.  If any information that a Disclosing Party deems to be a trade secret is found by a court of competent jurisdiction not to be a Trade Secret for purposes of this Agreement, such information will still be considered Confidential Information for the purposes of this Agreement to the extent included within the definition.  In the case of Trade Secrets, Purchaser and Seller hereby waive any requirement that the other party submit proof of the economic value of any trade secret or post a bond or other security.

Upon the Closing, all Confidential Information of Seller relating to the Business, other than Confidential Information solely related to the Excluded Assets or the Excluded Liabilities, will become the property of Purchaser and thereafter treated by Seller for all purposes as Confidential Information of Purchaser subject to the provisions of Section 7.8.

"Contract" means any written or oral contract, agreement or instrument, including, without limitation, supply contracts, purchase orders, sale orders, bids, understandings or commitments, customer agreements, licenses, mortgages, subcontracts, indentures, leases of personal property, deeds of trust, notes or guarantees, pledges, liens, or conditional sales agreements to which the Person referred to is a party or by which any of its assets may be bound.

"Controlled Group Member" has the meaning set forth in Section 5.1(h)(i).

"Cure Amounts" has the meaning set forth in Section 2.5(b).

"Disclosure Schedules" means the disclosure schedules of Seller as specified in this Agreement that are delivered to Purchaser at or prior to the date hereof.

"Effective Time" means 12:01 a.m., New York, New York time, on the Closing Date.

"Employee Benefit Plans" has the meaning set forth in Section 5.1(h)(i).

"Environmental Laws" means all federal, state and local Laws, statutes, and regulations, ordinance, code, binding and enforceable guidelines, policy or rule of common law or judicial or administrative interpretation thereof relating to pollution, public health and safety or protection of the environment, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Clean Air Act, the Clean Water Act, and any state or local counterparts or equivalents, as such requirements have been enacted and are in effect on or prior to the Closing Date.

"Environmental Liabilities" means all Liabilities relating to the Seller's ownership and/or operation of the Business and/or the Acquired Assets and consisting of or relating to:

> (i)      any Hazardous Materials, environmental matters or conditions (including on-site or off-site contamination and regulation of chemical substances or products);

> (ii)      fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and investigative, remedial, or inspection costs and expenses arising under Environmental Laws or relating to Hazardous Materials;

> (iii)      financial responsibility under Environmental Laws for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions required by applicable Environmental Laws and for any natural resource damages; or

> (iv)      any other compliance, corrective, investigative or remedial measures required under Environmental Laws.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"Estimated Closing Date Working Capital" has the meaning set forth in Section 3.2.

"Estimated Closing Date Working Capital Schedule" has the meaning set forth in Section 3.2.

"Excluded Assets" means:

> (i)      all cash, rights in bank accounts, certificates of deposit, bank deposits, cash equivalents, the cash surrender value of any life insurance policies,

6

investment securities and checks or other payments received by Seller (including received in lock boxes) by the Effective Time;

(ii)     all Excluded Tangible Personal Property;

(iii)     all of Seller's income Tax Returns and records (provided, however, that Seller shall provide copies of all such Tax Returns for the prior three (3) fiscal years to Purchaser prior to the Closing) and any rights to Tax refunds or credits and current and deferred Tax assets;

(iv)     all Employee Benefit Plans, arrangements and agreements of Seller and all assets and rights relating to Employee Benefit Plans and similar arrangements and agreements of Seller;

(v)     Seller's rights under this Agreement and the Related Agreements;

(vi)     all contracts that are not Transferred Contracts, including those listed on Schedule 1-C, including any real property leases other than the Atlanta Showroom Lease;

(vii)     the Excluded Books and Records;

(viii)     Seller's interest in any real property, other than the leasehold interest under the Atlanta Showroom Lease (the "Retained Real Property");

(ix)     all of Seller's life and other insurance policies and contracts and all rights thereunder (including, but not limited to, the right to make claims thereunder and to the proceeds thereof);

(x)     third party products meeting all of the following criteria:   (i) customarily sold by Seller in its retail outlet stores, (ii) not included in Seller's SAP inventory system and (iii) not sold under a Reed & Barton name, trademark or tradename, including Reed and Barton, R&B Everyday, Lunt and Williamsburg; and

(xi)     those assets identified on Schedule 1-D hereto.

"Excluded Books and Records" means, except for the Business Books and Records, all minute books, all books and records relating to employee benefit matters, all books and records relating to employees other than Hired Employees, and any other books and records relating solely to the Excluded Assets or Excluded Liabilities.

"Excluded Liabilities" means all Liabilities of Seller that are not Assumed Liabilities, including, but not limited to:

(i)     all Liabilities of Seller or any Affiliate of Seller in respect of capital leases or for borrowed money and guaranties of Seller or any Affiliate of

Seller of indebtedness or obligations of any Person (the "Closing Date Indebtedness");

(ii)    all Liabilities of Seller or any Affiliate of Seller for Taxes (whether or not then due), including Transfer Taxes and other Taxes imposed by Law upon the Seller arising in connection with the consummation of the transactions contemplated by this Agreement, and for the unpaid Taxes of any other Person under Treasury Regulation Section 1502-6 (or any similar provision of state, local or foreign law) or as a transferee, successor, by contract, by Law or otherwise;

(iii)    all Liabilities for Taxes with respect to the Acquired Assets, the Business or any of its facilities (including the Atlanta Showroom) for periods through the Closing Date;

(iv)    all Liabilities arising from any litigation, arbitration or any proceeding with any Governmental or Regulatory Authority involving Seller, the Business or any Affiliate of Seller, whether arising prior to, pending on, or arising after the Closing Date relating to events occurring prior to the Effective Time;

(v)    all Liabilities of Seller to their current or former employees (including any severance or retirement obligations) other than Liabilities owing to Hired Employees that are expressly assumed by Purchaser pursuant to the terms of this Agreement or in connection with the Hired Employees' employment with Purchaser or Purchaser Controlled Group;

(vi)    all Liabilities of Seller to any current or former shareholder, director, officer or Affiliate of Seller, including, without limitation, any Liability arising out of or related to any loan, or any accrued interest related thereto, from any member, director, officer or Affiliate to Seller;

(vii)    any Liability to, or arising under any workers' compensation program, any Employee Benefit Plans of Seller, including, without limitation, any Liability for withdrawal from, or termination of, any Employee Benefit Plan, any Lien arising under ERISA or the Code, any liability under Seller's supplemental executive retirement plan and any Tax including excise taxes or penalties) arising from the Employee Benefit Plans or resulting from any transaction with or by any Employee Benefit Plan;

(viii)    all Liabilities related to the Excluded Assets, including any Liabilities arising under any contract that is not a Transferred Contract;

(ix)    all Product Liability Obligations; and

(x)    all Environmental Liabilities.

"Excluded Tangible Personal Property" means all Tangible Personal Property other than Acquired Tangible Personal Property.

"Final Working Capital Schedule" has the meaning set forth in Section 3.3(c)(ii).

"Financial Statements" has the meaning set forth in Section 5.1(e).

"FY 2015 Data" has the meaning set forth in Section 5.1(e).

"GAAP" means United States generally accepted accounting principles consistently applied.

"General Assignment" means the General Assignment substantially in the form attached hereto as Exhibit B.

"Goods" has the meaning set forth in Section 5.1(x)(ii).

"Governmental or Regulatory Authority" means any court, tribunal, public or private arbitrator, authority, agency, commission, official or other instrumentality of the United States, or any country, state, county, city or other political subdivision.

"Hazardous Materials" means any substance or material that has been listed, defined or regulated or otherwise classified by any Environmental Law as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "pollutant," "contaminant," or any other similar term intended to define, list, or classify a substance by reason of such substance's ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, "EP toxicity" or adverse effect on human health or the environment, including, but not limited to, substances that are radioactive, toxic, hazardous or otherwise a pollutant, contaminant or waste, including PCBs, asbestos, petroleum products, petroleum derived substances or any fraction thereof, and urea-formaldehyde.

"Hired Employee" has the meaning set forth in Section 8.1(a).

"Included Payables" has the meaning set forth in the definition of Working Capital.

"Intellectual Property" means all rights or interests, whether as owner, licensor, licensee or otherwise, in any of the following throughout the world:

(i)    all inventions in any country (whether patentable or unpatentable, and whether or not reduced to practice), all improvements thereto, all invention disclosures and all patents, patent applications, and all rights to claim priority, including, without limitation, any rights to any foreign counterparts of the patents or patent applications, together with all reissues, continuations, continuations-in-part, revisions, extensions, divisions, and reexaminations thereof (collectively, "Patents");

(ii)    all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith;

(iii)    all confidential business information, including, without limitation, recipes, customer lists, ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data,

9

designs, drawings, specifications, supplier lists, pricing and cost information, and business and marketing plans and proposals;

(iv)     all trademarks and service marks (whether common law or registered), trade dress, logos, trade names, internet domain names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof, including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith;

(v)     Software;

(vi)     all rights in mask works;

(vii)    all know-how and trade secrets (collectively, "Trade Secrets");

(viii)   all e-commerce website content and images in all forms and mediums;

(ix)    moral and economic rights of authors and inventors; and

(ix)    all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"Interest" with initial capitalization means Liens, encumbrances, pledges, mortgages, deeds of trust, security interests, leases, charges, fines or penalties related to governmental violations, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, and any other rights, claims or demands of any kind whatsoever of other Persons, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, mature or unmatured, material or non-material, disputed or undisputed.

"Interim Balance Sheet" has the meaning set forth in Section 5.1(e).

"Inventory" means all inventory owned by Seller as of the Effective Time, including all inventories of raw materials, work-in-process, finished goods, supplies, parts, packaging materials and promotional and demonstration materials, including inventory that is either (i) located at any of Seller's facilities, (ii) in transit to any of Seller's facilities or to suppliers or customers, (iii) with customers on consignment or third parties for cleaning or repair, or (iv) pertaining to goods manufactured or to be manufactured at sites other than any of the Seller's facilities.

"Knowledge" means the knowledge of either of Tim K. Riddle or Charles F. Daly after reasonable documentary inquiry, including appropriate review of Seller's files and other relevant Business records in connection with the relevant matter.

"Laws" means all laws, statutes, rules, regulations and ordinances in any jurisdiction or any state, county, country, city or other political subdivision or of any government, governmental

10

authority or regulatory authority, including, without limitation, ERISA, Environmental Laws, public health and OSHA and anti-kickback statutes.

"Lease" means the Atlanta Showroom Lease.

"Lease Assignment" means the assignment of the Atlanta Showroom Lease, in form and substance satisfactory to Purchaser in its reasonable discretion.

"Liability" or "Liabilities" means any or all obligations (whether to make payments, to give notices or to perform or not perform any action), commitments, contingencies and other liabilities of a Person (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due).

"Lien" means any mortgage, pledge, security interest, hypothecation, assignment, encumbrance, lease, lien, option, right of use and other rights and claims of other Persons, any conditional sale contract, title retention contract, or other encumbrance of any kind, including easements, conditions, reservations and restrictions.

"Material Contracts" has the meaning set forth in Section 5.1(k).

"Names" has the meaning set forth in Section 7.12.

"Net Sales" means gross sales of Purchaser and its Affiliates (or any of their respective successors) from sales of Products, less all customer-related returns, allowances, discounts and rebates, calculated in accordance with GAAP consistently applied (including Purchaser's policies for allocating such returns, allowances, discounts and rebates).

"Net Sales Statement" has the meaning set forth in Section 3.4.

"Non-Assumed Payables" has the meaning set forth in Section 3.2.

"Notice of Disagreement" has the meaning set forth in Section 3.3(b)(ii).

"Order" means and includes any writ, judgment, decree, injunction, award or other order of any Governmental or Regulatory Authority.

"Ordinary Course of Business" means an action taken by a Person if: (a) such action is in the ordinary course of business and consistent with the past practices of such Person including with respect to quantity and frequency; and (b) such action is similar in nature and magnitude to actions customarily taken in the ordinary course of normal day-to-day operations of other Persons that are in the same line of business as such Person; subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case, provided, however, that Seller complies with the requirements of the Bankruptcy Code after the filing of the Bankruptcy Case.

