(g)    Formats and file structures for uploading or removing items and item related information to the Web consumer Site and the Dealer Network (i.e., "Product-export-blacked-out-updated R+B MMM YYYY Intros") and identification of all web collateral material;

(h)    Review of all Seller's active domains within systems landscape that will be transferred to Purchaser;

(i)    Identify and catalogue all sales, promotional and marketing materials, including, but not limited to, all catalogs and collateral materials and marketing data, image/copy/designs assets related to products, packaging and marketing material, including, but not limited to, technical drawings and design specifications as available, as well as all product development materials and files; and

(j)    Identify and catalogue all sourcing and item specifications as available for all SKUs currently in development and not activated in SAP.  Information as available to include, but not necessarily limited to, vendor, material(s), technical drawings, design specifications, tooling design if applicable, tooling vendor, ownership of tooling, photographs, unit, inner pack and case pack specifications, brand and category, and UPC assignment.

Nothing contained in the <u>Section 7.11</u> shall in any way limit Purchaser's obligations to Seller with regard to Seller's Confidential Information, nor shall be construed to convey any Business Books and Records, Purchased Intellectual Property, or other Acquired Assets prior to the Closing.  Seller shall have all right, title and interest in and to the aforementioned Purchaser deliverables until the Closing, at which time such deliverables shall be considered Acquired Assets, *provided however*, in the event that Purchaser does not acquire the Acquired Assets for any reason (including, without limitation due to a breach hereunder by Seller), (i) all Purchaser deliverables and other information, and data acquired or learned by Purchaser pursuant to this Section 7.11 shall remain the property of Seller or any successor or assign, (ii) may be transferred by Seller to, or otherwise used by any buyer of the assets of the Seller, and (iii) to the extent in the possession of Purchaser, all copies thereof shall be returned to Seller, or at Seller's election destroyed by Purchaser .

7.12    <u>No Use of Certain Names</u>.  Seller shall promptly, and in any event (a) within thirty (30) days after the Closing Date, revise print advertising, product labeling and all other information or other materials, including any internet or other electronic communications vehicles, to delete all references to the name "Reed & Barton" and all variations and derivatives thereof and all other logos or trademarks of Seller (collectively, the "<u>Names</u>") and (b) within thirty (30) days after the Closing Date, change signage and stationery and otherwise discontinue use of the Names; <u>provided</u>, <u>however</u>, that for a period of thirty (30) days after the Closing Date Seller shall have a limited royalty free license to continue to distribute product literature relating to its Kittery Outlet and distribute and sell Products out of the Kittery Outlet with labeling that uses any Name to the extent that such product literature and labeling exists on the Closing Date and such Products are located at the Kittery Outlet on the Closing Date.  In no event shall Seller use any Name after the Closing in any manner or for any purpose different from the use of such Name by Seller during the 90-day period preceding the Closing Date.  Within seven (7) days

after the Closing Date, Seller shall file applications to amend or terminate any certificate of incorporation, certificate of assumed name or d/b/a filings so as to eliminate their rights to use the Names.

ARTICLE 8

Employee Matters

8.1    <u>Employees</u>.

(a)    <u>Offer of Employment</u>. Purchaser will make offers of employment to certain of Seller's employees, in Purchaser's sole discretion. Any such employees who accept Purchaser's offers of employment are referred to herein as "<u>Hired Employees</u>". Nothing herein will require the continuation of any employment or any terms of employment after the Closing with respect to the Hired Employees. The employment of each Hired Employee will be effective as of the termination of such Hired Employee's employment with Seller (or such later date that an employee accepts such employment), it being understood that such Hired Employee will continue to be employed by Seller during the term of the Seller Services (as defined in the Transition Services Agreement) under the Transition Services Agreement for which such Hired Employee renders services, subject nevertheless, to Seller's right to terminate the employment of such Hired Employee for reasons consistent with Seller's past practices for the termination of employment of employees.

(b)    <u>Information</u>. Seller will upon reasonable request by Purchaser provide to Purchaser all relevant personnel information regarding each Hired Employee.

(c)    <u>No Third Party Beneficiary</u>. This <u>Section 8.1</u> is solely for the purpose of defining the obligations between Purchaser and Seller concerning the employees of Seller, and will in no way be construed as creating any employment contract or other contract between Purchaser and any employees of Seller. Nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any employees of Seller (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

8.2    <u>Employee Benefit Plans</u>. Purchaser will not be responsible for nor assume any obligations or Liabilities with respect to the Employee Benefit Plans including, but not limited to, any contributions, obligations or other Liabilities with respect to the Employee Benefit Plans or benefits due to employees, former employees, or retirees of Seller, the Business or their families, beneficiaries or dependents.

8.3    <u>COBRA</u>. Purchaser or the Purchaser Controlled Group shall be responsible for providing continuation coverage to the extent required by Section 4980B of the Code and Section 601 et seq. of ERISA ("<u>COBRA</u>") to any "M&A qualified beneficiary" as set forth and in accordance with Treas. Reg. Section 54.4980B-9, provided that in no event shall Purchaser or

the Purchaser Controlled Group have any such responsibility prior to Seller ceasing to offer any applicable group health plan coverage to any employee or former employee of Seller.  For purpose of clarification, Purchaser and Purchaser Controlled Group shall have no right of indemnification against Seller for the cost of any coverage described in the preceding sentence for which Purchaser or Purchaser Controlled Group is responsible.

8.4     Severance Benefits.  Purchaser shall not be responsible for any severance benefits and related payments and liabilities payable to employees who terminate employment with Seller.

8.5     Worker's Compensation and Occupational Disease Claims.  Purchaser will be responsible for the administration and payment of all worker's compensation and occupational disease claims made for injuries or illnesses to any Hired Employee for an injury that relates to facts or circumstances arising after such Hired Employee's date of hire by Purchaser.  Purchaser will not be responsible for any injury that relates to facts or circumstances existing on or prior to such date of hire, whether or not such claims are made after such date of hire, as may be required by Law and the Assumed Liabilities do not include any liability for any injury that relates to facts or circumstances existing on or prior to such date of hire.

8.6     WARN Act.  Notwithstanding anything contrary in this Agreement, Seller will terminate the employment of each Hired Employee at the conclusion of such employee's shift or scheduled hours on the last day that such Hired Employee is performing services for Seller in connection with the Transition Services Agreement.  If any notice is required under the Worker Adjustment Retraining Notification Act (the "WARN Act") or other applicable plant closure law, such notice will be the sole responsibility of Seller as to its employees.  Purchaser will not be liable for any and all obligations and Liabilities in respect of Seller's employees arising under any Law (including the WARN Act) or arising under any employee severance plan or agreement of Seller or its Affiliates including, any Liabilities imposed or incurred as a result of Seller's or Purchaser's failure to give any requisite notice under the WARN Act.

ARTICLE 9

Conditions to Closing

9.1     Conditions to the Obligations of Purchaser.  The obligation of Purchaser to effect the Closing is subject to the satisfaction (or waiver by Purchaser) on the Closing Date of the following conditions:

(a)     Representations and Warranties.  The representations and warranties of Seller contained herein will be true and correct in all material respects (unless the same are qualified by materiality, in which case they shall be true and correct in all respects), in each case as of the date of this Agreement and as of the Closing as if made as of the Closing, except that the representations and warranties that are made as of a specific date need be true and correct in all material respects only as of such date.  Purchaser will have received a certificate from Seller signed on behalf of Seller by an officer thereof with respect to the foregoing.

4815-5486-2370.2

(b)     <u>Covenants</u>.  The covenants and agreements of Seller to be performed on or prior to the Closing will have been duly performed in all material respects.  Purchaser will have received a certificate from Seller signed on behalf of Seller by an officer thereof with respect to the foregoing.

(c)     <u>Related Agreements</u>.  Seller will have duly executed and delivered to Purchaser the Related Agreements to which Seller is to be a party.

(d)     <u>Seller's Deliveries</u>.  Seller will have delivered or caused to be delivered to Purchaser the items listed in <u>Section 4.2(a)</u> in form and substance as required herein.

(e)     <u>No Injunction</u>.  There will not be in effect any injunction or other Order adopted or issued, or otherwise effective, since the date of this Agreement, which prohibits the consummation of the transactions contemplated by this Agreement.

(f)     <u>Certain Pending Litigation</u>.  There will not be pending any litigation brought by a Governmental or Regulatory Authority of competent jurisdiction seeking to prohibit or enjoin the sale or purchase of the Acquired Assets, the assignment of the Atlanta Showroom Lease pursuant to the Lease Assignment or the assumption of the Assumed Liabilities in accordance with this Agreement.

(g)     <u>Material Adverse Effect</u>.  There shall not have occurred or been discovered any developments, circumstances or occurrences with regard to any of the Acquired Assets, the Atlanta Showroom or the Business, which, individually or in the aggregate, would have or would reasonably be expected to have a Business Material Adverse Effect.

(h)     <u>Employee Obligations</u>.  Purchaser will have made satisfactory arrangements with the Hired Employees including the obtaining of releases related to the pre-Closing severance/retirement obligations of the Seller.

9.2     <u>Conditions to the Obligations of Seller</u>.  The obligation of Seller to effect the Closing is subject to the satisfaction (or waiver by Seller) on the Closing Date of the following conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained herein will be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing as if made as of the Closing, except that the representations and warranties that are made as of a specific date need be true and correct in all material respect only as of such date.  Seller will have received a certificate from Purchaser signed on behalf of Purchaser by an officer thereof with respect to the foregoing.