"Organizational Document" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) operating agreement, limited liability company agreement, or similar

document governing a limited liability company; (c) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (d) any amendment to any of the foregoing.

"OSHA" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §651, et seq.

"Outside Closing Date" means May 31, 2015.

"Parent" has the meaning set forth in the preamble.

"Payables" means Seller's indebtedness to trade creditors, including without limitation voucher payable and unvouchered payables relating to goods received but not invoiced or in goods in transit, incurred as of the Closing Date in accordance with GAAP, other than those set forth in Schedule 1-I.

"Patents" has the meaning set forth in the definition of Intellectual Property.

"Permits" means all licenses, permits, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"Permitted Encumbrances" has the meaning set forth in Section 5.1(s).

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, government, governmental authority, regulatory authority, court or arbitrator, or any other entity whatsoever.

"Preliminary Purchase Price" has the meaning set forth in Section 3.1.

"Private Resolution Period" has the meaning set forth in Section 3.3(c)(i).

"Product Obligations" has the meaning set forth in Section 5.1(y).

"Product Liability Obligations" means all Liabilities for damage to any Person or property under any product liability theory (whether negligence, breach of express or implied warranty, strict liability, violation of Laws or other), arising from any products (including, without limitation, Products) manufactured, sold or delivered by Seller, prior to the Effective Time.

"Products" means products manufactured, sold, licensed or distributed by Seller prior to the Effective Time (or, for purposes of Section 3.4, by Purchaser and its Affiliates or their successors after the Effective Time) under the Reed & Barton name or any other trademark, tradename or brand currently used in connection with the sale or distribution of products by Seller, including without limitation Reed and Barton, R&B Everyday, Lunt and Williamsburg.

"Promissory Note" means the Promissory Note in the form attached hereto as Exhibit F.

"Proposition 65" has the meaning set forth in Section 5.1(g).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Intellectual Property" means all Intellectual Property owned or used by Seller in the conduct of the Business.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Controlled Group" means Purchaser together with any other entity with which it is treated as a single employer for purposes of Section 4001(b) of ERISA or Section 414 of the Code.

"Receivables" means the accounts receivable listed on Schedule 1-F, including any claim, remedy or other right related to the foregoing, but adjusted, as necessary, to include all accounts receivable of Seller from the date of such Schedule to the Effective Time as reflected in the Closing Date Working Capital Schedule.

"Reed and Barton Corporation Retirement Plan" or the "Plan" means the Reed and Barton Corporation Retirement Plan, as amended and restated as of February 1, 2002, as further amended after such date.

"Related Agreements" means all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with this Agreement by any Person, including, without limitation, the Assumption Agreement, the General Assignment, the Transition Services Agreement, the Lease Assignment, the Promissory Note and the Consulting Agreements.

"Resolved Objections" has the meaning set forth in Section 3.3(c)(i).

"Restriction Period" has the meaning set forth in Section 7.7.

"Retained Real Property" has the meaning set forth in the definition of Excluded Assets.

"Review Period" has the meaning set forth in Section 3.3(b).

"Sale Hearing" means the hearing(s) before the Bankruptcy Court to consider the Sale Motion and entry of the Sale Order.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Sale Order and the Bidding Procedures Order.

"Sale Order" means the Order of the Bankruptcy Court approving the Closing.

"Seller" has the meaning set forth in the preamble.

"Show Costs" has the meaning set forth in Section 7.1(a).

"Software" means computer software, including, without limitation, source code, object code, disks, documentation, operating manuals, related systems data, source programs, record

layouts, program libraries, and any other documentation in those application areas that may pertain to any data processing system or operation

"Tangible Personal Property" means the equipment, machinery, tools, dies, molds, tooling (including that located at suppliers' places of business) furniture, fixtures, leasehold improvements, computers, hardware supplies, motor vehicles, supplies and other tangible personal property owned by Seller including, without limitation, the tangible personal property listed on Schedule 1-G.

"Target Working Capital" means Ten Million Dollars ($10,000,000).

"Taxes" means all taxes, charges, fees, levies or other like assessments, including without limitation, United States federal, state, local, foreign, and other net income, gross income, gross receipts, social security, estimated, sales, use, ad valorem, franchise, profits, net worth, alternative or add-on minimum, capital gains, license, withholding, payroll, employment, unemployment, social security, excise, property, Transfer Taxes, and any and all other taxes, assessments, fees or other governmental charges, whether computed on a separate, consolidated unitary, combined or any other basis together with any interest and any penalties, additions to tax, estimated taxes or additional amounts with respect thereto, and including any liability for Taxes as a result of being a member of a consolidated, combined, unitary or affiliated group or any other obligation to indemnify or otherwise succeed to the Tax liability of any other Person and the term "Tax" means any one of the foregoing Taxes.

"Tax Returns" means all returns, declarations, reports, statements, schedules, notices, forms or other documents or information required to be filed in respect of the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of any legal requirement relating to any Tax, and the term "Tax Return" means any one of the foregoing Tax Returns.

"Top Customers" has the meaning set forth in Section 5.1(x)(i).

"Top Suppliers" has the meaning set forth in Section 5.1(x)(ii).

"Trade Secrets" has the meaning in the definition of Intellectual Property.

"Transition Services Agreement" means the Transition Services Agreement in the form of Exhibit D.

"Transfer Taxes" means all transfer, sales, use, bulk sales, reporting, recording, filing and other similar fees, taxes and charges arising out of or in connection with the transfer of the Acquired Assets affected pursuant to this Agreement.

"Transferred Contracts" means the Contracts identified and/or described in Schedule 1-H; provided, however that Purchaser shall have the right to reject any Transferred Contract pursuant to the Bankruptcy Code and remove such Transferred Contract from Schedule 1-H.

"Universal Product Code Transfer Agreement" means the Universal Product Code Transfer Agreement in the form attached hereto as Exhibit E.

14

"Upward Adjustment Cap" has the meaning set forth in Section 3.2.

"WARN Act" has the meaning set forth in Section 8.6.

"Working Capital" means (a) Receivables (net of all sales related allowances and reserves) and Inventory (net of all inventory related reserves other than LIFO reserves), less (b) Payables related to the purchase of Inventory and occupancy of the Atlanta Showroom ("Included Payables") and the accrued liabilities set forth on Schedule 1-B, all items to be determined in accordance with GAAP consistent with past practice and consisting only of such Receivables, Inventory and Included Payables that are actually transferred to, or assumed by, Purchaser, all as further described on Schedule 3.2.  For clarification, and notwithstanding anything to the contrary in the preceding sentence, all payments received by Seller (including received in lock boxes) by the Closing Date will be deemed to be cash and will be an Excluded Asset (and thus not included in the Working Capital calculation) and any liability that Seller has paid at or prior to the Effective Time (including by sending a check whether or not such check has cleared Seller's bank account, provided such check clears Seller's bank account upon presentment) will be deemed to have been paid and will also not be included in the Working Capital calculation.  The parties agree that the Amount of Inventory included in the calculation of Working Capital shall be at least Seven Million Dollars ($7,000,000) but not more than Ten Million Dollars ($10,000,000).

> 1.2     Construction of Certain Terms and Phrases.

(a)     Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; or (iv) the terms "Article," "Section," or "clause" refer to the specified Article, Section, or clause of this Agreement.

(b)     Any representation or warranty contained herein as to the enforceability of a Contract (including this Agreement and any Related Agreement) will be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).  Unless otherwise indicated, whenever this Agreement refers to a number of days, such number will refer to calendar days.

(c)     This Agreement is being entered into by and among competent and sophisticated parties who are experienced in business matters and represented by counsel and other advisors, and have been reviewed by the parties and their counsel and other advisors.  Therefore, any ambiguous language in this Agreement will not be construed against any particular party as the drafter of the language.

## ARTICLE 2

## Purchase and Sale and Assumption

2.1     <u>Purchase and Sale of Acquired Assets</u>.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller will sell, transfer, convey, assign, deliver and set over to Purchaser, and Purchaser will purchase and accept, all of the right, title, benefit and interest of Seller in, to and under the Acquired Assets, free and clear of all Liens or any other Interest, including but not limited to pursuant to section 363(f) of the Bankruptcy Code.  Other than the Permitted Encumbrances, all indebtedness secured by mortgages or other Liens on the Acquired Assets shall attach to the proceeds pursuant to Section 363(f) of the Bankruptcy Code so that the Acquired Assets will be sold free and clear of such Liens and other Interests.  At the Closing, the sale, transfer, conveyance, assignment and delivery of the Acquired Assets will be effected pursuant to the General Assignment.  Notwithstanding anything to the contrary contained in this Agreement, the transfer of the Acquired Assets will not include the assumption of any Liability related to the Acquired Assets unless Purchaser expressly assumes that Liability pursuant to <u>Section 2.3</u> of this Agreement.

2.2     <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained herein, the Acquired Assets do not include, and in no event will Purchaser acquire any right, title, benefit or interest in, to or under, any of the Excluded Assets.

2.3     <u>Assumed Liabilities</u>.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Purchaser will assume and agree to pay, perform and discharge or hold Seller harmless from only the Assumed Liabilities.  The assumption of the Assumed Liabilities by Purchaser will be effected pursuant to the Assumption Agreement.  Seller will retain and will be responsible for all Excluded Liabilities.

2.4     <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary contained herein, the Assumed Liabilities will not include, and in no event will Purchaser assume, be required to pay, perform, discharge or hold Seller harmless from any Excluded Liabilities, it being understood and agreed that Purchaser is responsible for all Liabilities in operating the Business after the Closing Date, except as otherwise expressly provided in this Agreement.

2.5     <u>Assignment and Cure Amounts</u>.

(a)     Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from Seller, of the Transferred Contracts.  No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser.  Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

16

(b)   The cure amounts (collectively, the "Cure Amounts"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Transferred Contracts shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Seller amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Transferred Contracts) and Seller shall have no Liability for any such cure amount; provided, however, that the aggregate Cure Amounts payable by or reserved to Purchaser hereunder shall be applied as a reduction in the principal amount of the Promissory Note.   Consistent with the Bidding Procedures Order, if requested by the Purchaser, the Seller will commence and prosecute to conclusion, in expedited proceedings before the Bankruptcy Court, objection(s) to the cure amount(s) claimed by the counterparty to any contract, lease or license.   A good faith estimate as of the date hereof of the Cure Amounts described in this section, based on the Knowledge of Seller, is set forth on Section 2.5(b) of the Seller Disclosure Schedule.   At least fifteen (15) Business Days prior to the Closing Date, the Seller shall prepare and deliver to Purchaser an updated Section 2.5(b) of the Seller Disclosure Schedule setting forth the Cure Amounts. Nothing contained in this Section 2.5 shall restrict or prohibit Purchaser's right to remove any item identified Schedule 1-H pursuant to the definition of Transferred Contracts.

2.6   <u>Bulk Sales Laws</u>.  The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Purchaser.

ARTICLE 3

Purchase Price and Adjustments

3.1   <u>Purchase Price</u>.   The purchase price for the Acquired Assets will be, in addition to the Assumed Liabilities, an amount equal to (a) Fifteen Million Dollars ($15,000,000) (the "<u>Preliminary Purchase Price</u>"), <u>plus</u> (b) the Excess Amount, if applicable, <u>minus</u> (c) the Shortfall Amount, if applicable, ((a) plus (b) minus (c), the "<u>Closing Date Purchase Price</u>" and, as subsequently adjusted as provided in Section 3.3(d), the "<u>Purchase Price</u>").   On the first Business Day after the date hereof, Purchaser shall make an earnest deposit by wire transfer of immediately available funds to an account specified by Seller equal to Two Hundred and Fifty Thousand Dollars ($250,000) (the "<u>Earnest Deposit</u>").   At the Closing, (x) the Earnest Deposit shall be credited against the Purchase Price; and (y) Purchaser will (i) pay to Seller by wire transfer of immediately available funds to an account specified in writing by Seller an amount equal to Ten Million Dollars ($10,000,000) <u>minus</u> the Earnest Deposit (the "<u>Closing Date Cash Consideration</u>"); and (ii) deliver to Seller a the Promissory Note in the principal amount of Five Million Dollars ($5,000,00.00) <u>plus</u> (I) the Excess Amount, if applicable, <u>minus</u> (II) the Shortfall Amount, if applicable, <u>minus</u> (III) the Cure Amounts on a dollar-for dollar-basis payable by or reserved to Purchaser pursuant to <u>Section 2.5(b)</u> (without duplication as a result of the Working Capital adjustment), in the form annexed to this Agreement as <u>Exhibit E</u> (the "<u>Promissory Note</u>").