(b)     <u>Covenants</u>.  The covenants and agreements of Purchaser to be performed on or prior to the Closing will have been duly performed in all material respects.  Seller will have received a certificate from Purchaser signed on behalf of Purchaser by an officer thereof with respect to the foregoing.

(c)      Receipt of Purchase Price.  Seller will have received from Purchaser the Closing Date Cash Consideration and the Promissory Note as provided and in accordance with Section 3.1 of the Agreement.

(d)      Related Agreements.  Purchaser will have duly executed and delivered to Seller each of the Related Agreements to which Purchaser is a party.

(e)      Purchaser's Deliveries.  Purchaser will have delivered or caused to be delivered to Seller the items listed in Section 4.2(b).

(f)      No Injunction.  There will not be in effect any injunction or other Order adopted or issued, or otherwise effective, since the date of this Agreement, which prohibits the consummation of the transactions contemplated by this Agreement.

(g)      Certain Pending Litigation.  There will not be pending any litigation brought by a Governmental or Regulatory Authority of competent jurisdiction seeking to prohibit or enjoin the sale or purchase of the Acquired Assets, the assignment of the Atlanta Showroom Lease pursuant to the Lease Assignment or the assumption of the Assumed Liabilities in accordance with this Agreement.

9.3      Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of the parties to effect the Closing are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser or Seller in whole or in part to the extent permitted by applicable law):

(a)      there shall not be in effect any Order by a Governmental or Regulatory Authority restraining, enjoining or otherwise prohibiting the Closing; and

(b)      the Sale Order shall have been entered by the Bankruptcy Court and (i) is not subject to any stay, (ii) has not been vacated, reversed or modified in a material manner with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent, and (iii) either the time for an appeal of the Sale Order has expired or the Sale Order provides for a waiver of the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

ARTICLE 10

Termination

10.1      Termination.  This Agreement may be terminated at any time prior to the Closing Date:

(a)      by written agreement of Seller and Purchaser;

(b)      by either Seller or Purchaser, by written notice to the other, if the Closing will not have occurred on or prior to the Outside Closing Date (unless the failure to consummate the Closing by such date will be due to the failure of the party

seeking to terminate this Agreement to have fulfilled any of its obligations under this Agreement);

(c)     by either Seller or Purchaser, by written notice to the other, in the event that any Governmental or Regulatory Authority will have issued a final, non-appealable Order or ruling or taken any other final, non-appealable action, or adopted any applicable state, federal or foreign law, in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement;

(d)     By Seller, by written notice to Purchaser, (i) in the event that, through no fault of Seller, one or more of the conditions to Seller's obligation to effect the Closing is not satisfied prior to the Outside Closing Date or satisfaction of such condition is or becomes impossible at any time after the date hereof or (ii) if the Seller is not in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of Purchaser set forth in this Agreement that is not capable of being cured within 30 days, or if any representation, warranty, or covenant of the Seller shall have become untrue in either case, that the conditions set forth in Section 9 would not be satisfied on or prior to Outside Closing Date; or

(e)     By Purchaser, by written notice to Seller, (i) in the event that, through no fault of Purchaser, one or more of the conditions to the Purchaser's obligation to effect the Closing is not satisfied prior to the Outside Closing Date or satisfaction of such condition is or becomes impossible at any time after the date hereof or (ii) if the Purchaser is not in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of Seller set forth in this Agreement that is not capable of being cured within 30 days, or if any representation, warranty, or covenant of the Purchaser shall have become untrue in either case, that the conditions set forth in Section 9 would not be satisfied on or prior to Outside Closing Date.

(f)     By Purchaser, if the Sale Order is not entered within sixty (60) days from the date the Sale Motion is filed;

(g)     By Purchaser, if the Sale Order or Bidding Procedures Order has been vacated, reversed or modified in a material manner with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent; or

(h)     By either Seller or Purchaser, if the Bankruptcy Court shall enter an Order approving a Competing Bid and a transaction associated with that bid actually closes, subject to the provisions of the Bidding Procedures Order and the Sale Order.

10.2    Effect of Termination.  In the event of the termination of this Agreement in accordance with Section 10.1, this Agreement will thereafter become void and have no effect, and no party hereto will have any liability to the other party hereto or their respective Affiliates, directors, officers or employees, except for the obligations of the parties hereto contained in this Section 10.2, in Section 11.3, in Article 12 and in Section 7.6; provided, however, that if this

Agreement is terminated because of a breach of this Agreement by the non-terminating party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the non-terminating party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal and equitable remedies will survive such termination unimpaired; provided, further, that Seller shall immediately refund the Earnest Deposit to Purchaser on termination of this Agreement in all cases except in the event that Purchaser fails to close the transactions contemplated by this Agreement in breach of this Agreement, in which case the Earnest Deposit shall be retained by Seller.

ARTICLE 11

Bankruptcy Matters

11.1    Bankruptcy Case.  Seller shall file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on or before February 18, 2015, in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court").

11.2    The Sale Motion.

(a)    This Agreement is subject to approval by the Bankruptcy Court.

(b)    Following the filing of the Petition, this Agreement shall be submitted to the Bankruptcy Court pursuant to a properly-noticed Sale Motion, which Sale Motion shall include a request for a Sale Hearing to approve the Sale Order and the Closing. No later than February 27, 2015, Seller shall file with and seek the approval of the Bankruptcy Court of the Sale Motion, including a request for approval of the Break-Up Fee (defined below).

(c)    Seller will solicit further bids in accordance with bid procedures approved by the Bankruptcy Court (the relevant order referred to as the "Bidding Procedures Order") and reasonably acceptable to Purchaser (the "Bid Procedures").  In the event overbids are received as a result of such solicitation (each a "Competing Bid"), the determination of the party submitting the highest and best bid entitled to purchase the Acquired Assets shall be made through an auction conducted in accordance with the Bid Procedures (the "Auction").  Seller shall require each bidder to submit a good faith deposit equal to the amount of the Earnest Deposit upon submission of such bidder's bid in order to be determined, among the other requirements provided in the Bid Procedures to be a qualified bidder.

(d)    If an Auction does occur, Seller agrees that Purchaser shall be a qualified bidder at the Auction for all purposes, without the requirement of additional information, documents or an additional deposit from Purchaser.

(e)    Seller is permitted to cause its representatives and affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Acquired Assets.

55

In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Acquired Assets to prospective purchasers.

11.3    <u>Break-Up Fee</u>.

(a)    In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Purchaser shall be the "stalking horse bidder" and, in the event that Seller does not effect the Closing contemplated by this Agreement with Purchaser by reason of Seller's consummation of a Competing Bid, Purchaser shall be entitled to a break-up fee in an amount equal to Seven Hundred and Fifty Thousand Dollars ($750,000.00) (the "<u>Break-Up Fee</u>").

(b)    The Break-Up Fee shall be due and payable to Purchaser on the first Business Day following the date of the closing of a transaction that is the subject of a Competing Bid, and shall only be payable from the proceeds of such a transaction.   In addition, in the event the Auction occurs, on the first Business Day following the entry of a sale order by the Bankruptcy Court approving Seller's acceptance of a Competing Bid, Seller shall (1) refund the Earnest Deposit to Purchaser and (2) reimburse Purchaser for the Show Costs (but in no event more than $150,000).

(c)    Seller acknowledges and agrees that (a) the approval of the Break-Up Fee is an integral part of the transactions contemplated by this Agreement, (b) in the absence of Seller's obligation to pay the Break-Up Fee and its agreement to request such status, Purchaser would not have entered into this Agreement, (c) the entry of Purchaser into this Agreement is necessary for preservation of the estate of Seller and is beneficial to Seller and (d) the Break-Up Fee is reasonable in relation to Purchaser's efforts and to the magnitude of the Contemplated Transactions.

(d)    Each of the Sale Motion, Bidding Procedures Order, Sale Order, and any other filing related to this Agreement shall be in form and substance reasonably acceptable to Purchaser.

11.4    <u>Further Filings and Assurances</u>.

(a)    Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    In the event the entry of the Bidding Procedures Order or Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.  The Sale Order must be entered within sixty (60) days of

56

the filing of the Sale Motion, is subject to the conditions of Section 9.3(b), and must contain, among other provisions consistent with this Agreement and applicable law, decretal paragraphs granting relief fully consistent with Sections 11.6 and 11.7 of this Agreement.

11.5    Notice of Sale.    Notice of the sale of Acquired Assets contemplated in this Agreement shall be served in accordance with applicable U.S. bankruptcy law and the Bidding Procedures Order.

11.6    No Successor Liability.    Purchaser is not a "successor" to Seller or its estate by reason of any theory of law or equity, and Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of Seller and/or its estate, other than the Assumed Liabilities, with respect to the Business or otherwise, including, but not limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability except for the assumption of the Transferred Contracts and the Assumed Liabilities as expressly provided in this Agreement.  Except for, and solely to the specific and limited extent of, the assumption by Purchaser of the Transferred Contracts and Assumed Liabilities pursuant to this Agreement, neither the purchase of the Acquired Assets by Purchaser or any of its Affiliates nor the fact that the Purchaser or any of its Affiliates is using any of the Acquired Assets previously operated by Seller will cause Purchaser or any of its Affiliates to be deemed a successor in any respect to the Business or any liability derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Seller's liability under such law, rule or regulation or doctrine.  Without limiting the foregoing, Purchaser is not liable (i) as a successor, (ii) under this Agreement, or (iii) under any other basis for any liabilities or responsibility with respect to the any Employee Benefit Plan, including the Reed and Barton Corporation Retirement Plan, including without limitation, for any and all claims under any provision of ERISA, including Title IV of ERISA, including without limitation as a "successor employer" for purposes of the Internal Revenue Code or ERISA, or under any other statute, regulation or common law principle, whether such liability or claim arose prior to the Closing Date or arises on or after the Closing Date.