17

4815-5486-2370.2

3.2     <u>Closing Date Working Capital</u>.  At least five days prior to the Closing Date Seller will prepare and deliver to Purchaser a proposed schedule of estimated Working Capital as of the Closing Date and, during the period up to one day prior to the Closing Date, Seller and Purchaser shall in good faith discuss such proposed schedule and reach mutual agreement on a schedule (the "<u>Estimated Closing Date Working Capital Schedule</u>") setting forth the computation of the estimated Working Capital as of the Closing Date (the "<u>Estimated Closing Date Working Capital</u>").  If the Estimated Closing Date Working Capital Schedule shows the Estimated Closing Date Working Capital is less than the Target Working Capital, the principal amount of the Promissory Note will be reduced by the amount by which the Estimated Closing Date Working Capital shown on such schedule is less than the Target Working Capital (the "<u>Shortfall Amount</u>").  If the Estimated Closing Date Working Capital Schedule shows the Estimated Closing Date Working Capital to be greater than the Target Working Capital, the principal amount of the Promissory Note will be increased by the amount by which the Estimated Closing Date Working Capital shown on such schedule exceeds the Target Working Capital (the "<u>Excess Amount</u>"), provided that in no event shall the Excess Amount exceed One Million Dollars ($1,000,000) (the "<u>Upward Adjustment Cap</u>") except in the event that the Purchaser does not assume the Included Payables (the "<u>Non-Assumed Payables</u>"), in which case the Upward Adjustment Cap shall be increased from One Million Dollars ($1,000,000) to the sum of (a) One Million Dollars ($1,000,000) plus (b) the amount of the Non-Assumed Payables.

3.3     <u>Reconciliation of Purchase Price</u>.

(a)     <u>Closing Date Working Capital Schedule</u>.  On or before sixty (60) days following the Closing Date, Purchaser will prepare and deliver to Seller a schedule (the "<u>Closing Date Working Capital Schedule</u>") setting forth Purchaser's computation of the Working Capital as of the Closing Date (the "<u>Closing Date Working Capital</u>").  The records necessary to prepare the Closing Date Working Capital Schedule and the computations therein will be furnished by the party possessing such records to the other party.

(b)     <u>Review of Closing Date Working Capital Schedule; Disputes</u>.

(i)     Upon receipt of the Closing Date Working Capital Schedule, Seller (together with its professional advisors) will have the right during the succeeding fifteen (15) Business Day period (the "<u>Review Period</u>") to examine the Closing Date Working Capital Schedule, and all information reasonably related thereto contained in the books and records used to prepare the Closing Date Working Capital Schedule.  Purchaser will provide to Seller and its professional advisors reasonable access to the work papers used to prepare the Closing Date Working Capital Schedule.

(ii)     If Seller disagrees with the calculation of the Closing Date Working Capital set forth in the Closing Date Working Capital Schedule, it will notify Purchaser in writing (such notice, a "<u>Notice of Disagreement</u>") on or before the last day of the Review Period, setting forth a specific description of Seller's objection(s), the amount of the adjustment which Seller believes should be made to each item to which it objects, and the basis for Seller's disagreement therewith.

18

In the event that Seller does not provide a Notice of Disagreement on or before the last day of the Review Period or Seller affirmatively notifies Purchaser in writing that Seller agrees with the calculation of the Closing Date Working Capital set forth on the Closing Date Working Capital Schedule, Seller will be deemed to have accepted the Closing Date Working Capital Schedule delivered by Purchaser and the calculation of the Closing Date Working Capital set forth in the Closing Date Working Capital Schedule will be final, binding and conclusive for all purposes hereunder.

(c)     Determination of Final Working Capital Schedule.

(i)     If a Notice of Disagreement is timely provided by Seller, Purchaser and Seller will use Best Efforts for a period of fifteen (15) days (or such longer period as they may mutually agree, the "Private Resolution Period") to resolve any disagreements with respect to the calculation of Closing Date Working Capital. The objections set forth in the Notice of Disagreement that are resolved by Seller and Purchaser in accordance with this Section 3.3(c)(i) will collectively be referred to herein as the "Resolved Objections" and the Closing Date Working Capital Schedule will be adjusted to reflect any Resolved Objections.

(ii)     If, at the end of the Private Resolution Period, Seller and Purchaser are unable to resolve all of the objections set forth in any Notice of Disagreement, Seller and Purchaser will submit any remaining disagreements to the Bankruptcy Court for determination. The finally determined Closing Date Working Capital Schedule (whether determined pursuant to Section 3.3(b)(ii) or 3.3(c) is referred to as the "Final Working Capital Schedule".

(d)     If the Final Working Capital Schedule shows the Closing Date Working Capital is less than the Estimated Closing Date Working Capital (the "Shortfall"), the principal amount of the Promissory Note shall be reduced by the amount by which the Closing Date Working Capital shown on the Final Working Capital Schedule is less than the Estimated Closing Date Working Capital. If the Final Working Capital Schedule shows the Closing Date Working Capital is greater than the Estimated Closing Date Working Capital (the "Excess"), the principal amount of the Promissory Note shall be increased by the amount by which the Closing Date Working Capital shown on the Final Working Capital Schedule is greater than the Estimated Closing Date Working Capital, provided that in no event shall the Purchase Price exceed the sum of Sixteen Million Dollars ($16,000,000) and the amount of the Non-Assumed Payables, if applicable.

3.4     Intentionally Omitted.

3.5     Allocation of Consideration. The Purchase Price, the Assumed Liabilities, and any capitalized costs will be allocated among the Acquired Assets for all Tax purposes in accordance with Schedule 3.5. Each party hereto agrees (a) to complete and to file Form 8594 with its Federal income tax return consistent with such allocation for the tax year in which the Closing occurs, and (b) that it will not take a position on any Tax Return, or before any

19

Governmental or Regulatory Authority charged with the collection of any such Tax or in any judicial proceeding, that is in any manner inconsistent with the terms of any such allocation.

       3.6    <u>Prorations</u>.  The following prorations relating to the Acquired Assets will be made as of the Closing Date, with Seller liable to the extent such items relate to any time period ending prior to the Closing Date and Purchaser liable to the extent such items relate to periods on or subsequent to the Closing Date: (a) rents, Taxes and other items relating to the Business, paid or payable under any real estate or vendor lease to be assigned to or assumed by Purchaser pursuant to the terms of this Agreement and (b) the amount of rents, personal property and real property Taxes and charges for sewer, water, fuel, telephone, electricity and other utilities relating to the Atlanta Showroom; provided, however, that if practicable, meter readings will be taken on the Closing Date and the respective obligations of the parties determined in accordance with such readings.  If any of the foregoing proration amounts cannot be determined as of the Closing Date due to final bills therefor not being issued as of the Closing Date, the parties will prorate such items as and when the actual bills therefor are issued to the appropriate party.  The party owing amounts to the other by means of such prorations shall pay the same within thirty (30) days following such proration.

ARTICLE 4

Closing Matters

       4.1    <u>Closing</u>.  Upon the terms and subject to the conditions of this Agreement, the Closing will take place beginning at 9:00 a.m. (local time) remotely by electronic transmissions or, in the event that the parties deem an in-person Closing necessary, at the offices of Nixon Peabody LLP in Jericho, New York, on the second Business Day after the satisfaction or waiver of all conditions described in Article 9 that are required to be satisfied prior to the Closing, or at such other time, date, and place as the parties may agree (the "<u>Closing Date</u>").  All documents delivered and all transactions consummated at the Closing will be deemed for all purposes to have been delivered and consummated effective as of the Effective Time.

       4.2    <u>Deliveries at Closing</u>.

       (a)    <u>Deliveries of Seller</u>.  At the Closing, Seller will deliver or cause to be delivered to Purchaser the following:

       (i)    duly executed counterparts of the General Assignment, Assumption Agreement, Lease Assignment, Transition Services Agreement and Universal Product Code Transfer Agreement;

       (ii)    a Consulting Agreement duly executed by each of Tim K. Riddle (in the Form of Exhibit G-1) and Charles F. Daly (in the Form of Exhibit G-2) (collectively, the "<u>Consulting Agreements</u>");

       (iii)    a certificate of good standing from the Massachusetts Secretary of State as to Seller and from any other jurisdiction where Seller is registered to do

20

business, which will be dated not more than twenty (20) days prior to the Closing Date;

(iv)    a certificate of an officer of Seller certifying that its Organization Documents, as certified and as delivered at the Closing, have not been amended or rescinded since the date of such certification and remain in full force and effect at the Closing Date;

(v)    certified copies of resolutions of the directors of Seller authorizing the execution, delivery and performance of this Agreement and the Related Agreements;

(vi)    any and all assignments, in recordable form and executed by Seller in order to assign the Purchased Intellectual Property to Purchaser, including without limitation trademark, domain name and copyright assignments;

(vii)    all certificates of title or origin (or similar documents), duly endorsed with respect to any vehicles or other equipment included in the Acquired Assets for which a certificate of title or origin is required to transfer title;

(viii)    an affidavit by Seller stating Seller's United States taxpayer identification number and that Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code);

(ix)    such other duly executed documents, instruments and certificates as may be required to be delivered by Seller pursuant to the terms of this Agreement including evidence of the removal of all Liens affecting the Acquired Assets, all in form reasonably satisfactory to Purchaser;

(x)    all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Acquired Assets to Purchaser free and clear of all Liens and other Interests (except Permitted Encumbrances), provided, however, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens and other Interests; and

(xi)    such other documents, instruments and certificates as Purchaser may reasonably request.

(b)    Deliveries by Purchaser.  At the Closing, Purchaser will deliver or cause to be delivered to Seller the following:

(i)    the Purchase Price as provided in Section 3.1;

(ii)    duly executed Promissory Note;

(iii)    duly executed counterparts of the Assumption Agreement, Lease Assignment, Transition Services Agreement and Universal Product Code Transfer Agreement;

(iv)    duly executed counterparts of the Consulting Agreements;

(v)    a certificate of good standing of Purchaser from the Delaware Secretary of State as to Purchaser, which will be dated not more than twenty (20) days prior to the Closing Date;

(vi)    a certificate of an officer of Purchaser certifying that its Organizational Documents, as certified and as delivered at the Closing, have not been amended or rescinded since the date of such certification and remain in full force and effect at the Closing Date;

(vii)    copies of resolutions of the directors of Purchaser authorizing the execution, delivery and performance of this Agreement and the Related Agreements; and

(viii)    such other duly executed documents, instruments and certificates as may be required to be delivered by Purchaser pursuant to the terms of this Agreement, all in form reasonably satisfactory to Seller.

4.3    <u>Further Assurances and Cooperation</u>.

(a)    <u>Further Assurances</u>.    Subject to the terms and conditions of this Agreement, from time to time after the Closing through the date on which the Bankruptcy Case is closed, at a party's reasonable request, the other party will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and assumption, and provide such materials and information and take such other actions as the other party may reasonably deem necessary or desirable in order to more effectively transfer, convey and assign to Purchaser all of the Acquired Assets and/or in order to more effectively effect the assumption by Purchaser of the Assumed Liabilities and Purchaser's operation of the Business.