11.7    Free and Clear.    The transfer of the Acquired Assets shall vest Purchaser with all right, title, and interest of Seller in the Acquired Assets pursuant to section 363(f) of the Bankruptcy Code, free and clear of any and all Liens and other Interests, whether arising by statute or otherwise and whether arising before or after the commencement of the Bankruptcy Case, whether known or unknown, including, but not limited to, Interests of or asserted by any of the creditors, vendors, employees, suppliers, or lessors of Seller or any other third party.  Any and all such Liens and Interests shall attach to the proceeds of the Purchase Price, with the same priority, validity, force, and effect as they now have against the Acquired Assets.  Purchaser shall not be liable for any liability for any Lien or other Interests, including without limitation, statutory claims, that any of the foregoing parties or any other third party may have against Seller whatsoever, with respect to the operation of the Business prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part,

57

directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.

11.8    <u>Treatment of Pension Plan Matters</u>.  Without limiting the generality of the definition of Excluded Liabilities, Buyer shall not be responsible for the pension benefits accrued by employees of the Business.

11.9    <u>Treatment of Monetary Obligations</u>.  The transactions provided for herein are intended to constitute a transfer under a plan confirmed under Section 1129 of the Bankruptcy Code and, therefore, exempt from Transfer Tax.  To the extent the assertion of such exemption is denied, the obligation of Seller in respect of Transfer Taxes shall be entitled to administrative expense priority in the Bankruptcy Case.  In addition, all monetary obligations of the Seller to Purchaser specifically identified herein (including but not limited to the Break-Up Fee) shall be entitled to administrative expense priority in the Bankruptcy Case.

<u>ARTICLE 12</u>

<u>Miscellaneous</u>

12.1    <u>Governing Law and Jurisdiction</u>.  This Agreement will be governed by and be construed in accordance with the Laws of the State of New York, without regard however to the conflicts of laws principles thereof.  Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.2 hereto. To the extent not prohibited by applicable Law or court rule, each party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any claim (i) that it is not subject to the jurisdiction of the above-named court, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper or (v) that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each of the parties hereto hereby (a) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of the aforesaid court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the court referenced above; <u>provided</u>, that, a party may commence any action or proceeding in a court other than as set forth above solely for the purpose of enforcing an order or judgment issued by such court.  The parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the party and at the address set forth in <u>Section 12.2</u> of this Agreement, and service so made shall be complete as stated in such section.

4815-5486-2370.2

12.2    <u>Notices</u>.  All notices and other communications hereunder will be in writing and will be deemed to have been duly given when delivered in person, by telecopy, receipt confirmed, or on the next Business Day when sent by overnight courier or on the third Business Day after being sent when sent by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as will be specified by like notice):

(1)    If to Seller, to:

Reed and Barton Corporation
144 W. Britannia Street
Taunton, Massachusetts 02780
Attention:  President
Telecopy:  (508) 822-4013

and an additional copy (which will not constitute notice to Seller) to:

Holland & Knight, LLP
10 St. James Avenue, 11th Floor
Boston, Massachusetts 02116
Attention:  John J. Monaghan, Esq.
Telecopy:  (617) 523-6850

(2)    If to Purchaser to:

Francis I Acquisition Corp.
c/o Lifetime Brands, Inc.
1000 Stewart Avenue
Garden City, New York 11530
Attention:  Sara A. Shindel, Esq.
Telecopy:  (516) 450-0009

and an additional copy (which will not constitute notice to Purchaser) to:

Nixon Peabody LLP
50 Jericho Quadrangle
Jericho, New York 11753
Attention:  Allan H. Cohen
Telecopy:  (866) 947-2070

12.3    <u>Amendments and Waivers</u>.

(a)    This Agreement may be amended, superseded, canceled, renewed, or extended, and the terms hereof may be waived, only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party against whom the waiver is to be effective.  Neither the failure nor any delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power

or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable Law (i) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (ii) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

(b)     A failure or omission of any party to insist, in any instance, upon strict performance by another party of any term or provision of this Agreement or to exercise any of its rights hereunder will not be deemed a modification of any term or provision hereof or a waiver or relinquishment of the future performance of any such term or provision by such party, nor will such failure or omission constitute a waiver of the right of such party to insist upon future performance by another party of any such term or provision or any other term or provision of this Agreement.

12.4     <u>Entire Agreement</u>.  This Agreement, together with the Disclosure Schedules, all Exhibits and Schedules hereto and the documents, agreements, certificates and instruments referred to herein and therein, constitutes the entire agreement between the parties hereto and with respect to the subject matter hereof and supersedes all prior representations, warranties, agreements,  and understandings, oral or written, with respect to such matters and other than any written agreement of the parties that expressly provides that it is not superseded by this Agreement.

12.5     <u>Headings; Interpretation</u>.  The headings in this Agreement are intended solely for convenience of reference and will be given no effect in the construction or interpretation of this Agreement. Unless the context otherwise requires, the singular includes the plural, and the plural includes the singular.

12.6     <u>No Assignment; Binding Effect</u>.  This Agreement is not assignable by any party without the prior written consent of the other party.  Notwithstanding the foregoing, (a) Purchaser may assign this Agreement in whole or in part to any of its Affiliates but in no event will such an assignment release the Purchaser from its obligations hereunder, and (b) Purchaser may assign this Agreement to its lenders, and (c) Purchaser may assign this Agreement to any party acquiring all or substantially all of the assets of Purchaser, provided such assets include all or substantially all of the Acquired Assets.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12.7     <u>Invalidity</u>.  In the event that any provision of this Agreement is declared to be void or unenforceable, the remainder of this Agreement will not be affected thereby and will remain in full force and effect to the extent feasible in the absence of the void and unenforceable declaration. The parties furthermore agree to execute and deliver such amendatory contractual provisions to accomplish lawfully as nearly as possible the goals and purposes of the provision so held to be void or unenforceable.

12.8    <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

12.9    <u>Incorporation by Reference</u>.  The Disclosure Schedules and other Schedules and Exhibits and the documents referenced therein constitute integral parts of this Agreement and are hereby incorporated by reference herein.

12.10   <u>Time of the Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

12.11   <u>Specific Performance</u>.   The parties agree that irreparable damages would occur in the event any provision of this Agreement is not performed in accordance with the terms hereof and each of the parties will be entitled to specific performance of the terms hereof or injunctive relief, in addition to any other remedy at law or in equity that may be available under applicable Law.

12.12   <u>No Third Party Beneficiaries</u>.  The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors and permitted assigns, and it is not the intention of the parties hereto to confer third party beneficiary rights upon any other Person.

12.13   <u>Facsimile Signature</u>.   Any facsimile signature, including via portable document format (pdf) attached hereto will be deemed to be an original and will have the same force and effect as an original signature.

12.14   <u>Expenses</u>.    Whether or not the transactions contemplated hereby are consummated, each party hereto will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the Related Agreements and the transactions contemplated hereby and thereby provided.   In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.   Notwithstanding the foregoing, Seller agrees to pay all costs of releasing existing Liens and recording the releases and all Transfer Taxes arising by reason of the transactions contemplated by this Agreement to the extent the transaction contemplated herein is determined not to be exempt from such costs.

[Signature Page to Follow]

4815-5486-2370.2

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this Agreement to be duly executed and delivered as of the day and year first herein above written.

**SELLER:**

REED AND BARTON CORPORATION

By: _____
        Name: _____
        Title: _____

**PURCHASER:**

FRANCIS I ACQUISITION CORP.

By: _____
        Name: Laurence Winoker
        Title: Chief Financial Officer & Treasurer

**PARENT:**

LIFETIME BRANDS, INC.

By: _____
        Name: Laurence Winoker
        Title: Senior Vice President - Finance, Chief Financial Officer & Treasurer

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this Agreement to be duly executed and delivered as of the day and year first herein above written.

**SELLER:**

REED AND BARTON CORPORATION

By: _____
      Name: _Tim Riddle_____
      Title: _President & CEO_____

**PURCHASER:**

FRANCIS I ACQUISITION CORP.

By: _____
      Name: _____
      Title: _____

**PARENT:**

LIFETIME BRANDS, INC.

By: _____
      Name: _____
      Title: _____

## EXHIBITS

Exhibit A                      Assumption Agreement

Exhibit B                      General Assignment

Exhibit C                      [INTENTIONALLY OMITTED]

Exhibit D                      Transition Services Agreement

Exhibit E                      Universal Product Code Transfer Agreement

Exhibit F                      Promissory Note

Exhibit G-1                    Riddle Consulting Agreement

Exhibit G-2                    Daly Consulting Agreement

## SCHEDULES

Schedule 1-A                   Acquired Tangible Personal Property

Schedule 1-B                   Assumed Liabilities

Schedule 1-C                   Excluded Contracts

Schedule 1-D                   Certain Excluded Assets

Schedule 1-E                   [INTENTIONALLY OMITTED]

Schedule 1-F                   Receivables

Schedule 1-G                   Tangible Personal Property

Schedule 1-H                   Transferred Contracts

Schedule 1-I                   Excluded Payables

Schedule 3.2                   Working Capital Principles

Schedule 3.5                   Allocation of Consideration

Seller's Disclosure Schedules

# EXHIBIT A

## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT (the "Agreement"), made as of _____, 2015, by and between Reed and Barton Corporation (the "Assignor") and Francis I Acquisition Corp. (the "Assignee"), is being executed pursuant to a Asset Purchase Agreement dated as of _____, 2015, by and among the Assignor and the Assignee, et al. (the "Purchase Agreement").