(b)    <u>Post Closing Access to Books and Records</u>.    Following the Closing, Purchaser and Seller will afford each other, and their respective advisors, during normal business hours, reasonable access to, in the case of Seller, the Excluded Books and Records and, in the case of Purchaser, the Business Books and Records in its possession with respect to periods through the Closing and the right to make copies and extracts therefrom to the extent that such access may be reasonably required by the requesting party in connection with (i) the preparation of Tax Returns, (ii) any Tax audit, Tax protest or other proceeding relating to Taxes, (iii) the enforcement of rights and obligations under this Agreement or the transactions contemplated hereby, (iv) compliance with the requirements of any Governmental or Regulatory Authority, or (v) any actual or threatened third party action or proceeding.   Neither Purchaser nor Seller may, for a period of seven (7) years after the Effective Time, destroy or otherwise dispose of any such books, records and other data unless such party will first offer in

22

writing to surrender copies of such books, records and other such data to the other party and such other party has not agreed in writing to take possession thereof during the thirty (30) day period after such offer is made, provided that the Seller's motion for issuance of a final decree in the Bankruptcy Case shall be deemed to constitute notice to the Purchaser of the Seller's intention to destroy all books, records and data and its offer to surrender such books, records and data to Purchaser.  Purchaser and Seller further will reasonably cooperate with the other in the conduct of any audit or other proceeding related to Taxes involving the Business.  This reasonable cooperation does not include payment to attorneys, accountants or other professional advisors in connection with such cooperation.

(c)    Cooperation.  If, in order to properly prepare its Tax Returns or other documents or reports required to be filed with any Governmental or Regulatory Authority, it is necessary that either Purchaser or Seller be furnished with additional information, documents or records relating to the Business, the Acquired Assets or the Assumed Liabilities not referred to in Section 4.3(b), and such information, documents or records are in the possession or control of the other party, such other party will use its Best Efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's reasonable request and at recipient's cost and expense.

4.4    Post Closing Receipts.  After the Closing, Seller will promptly, but in no event later than five (5) Business Days after the Closing, notify all parties obligated in respect of the Receivables to remit payments thereafter directly to Purchaser and Seller will receive and hold any payments in respect of Receivables in trust for Purchaser and promptly transfer to Purchaser any payments or other receipts Seller receives with respect to any Receivables in the form received and with any necessary endorsements of Seller.

4.5    Charges and Utilities.  With respect to the Atlanta Showroom, Seller will cause, if applicable, final water, gas, sewer, electric and all other utility meter readings to be made as of the Closing Date or as close thereto as is reasonably possible, and will use its Best Efforts to cause the utilities to be transferred to Purchaser without interruption of service.  Seller will promptly pay the final bills rendered on such final readings and will deliver to Purchaser evidence of payment of the same.

ARTICLE 5

Representations and Warranties

5.1    Representations and Warranties of Seller.  Seller represents and warrants to Purchaser that the statements contained in this Section 5.1 are correct and complete as of the date of this Agreement and will be correct and complete as of the Effective Time (as though made then and as though the Effective Time were substituted for the date of this Agreement throughout this Section 5.1), except as set forth in the Disclosure Schedules.  The Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 5.1 (as to which Purchaser acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Disclosure Schedules shall be deemed disclosed for all other purposes of the Disclosure Schedules as and to the extent the

23

content or context of such disclosure makes it reasonably apparent, if read in the context of such other section, subsection, paragraph or subparagraph of the Disclosure Schedules, that such disclosure is applicable to such other section, subsection, paragraph or subparagraph of the Disclosure Schedules):

(a)      <u>Organization and Existence</u>.  Seller is a corporation organized, validly existing, and in good standing under the laws of the Commonwealth of Massachusetts, with full power and authority to own, lease, and operate the Business and the Acquired Assets and to carry on the Business as and where such assets are now owned or leased and the Business is now conducted.  The states in which the Seller is required by law to be qualified to do business as a foreign corporation are set forth on <u>Section 5.1(a)</u> of the Disclosure Schedules.

(b)      <u>Authority and Approval</u>.   Seller has the power to enter into this Agreement and each of the Related Agreements to which it is a party and to perform its obligations thereunder.   The execution, delivery and performance by Seller of this Agreement and the Related Agreements to which it is to be a party, and the consummation by Seller of the transactions contemplated herein and therein, have been duly authorized by all required action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and when executed and delivered by Seller, the Related Agreements to which it is a party will have been duly executed and delivered by Seller.  This Agreement is, and each of the Related Agreements to which Seller is a party when executed and delivered by Seller will be the valid and binding obligations of Seller, enforceable against Seller, in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, moratorium, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (regardless of whether considered in a proceeding at Law or in equity).

(c)      <u>No Conflict</u>.  The execution and delivery by Seller of this Agreement and each of the Related Agreements to which it is to be a party, and Seller's compliance with the terms and conditions hereof and thereof, and the consummation by Seller of the transactions contemplated hereby and thereby, do not and will not (i) conflict with, or require the consent of any Person that has not been obtained under Seller's Organizational Documents, (ii) subject to obtaining the authorizations referred to in <u>Section 5.1(d)</u>, violate in any material respect any provision of, or require any consent, authorization, or approval under, any Law or Order applicable to Seller, (iii) except as set forth in <u>Section 5.1(c)</u> of the Disclosure Schedules, violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any Transferred Contract of material other Contract or material Permit to which Seller is a party or by which Seller is bound or to which any of its assets or properties are subject, or (iv) result in the creation of any Lien upon the Acquired Assets other than Liens created by Purchaser.

(d)      <u>Governmental Approvals and Filing</u>.   Except as set forth in Section 9.3(b) or   as disclosed in <u>Section 5.1(d)</u> of the Disclosure Schedules, no consent, authorization, approval or action of, filing with, notice to, or exemption from

24

any Governmental or Regulatory Authority on the part of Seller is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which Seller is to be a party or the consummation of the transactions contemplated hereby or thereby.

(e)     Financial Statements.

(i)     Seller has furnished Purchaser with copies of (A) the audited financial statements of the Seller as of January 28, 2012, February 2, 2013 and February 1, 2014 and the related statements of income and cash flow of the Seller for the 12-month periods then ended, (B) the unaudited balance sheet of the Seller as of November 1, 2014 (the "Interim Balance Sheet") and the statements of income, and cash flow of the Seller for the 11-month period ended November 1, 2014, and (C) a statement of Sales & Margin for Seller's fiscal year ended January 31, 2015 (the "FY 2015 Data" and, collectively, the "Financial Statements"). The Financial Statements (x) to Seller's Knowledge at such time, were, when issued, true, complete and correct in all material respects and fairly presented the financial condition and results of operations, and cash flow of the Seller at and as of the dates thereof and for the periods covered thereby, (y) were compiled from books and records regularly maintained by management of Seller used to prepare the financial statements of Seller, and (z) except with respect to the liabilities set forth in the Financial Statements, are, to Seller's Knowledge, true, complete and correct in all material respects at and as of the dates thereof and for the periods covered thereby. The FY 2015 Data has been calculated in a manner consistent with past practice and the other Financial Statements.

(ii)     Except as and to the extent reflected on the Interim Balance Sheet or set forth in the Disclosure Schedules, Seller has no material Liabilities that would adversely affect the ability of the Seller to consummate the transactions contemplated by this Agreement, other than Liabilities incurred after November 1, 2014 in the ordinary course of business and consistent with past practice.

(f)     Legal Proceedings. Section 5.1(f) of the Disclosure Schedules contains an accurate description (including the case caption and case number) of each lawsuit, arbitration or other legal proceeding to which Seller is currently or, in the last three (3) years, had been, a party. Except as disclosed in Section 5.1(f) of the Disclosure Schedules, Seller has received no written notice that: (i) there is any pending or threatened claim, litigation, proceeding, investigation or Order of any Governmental or Regulatory Authority, in each case relating to Seller, the Business, the Atlanta Showroom or any of the Acquired Assets; (ii) there are any lawsuits or arbitrations pending or threatened against Seller that would reasonably be expected (x) to have a Business Material Adverse Effect, or (y) to adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against Seller or adversely affect the ability of Seller to consummate the transactions contemplated by this Agreement; or (iii) there is any Order outstanding against Seller which would adversely affect the ability of Seller to consummate the transactions contemplated by

4815-5486-2370.2

this Agreement or that are otherwise related to Seller, the Business, the Atlanta Showroom or the Acquired Assets.

(g) <u>Compliance with Laws and Orders</u>.  There is no material violation of or default under any Law or Order applicable to Seller, the Business, the Acquired Assets, the Atlanta Showroom, the Products or the Assumed Liabilities.  Seller has during the last six (6) years been in compliance in all material respects with, and is presently in full compliance with, all applicable Laws regulating the manufacture, distribution and labeling of products and the Safe Drinking and Toxic Enforcement Act of 1986 of the State of California ("<u>Proposition 65</u>").

(h) <u>Employee Benefit Plans</u>.

(i) <u>Section 5.1(h)(i)</u> of the Disclosure Schedules lists the following programs, plans and arrangements which are provided to, for the benefit of, or in connection with the current and former employees or directors of Seller for which Seller has any current (including current but contingent) Liability: (i) any collective bargaining agreement and any written employment agreement, not terminable upon sixty (60) days notice without penalty, (ii) each defined benefit plan and defined contribution plan, stock option or ownership plan, executive compensation, bonus, incentive compensation or deferred compensation or profit-sharing plan, (iii) each material medical, dental, vision, disability or death benefit plan, and (iv) any other material employee benefit plan, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, and any vacation, holiday, sick leave, fringe benefit, or group life insurance plan, in each case which is maintained or contributed to or by Seller or by any member of the controlled group of corporations, or trades or businesses under common control (within the meaning of Sections 414(b) and (c) of the Code) of which Seller is a member (a "<u>Controlled Group Member</u>"), and which covers current or former employees or directors of Seller (such plans, contracts, agreements, arrangements, programs and policies being referred to herein as the "<u>Employee Benefit Plans</u>").  True and complete copies of the Employee Benefit Plans listed in <u>Section 5.1(h)(i)</u> of the Disclosure Schedules have been delivered to Purchaser.

(ii) Except as set forth on <u>Section 5.1(h)(ii)</u> of the Disclosure Schedules, there exists no non-compliance with any applicable Law or any Employee Benefit Plan that would adversely affect the ability of Seller to consummate the transactions contemplated by this Agreement

(i) <u>Title and Condition</u>.  Except as set forth in <u>Section 5.1(i)</u> of the Disclosure Schedules, Seller has good and marketable title to all of the Acquired Assets, a valid leasehold interest in and right to use all property that is subject to any leases that are Acquired Assets, and the right to use all Purchased Intellectual Property in each case, free and clear of all Liens.  At the Closing, but subject to the filing or recording of such conveyance instruments and the giving of such notice as may be required under applicable Law, Purchaser will receive good and marketable title to all of the Acquired Assets transferred to it free and clear of all Liens.  Except as set forth in

26

Section 5.1(i) of the Disclosure Schedules, all of the Acquired Assets and the Atlanta Showroom are in good condition and repair (allowing for ordinary wear and tear) and are adequate for the purposes for which they are being used in Seller's normal business operations.