FOR VALUE RECEIVED, Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee all of its right, title and interest in and to the Assumed Liabilities (as defined in the Purchase Agreement) and Assignee hereby accepts such assignment and hereby assumes and agrees to pay, perform and discharge when due the Assumed Liabilities.

1.      Assignee covenants and agrees with Assignor, its successors and permitted assigns, that Assignee will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered any and all such further acts, instruments, papers and documents, and will give such further assurances, as may be necessary, proper or convenient to carry out and effectuate the intent and purposes of this Assumption Agreement.

2.      This Assumption Agreement will inure to the benefit of the Assignor, its successors and assigns, and will bind Assignee and its successors and assigns.

3.      This Assumption Agreement will be governed in all respects, whether as to validity, construction, capacity, performance or otherwise, by the laws of the State of New York applicable to contracts made and to be performed within that state.

4.      If any term or provision of this Assumption Agreement will, to any extent or for any reason, be held to be invalid or unenforceable, the remainder of this Assumption Agreement will not be affected thereby and will be construed as if such invalid or unenforceable provision had never been contained herein or been applicable in such circumstances.

5.      This Agreement incorporates by reference all terms, conditions and limitations contained in the Purchase Agreement.

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this Assumption Agreement to be duly executed as of the day and year first herein above written.

**ASSIGNOR:**

REED AND BARTON CORPORATION


By: _____
       Print: _____
       Title: _____

**ASSIGNEE:**

FRANCIS I ACQUISITION CORP.

By: _____
       Name: _____
       Title: _____

2

**EXHIBIT B**

**GENERAL ASSIGNMENT**

KNOW ALL MEN BY THESE PRESENTS, That:

WHEREAS, Reed and Barton Corporation ("Seller"), Francis I Acquisition Corp. ("Purchaser") and others, have entered into a Asset Purchase Agreement dated as of _____ ____, 2015 (the "Purchase Agreement") whereby Seller has agreed to sell, assign and transfer to Purchaser certain  Acquired Assets (as defined in the Purchase Agreement) in accordance with the terms and provisions of the Purchase Agreement (capitalized terms not otherwise defined herein will have the meanings ascribed thereto in the Purchase Agreement).

NOW THEREFORE, in consideration of the mutual premises contained herein and in the Purchase Agreement, the receipt and adequacy of which are hereby acknowledged, Seller hereby agrees as follows:

1.      Seller, pursuant to the terms and conditions of the Purchase Agreement, hereby sells, assigns, transfers, conveys, sets over, and delivers to Purchaser to have and to hold forever, all of Seller's right, title, and interest in the Acquired Assets, as, at, and from the Effective Time.

2.      Seller covenants and agrees with Purchaser and its successors and assigns that Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered any and all such further acts, instruments, papers and documents, and will give such further assurances, as may be necessary, proper or convenient to carry out and effectuate the intent and purposes of this General Assignment.

3.      This General Assignment will inure to the benefit of Purchaser, its successors and permitted assigns, and will bind Seller and its successors and permitted assigns.

4.      This General Assignment will be governed in all respects, whether as to validity, construction, capacity, performance or otherwise, by the laws of the State of New York applicable to contracts made and to be performed within that state.

5.      If any term or provision of this General Assignment will, to any extent or for any reason, be held to be invalid or unenforceable, the remainder of this General Assignment will not be affected thereby and will be construed as if such invalid or unenforceable provision had never been contained herein or been applicable in such circumstances.

6.      This General Assignment incorporates by reference all terms, conditions and limitations contained in the Purchase Agreement.

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this General Assignment to be duly executed as of the day and year first herein above written.

**SELLER:**

REED AND BARTON CORPORATION


By: _____
      Print: _____
      Title: _____

4841-1679-4402.4

**EXHIBIT C**

**INTENTIONALLY OMITTED**

**EXHIBIT D**

**TRANSITION SERVICES AGREEMENT**

ATTACHED

4841-1679-4402.4

**TRANSITION SERVICES AGREEMENT**

This TRANSITION SERVICES AGREEMENT (including the Annexes hereto, this "<u>Agreement</u>") is made as of _____ __, 2015, by and among REED AND BARTON CORPORATION, a Massachusetts corporation ("<u>Seller</u>"), and FRANCIS I ACQUISITION CORP., a Delaware corporation (together with any affiliate used in the Acquisition, as defined below, "<u>Purchaser</u>").

**WHEREAS**, Purchaser, Seller and Lifetime Brands, Inc. are parties to that certain Asset Purchase Agreement dated as of February __, 2015 (the "<u>Purchase Agreement</u>"), pursuant to which, among other things, Purchaser has agreed to purchase the Acquired Assets (as defined in the Purchase Agreement) from Seller (the "<u>Acquisition</u>"), subject to the terms and conditions of the Purchase Agreement;

**WHEREAS**, Seller filed a voluntary petition for relief, thereby commencing a case, under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Case</u>") on February ___, 2015 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the District of Massachusetts (the "<u>Bankruptcy Court</u>");

**WHEREAS**, in order to preserve the continuity of the Business (as defined in the Purchase Agreement) following the Acquisition, Purchaser desires to receive, and Seller, to the extent it is able to do so (it being understood that as a result of the filing of the Bankruptcy Case, and other factors, current employees of the Seller may voluntarily terminate their employment with the Seller, leaving it unable to provide some or all of the services contemplated hereby), is willing to provide certain warehousing, product distribution, administrative, information technology, and finance services and to assist Purchaser with developing the capacity to provide such services on its own behalf, in each case as set forth herein upon the terms and provisions and subject to the conditions hereof;

**WHEREAS,** from and after the consummation of the Closing, Seller will have no ability to fund any operations and, but for the desire of Purchaser to receive the services described herein, Seller would have terminated its employees and ceased operations of all kinds as of the Closing; and

**WHEREAS**, in order to induce Seller after the Closing to retain certain of its employees, continue to maintain the operation of certain of its facilities, and to provide the services described herein, Purchaser is willing to bear all reasonable, documented costs and expenses of Seller associated with the foregoing.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual covenants and provisions set forth herein, and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1

Section 1.   <u>General Understanding and Intent of the Parties</u>.  The parties acknowledge and agree that (i) the commencement of the Bankruptcy Case, as well as other factors, may result (or may have resulted) in voluntary termination of employment by employees of the Seller (some of whom prior to the date hereof have already terminated or provided notice of their termination of employment), and an inability of Seller to provide some or many of the Seller Services, (ii) some  of the departed employees may have been critical to the provision, or level of provision of certain of the Seller Services and that it would be difficult, if not impossible, for Seller to replace those departed individuals or any other departed employees, especially given the short-term nature of any such employment during the Seller Service Period, and (iii) given the foregoing constraints Seller shall not be liable in any way to Purchaser for Seller's inability to provide any Seller Services, any component thereof, or any particular level thereof.   Without limiting the generality of the foregoing, the provisions of this <u>Section 1</u> shall supersede and have precedence over any specific requirements for the delivery of any Seller Services, any components thereof, the provision of reports, taking of any actions, making of any filings, or the doing of any things purportedly required by this Agreement.

Section 2.   <u>Services to be Provided by Seller</u>.

(a)   Purchaser hereby engages Seller as an independent contractor to provide to Purchaser during the Seller Service Period, <u>but subject in all events to the provisions of Section 1 above</u>, the following services to operate the Business on behalf of Purchaser, consistent with the Seller's undertaking of such services prior to the Closing (the "<u>Seller Services</u>"): (i) general accounting, payroll and accounts payable services, (ii) cash applications, chargebacks and credit/collection services, (iii) demand forecasting and planning services, (iv) distribution and warehousing services, (v) web services and brand management, (vi) information technology services, (vii) customer service and order management, (viii) sales and sales promotion services, (ix) design and product development services and material master, and (x) overseas sourcing services; *provided, however*, that Purchaser may from time to time provide six (6) business days' prior written notice to Seller either (A) terminating any one or more of the Seller Services, or (B) reducing the scope of services under a particular Seller Service, in which case Seller shall use its commercially reasonable efforts to align the number and skill level of personnel providing such Seller Service with such Seller Service's reduced scope.  Once Purchaser has terminated any one of the Seller Services in accordance with the foregoing, Seller shall have no obligation to provide such terminated Seller Services at any time thereafter absent Seller's prior written consent (which may be given or withheld in Seller's sole and absolute discretion) to reinstate such terminated Seller Service.  Subject to the foregoing, the initial Seller Services shall have been determined by Purchaser no later than three (3) business days prior to the date hereof.