      (j)      Intellectual Property.  Section 5.1(j) of the Disclosure Schedules (a) contains a complete and accurate list of all of the following Purchased Intellectual Property:  Patents, registered or unregistered trademarks and trademark applications, registered copyrights and applications for copyright registrations, domain names, proprietary Software, and Software that is material to the operation of the Business, (b) identifies whether any Purchased Intellectual Property is used by a Person other than Seller, either to the Knowledge of Seller or with Seller's permission, and (c) lists any Contract to which Seller is a party, pursuant to which any Purchased Intellectual Property is licensed to, licensed by or otherwise used by Seller.  Except as set forth in Section 5.1(j) of the Disclosure Schedules:

      (i)      No registration in respect of the Purchased Intellectual Property owned by Seller, or application to register the Purchased Intellectual Property owned by Seller has lapsed, expired, been abandoned, been disclaimed, been withdrawn, been the subject of a final judgment of invalidity by any court of competent jurisdiction, been the subject of a final judgment of unenforceability by any court of competent jurisdiction, been the subject of any holding or declaration of unenforceability, invalidity, or refused to be reissued by any domestic or foreign Governmental or Regulatory Authority, including, without limitation, the United States Patent and Trademark Office, or been canceled within the past thirty-six (36) months;

      (ii)      Any and all renewal and maintenance fees, taxes, annuities or other fees payable in respect of the Purchased Intellectual Property owned by Seller and due before the date hereof have been paid in full through the date hereof, and no such fees are due in the three (3) month period after the date hereof;

      (iii)      All actions required to record each owner throughout the entire chain of title of all of the Purchased Intellectual Property owned by Seller required to have been listed on Section 5.1(j) of the Disclosure Schedule with each applicable Governmental or Regulatory Authority up through Closing, have been taken, including payment of all costs, fees, taxes and expenses associated with such recording activities;

      (iv)      No written claim has been asserted and, to Seller's Knowledge, no claim has been threatened by any Person (1) against the use by Seller of any of the Purchased Intellectual Property; (2) against Seller claiming infringement upon or misappropriation of any Intellectual Property rights of third parties as a result of the operation by Seller of the Business as presently conducted; or (3) challenging the ownership or validity of any of the Purchased Intellectual Property;

27

(v)     Seller is the sole owner or the licensee of the Purchased Intellectual Property, and has the right to use, free and clear of all Liens, other than applicable license agreements, the Purchased Intellectual Property; each officer, director, stockholder, employee, consultant, agent or other representative of Seller has assigned to Seller all of such individual's right, title and interest in and to any Purchased Intellectual Property, including, without limitation, that Intellectual Property (i) embodied in or used in connection with any products produced or contemplated to be produced by or in the Business; (ii) used in connection with providing services associated with the Business; or (iii) used in the operations of the Business. No director, stockholder, employee, consultant, agent or other representative of Seller owns or has claimed in writing to Seller any personal rights in (nor has any of them made application for) any of the Purchased Intellectual Property;

(vi)     Section 5.1(j) of Disclosure Schedules lists all registered Purchased Intellectual Property that has expired within the last five (5) years;

(vii)     (1) Seller is not, and to Seller's Knowledge, no other party thereto is in default of any obligation under any license or similar agreement relating to the Purchased Intellectual Property; (2) Seller has not granted any right or interest to any Person in connection with the Purchased Intellectual Property; and (3) Seller is not obligated to pay any amount, whether as a royalty, license fee or other payment, to any Person, in order to use the Purchased Intellectual Property;

(viii)     The operation of the Business as currently conducted by Seller, and the possession or use of the Purchased Intellectual Property has, does and will not infringe, misappropriate, dilute, violate or otherwise conflict any Intellectual Property right of any other Person. To Seller's Knowledge, none of the Purchased Intellectual Property is being infringed or otherwise used or available for use by any Person other than Seller, except pursuant to an agreement set forth on Section 5.1(j) of the Disclosure Schedules;

(ix)     Seller has taken all customary actions to safeguard the secrecy of Purchased Intellectual Property and preserve its status as Intellectual Property under applicable Law, including as a Trade Secret; and

(x)     Seller has complied at all times and in all material respects with all relevant requirements of any applicable data protection Law, including, without limitation, compliance with Seller's own data protection principles and privacy policies. Seller has not received any Order or other notification from any Governmental or Regulatory Authority regarding non-compliance or violation of any data protection principles, privacy policy or Law.  No Person has asserted a claim against Seller relating to the loss of or unauthorized disclosure or transfer of personal data, and no facts or circumstances exist that might give rise to such a claim insofar as the same relate to the Business.

28

(k)     Material Contracts.

(i)     Section 5.1(k) of the Disclosure Schedules contains a true and correct lists of all of the Contracts to which Seller is a party, including without limitation the following ("Material Contracts"):

(A)     All Contracts involving commitments to others to make capital expenditures or purchases or sales in excess of $50,000;

(B)     Any written employment, confidentiality, non-competition, severance or termination agreements as to employees, consultants or others;

(C)     Any collective bargaining agreements;

(D)     All Contracts relating to any direct or indirect indebtedness for borrowed money (including, without limitation, loan agreements, lease purchase arrangements, guarantees, agreements to purchase goods or services or to supply funds or other undertakings on which others rely in extending credit), or any conditional sales contracts, chattel mortgages, equipment lease agreements and other security arrangements with respect to personal property;

(E)     All Contracts between Seller and any Affiliate of Seller;

(F)     All Contracts that in any way could limit the freedom of Purchaser to engage in any line of business or to compete with any Person in any area or territory;

(G)     All license agreements (either as licensor or licensee) and any other agreement or arrangement of any type relating to the Purchased Intellectual Property;

(H)     All Contracts (whether exclusive or otherwise) with any sales agent, representative, franchisee, dealer, distributor;

(I)     All Contracts that require the payment of royalties;

(J)     All Contracts with any Government or Regulatory Authority;

(K)     All Contracts involving a sharing of profits, losses, costs or liabilities;

(L)     All Contracts relating to contractual performance extended by Seller, including, without limitation all written warranties, guaranties and undertakings;

29

(M)     All Contracts with Top Customers and Top Suppliers; and

(N)     All other Contracts not of the type covered by any of the other items of this <u>Section 5.1(k)(i)</u> involving money or property having an obligation in excess of $2,500 per month or $30,000 in the aggregate in any period of twelve (12) consecutive months which are not terminable by Seller on not less than thirty (30) days' notice without penalty (other than Employee Benefit Plans).

(ii)     True and correct copies of the Contracts listed in <u>Section 5.1(k)</u> of the Disclosure Schedules have been delivered to Purchaser.  Each Material Contract that is a Transferred Contract is in full force and effect, is fully assignable without the consent of any third party, except as set forth on <u>Section 5.1(c)</u> of the Disclosure Schedules, and is valid, binding and enforceable in accordance with its terms as to Seller and, to Seller's Knowledge, the other parties to such Material Contract.  Seller has performed and is performing all obligations required to be performed by it under the Material Contracts that are Transferred Contracts.  Except as set forth in <u>Section 5.1(k)</u> of the Disclosure Schedules, no default exists (or, solely as a result of the consummation of the transactions contemplated hereby, will exist) on the part of Seller or, to Seller's Knowledge, on the part of any other Person under any of the Material Contracts that are Transferred Contracts.

(l)     <u>Permits</u>.  Seller owns or possesses all Permits necessary or material to the Condition of the Business or the ownership, operation and use of the Acquired Assets and the Atlanta Showroom. <u>Section 5.1(l)</u> of the Disclosure Schedules identifies all Permits possessed by Seller which are necessary to the conduct of the Business or the ownership or operation of the Acquired Assets and the Atlanta Showroom as conducted on the date hereof.  Except as disclosed in <u>Section 5.1(l)</u> of the Disclosure Schedules, (i) all such Permits possessed by Seller are in full force and effect; (ii) Seller has complied in all material respects with the terms and conditions of such Permits; and (iii) Seller has not received notice of violation or proposed revocation or termination of any such Permit from any Governmental or Regulatory Authority.

(m)     <u>Insurance</u>.  Seller maintains insurance covering the Business and the Acquired Assets in amounts (and subject to deductibles and self-insurance amounts) that, to the Seller's Knowledge, are consistent with industry practice.  All such insurance is listed in <u>Section 5.1(m)</u> of the Disclosure Schedules and is in full force and effect, all premiums due thereunder up to the Effective Time have or will be paid and no written notice of cancellation or termination has been received with respect to any such insurance.  Except as set forth in <u>Section 5.1(m)</u> of the Disclosure Schedules, each policy for such insurance is occurrence-based.

(n)     <u>Certain Environmental Matters</u>.  Except as (i) related solely to the Excluded Assets, or (ii) disclosed in <u>Section 5.1(n)</u> of the Disclosure Schedules:

4815-5486-2370.2

(i)        Seller holds, and is in compliance in all respects with, all Permits required to conduct the Business as currently being conducted under any Environmental Laws.

(ii)       To Seller's Knowledge, Seller, the Business, the Atlanta Showroom and the Acquired Assets are in compliance, in all respects with all Environmental Laws and, during the ten (10) years preceding the date of this Agreement, Seller has not received written notice from any Person alleging that Seller or the Business, the Atlanta Showroom or the Acquired Assets, is in violation of any applicable Environmental Law, which violation or liability is unresolved.

(iii)      Seller has no Knowledge of and, during the ten (10) years preceding the date of this Agreement, has not received any written request for information or any written notice that it is a potentially responsible party under any Environmental Laws with regard to the Business, any of its facilities (including the Atlanta Showroom), the Acquired Assets and the operation of the Business at any of its facilities or any off-site location for which any liability is currently being asserted.

(iv)      Seller is not subject to any outstanding Order relating to compliance with any Environmental Law or to investigation or cleanup of Hazardous Materials.

(v)       Seller does not operate any underground storage tanks and has no Knowledge of the presence, at any time, of underground storage tanks at any of its facilities.  No Hazardous Materials are present in, on or under any of its facilities, except those used by the Seller in the ordinary operation of the Business and in strict compliance with Environmental Laws.

(vi)      Seller has reviewed the requirements of Environmental Laws and represents, covenants and warrants that neither this Agreement, nor the consummation of the transaction contemplated by this Agreement, will subject the transaction to or otherwise trigger any pre-conditions to the transfer of assets that are the subject of this Agreement, including environmental site investigation, environmental remediation and cleanup, or notification to or consent of any Governmental or Regulatory Authority or third party, pursuant to Environmental Laws.

(vii)     During the ten (10) years preceding the date of this Agreement, Seller has not transported, stored, used, manufactured, disposed of or released Hazardous Materials in violation of Environmental Laws.  Seller has not disposed of, transported, sold or manufactured any goods or products, (including, without limitation, Products) containing a Hazardous Material in violation of any Environmental Law.

4815-5486-2370.2

(viii)   Seller has provided to Purchaser, true and complete copies of all environmental assessments, audits, reports, studies, analyses, correspondence, summaries, maps, photographs, tests and monitoring results (completed or uncompleted), and all material written communications filed by Seller or between Seller and any Governmental or Regulatory Authority or third parties, in Seller's possession or control or initiated or authorized by Seller or any of Seller's subsidiaries or Affiliates, arising under or relative to Environmental Laws, including any Orders, notices of violation, warning letters or requests for information.

(o)    Brokers.  No broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Seller.

(p)    Taxes.  Except as otherwise set forth in Section 5.1(p) of the Disclosure Schedules:

(i)    All Tax Returns required to be filed by Seller have been timely filed and all such Tax Returns are true, accurate and complete in all material respects.

(ii)   There are no Tax Liens on any of the Acquired Assets or any of Seller's facilities (including the Atlanta Showroom).

(iii)    Seller is not party to any type of Tax sharing or allocation agreement.  Seller is not liable for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law) or as a transferee, successor, by contract, law, regulation, rule, or otherwise.

(iv)    None of the Transferred Contracts could obligate Purchaser to make a payment that would not be deductible under Section 280G of the Code and no Assumed Liability is an obligation to make such payment.

(v)    No claim has ever been made in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation in that jurisdiction.

(vi)    Seller has provided Purchaser with true and completed copies of Seller's income, sales, use, employment, property and other material Tax Returns that relate to all periods since January 30, 2011.  Section 5.1(p) of the Disclosure Schedule sets forth all jurisdictions in which Seller has filed or will file Tax Returns with respect to the Business, any of its facilities (including the Atlanta Showroom) or the Acquired Assets for each taxable period, or portion thereof, ending on or before the Closing Date.

(vii)    Seller (i) has been a validly electing qualified subchapter S corporation (within the meanings of Sections 1361 and 1362 of the Code since December 31, 1986, (ii) does not have any potential liability for any Tax under

32

Section 1374 of the Code and (iii) has not acquired assets from another corporation in a transaction in which Seller's Tax basis was determined, in whole or in part, by reference to the Tax basis of the acquired assets (or any other property) in the hands of the transferor or acquired stock of any corporation that is a qualified subchapter S subsidiary.

(q)    <u>Absence of Undisclosed Liabilities</u>.  Seller has no material Liabilities that would adversely affect the ability of the Seller to consummate the transactions contemplated by this Agreement except for (i) Liabilities included, reserved or reflected on the Interim Balance Sheet, (ii) Liabilities (including the Assumed Liabilities) arising in the ordinary course of the business since the date of the Interim Balance Sheet, (iii) those listed in the Disclosure Schedules and (iv) Excluded Liabilities.