(b)   <u>Subject in all events to the provisions of Section 1 above</u>, during the Seller Service Period, Seller shall use its commercially reasonable efforts to effect, at Purchaser's cost and expense, a transition of each of the Seller Services to Purchaser and Seller shall provide such reasonable assistance and instruction as may be necessary or reasonably desirable to assist Purchaser in developing the capacity to

2

perform the Seller Services on its own behalf as soon as is reasonably practicable. In connection therewith, Seller will provide to Purchaser reasonable access to the information systems containing the data related to the Business, subject to any applicable license restrictions, in order to permit Purchaser to begin as soon as practicable to migrate such Business-related data to Purchaser's information systems. Seller shall be entitled to reimbursement for reasonable and customary out-of-pocket expenses incurred in connection with this Agreement; provided, however, that (A) no expense or expenditure of any kind arising or incurred prior to the Petition Date shall be reimbursable under this Agreement (all such matters being governed by the Purchase Agreement), and (B) no single out-of-pocket expense or series of related expenditures in excess of $5,000 shall be reimbursable under this Agreement if incurred or made without Purchaser's prior express written approval <u>other than</u> payments to third party providers under any outsourcing, contracting out or other similar arrangement under which a third party provides any service following the Closing Date that either (x) it provided to Seller prior to the filing of the Bankruptcy Case, or (y) if provided by Seller would constitute, or is necessary to, the provision of any Seller Service to the Business, which service arrangement described in clause (y) has been approved in writing by Purchaser in advance of the provision of such service following the Closing Date.

(c)     The term "<u>out-of-pocket expenses</u>" shall mean the actual amounts paid to a third-party provider of Seller Services other than Seller or any of its affiliates, including any outsourcing, contracting out or other similar arrangement for a third-party to provide any or all of the Seller Services which have been approved by Purchaser (or did not require approval) in accordance with clause (b) above. By way of example, and not for limitation, actual travel expenses paid to an airline, hotel or rental car company of the type customarily reimbursed to an employee of Seller in the normal course of his or her employment may be deemed "out-of-pocket expenses" if incurred in connection with performing any Seller Services.

(d)     The "<u>Seller Service Period</u>" shall commence on the Closing Date and terminate on the earliest of: (i) the ninetieth (90th) day after the Closing Date, (ii) six (6) business days after Purchaser provides written notice to Seller that Purchaser desires to terminate all Seller Services then being provided, (iii) upon termination by Seller pursuant to Section 3(b) below.

(e)     <u>Subject in all events to the provisions of Section 1 above</u>, Seller shall use its commercially reasonable efforts to maintain the employees providing the Seller Services in the employ of Seller and to notify Purchaser of any such employee who terminates his or her employment with Seller. In the event Purchaser determines, in its discretion, that, as a result of one or more employee terminations, a Seller Service is no longer substantially equivalent to the services Seller performed in connection with the Business before the date hereof, Seller shall, after consultation with Purchaser, use commercially reasonable efforts to attempt to engage temporary employees, until such Seller Service is fully transitioned to Purchaser. Purchaser agrees to bear the reasonable, documented cost of so engaging temporary employees.

(f)     Seller shall not: (i) violate any software license agreements required in connection with the delivery of the Seller Services, (ii) take any action that

3

would void warranties of Purchaser equipment, hardware or software; (iii) use any Purchaser or third party software in a manner not authorized or (iv) modify, enhance, create derivative works of, reverse engineer or otherwise attempt to derive the source code of any Purchaser or third party software, unless explicitly authorized to do so.

(g)    During the Seller Services Period, Seller, at Purchaser's sole cost and expense, shall maintain in force and shall not terminate, allow to expire, breach, violate the terms of, or default under, any of the Contracts set forth on Annex A to this Agreement.

(h)    Seller shall provide the Seller Services in a manner that complies with the requirements of all applicable federal, state and local laws, ordinances, regulations and codes.

Section 3.    Consideration.

(a)    Purchaser acknowledges and agrees that Seller has no ability to fund any operations and that in consideration of the Seller's providing the Seller Services, Purchaser shall bear all costs associated with the Seller's providing of the Seller Services and operation of the Business during the Seller Service Period. Without limiting the generality of the foregoing, during the Seller Service Period, Purchaser shall pay to Seller an amount equal to the fully-burdened cost of providing the Seller Services and otherwise conducting business operations from its Taunton, MA facilities (including, without limitation, all salary, benefits (including, without limitation, vacation time that accrues during the term of this Agreement), insurance, "stay-put" incentives (which Seller has advised shall be equal to one (1) week's salary for each four (4) weeks of Seller Services provided by such Seller employee providing the Seller Services, up to a maximum of two (2) weeks' salary for any such Seller employee, which stay-put incentive shall accrue (and shall therefore be payable by Purchaser) at the commencement of each four (4) week period (even though not payable to the employee until the end of his or her employment)), utilities and other overhead costs, all contractual costs, and any and all other costs associated with operation of the Business, providing the Seller Services, or otherwise conducting business from the Taunton, MA facilities) (the "Service Consideration"), payable as provided in the next succeeding paragraph. Set forth in Annex B hereto is the estimated Service Consideration for the initial three (3) weeks of the Seller Service Period, such amount being [$_____]. The amount of Service Consideration shall include, without limitation, any "stay-put" incentives to be paid to any Seller employee providing the Seller Services.

(b)    The estimated Service Consideration for the first three (3) weeks shall be paid on the Closing Date and will be reconciled as soon as practicable after the expiration of such three (3) weeks based upon Purchaser's receipt from Seller of the invoices for such components. In the event that, during the first three (3) weeks of the Seller Service Period, any Seller Service is continued but reduced in cost due to the reduction of staff related to such Seller Services, Seller will in good faith determine the credit due Purchaser and such credit shall be applied to the first Seller Services payment after the first three (3) weeks. In addition, prior to the expiration of the first week, the amount estimated to be due for Seller Services for the ensuing three (3) weeks shall be re-

4

estimated by Seller on a weekly basis (taking into consideration additional reductions in personnel and reductions in scope of services, and any credit due Purchaser pursuant to the preceding sentence) and paid by Purchaser to Seller in advance.  In the event that Purchaser fails to pay such amount to Seller within two (2) business days of its being invoiced for such amount, Seller shall have the right to terminate this Agreement upon written notice to Purchaser, which notice shall state the effective date of such termination, it being specifically agreed that Purchaser shall remain liable for all Service Consideration through the date of such termination.  The parties acknowledge and agree that the intent of the foregoing provision is to ensure that there is never less than two (2) week's pre-paid estimated Service Consideration being held by Seller.  After the initial three (3) weeks, all Service Consideration will be reconciled weekly as soon as practicable after the expiration of such week based upon Purchaser's receipt from Seller of the invoices for such components.  Seller shall have no obligation to provide services in addition to the Seller Services during the Seller Service Period.  Purchaser shall remain liable for any out-of-pocket expenses, subject to the approval limitations contained in the proviso set forth in Section 2(b), in each case, without duplication with the fixed costs impounded into the consideration amount above.

(c)     Notwithstanding anything in this Agreement to the contrary, in no event shall Purchaser have any financial responsibility for any direct costs or expenses of Seller that are related to any business endeavors of Seller other than Seller Services.

Section 4.     <u>Term of Agreement</u>.  The term of the provision of Seller Services under this Agreement shall commence on the Closing Date and shall continue until the end of the Seller Service Period.  Upon termination of this Agreement, all rights and obligations of each party hereunder, other than as to any payments due hereunder (and a final reconciliation thereof) and any breach occurring before the end of the Seller Service Period, shall cease as of the effective date of such termination, and any amounts owed by any party hereunder shall promptly be paid in full.  Upon the termination of this Agreement, at Purchaser's sole cost and expense, Seller shall make available, and Purchaser shall remove, within three (3) business days, all Acquired Assets (and other property belonging to Purchaser) then remaining at the Taunton, MA facilities.

Section 5.     <u>Confidentiality Obligations.</u>  The parties hereto acknowledge and agree that the information provided to them and their representatives in connection with this Agreement is subject to, and the parties shall, and shall cause their representatives to, fully comply with, their obligations under Section 7.8 of the Purchase Agreement.

Section 6.     <u>Seller Employees Providing the Seller Services</u>.  Seller and Purchaser agree that Seller shall perform the Seller Services as an independent contractor, retaining control over and responsibility for Seller's own operations and employees.  Purchaser shall not be responsible for payment of the wages, salaries, benefits and associated payments (including, without limitation, any health, workers' compensation insurance premiums, vacations, sick pay, holiday pay, severance and employee welfare benefit plan contributions) ("<u>Base Compensation</u>") to Seller's employees, including the Seller Employees providing the Seller Services, and  any "stay-put" incentives to any

5

Seller Employees providing the Seller Services in addition to Base Compensation. Purchaser shall not be responsible for payment of federal, state and local taxes or contributions imposed or required under unemployment insurance, social security and income tax laws with respect to such persons and their respective Base Compensation. Neither Purchaser nor any of its employees or other persons under its direction or control shall supervise, give directions to, or otherwise regulate the operations of, Seller or its employees.   Seller shall make all decisions concerning wages and salary, hiring, discipline, termination or other employment actions with respect to Seller's employees and nothing in this Agreement is intended, nor shall be interpreted, to make Purchaser an employer of Seller's employees.   Notwithstanding the foregoing, Purchaser acknowledges and agrees that the Service Compensation hereunder includes, and is intended to include, reimbursement of Seller in full by Purchaser for all Base Compensation and all other amounts described in this Section 6.

Section 7.   <u>Assignment</u>.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.   No party hereto may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other party hereto; <u>provided</u>, <u>however</u>, that Purchaser may assign its rights, interests and/or obligations hereunder to any of its affiliates without the prior written approval of the other party hereto.

Section 8.   <u>Indemnification; Limitations; No Liability</u>.