(r)    <u>No Material Adverse Change</u>.  Except as described in <u>Section 5.1(r)</u> of the Disclosure Schedules, since February 1, 2014:

(i)    to Seller's Knowledge, there has not occurred any event or condition which Seller would reasonably expect to have a Business Material Adverse Effect;

(ii)    Seller has carried on the Business in the Ordinary Course of Business;

(iii)    Seller has not, except in the Ordinary Course of Business, sold, leased, transferred, or assigned any of the properties, rights or other assets of Seller that would, but for such transaction, be an Acquired Asset;

(iv)    Seller has not cancelled, compromised, waived or released any right or claim (or series of related rights and claims) outside the Ordinary Course of Business;

(v)    Seller has not granted any license or sublicense of any rights under or with respect to any Purchased Intellectual Property outside the Ordinary Course of Business;

(vi)    Seller has not entered into any employment contract or collective bargaining agreement or modified the terms of any such existing contract or agreement outside the Ordinary Course of Business;

(vii)    Seller has not granted any increase in the base compensation of any employees;

(viii)    Seller has not adopted, amended, modified or terminated any bonus, profit-sharing, incentive, severance or other plan, contract or commitment for the benefit of any of the directors, officers and employees of the Business (or taken any such action with respect to any other Employee Benefit Plan) outside the Ordinary Course of Business;

33

(ix)    Seller has not made any other material change in employment terms for any employees outside the Ordinary Course of Business;

(x)    Seller has not made or committed to any capital expenditure pertaining to the Business other than in the Ordinary Course of Business;

(xi)    Seller has not made any change to any accounting method or practice or any change to any methods of reporting income, deductions or other items for Tax purposes; and

(xii)    Seller has not made any agreement to do any of the foregoing.

(s)    <u>Atlanta Showroom</u>.

(i)    Seller has a leasehold interest in and to the Atlanta Showroom free and clear of all Liens, except the Permitted Encumbrances (as hereinafter defined). As used in this Agreement, "<u>Permitted Encumbrances</u>" means: real estate taxes on the Atlanta Showroom for the year in which the Closing occurs; municipal, zoning and other governmental land use regulations; utility distribution line easements; the rights of the public in and to any public roads abutting the Atlanta Showroom; and those other encumbrances, easements, covenants and restrictions of public record set forth on <u>Section 5.1(i)</u> of the Disclosure Schedules, none of which shall materially interfere with the Purchaser's use of the Atlanta Showroom.

(ii)    The Lease is in full force and effect, and there have been no amendments, supplements, extensions or other modifications of any nature to the Lease, written or oral.

(iii)    The Lease constitutes the entire agreement between Landlord and Seller as to the Atlanta Showroom.

(iv)    Seller is not in default under the Lease and there are no facts or circumstances which with the passage of time or the giving of notice or both may constitute a default by Seller under the Lease.

(v)    To Seller's Knowledge, there are no conditions or events presently occurring or presently existing that would permit a cancellation or termination of the Lease by Landlord or by Seller.

(vi)    Seller has furnished to Buyer or its counsel true and complete copies of the Lease creating Seller's interest in the Atlanta Showroom. With respect to the Atlanta Showroom, except as set forth on <u>Section 5.1(s)</u> of the Disclosure Schedules:

(A)    Seller has obtained all appropriate Permits that it is required to obtain in order to conduct the Business as it is presently being conducted at the Atlanta Showroom;

34

(B)     No notice of a violation of any Law, or of any covenant, condition, easement or restriction affecting the Atlanta Showroom or relating to its use or occupancy has been given to Seller, nor does Seller have Knowledge of any such violation;

(C)     Seller has no Knowledge of any increase in the applicable rate for any utility service being furnished to the Atlanta Showroom from the rate in effect with respect to the most recent bill that Seller has received for such service;

(D)     Seller has no Knowledge of improvements made or contemplated to be made by any public or private authority, the costs of which are to be assessed as special taxes or charges against the Atlanta Showroom, and there are no present assessments;

(E)     Seller has no Knowledge of outstanding requirements or recommendations by the insurance companies who issued the current insurance policies insuring the Atlanta Showroom requiring or recommending any repairs or work to be done on the Atlanta Showroom;

(F)     Seller has no Knowledge of the necessity or desirability of any major repairs or renovations to the Atlanta Showroom including, but not limited to, the equipment located therein or thereon;

(G)     Seller will maintain the Atlanta Showroom, including the building systems in good working order, condition and repair from the date hereof until Closing, reasonable wear and tear excepted; and

(H)     Seller has not granted, and, to Seller's Knowledge, there are no outstanding, rights, options, agreements or other obligations, pursuant to which any Person could claim a right to acquire all or any part of, or interest in, Seller's leasehold interest in the Atlanta Showroom.

(t)     <u>Inter-Company Transactions</u>.   A true and complete list and brief description of all Contracts between Seller and any Affiliate, and relating to Products, Acquired Assets, Assumed Liabilities or the Business, is set forth in <u>Section 5.1(t)</u> of the Disclosure Schedules.

(u)     <u>Transactions with Affiliates</u>.  Except as set forth on <u>Section 5.1(u)</u> of the Disclosure Schedules, neither Seller nor, to the Seller's Knowledge, any shareholder, employee, officer, consultant or director of Seller (i) owns, directly or indirectly, any interest in (excepting not more than five percent (5%) stock holdings for investment purposes in securities of publicly held and traded companies) nor is it an officer, director, employee or consultant of, any Person which is a competitor, lessor, lessee, customer or supplier of the Business; or (ii) has any cause of action or other claim whatsoever against, or owes any amount to, the Business except for claims and obligations in the Ordinary Course of Business, including, without limitation, for

35

accrued salary, vacation pay, accrued benefits under benefit plans, travel and other expense advances/reimbursements and similar matters and agreements.

(v)      Illegal Payments.  Neither Seller nor any of its directors or officers have (i) used any corporate funds for unlawful contributions, gifts, entertainment, or other unlawful expenses relating to political activity, (ii) made any unlawful payments on behalf of Seller to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns from corporate funds, or (iii) violated in any material respect the Foreign Corrupt Practices Act of 1977.

(w)      Employee Matters.

(i)      Except as set forth in Section 5.1(w)(i) of the Disclosure Schedules, (A) the employment of each employee of the Business is terminable at will by Seller, (B) there are no outstanding agreements with respect to severance payments with any current or former employee of the Business, and (C) Seller is not a party to any employment agreement or consulting contract, and there is no agreement for the employment of any employee which cannot be terminated on reasonable notice and without penalty.

(ii)      Seller is, and since February 1, 2008 has been, in compliance in all material respects with all Laws respecting employment and employment practices, terms and conditions of employment with respect to the employment and prospective employment of the employees of the Business.  Except as set forth on Section 5.1(w)(ii) of the Disclosure Schedules, as of the date of this Agreement, and during the six (6) years prior to the date of this Agreement, with respect to any current, former or prospective employee, there is no charge, application, claim or complaint pending or, to the Knowledge of Seller, threatened against Seller alleging any unlawful employment practice or unfair labor practice.

(iii)      Except as set forth in Section 5.1(w)(iii) of the Disclosure Schedules, none of the employees of the Business are covered by any collective bargaining agreement, and no labor organization has been certified or recognized as the collective bargaining representative of any employees of the Business. To Seller's Knowledge, no union or labor organization is attempting to organize any employees of the Business, or has attempted to organize such employees during the two (2) years prior to the date of this Agreement. As of the date of this Agreement, there is no pending strike, or, to the Knowledge of Seller, any pending or threatened slowdown, work stoppage or other material labor dispute pending or in respect of any of the employees of the Business and there have been no material labor disputes during the five (5) years prior to the date of this Agreement.

(iv)      As of the date of this Agreement, and during the three (3) years prior to the date of this Agreement, neither the Company nor any of its Subsidiaries has implemented any plant closing or layoff which could implicate the WARN Act or any similar foreign, state or local law, regulation or ordinance.

4815-5486-2370.2

(v)      All employees of the Business are citizens of, or are authorized in accordance with federal immigration laws to be employed in, the United States.

(vi)      Seller is in compliance with the Fair Labor Standards Act and all relevant state or foreign wage and hour Laws and has (A) properly classified employees as either exempt or non-exempt for purposes of determining who is eligible for receiving overtime pay and (B) paid all non-exempt employees for any and all overtime work they have performed for Seller.

(vii)      Any Person who is providing services to the Seller, and who did not, has not or will not receive an IRS W-2 form and was or has been classified as an independent contractor, has been so classified in full compliance with the Code and federal and state wage and hour Laws and Seller, as applicable, has reported such independent contractors' compensation on IRS forms 1099 or other applicable forms or filings when required to do so and in accordance with applicable law.

(x)      Suppliers and Customers.

(i)      Customers.

(A)      Section 5.1(x)(i) of the Disclosure Schedules sets forth:

(1)      the names of Seller's top twenty (20) customers by dollar purchase volume (measured by the gross amount invoiced to the customer during the period) that purchased products from Seller during the twelve months ended January 31, 2014 (such customers being the "2013 Top Customers" and such period being the "2013 Period"); and

(2)      the names of Seller's top twenty (20) customers by dollar purchase volume (measured by the gross amount invoiced to the customer) that purchased products from Seller during the nine months ended November 1, 2014 (such customers being the "2014 Top Customers" and such period being the "2014 Period;

(B)      Except as set forth on Section 5.1(x)(i) of the Disclosure Schedules, none of the Top Customers has notified Seller in writing or to the Seller's Knowledge orally, that it (A) cancelled, materially modified, or otherwise terminated its relationship with Seller or materially decreased its usage or purchase of the products of Seller, nor, to Seller's Knowledge, has any such Top Customer indicated its intention to Seller to do any of the foregoing; or (B) will require Seller during the twelve (12) months immediately following the Closing Date to reduce prices, increase rebates or otherwise adversely change the terms of sale to such Top Customer as a condition of obtaining business or retaining existing business.

4815-5486-2370.2

(C)    Section 5.1(x)(i) of the Disclosure Schedules lists any customer of Seller which accounted for over $50,000 in revenue during the 2013 Period or over $30,000 in revenue during the 2014 Period to which Seller has not shipped Product since February 1, 2014.

(ii)    Suppliers.

(A)    Section 5.1(x)(ii) of the Disclosure Schedules sets forth:

(1)    the names and addresses of the top fifteen (15) suppliers by dollar purchase volume (measured by the purchase orders issued by the Business to such supplier during the period) from which Seller ordered raw materials, components, supplies, merchandise, finished goods or other goods and services ("Goods") during the 2013 Period (the "2013 Top Suppliers"), together with a brief description of the Goods provided;

(2)    the names and addresses of the top twenty (20) suppliers by dollar purchase volume (measured by the purchase orders issued by the Business to such supplier during the period) from which Seller ordered Goods during the first ten months of 2014 (the "2014 Top Suppliers" and together with the 2013 Suppliers, the "Top Suppliers"), together with a brief description of the Goods) provided;

(3)    the total amount Seller paid to the Top Suppliers in the 2013 Period and the 2014 Period;; and

(4)    other than as expressly set forth in the agreements with the Top Suppliers provided to Purchaser pursuant to Section 5.1(k), a description of any commitments made by Seller to any of the Top Suppliers, with respect to guaranteed minimum orders or exclusive supply arrangements.

(B)    Except as set forth on Section 5.1(x)(ii) of the Disclosure Schedules, since November 1, 2012, Seller has not experienced, and to Seller's Knowledge there do not exist, any material quality control or similar problems with the Goods currently being supplied or on order from any of the Top Suppliers.

(C)    None of the Top Suppliers has advised Seller in writing or to Seller's Knowledge orally that it (A) cancelled, materially modified, or otherwise terminated its relationship with Seller or materially decreased its supply of Goods to Seller, nor has any such Top Supplier indicated its intention to Seller to do any of the foregoing, or (B) has failed to comply with the quality, quantity or delivery standards of Seller in any material respect.  Section 5.1(x)(ii) sets forth the 2013 Top Suppliers that are no longer supplying Seller with any material amount of Goods.