(a)   Purchaser shall hold Seller and its affiliates, shareholders, directors, officers, employees and independent contractors (each, a "<u>Seller Indemnitee</u>") harmless from, and indemnify each Seller Indemnitee for, any Damages, as defined in the Purchase Agreement, arising out of, or related in any way to, (i) the operations of the Business during the Seller Service Period or (ii) such Seller Indemnitee's reliance on or in conformity with any instruction, direction or other guidance received from Purchaser or its affiliates, other than any such Damages arising from the gross negligence or willful misconduct of any Seller Indemnitee.

(b)   All claims under this Section 8 or otherwise under this Agreement shall be limited at law or equity to direct damages only and in no event shall a Seller Indemnitee or Purchaser Indemnitee be liable for any lost profits, or any indirect, incidental, punitive, exemplary or consequential damages.

(c)   Notwithstanding any provision of this Agreement to the contrary, in no event shall Seller be responsible for:  (i) the loss of any customers, vendors, or other business associates of Purchaser resulting from any cause or reason, including without limitation as a result of Purchaser's failure or delay in providing any notice, approval, consent, instruction or direction hereunder or pursuant to the Seller Services, or (ii) the profitability of the Business or the Seller Services.

Section 9.   <u>No Variance from Past Practice</u>.   Notwithstanding any provision of this Agreement to the contrary, in no event shall Seller be required or obligated to provide any service or report, take any action, make any filing, or do

anything, whether at the request or direction of Purchaser or otherwise, that vary in any way from Seller's past practice in connection with the operation of the Business immediately preceding the Closing Date except as may be required by reason of or in connection with the Bankruptcy Case.  Without limiting the generality of the foregoing, the provisions of this Section 9 shall supersede and have precedence over any specific requirements for the delivery of services, provision of reports, taking of any actions, making of any filings, or the doing of any things purportedly required by this Agreement.

Section 10.   Insurance.

(a)   Seller shall obtain and maintain insurance for the following risks in such amounts under such policies as is customary in Seller's industry: general liability in an amount not less than One Million Dollars ($1,000,000.00) per occurrence, with excess coverage in an amount not less than Five Million Dollars ($5,000,000.00) to cover claims in the aggregate; inventory; property; and workers' compensation (including employers' liability coverage in an amount not less than One Million Dollars ($1,000,000) in an amount not less than that required by applicable statute), *provided however*, Purchaser shall reimburse Seller for the post-Closing costs of any of the foregoing.

(b)   Certificates of insurance for such coverage shall be provided by Seller to Purchaser, naming Lifetime Brands, Inc., and its affiliates, shareholders, directors, officers, employees and independent contractors as additional insureds as respects such coverage prior to the date hereof.  Seller shall use commercially reasonable efforts (which shall not include a requirement to pay any money) to ensure the policies shall each contain a covenant by the company issuing the insurance that the policies shall not be materially amended or canceled by the issuing company unless a 30-day written notice first be given to Purchaser, and such covenant shall be reflected on the certificates of insurance.  Copies of the insurance policies referred to above shall be provided to Purchaser upon request therefor.

Section 11.   Force Majeure.   Each party will be excused from performance of any of its obligations to the other under this Agreement, where such non-performance is occasioned by any event beyond the non-performing party's control which shall include, without limitation, any order, rule, or regulation of any Federal, State, or local government body, agent, or instrumentality; work stoppage; natural disaster; terrorist act or threatened act of terrorism; or civil disorder; provided, however, that the party excused hereunder shall use commercially reasonable efforts to minimize its non-performance and to overcome, remedy, or remove such event in the shortest practical time, but all at Purchaser's cost.

Section 12.   Miscellaneous.

(a)   Amendment and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by duly authorized representatives of each of the parties hereto.  No waiver by any party hereto of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default,

7

misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No course of dealing or failure of any party hereto to strictly enforce any term, right or condition of this Agreement shall be construed as a waiver of such term, right or condition.

(b)     Notices.   All notices, requests, claims, demands or other communications that are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been duly given: (a) when delivered, if delivered by hand to the person identified below; (b) one business day after transmitted, if transmitted by a nationally-recognized overnight courier service; or (c) three business days after mailing, if mailed by registered or certified mail (return receipt requested), in each case to the parties at the following (or at such other address for a party as shall be specified by like notice):

(i)     if to Seller, to:

144 W. Britannia Street
Taunton, Massachusetts 02780
Attention:  Charles Daly, Treasurer

with an additional copy to:

Holland & Knight, LLP
10 St. James Avenue, 11th Floor
Boston, Massachusetts 02116
Attention:  John J. Monaghan, Esq.

(ii)     if to Purchaser:

Lifetime Brands, Inc.
1000 Stewart Avenue
Garden City, New York 11530-4814
Attn: Ronald Shiftan, Vice Chairman

with a copy to:

Sara Shindel
General Counsel
Lifetime Brands, Inc.
1000 Stewart Avenue
Garden City, New York 11530-4814

(c)     Counterparts; Facsimile Signatures.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.   Any facsimile signature, including via portable document format (pdf) will be deemed to be an original and will have the same force and effect as an original signature.

8

(d)    <u>Headings</u>.  The headings and numbering of sections in this Agreement are for convenience only and shall not be construed to define or limit any of the terms or provisions of this Agreement or affect the scope, meaning, or interpretation of this Agreement or the particular sections to which they relate.

(e)    <u>Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto, associated parties specifically referenced herein, and their respective successors and permitted assigns.  For the avoidance of doubt, nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any employees of Seller (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

(f)    <u>Bankruptcy Matters</u>.   This Agreement is subject to the approval of, and to be binding must be approved by, the Bankruptcy Court in connection with approval of the Purchase Agreement.  Nothing in this Agreement shall constitute the assumption by Purchaser of any claim, lien, liability, lease or executory contract of Seller of any kind arising before the Petition Date, and is not meant to supplement, modify or alter in any way the provisions of the Purchase Agreement and the Sale Order (as defined in the Purchase Agreement) governing such matters.

(g)    <u>Entire Agreement</u>.   The Purchase Agreement, and this Agreement (including the other Related Agreements and the other documents referred to therein and herein) constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede any prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent they related in any way to the subject matter hereof.

(h)    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(i)    <u>Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including, without limitation.  Capitalized terms used and not otherwise defined herein shall have the meaning ascribed thereto in the Purchase Agreement.

(j)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving

effect to any choice or conflict of Law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

(k)    <u>Relationship of Parties</u>.  Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, trust or other association of any kind, each party hereto being individually responsible only for its obligations as set forth in this Agreement.

(l)    <u>Incorporation of Annexes</u>.  The Annexes identified in this Agreement are incorporated herein by reference and made a part hereof.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date and year first set forth above.

**REED AND BARTON CORPORATION**

By _____
     Name:
     Title:

**FRANCIS I ACQUISITION CORP.**

By _____
     Name:
     Title:

4812-9704-3234.2

## ANNEX A

## TRANSITION SERVICES AGREEMENT

## MAINTAINED CONTRACTS

4812-9704-3234.2

## ANNEX B

## ESTIMATED 3 WEEK SERVICE CONSIDERATION

**EXHIBIT E**

**<u>UNIVERSAL PRODUCT CODE TRANSFER AGREEMENT</u>**

ATTACHED

4841-1679-4402.4

## UNIVERSAL PRODUCT CODE TRANSFER AGREEMENT

This Universal Product Code Transfer Agreement is entered into as of _____ __, 20__ by and between REED AND BARTON CORPORATION, a Massachusetts corporation (hereinafter referred as "Assignor"), and FRANCIS I ACQUISITION CORP., a Delaware corporation (hereinafter referred to as "Assignee").

Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of _____ __, 20__ (the "Purchase Agreement"), pursuant to which Assignor has agreed to transfer to Assignee the Universal Product Codes referred to herein.

For good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.    Transfer of Codes.  Assignor hereby sells, assigns, transfers and conveys to Assignee its entire interest, to the extent such interest is transferable, in the 12-digit Universal Product Code ("UPC") for each of the Products, including without limitation the products listed on Schedule A hereto, whether or not the product covered by such UPC is currently in production or inventory (the UPCs pertaining to the Products, including without limitation those set out alongside the Products on Schedule A, collectively, the "Codes").  Assignor has used its best efforts to assure that the Products include each item of flatware, seasonal giftware, baby giftware, wood storage, crystal, and holloware (including silver plate, alternative metals and sterling) covered by the Purchased Intellectual Property, as defined in the Purchase Agreement, for which Assignor has ever created or acquired a UPC, and Assignor hereby represents and warrants as to the completeness of such list.

2.    Restriction on Use of Codes.

(a)    Assignor shall not at any time hereafter or for any purpose use any of the Codes transferred to Assignee hereunder.

(b)    Assignee shall not hereafter use the initial six digits included in the Codes as the initial six digits in any UPC created by it hereafter.

3.    Miscellaneous Provisions.

(a)    Definitions.  All capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement.

(b)    Amendment.  This Agreement may not be modified, amended, altered or supplemented, except by a written agreement executed by each of the parties hereto.

(c)    Binding Effect, No Assignment, etc.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor any right, interest or obligation hereunder may be assigned by either party hereto without the prior written consent of the other party, and any attempt to do so shall be void and of no force and effect.

1

(d)    <u>Notices</u>.  Any and all notices and other communications hereunder shall be in writing and shall be delivered to the parties at the addresses and in the manner set forth in the Purchase Agreement.

(e)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in that state, without regard to any of its principles of conflicts of laws or other laws that would result in the application of the laws of another jurisdiction.