(y)      <u>Warranty Obligations and Product Liability Obligations</u>.  The products manufactured and delivered by Seller were manufactured in material compliance with all applicable Law.  Except as disclosed on <u>Section 5.1(y)</u> of the Disclosure Schedules, (i) no product warranty, recall or similar claims have been made against Seller, and Seller has not received notice as to any claim or allegation of personal injury, death, or property or economic damages, product recall, any claim for punitive or exemplary damages, any claim for contribution or indemnification, or any claim for injunctive relief in connection with any Product or in connection with any service provided in connection with Seller, (ii) there are no statements, citations or decisions by any Governmental or Regulatory Authority stating that any Product is defective or unsafe or fails to meet any standards promulgated by the Governmental or Regulatory Authority, and (iii) there is no (A) fact relating to any Product that may impose upon Seller a duty to recall any such Product or a duty to warn customers of a defect in any such Product, (B) to Seller's Knowledge, design, manufacturing or other defect of any kind in any Product, (C) to Seller's Knowledge, material liability for warranty claims, returns or servicing with respect to any Product not fully reflected in the Financial Statements or (D) Proposition 65 claim for lead-based products with respect to any Product (collectively "<u>Product Obligations</u>"), and, to Seller's Knowledge, there are no Product Obligations threatened against Seller.  Except as provided by the Laws enacted in various jurisdictions with respect to implied warranties of merchantability and the like and Seller's standard form of warranty set forth on <u>Section 5.1(y)</u> of the Disclosure Schedules, no products to Seller's Knowledge are subject to any guaranty or indemnity of any kind.  Seller has delivered to Purchaser a true and correct copy of the product warranty it utilized in connection with the sale of products.  Since February 1, 2013, Seller has not received any notice of any claim based on any such warranty, except for product returns through Seller's customer service department in the Ordinary Course of Business.

(z)      <u>Inventory</u>.  All Inventory is included in the Financial Statements.  The Inventory (i) consists only of raw materials, work-in-process, finished goods, packaging and supplies of a quality and quantity usable and saleable and with adequate reserves for repair, obsolete, slow-moving or non-salable goods in the Ordinary Course of the Business, and (ii) is valued in the Financial Statements at the lower of Seller's cost or fair market value and in accordance with GAAP.  All Inventory is owned by Seller and is an Acquired Asset.  Inventory now on hand purchased after the Financial Statements was purchased in the Ordinary Course of Business at a cost not exceeding market prices prevailing at the time of purchase.  The quantities of each item of Inventory (whether raw materials, work-in-process or finished goods) are not excessive but are reasonable in the present circumstances of Seller.  Work in process Inventories are now valued, and will be valued on the Closing Date in accordance with GAAP.

(aa)      <u>Sufficiency of Acquired Assets</u>.  The Acquired Assets (together with the Excluded Tangible Personal Property) constitute all of the material assets, tangible and intangible services and rights used in or necessary to conduct the Business as conducted by Seller.  Seller has good and marketable title to the Acquired Assets.  The Acquired Assets are in good physical condition, normal wear and tear excluded, are adequate for the purposes for which they are presently used and constitutes (together with the

39

Excluded Tangible Personal Property) all of the assets necessary to operate the Business by Purchaser after the Closing Date as the Business was operated by Seller prior to the Closing Date.

(bb)    <u>Receivables</u>.  The Receivables (net of reserves) reflected on the Interim Balance Sheet and Receivables arising after the date of the Interim Balance Sheet and reflected on the books and records of Seller represent valid obligations arising from bona fide sales actually made in the Ordinary Course of Business, are, to the Seller's Knowledge, (i) not subject to any setoffs or counterclaims and (ii) are current and collectible and will be collected in accordance with their terms at their recorded amounts (subject to applicable reserves).  The reserves for doubtful accounts, rebates and unearned revenues included in the Financial Statements are believed by Seller to be adequate and are in accordance with GAAP consistently applied and in accordance with past practices of Seller.  Except as disclosed in <u>Section 5.1(bb)</u> of the Disclosure Schedules, Seller has not received notice of any contest, claim or right of setoff with respect to Receivables for which adequate reserves have not been established or, to Seller's Knowledge, notice of any intention to assert any such contest, claim or right of setoff.

(cc)    <u>Material Misstatements or Omissions</u>.  No representations or warranties made by Seller in this Agreement or in any Related Agreement contain or will contain any untrue statement of a material fact, or, to Seller's Knowledge, omit or will omit to state a material fact necessary to make the statements of fact contained therein not misleading.

5.2    <u>Representations and Warranties of Purchaser</u>.  Purchaser represents and warrants to Seller that the statements contained in this <u>Section 5.2</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Effective Time (as though made then and as though the Effective Time were substituted for the date of this Agreement throughout this <u>Section 5.2</u>):

(a)    <u>Organization and Existence</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with full power and authority to own, lease, and operate its business and properties and to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

(b)    <u>Authority and Approval</u>. Purchaser has the power to enter into this Agreement and each of the Related Agreements to which it is to be a party and to perform its obligations thereunder. The execution, delivery and performance by Purchaser of this Agreement and the Related Agreements to which it is to be a party, and the consummation by Purchaser of the transactions contemplated herein and therein, have been duly authorized by all required action on the part of Purchaser.  This Agreement has been duly executed and delivered by Purchaser and, when executed and delivered by Purchaser, the Related Agreements to which Purchaser is to be a party will have been duly executed and delivered by Purchaser.  This Agreement is, and each of the Related Agreements to which Purchaser is to be a party when executed and

delivered by Purchaser will be, the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, moratorium, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (regardless of whether considered in a proceeding at Law or in equity).

(c)    No Conflict. The execution and delivery by Purchaser of this Agreement and each of the Related Agreements to which it is to be a party, and Purchaser's compliance with the terms and conditions hereof and thereof, and the consummation by Purchaser of the transactions contemplated hereby and thereby, do not and will not (i) conflict with any of, or require any consent of any Person that has not been obtained under, the Purchaser's Organizational Documents, (ii) violate any provision of, or require any consent, authorization, or approval under, any Law or any Order applicable to Purchaser, (iii) conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any material contract to which Purchaser is a party or by which it is bound or to which any of its assets or property is subject, or (iv) result in the creation of any Lien upon the assets or property of Purchaser, except in each case as would not reasonably be expected to have a material adverse effect on Purchaser or materially adversely affect the validity or enforceability of this Agreement against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(d)    Governmental Approvals and Filing.    No consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which Purchaser is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (i) have a material adverse effect on Purchaser or (ii) materially adversely affect the validity or enforceability against Purchaser of this Agreement or such Related Agreements or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(e)    Legal Proceedings.

(i)    There are no lawsuits or arbitrations pending or, to Purchaser's knowledge, threatened against Purchaser as would reasonably be expected (x) to have a material adverse effect on Purchaser, (y) to materially adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement, or (z) result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement; and

41

(ii)     There are no Orders outstanding against Purchaser which would be reasonably expected to have a material adverse effect on Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(f)     Brokers.  No broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

5.3     Survival of Representations and Warranties.  The representations and warranties of Seller set forth in this ARTICLE 5 shall survive only until the Closing.  From and after the Closing Date, all such representations and warranties of Seller shall expire and be of no further force or effect.


ARTICLE 6

Intentionally Omitted

ARTICLE 7

Certain Covenants

7.1     Conduct of Business Pending Closing.  Except as (x) to those matters set forth on Section 7.1 of the Disclosure Schedules, (y) otherwise contemplated by this Agreement, or (z) with the written consent of Purchaser (which consent will not be unreasonably withheld or delayed), during the period from the date of this Agreement to the Closing Date, Seller will, in all material respects, use Best Efforts to:

(a)     conduct the Business in the ordinary course consistent with current practice, preserve its business organization and maintain its customary relationships with suppliers, employees and customers.  Without limiting the generality of the foregoing, Seller shall participate in the April 2015 NY Tabletop Show, in a manner consistent with Seller's past practice, and Purchaser shall, upon presentation by Seller of reasonable supporting documentation, make advances to Seller in order for Seller to pay when due all of Seller's costs associated with maintaining its New York City showroom and participated in the April 2015 NY Tabletop Show, including rent and other amounts due under Seller's lease of its New York City showroom, from February 1, 2015 through the last day of April 2015, personnel, travel lodging, meals, props, product shipping costs, and merchandising costs, and all other out-of-pocket costs associated therewith (the "Show Costs");

(b)     not dispose of any of the Acquired Assets material to the operation of the Business outside of the Ordinary Course of Business;

42

(c)      not terminate or amend in any material respect any material Contract that is part of the Acquired Assets, except in the Ordinary Course of Business consistent with past practice;

(d)      not waive or release any rights of the Business that are part of the Acquired Assets outside of the Ordinary Course of Business;

(e)      not take any action which would be reasonably likely to encourage or promote gift cards issued prior to the Closing Date, or redemption after the Closing Date of gift cards issued by Seller prior to the Closing Date;

(f)      not take any of the actions described in Section 5.1(r); and

(g)      not agree in writing or otherwise to take any of the actions described above in clauses (a) through (f) of this Section 7.1.

7.2      Efforts to Satisfy Closing Conditions, Etc.  Each party to this Agreement will use their commercially reasonable efforts to take, or cause to be taken, all actions necessary, proper or advisable (i) to satisfy all of the conditions set forth in Article 9 within such party's reasonable control; (ii) to comply promptly with all legal requirements which may be imposed on such party with respect to the transactions contemplated by this Agreement and, subject to the conditions set forth in Article 9, to consummate the transactions contemplated by this Agreement; and (iii) to make any required filing with or notification to, and obtain (and to cooperate with the other party to obtain) any consent, authorization, order or approval of, or any exemption by, any Governmental or Regulatory Authority and any other third party which is required to be made or obtained by it in connection with the transactions contemplated by this Agreement.

7.3      Collection of Accounts Receivable.  From and after the Closing, Purchaser will have the right and authority to collect for its own account any Receivables and to endorse with the name of Seller any checks or drafts received with respect to any such Receivables. Seller agrees promptly to deliver to Purchaser any cash or other property received directly or indirectly by it with respect to such Receivables, including any amounts payable as interest.  At Closing, Seller shall instruct any bank at which it has a lockbox arrangement, including without limitation Rockland Trust Company, to forward any payments that are deposited into such lockbox after the Effective Time as Purchaser may direct.  Further, prior to Closing, Seller shall cooperate on a commercially reasonable basis with Purchaser in establishing an arrangement with such bank for the turning over of such lockbox and forwarding of such payments at and after the Closing.

7.4      Assets Incapable of Transfer.  To the extent that any Transferred Contract or Permit is not assignable or transferable without the consent of another Person and such consent requirement is not made unenforceable by the Bankruptcy Code, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof.  Seller, upon request by Purchaser, will use its Best Efforts to obtain the consent of such other Person to the assignment

43

or transfer of any such Transferred Contract and/or Permit to Purchaser in all cases in which (a) such consent is or may be required for such assignment or transfer and (b) such consent requirement is not made unenforceable by the Bankruptcy Code. Purchaser will, without additional cost or expense to Purchaser, cooperate with Seller in its efforts to obtain such consents. For purposes of clarification, the Best Efforts by Seller will in no event require the payment of any money or permit, without the prior written consent of Purchaser, the amendment or modification of any material term or provision of any Transferred Contract or Permit, but Best Efforts shall include appropriate filings by the Seller in the Bankruptcy Court (and in the relevant appellate court(s), if applicable) seeking a determination that the Bankruptcy Code renders unenforceable the consent requirement in question. If any such consent will not be obtained, or an appropriate court order determining such unenforceability cannot be obtained, Seller will use Best Efforts, upon reasonable request by Purchaser, to provide an alternate reasonable arrangement reasonably satisfactory to Purchaser and Seller designed to provide to Purchaser the full economic benefits intended to be assigned or transferred to Purchaser under the relevant Transferred Contract or Permit. Without limiting the generality of the foregoing, the beneficial interest in and to the Transferred Contracts or Permits, to the fullest extent permitted by the relevant contract or Permit and applicable Law, will pass to Purchaser.

7.5     Discovery of Breach.  Seller must immediately notify Purchaser if, prior to the Closing, Seller concludes or discovers that any of Seller's representations and warranties contained in this Agreement is not accurate, which notice will summarize the reason for such conclusion.