(f)    <u>Cooperation</u>.  The parties will use good faith efforts to cooperate with each other in all matters reasonably necessary to the provision and receipt of the grant set forth herein.  Such cooperation shall include exchanging information and using reasonable efforts to obtain all third party consents, licenses, sublicenses or approvals necessary to permit each party to perform its obligations hereunder.

(g)    <u>Severability</u>.  The provisions of this Agreement (including the schedules hereto) shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement or any appendices hereto, or the application thereof to any person or entity or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other persons, entities or circumstances shall not be affected by such invalidity or unenforceability.

(h)    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and may be executed by delivery of a signed signature page hereto and a photostatic or facsimile copy of a signed signature page to or counterpart of this Agreement shall be given the same effect as the original.

[Signatures appear on the following page.]

2

4849-0950-5824.4

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

ASSIGNOR**:**

REED AND BARTON CORPORATION

By _____
    Name:
    Title:

ASSIGNEE:

FRANCIS I ACQUISITION CORP.

By _____
    Name:
    Title:

3

## SCHEDULE A

## LIST OF PRODUCTS AND CORRESPONDING CODES

**EXHIBIT F**

**PROMISSORY NOTE**

ATTACHED

4841-1679-4402.4

THIS UNSECURED PROMISSORY NOTE (THIS "<u>NOTE</u>") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION TO THE REGISTRATION REQUIREMENTS OF SUCH ACT OR SUCH LAWS.

### UNSECURED PROMISSORY NOTE

$_____

_____ \_\_, 2015
Garden City, New York

FOR VALUE RECEIVED, the undersigned, Lifetime Brands, Inc., a Delaware corporation ("<u>Maker</u>"), hereby covenants, promises and agrees to pay to Reed and Barton Corporation, a Massachusetts corporation ("<u>Payee</u>"), at Payee's address set forth in Section H hereinafter or at such other address as Payee may designate in writing, the principal sum of _____ Dollars ($_____), adjusted in accordance with ARTICLE 3 of the Purchase Agreement (as adjusted, the "<u>Principal</u>"), together with Interest (defined below), payable in accordance with the terms and conditions set forth herein.

### A.    Definitions

1.    For the purposes of this Note, unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed to such terms in the Purchase Agreement.  The following definitions shall apply to the words and phrases used herein:

"<u>Bankruptcy Code</u>" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. or other applicable bankruptcy, insolvency or similar laws.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday, legal holiday or other day on which banks are required or permitted to be closed in the State of New York.

"<u>Interest</u>" means interest computed at the annual rate of four and one-quarter percent (4.25%) per annum, subject to Section E.2.  Interest shall accrue on the outstanding Principal balance of this Note until all Principal outstanding under this Note shall be paid in full.   Interest shall be calculated on the basis of a 360-day year, for the actual number of days this Note is outstanding.

"<u>Maturity Date</u>" means the date that is seven (7) years from the date hereof.

"<u>Purchase Agreement</u>" means that certain Asset Purchase Agreement by and among Payee, Maker, and Francis I Acquisition Corp., a Delaware corporation, dated February \_\_, 2015.

**B.      Payments**

1.      Interest on the outstanding Principal balance of this Note will be due and payable quarterly in arrears (for all periods up to and including the date preceding the Payment Date) commencing on the three month anniversary of the date hereof, and continuing on each three month anniversary of the date hereof (each a "Payment Date") until the Principal is paid in full.   Maker shall, (i) on each Payment Date for the first two (2) years after the date hereof, make payments of Interest only, and (ii) on each Payment Date thereafter, make level payments of Principal and Interest, in an amount sufficient to fully amortize the Principal and Interest on the Maturity Date.   In the event that a Payment Date falls on a day that is not a Business Day, any payment due on such Payment Date shall be due on the next succeeding Business Day.

2.      On the Maturity Date, or upon acceleration of this Note in accordance with Section E below, Maker shall pay to Payee the entire outstanding Principal balance of this Note, together with any then accrued and unpaid Interest.

3.      Principal and Interest payments shall be made in lawful money of the United States of America at Payee's address listed in Section H below unless otherwise designated by Payee in writing.

4.      Maker shall have the right, at any time, or from time to time, to prepay this Note in full or in part, without notice, premium or penalty.   Any such prepayment shall include Interest on such amount of prepayment through the date of such prepayment and shall be applied first to unpaid Interest, including any unpaid Default Interest pursuant to Section E.2 below, and then to the outstanding Principal balance.

**C.      Covenants**

Maker will, at its own cost and expense, cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as may from time to time be reasonably necessary or as Payee may from time to time reasonably request in order to carry out the intent and purposes of this Note and the transactions contemplated thereby.

**D.      Events of Default**

The occurrence of any of the following will constitute an event of default ("Event of Default") under this Note: (a) if Maker fails to make any payment when due of Principal or accrued Interest on this Note and such nonpayment remains uncured for a period of five (5) Business Days after notice thereof from Payee to Maker; (b) if Maker fails to observe or comply in any material respect with any provision of this Note (other than clause (a) of this Section D), and such failure continues for a period of thirty (30) days after Payee provides Maker with notice of such failure; (c) if there shall be an assignment by Maker for the benefit of creditors, the institution of proceedings by Maker under the Bankruptcy Code or any other law in which Maker is alleged to be insolvent or unable to pay its debts as they mature, or the institution of such proceedings by another party or parties against Maker which proceedings are not dismissed within sixty (60) days of the filing of such proceedings; (d) the appointment of a receiver for substantially all of the property of the Maker, which appointment remains undischarged for thirty

(30) days; (e) the acceleration of any senior, secured debt of Maker; or (f) the sale of all or substantially all of the assets of Maker.

## E.     Remedies

1.       If any Event of Default referred to in Section D above shall occur, all accrued and unpaid Interest and the outstanding Principal balance of this Note will immediately become due and payable in full at the sole option of Payee, but automatically in the case of an Event of Default under Section D(c), notwithstanding the Maturity Date without any presentment or demand and without any further or other notice of any kind, all of which are hereby waived by Maker.

2.       From and after the occurrence of an Event of Default, overdue amounts of Interest and Principal shall bear interest ("Default Interest") until paid, at the annual rate equal to nine and one-quarter percent (9.25%) per annum.  Default Interest shall be payable on demand.  The Maker agrees to pay on demand all costs of collection, including reasonable attorneys' fees, incurred by the Payee in enforcing the obligations created by this Note.

## F.     Security Interest

This Note is a general, unsecured obligation of the Maker.

## G.     Waiver; Modifications in Writing

This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change, modification, termination, waiver, or discharge is sought.  No failure or delay on the part of Payee in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to Payee at law, in equity or otherwise.

## H.     Notices

All notices, demands or other communications which are required or are permitted to be given hereunder shall be in writing and shall be deemed to have been sufficiently given when delivered personally, by Federal Express or similar overnight delivery, by telecopy or facsimile transmission or on the third Business Day following due deposit in the United States mail at a post office or mail box, with certification and postal charges prepaid, addressed to Maker or Payee at the address identified from time to time to the other, in accordance with these notice provision, *provided however*, the initial notice addresses shall be:

Maker:

Lifetime Brands, Inc.
1000 Stewart Avenue
Garden City, New York 11530

- 4 -

Payee:

Reed and Barton Corporation
144 West Britannia St.
Taunton, MA 02780

## I.    Miscellaneous

1.      Maker may not assign any or all of its obligations under this Note.  Payee may assign this Note without the prior written consent of Maker.

2.      This Note shall bind Maker and its respective successors and assigns, and the benefits hereof shall inure to Payee and Payee's successors and assigns.

3.      On Maker's receipt of Payee's sworn affidavit of the loss, theft, destruction or mutilation of this Note, and an indemnity agreement from Payee in reasonable form to Maker or, in the case of any such mutilation, on surrender and cancellation of such Note, Maker will execute and deliver, in lieu thereof, a new Note of like tenor.

4.      This Note will be governed by and be construed in accordance with the Laws of the State of New York, without regard however to the conflicts of laws principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Note and to decide any claims or disputes which may arise or result from, or be connected with, this Note, or any breach or default hereunder, and (b) any and all legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section H above. To the extent not prohibited by applicable Law or court rule, each party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any claim (i) that it is not subject to the jurisdiction of the above-named court, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper or (v) that this Note or the subject matter hereof or thereof may not be enforced in or by such court. Each of the parties hereto hereby (a) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of the aforesaid court in the event any dispute arises out of this Note, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Note in any court other than the court referenced above; provided, that, a party may commence any action or proceeding in a court other than as set forth above solely for the purpose of enforcing an order or judgment issued by such court.  The parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the party and at the address set forth in Section H above, and service so made shall be complete as stated in such Section.  If any term or provision of this Note or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Note, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be

- 5 -

affected thereby, and each term and provision of this Note shall be valid and be enforceable to the fullest extent permitted by law.

5.    Notwithstanding anything in this Note to the contrary, nothing contained in this Note or in any other agreement between the Maker and Payee requires the Maker to pay or Payee to accept, interest in an amount, which would subject Payee to any penalty or forfeiture under applicable law. In no event shall the total of all charges payable hereunder, whether of interest or of such other charges, which may or might be characterized as interest, exceed the maximum rate permitted to be charged under the laws of the State of New York. Should Payee receive any payment on this Note which is or would be in excess of that permitted to be charged under said laws, such payment shall have been, and shall be deemed to have been, made in error and shall automatically be applied to reduce the principal indebtedness outstanding on this Note.

EXECUTED under seal as of the date first written above.