7.6     Duty to Supplement Disclosure Schedules.  Seller shall, prior to Closing, supplement or amend the Disclosure Schedules with respect to any matter hereafter arising that, if existing or known at the date of this Agreement, would have been required to be set forth or described in such Disclosure Schedule. Any such supplemental or amended disclosure will not cure any breach or inaccuracy of any representation or warranty made in this Agreement for any purpose or diminish the rights or remedies of Purchaser with respect thereto, nor shall any such notification affect any conditions to the obligations of the parties hereunder. Notwithstanding the foregoing, if, prior to the Closing Date, Seller supplements or amends the Disclosure Schedules pursuant to this Section 7.6 and Purchaser subsequently elects to effect the Closing, then Purchaser thereby waives any rights it may have with respect to any damages it may have suffered or incurred based upon, arising out of or otherwise in respect of the subject matter of such supplement or amendment.

7.7     Non-Compete and Non-Solicitation.

(a)     Seller acknowledges that an important part of the benefit that Purchaser will receive in connection with the transactions contemplated hereby is the ability to conduct the Business free from competition from Seller. In order that Purchaser may enjoy such benefits, Seller agrees that: (i) for a period of five (5) years from the Closing Date (the "Restriction Period"), Seller shall not (A) directly or indirectly, engage or participate or have any ownership or other financial interest in, or in any way assist (as an employee, agent, consultant, investor, partner, shareholder or otherwise) any Person to engage in, a Competing Business anywhere in North America; (B) attempt to induce or encourage others to induce any employee of or consultant to Purchaser, or (as to

44

employees of Seller) any person who becomes an employee of or consultant to Purchaser to (x) terminate such person's employment with Purchaser (in the case of an employee), or cease  providing services to Purchaser (in the case of a consultant), (y) engage in any of the activities prohibited to Seller under clause (A) above; (C) hire or encourage any Person to hire any employee of Purchaser or any person who was a employee of Purchaser during the one (1) year preceding the date of proposed hire; or (D) divert, solicit or attempt to divert, or assist or encourage any Person in diverting, soliciting or attempting to divert, to or for any Competing Business, any customer or supplier of Purchaser; provided, however, that this provision shall not prohibit Seller from (I) acquiring, solely as an investment, securities of any Person listed on a national securities exchange or regularly traded in the over-the-counter market if Seller does not own, collectively, one (1%) or more of any class of securities of such Person or (II) operating the Kittery Outlet in accordance with Section 7.12 below.  Nothing in this Section 7.7 shall impair any broader or more extensive covenant under any employment, consulting or confidentiality or non-competition agreement between Seller and Purchaser.  For purposes of this Section 7.7, "Competing Business" shall include any business that manufactures and sells products or related products that are functionally similar to those manufactured and sold by Seller prior to the Closing.  For purposes of this Section 7.7, all references to Purchaser shall be deemed to include any and all Affiliates of Purchaser.

(b)      Seller agrees and acknowledges that the duration and scope of the covenant not to compete, the non-solicitation/no-hire, and other provisions described in this Section 7.7 are fair, reasonable and necessary in order to protect the legitimate interests of Purchaser, and that adequate consideration has been received by Seller for such obligations.  If, however, for any reason any court determines that the restrictions in this Section 7.7 are not reasonable or that such consideration is inadequate, such restrictions shall be interpreted, modified or rewritten to include as much of the duration, scope and geographic area identified in this Section 7.7 as will render such restrictions valid and enforceable.

(c)      Seller acknowledges that any breach of the provisions contained in this Section 7.7 will result in serious and irreparable injury to Purchaser.  Therefore, Seller acknowledges and agrees that in the event of a breach by Seller, Purchaser shall be entitled, in addition to any other remedy at Law or in equity to which Purchaser may be entitled, to equitable relief against Seller, including, without limitation, an injunction to restrain Seller from such breach and to compel compliance with the obligations of Seller hereunder in protecting or enforcing Purchaser's rights and remedies, all without the posting of any bond.

7.8      Restricted Use of Confidential Information.

(a)      Non-Disclosure and Non-Use of Confidential Information.   Each Receiving Party acknowledges the confidential and proprietary nature of the Confidential Information of the Disclosing Party and agrees that such Confidential Information (i) will be kept confidential by the Receiving Party; (ii) will not be used for any reason or purpose other than to evaluate and consummate the transactions

contemplated by this Agreement; and (iii) without limiting the foregoing, will not be disclosed by the Receiving Party to any Person, except in each case as otherwise expressly permitted by the terms of this Agreement or with the prior written consent of an authorized representative of the Disclosing Party.  Each of Purchaser and Seller will disclose the Confidential Information of the other party only to its Representatives and equity investors and Affiliates of such equity investors who, in each case, require such material for the purpose of evaluating the transactions contemplated by this Agreement and are informed by Purchaser or Seller, as the case may be, of the obligations of this Section 7.8 with respect to such information.  Each of Purchaser and Seller will (x) enforce the terms of this Section 7.8 as to its respective Representatives; (y) take such action to the extent necessary to cause its Representatives to comply with the terms and conditions of this Section 7.8; and (z) be responsible and liable for any breach of the provisions of this Section 7.8 by it or its Representatives.

(b)     Unless and until this Agreement is terminated, Seller and its Affiliates will maintain as confidential any Confidential Information of Seller relating to any of the Acquired Assets or Assumed Liabilities.  Notwithstanding the preceding sentence, Seller may use any Confidential Information of Seller before the Closing consistent with Seller's past practices.

(c)     From and after the Closing, the provisions of Section 7.8(a) will not apply to or restrict in any manner Purchaser's use of any Confidential Information of Seller that is, or relates to, an Acquired Asset or Assumed Liability.

(d)     Section 7.8(a) does not apply to that part of the Confidential Information of a Disclosing Party that a Receiving Party demonstrates (i) was, is or becomes generally available to the public other than as a result of a breach of this Section 7.8 or any applicable confidentiality agreement by the Receiving Party or its Representatives; (ii) was or is developed by the Receiving Party independently of and without reference to any Confidential Information of the Disclosing Party; or (iii) was, is or becomes available to the Receiving Party on a nonconfidential basis from a third party not bound by a confidentiality agreement or any legal, fiduciary or other obligation restricting disclosure.  Seller will not disclose any Confidential Information of Seller relating to any of the Acquired Assets or the Assumed Liabilities in reliance on the exceptions in clauses (ii) or (iii) above.

(e)     If a Receiving Party is required by Law to make any disclosure that is prohibited or otherwise constrained by this Section 7.8, that Receiving Party will provide the Disclosing Party with prompt notice of such compulsion or request so that it may seek an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this Section 7.8.  In the absence of a protective order or other remedy, the Receiving Party may disclose that portion (and only that portion) of the Confidential Information of the Disclosing Party that, based upon advice of the Receiving Party's counsel, the Receiving Party is legally compelled to disclose; provided, however, that the Receiving Party will use reasonable efforts to obtain reliable assurance that confidential treatment will be accorded by any Person to whom

46

any Confidential Information is so disclosed.  The provisions of this <u>Section 7.8(e)</u> do not apply to any legal proceedings between the parties to this Agreement.

7.9    <u>Announcement</u>.  Prior to the Closing, neither Seller nor Purchaser will issue any press release or otherwise make any public statement with respect to this Agreement and the transactions contemplated hereby without the prior consent of the other party (which consent may be withheld for any reason), except as may be required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof.  After the Closing, Purchaser may issue a press release or otherwise make a public statement to announce the Closing and the transactions contemplated by this Agreement.  Notwithstanding anything in this <u>Section 7.9</u> to the contrary, Seller and Purchaser will, to the extent practicable, consult with each other before issuing, and provide each other a reasonable prior opportunity to review and comment upon, any such press release or other public statements with respect to this Agreement and the transactions contemplated hereby, whether or not required by applicable Law.  No party will disclose the Preliminary Purchase Price, the Purchase Price or Closing Date Cash Consideration in any release or announcement except as may be required by applicable Law, by the Bankruptcy Court or as set forth in the Sale Motion, the Bidding Procedures Order, the Sale Order and any other pleading or document relating to the Sale Motion filed with the Bankruptcy Court.

7.10    <u>Review and Inspections</u>.  Seller will provide Purchaser and its agents, representatives and designees with reasonable access to the Seller's books, records, systems, system master data and transactional data and facilities and make appropriate employees, accountants, attorneys, advisors and customers available during normal business hours in order to permit Purchaser to complete its review of Seller in order to permit Purchaser to complete its review of Seller for purposes of facilitating the transfer to Purchaser of the Acquired Assets, and will promptly comply with any reasonable requests relating thereto made by or on behalf of Purchaser.   Seller acknowledges that Purchaser's review includes an assessment of and preparation for the efficient and orderly transition of the Business to Purchaser, at and after and subject to the Closing.  Without limiting the generality of the foregoing, at any time on or before the Closing Date, Purchaser, its agents, representatives and designees, shall be granted access by Seller to inspect the Atlanta Showroom and Seller's records relating thereto (including interviews with Seller and any Seller representatives) to evaluate the Atlanta Showroom for Hazardous Materials and compliance with Environmental Laws.  Purchaser shall be entitled to obtain and evaluate all environmental reports and studies related to the Atlanta Showroom that are in Seller's possession, necessary or advisable in Purchaser's sole discretion.  Notwithstanding any of the foregoing provisions of this <u>Section 7.10</u>, Purchaser shall not have the right to conduct any structural evaluation or invasive environmental investigation of any kind, including without limitation, in the form of soil and groundwater sampling, nor be entitled to any environmental reports or other similar information solely related to Excluded Assets.

7.11    <u>Transition Services</u>.  Purchaser and Seller acknowledge and agree that the present state of Seller's systems and data would impede the orderly transition of the Business to Purchaser or any other buyer of the Business, and thus would likely erode the value of the

4815-5486-2370.2

Business and the purchase price that a buyer would be willing to pay therefor. Accordingly, upon commencement of the Bankruptcy Case and through the Closing Date, Purchaser and its agents, representatives and designees shall be granted access by Seller to sales collateral, product designs, new product introductions and sales forecasting / inventory planning, Seller's SAP data in the form of downloaded reports, and employees who manage those functional disciplines and systems and maintain and understand the Business' master and transactional data, in order for Purchaser to develop for Seller a business transition plan and a systems and data cutover plan. Purchaser, at its sole cost and expense, will review all necessary data and programs to support interface and systems customization design and data mapping for conversion to a buyer's systems at a time of such buyer's choosing at or after Closing. Seller will provide Purchaser as available, and as permitted by applicable licenses, all interface design and mapping documentation and source code for, but not limited to, SAP / Dealer network interfaces, SAP / Consumer Web interfaces and any customizations within SAP that support specific business requirements. To the extent practicable, Seller will provide direct access to Seller's SAP system and database to Purchaser personnel for purposes of, but not limited to, creating requested reports of transactional and master data. Access will also allow Purchaser's personnel to gain understanding where possible of interface design and functionality, as well as SAP system configuration, to support Seller's business requirements. Purchaser acknowledges that it will not be given access to any information that is subject to protection under any privacy, red flags, or similar laws or regulations, agrees to immediately notify Seller if it gains access to any such information, and further agrees not to copy, download, or otherwise retain possession of any such information. Business, systems and data review and Purchaser's deliverables will include but not be limited to:

      (a)    Review formatting of Material Master, Inventory balances, Inbound Deliveries, Vendor Purchase Orders, Purchasing Info Records;

      (b)    Review and formatting of Vendor Master, Accounts Payable, Sales Orders Header and Detail, Customer Material Info Records, Pricing data and rules (i,e., list pricing, customer specific pricing, group pricing, other), Manufacturing BOMs, Duty BOM's, Assembly BOM's, Sales BOM's;

      (c)    Review and formatting Customer Masters to include SAP Sold to / Bill to / Ship to partners and Consumer Account Master from the Web / Magento Platform and related master data for the Dealer Network;

      (d)    Review of Web / Magento Platform interface structures (data maps, as available) to and from SAP to both Consumer Web-site and Dealer network to include as applicable but not limited to master data information (items, customers), inventory feeds, item availability, item pricing, and consumer and wholesale orders;

      (e)    Review and preparation for transfer of ownership of all Uniform Commercial Code (UCC) company numbers and outside item catalogue subscriptions;

      (f)    Defining all electronic data interchange (EDI) value added networks (VANs), AS2 file transfer or other communication portals effecting EDI with current trading partners and transactional mapping for each trading partner;