**LIFETIME BRANDS, INC.**


By:_____
            Name: _____
            Title: _____

**EXHIBIT G-1**

**<u>RIDDLE CONSULTING AGREEMENT</u>**

ATTACHED

CONSULTING AGREEMENT

This agreement (the "Agreement") is made as of the __ day of
_____, 2015, by and between Lifetime Brands, Inc., on behalf of
itself, its subsidiaries and its divisions, with its corporate offices at 1000 Stewart Avenue, Garden
City, New York 11530 (hereinafter the "Company") and Tim K. Riddle, an individual, with an
address of 32 Hounds Ditch Lane, Duxbury, Massachusetts 02332 (hereinafter "Consultant").
The Company and Consultant are collectively referred to herein as the "Parties" and each a
"Party."

WHEREAS, the Company desires to retain Consultant to render certain consultation and
advisory services to the Company; and

WHEREAS, the Consultant desires and has the capacity to render such services to the
Company;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for
other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the Parties hereby agree as follows:

1.    Services.  The Consultant shall perform those duties and render those services set
out in Exhibit A, attached hereto (hereinafter, the "Services") and made a part hereof, which may
be amended by mutual consent in writing from time to time.

2.    Scope and Limitation of Authority.

2.1    It is understood and agreed that Consultant shall have no authority to bind,
commit, or obligate the Company to or with any third party, without the Company's prior written
authorization, and Consultant shall not hold himself out, expressly or impliedly, as having any
such authority.

2.2    The reputation and integrity of the Company and its subsidiaries are
valuable assets that are vital to the Company's success. As such, the Consultant agrees to deal
fairly and in good faith with the Company's customers, suppliers, regulators, business partners,
and others while providing its duties and responsibilities under this Agreement.  Additionally,
the Consultant acknowledges and agrees that:

(i)    the Consultant is responsible for conducting its Services hereunder
in a way that demonstrates a commitment to the highest standards of integrity;

(ii)    the Consultant agrees to comply with all applicable laws and
regulations, including without limitation the Foreign Corrupt Practices Act and any applicable
laws of the local territory;

4837-4054-1217.5

(iii)     the Consultant represents that he is not an employee, officer, or representative of any government or any agency or other instrumentality of any government and further agrees to inform the Company of any change in such status or representations;

(iv)     the Company's policy is that no employee, officer, consultant or worker will offer or make or agree or promise to receive or accept any improper payment or anything of value, directly or indirectly, to or from anyone anywhere in the world in order to obtain, influence, or retain business or to secure any improper advantage, nor will they accept payment from a third party that they know or suspect is offered with the expectation that it will obtain a business advantage for that third party;

(v)     the Consultant must use discretion and care to ensure that expenditures on customers and on Company personnel or representatives are reasonable and in the ordinary and proper course of business and could not reasonably be construed as bribes or improper inducement or otherwise violate applicable laws and/or regulations;

(vi)     the Company will give up any business opportunity that can be secured only by giving an improper or illegal payment, bribe, gift, rebate, kickback, or similar inducement;

(vii)     trading in Company securities while in possession of material inside information, can, among other things,  subject the Consultant to criminal or civil penalties;

(viii)     the Company will not tolerate any employee, officer or consultant taking unfair advantage of anyone through manipulation, misrepresentation, inappropriate threats, fraud, abuse of confidential information, or other related conduct;

(ix)     Company assets, such as information, materials, supplies, time, intellectual property, facilities, software, and other assets owned or leased by the Company, or that are otherwise in the Company's possession, may be used only for legitimate business purposes and that the personal use of Company assets, without the Company's prior written approval, is prohibited.

3.     Term.  The term of this Agreement shall commence on the first day of the month following the month in which the services provided under the Transition Services Agreement of even date herewith, between Reed and Barton Corporation and Francis I Acquisition Corp., are terminated in full (the "Effective Date") and, unless as sooner terminated in accordance with Section 12 below or renewed, shall continue for a period of three (3) years from the Effective Date (hereinafter referred to as the "Term").  This Agreement may be renewed upon written agreement by the Parties prior to the expiration of the Term.

4.     Relationship with Consultant.  Nothing set forth herein shall be deemed or construed to render the Parties hereto as joint ventures, partners or employer and employee. Consultant agrees that the relationship created by this Agreement is one of consultant.  The Company shall not be responsible for withholding taxes with respect to the Consultant's Compensation (as hereinafter defined) hereunder.  The Consultant shall have no claim against

the Company hereunder or otherwise for vacation pay, sick leave, retirement benefits, social security, worker's compensation, health or disability benefits, unemployment insurance benefits, or employee benefits of any kind.

5.    Standard for Services and Products.  Consultant shall perform all Services hereunder in a competent and professional manner consistent with the goals and objectives as communicated to Consultant by the Company from time to time in writing.

6.    Ownership or Work Product.

6.1    Consultant and the Company both acknowledge and agree the Company, or one of its designated subsidiaries, is and shall be the sole and exclusive owner of all work product to be delivered by Consultant to the Company under this Agreement, including, but not limited to, any and all concepts, artwork, and designs (as may be applicable in the performance of the Services by Consultant), and including all proprietary rights and associated good will related thereto (hereinafter, collectively referred to as the "Work Product").  The Parties agree that the Work Product is and shall be considered a "work made for hire" within the meaning of the United States Copyright Act (the "Act") by virtue of either being prepared by an employee within the scope of his or her employment or of being specially commissioned pursuant to a written agreement, including for use as a contribution to a collective work or a compilation. Consultant hereby irrevocably sells, assigns and transfers to the Company and its successors and assigns, any and all of Consultant's right, title and interest of every kind and nature throughout the world in and to the Work Product, including without limitation any and all applicable trademarks, trade dress, copyrights, patents and all other proprietary rights therein, all goodwill associated thereto, and any adaptation or derivation therefor, to the Company in perpetuity. These rights include the right of the Company to sue, seek equitable relief, and recover damages, attorneys' fees and costs for all past, present and future infringement.  The Company, in its sole discretion, in its own name and for its own benefit, may secure any applications, renewals or extension of any such trademarks, trade dress, copyrights, patents and/or other proprietary rights.

6.2    Consultant will fully cooperate with the Company and, at the Company's sole expense, assist the Company in obtaining any trademark registration, copyright registration, utility patent, design patent and/or other proprietary right for the Work Product (if applicable) and take such further actions as the Company may reasonably request for the purpose of further evidencing, confirming, perfecting, protecting or preserving the Company's rights in and to the Work Product or for the purpose of otherwise documenting or effecting the terms of this Agreement, at the Company's expense.   In the event that Consultant fails to execute or deliver, or cause to be executed or delivered any such document, certificate or instrument reasonably requested by the Company, Consultant hereby appoints the Company or its designee as Consultant's irrevocable attorney-in-fact to execute such instruments.  Consultant agrees that he will not knowingly register or attempt to register or establish any rights in and to the Work Product in his name or the name of any other person, firm or corporation other than the Company.

6.3    Consultant recognizes and acknowledges that the Company may develop and use certain trademarks and tradenames ("Trademarks") to identify, and/or market the Company's products.  Consultant represents and warrants, and Consultant recognizes and

acknowledges, that the Company is either the sole and exclusive owner of any Trademarks or a licensee of any Trademarks in connection with the Company's products. Consultant agrees that he will not knowingly register or attempt to register or establish such Trademark rights in his name or the name of any other person, firm or corporation.  Consultant shall not at any time knowingly apply for or assist any third party to apply for trademark protection which would affect the Company's ownership of any Trademark rights in the Company's products.  In the event that Consultant is deemed or appears to own any Trademark rights in any of the Company's products, Consultant shall execute all documents necessary to confirm or establish the Company's sole right therein. Consultant's obligation under this Section 6 shall survive the termination of this Agreement.

7.     Compensation/Expenses.

7.1     As compensation to Consultant for the Services rendered, the Company agrees to pay Consultant during the Term hereof, twelve quarterly payments of Fifty Thousand Dollars ($50,000.00) (the "Compensation").  Compensation will be paid, in advance, commencing on the Effective Date, and will be payable whether or not Consultant provides Services to the Company in respect of the quarter for which such Compensation is due.

7.2     The Company will reimburse Consultant for reasonable, pre-approved (by the Company, in writing), out-of-pocket expenses, including any business travel, incurred in connection with Company business during the Term of this Agreement.  Should Consultant be required to travel on behalf of the Company, Consultant will devote such travel solely to Services to be performed on behalf of the Company (and to no other client of Consultant) and when possible, will work with the Company's designated travel office to make advance arrangements.  Any such travel by Consultant shall be in accordance with the Company's established policies.

8.     Payment of Compensation and Expenses/Advance.

8.1     The Compensation shall be payable to Consultant, upon Consultant's submission of a quarterly invoice, within thirty (30) days after receipt of the invoice.  Consultant shall submit a quarterly invoice, due on the last day of each calendar quarter, to the Company in a form that is acceptable to the Company.  Consultant's delay in submitting an invoice shall not be deemed a waiver of Consultant's right to receive payment thereof.

8.2     Reimbursement of pre-approved, out-of-pocket expenses shall be made within forty five (45) days after the Company's receipt of an acceptable expense report and all receipts for expenses as submitted by Consultant.

8.3     The Company shall issue a Form 1099 to Consultant with respect to the Compensation and any expense reimbursement.  Consultant agrees that Consultant is solely responsible for the payment of any and all federal, state and local taxes assessed against Consultant with respect to the Compensation and expense reimbursement.  Consultant further agrees to indemnify and hold harmless the Company for any taxes, interest or penalties assessed