**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| In re: | |
| REED AND BARTON CORPORATION, | Chapter 11 |
| Debtor. | Case No. _____ (___) |

**MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING
IMPLEMENTATION OF KEY EMPLOYEE RETENTION PLAN
AND KEY EMPLOYEE INCENTIVE PLAN**

Reed and Barton Corporation ("Reed and Barton" or the "Debtor"), the debtor and

debtor-in-possession in the above-captioned chapter 11 case, hereby submits this *Motion of the*

*Debtor for Entry of an Order Authorizing Implementation of Key Employee Retention Plan and*

*Key Employee Incentive Plan* (the "Motion"). In support of the Motion, the Debtor relies on the

*Declaration of Timothy K. Riddle in Support of Debtor's First Day Motions and Applications*

(the "First Day Declaration"),[1] filed contemporaneously herewith and incorporated herein by

reference, and respectfully represents and sets forth as follows:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court

pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein

are sections 105(a), 363 and 503(c)(3) of title 11 of the United States Code (the "Bankruptcy

Code").

---

[1] Except where otherwise indicated, capitalized terms used but not defined in this Motion have the meanings
ascribed to them in the First Day Declaration.

## **GENERAL BACKGROUND**

2.      On the date hereof (the "Petition Date"), the Debtor commenced the above-captioned chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      The Debtor continues to operate its business and manage its properties as debtor-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in this Chapter 11 Case.

4.      Founded in approximately 1824, Reed and Barton is one of the nation's foremost designers and distributors of high quality silverware and tableware, along with flatware, crystal drinkware, picture frames, ornaments, and baby giftware. Reed and Barton's operations are based in Taunton, Massachusetts.  Its products are sold primarily through business-to-business channels for re-sale in department stores, specialty gift shops, and more recently, membership warehouse clubs and television shopping networks.  In addition, the Debtor sells directly to the consumer through its on-site factory store in Taunton and a showroom in Atlanta, Georgia; Reed and Barton has also operated retail showrooms and outlet stores in Maine, New York, and Texas in the year leading up to the bankruptcy filing.

5.      The Debtor initiated this Chapter 11 Case to stabilize its business operations and maximize the value of its assets through one or more sale processes, thereby maximizing the recovery for its creditors. With the help of its restructuring advisors, the Debtor has conducted a months-long process to sell its assets and line of business, and the Debtor contemplates a further marketing process during this Chapter 11 Case.[2] The Debtor's ability to preserve the value of its

---

[2] The Debtor has filed concurrently herewith its *Motion for (I) an Order (A) Approving Sale Procedures in Connection with Sale of Substantially All of the Debtor's Assets, (B) Approving the Break-Up Fee, (C) Scheduling*

assets, continue normal operations, and maximize recovery through the sale processes hinges upon the Debtor's ability to retain its employees and incentivize employee performance. The assistance of the Debtor's employees during the Chapter 11 Case and the marketing and sale processes is vital if the Debtor hopes to receive higher than the current sale price.

6.     By this Motion, the Debtor seeks authority to implement a key employee incentive plan for certain of its insiders (the "KEIP"), and a key employee retention plan for non-insiders only (the "KERP"), and authorizing the payments contemplated thereunder to enable the Debtor to complete an orderly sale process and to maximize the value of its estate. As described further herein, the goals of these employee programs are as follows:

- to motivate and preserve essential personnel through the sale of substantially all of the Debtor's assets and line of business;

- to reward essential employees if targeted goals are satisfied; and

- to maximize the value of the Debtor's estate for the benefit of all creditors.

7.     A description of the Debtor and its business, and the facts and circumstances supporting this Motion and the Chapter 11 Case, is set forth in greater detail in the First Day Declaration.

**RELIEF REQUESTED**

8.     By this Motion, the Debtor seeks entry of an order, substantially in the form of the proposed order attached hereto, approving the KEIP and KERP and authorizing payment thereunder.

---

*an Auction and Hearing to Approve the Transaction and Approving the Form and Manner of Notice Thereof, and (D) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts; and (II) an Order (A) Approving the Proposed Sale, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion"). In the Sale Motion, the Debtor seeks entry of an order which, among other requested relief, authorizes the sale of substantially all of Debtor's assets to Lifetime Brands, Inc., or its designee ("Proposed Purchaser"), in accordance with the terms of that certain Asset Purchase Agreement attached as Exhibit A to the Sale Motion ("Asset Purchase Agreement"), subject to higher or better offers.

## THE EMPLOYEE COMPENSATION PLANS

**A.**    **The KERP**

9.      The Debtor considers continuity of its non-insider employees to be critical to its business, the chapter 11 process and, perhaps most importantly, the ability to consummate the sale transaction that provides the underpinnings of this Chapter 11 case. All Reed and Barton employees are acutely aware that they are working themselves out of a job—if they succeed they will effect a sale of their employer to Lifetime Brands, Inc. ("Lifetime Brands") and they will no longer be employed.  Absent continuity of those very same employees, however, the Debtor's business operations would be compromised, the sale process would fail because Lifetime Brands has conditioned its obligation to close the sale transaction on the Reed and Barton employees providing up to ninety days of "transition services," and the Debtor's ability to deliver value to its creditors would be lost.[3] Given the importance of employee continuity to the continuation of its business and the success of the sale processes, the Debtor has developed the KERP.

10.      The proposed KERP would provide as follows:

(i)      Eligible Employees (as defined below) would be paid as an administrative expense an amount equal to four weeks' salary, payable as soon as

---

[3] An integral part of the proposed sale which is the subject of the Sale Motion is the Proposed Purchaser's requirement that the Debtor enter into a Transition Services Agreement ("TSA"). Pursuant to the terms of the TSA and in order to preserve the continuity of the Business, as that term is defined in the Asset Purchase Agreement, the Proposed Purchaser seeks to engage Debtor as an independent contractor to provide the Seller Services (as defined in the TSA) described in Annex A to the TSA. Essentially, the Seller Services constitute the Debtor's continued operation of its business during the Seller Service Period, as that term is defined in the TSA. In order to provide the Seller Services, the Debtor must retain its employees, and the TSA requires the Debtor to "use commercially reasonable efforts to maintain the employees providing the Seller Services in the employ of [Debtor] and to notify [Proposed Purchaser] of any such employee who terminates his or her employment with [Debtor]." TSA, Section 1(e). In consideration for the Seller Services during the Seller Service Period, the TSA provides that the Proposed Purchaser will pay to Debtor an amount equal to the "fully-burdened cost of providing the subject Seller Services (including … all salary, benefits, insurance, "stay-put" incentives (which [Debtor] has advised shall be equal to one (1) week's salary for each four (4) weeks of Seller Services provided by such … employee … up to a maximum of two (2) weeks' salary for any such [Debtor] employee …), utilities and other overhead costs associated with the provision of such Seller Service…)." TSA, Section 2. The TSA is attached as an exhibit to the Asset Purchase Agreement.

administratively possible following the closing of the sale of substantially all of

the Debtor's assets (the "Sale Date");

(ii)      In order to be eligible for the payment under the KERP, an employee (an

"Eligible Employee") must: (a) not be discharged for cause, as defined herein, and

(b) not voluntarily terminate their employment;

(iii)     For the purpose of the KERP, termination "with cause" shall mean

termination based upon the gross negligence or willful misconduct of the

employee.

11.    The total cost of the KERP for all of the Debtor's non-insider employees is

approximately $150,000.

12.    The KERP provides retention payments to 70-75 non-insider employees (the

"KERP Participants") consisting of a payment of four weeks' salary for each KERP Participant.

It is essential to the success of the Debtor's Chapter 11 Case and the sale processes that the

KERP Participants remain employed until the Sale Date. Without the retention payments under

the proposed KERP, the KERP Participants are likely to seek alternative employment, harming

the value of the Debtor's estate and negatively affecting the efficiency and outcome of the sale

processes. Indeed, during the week of February 8, 2015 two longtime employees, one the

director of operations and the other a vice president of sales, gave notice of their intention to

leave Reed and Barton, and the management believes that additional departures are likely absent

providing financial incentive to stay through the closing of the sale.

13.    While a few of the KERP Participants have titles that include words such as "vice

president" or "director" suggesting officer or director status, none of the KERP Participants are

in reality insiders. Although the KERP Participants are important to the Debtor's business and

are particularly vital to the success of the Chapter 11 Case and the proposed sale described in the Sale Motion, their titles do not reflect that they have any control of the Debtor. None of the KERP Participants are members of the Debtor's board of directors. Further, none of the KERP Participants participate in corporate governance, attend board meetings or report to the board. The titles of some of these KERP Participants have been given to reflect the employees' individual functions and roles or for purposes of marketing only. These KERP Participants have no involvement in the Debtor's "inner circle" making critical financial or other corporate decisions. The KERP is more fully described in the attached Exhibit 1.

**B.    The KEIP**

14.    The KEIP provides incentive payments to three senior management employees, including insiders (the "KEIP Participants"), based solely on success in increasing the purchase price received by the Debtor for its assets above the gross sales price that would be realized by the Debtor were the closing of that sale to have occurred under the terms of the Asset Purchase Agreement between the Debtor and Lifetime Brands when agreement in principle was reached as to that deal.

15.    The Asset Purchase Agreement provides for a purchase price of $15 million, payable $10 million in cash and $5 million is a promissory note.  Lifetime Brands' obligation to close, however, is conditioned on Reed and Barton having at least $7 million in inventory on the closing date.  The Asset Purchase Agreement also provides for a dollar for dollar adjustment of the promissory note to the extent that "Working Capital," defined generally as the total of accounts receivable plus inventory less assumed liabilities, varies from $10 million.  Any downward adjustment is limited to the $5 million amount of the promissory note.  Any upward adjustment is limited to an increase in the principal amount of the promissory note to $16 million.

16.     When that deal was struck, Working Capital was approximately $8.5 million, which would have yielded a purchase price of $13.5 million. The KEIP establishes that value as a baseline, setting $13.5 million as the "Threshold Value," and provides incentive for that portion of the Debtor's management team that can, through careful management, retain the employees necessary to close the deal and increase the amount of Working Capital, to do so.[4]

17.     The KEIP Participants have control and oversight over the sale process and of the Debtor's operations critical to the success of that sale process. Incentivizing their performance will ensure that the sale process is conducted efficiently and quickly, but in a way which will promote the goal of maximizing the value of the Debtor's estate for the benefit of all creditors.

18.     The KEIP is purely an incentive, and not retention, based compensation plan that rewards these KEIP Participants only if the Debtor achieves certain operational and financial benchmarks that are directly related to the preservation and maximization of the value of the Debtor's assets and line of business. The KEIP Participants are not guaranteed any payments and must meet specific targets.

19.     The proposed KEIP would provide as follows:

(i)     The Debtor has limited participation in the KEIP to three (3) senior employees who will share in an "Incentive Pool" payable as an administrative expense from the proceeds of the sales of the Debtor's assets and line of business. The Debtor believes that all of the KEIP Participants have the ability to materially

---

[4] The three proposed KEIP Participants are Timothy K. Riddle, Debtor's President and Chief Executive Officer ("Riddle"), Charles F. Daly, Debtor's Chief Financial Officer ("Daly"), and Karen J. Cataldo, Debtor's Vice President, Human Resources. Pursuant to the terms of the Asset Purchase Agreement, Proposed Purchaser seeks to enter into consulting agreements with each of Riddle and Daly. Pursuant to the terms of the consulting agreements, the Proposed Purchaser agrees to pay as compensation to Riddle as a consultant twelve (12) equal quarterly payments of $50,000.00 and agrees to pay as compensation to Daly as a consultant eight (8) equal quarterly payments of $25,000.00. The consulting agreements are attached as exhibits to the Asset Purchase Agreement.

impact the sale processes, including the ability to maximize the recovery to creditors by effectuating the sales at the highest possible price.

(ii)     The Incentive Pool is comprised by the "Sales Proceeds Incentive" which is based on the gross proceeds received by the Debtor's estate in one or more transactions involving a sale of the Debtor's line of business and/or substantially all of the assets of the Debtor's estate.

(iii)    The Sale Proceeds Incentive is designed to increase as gross proceeds realized through the sales processes escalate. If the gross sales proceeds realized by the Debtor's estate are not in excess of the Threshold Value, the KEIP Participants will earn $0.00 for the Incentive Pool. Only if the gross sales proceeds increase beyond the Threshold Value will the KEIP Participants be rewarded.

(iv)    The highest level of performance that the Debtor has determined may possibly be achievable through the sales processes is a sales price of $23 million (the "Maximum Value"). If the gross sales proceeds realized through the sale processes reaches the Maximum Value, the KEIP Participants will earn $600,000.00 for the Incentive Pool. The amount of the Incentive Pool cannot exceed $600,000.00.

(v)     For gross sales proceeds falling between the Threshold Value and the Maximum Value, the amount of the Incentive Pool will be determined via linear interpolation.

(vi)    The Incentive Pool will be allocated to the KEIP Participants pro rata by the KEIP Participants' current annual salary and will be paid as soon as

8

administratively possible following the Sale Date. If, however, a KEIP Participant resigns or is discharged for cause, as previously defined herein, before the Sale Date, that KEIP Participant will forfeit all right to payment from the Incentive Pool.

The details of the KEIP are described more fully in the attached Exhibit 1.

20.     The Debtor conducted significant due diligence in identifying the needs for and designing the KEIP. For example, the Debtor's board of directors vetted the KEIP, and they only approved the KEIP after analysis and discussion by their members and the Debtor's professional advisors. The Debtor's counsel advised the Debtor about the necessity and propriety of the KEIP, as well as its comparison to other chapter 11 cases. The board of directors, with the assistance of their counsel, ensured that the terms of the KEIP were similar to those previously approved by bankruptcy courts. The Debtor's board of directors also scrutinized the terms of the KEIP at length and ensured that compensation targets were sufficiently challenging for the KEIP Participants.

21.     The Debtor also worked diligently in identifying the appropriate personnel to participate in the KEIP. The KEIP Participants were selected because of their unique operational roles and historical knowledge of the business which will enable them to best operate the Debtor's business and to obtain the highest possible value for the Debtor's assets. The KEIP Participants are highly accomplished and capable officers and possess invaluable knowledge about the Debtor's operational, financial, and legal affairs.

22.     Most importantly, the KEIP participants were selected because they, more than any other individuals, have the skill set, the management acumen and the control to manage Reed and Barton's operations so as to increase the amount of Asset Purchase Agreement defined

Working Capital the Debtor has at closing, yielding a dollar for dollar increase in the funds made available to unsecured creditors.

23.     The KEIP Participants were also selected to participate in the KEIP because, prior to the Petition Date, they assumed significant additional responsibilities and time commitments above and beyond their normal duties in order to assist the Debtor in managing its business, assisting with the filing of this Chapter 11 Case and negotiating the terms of the sale which is the subject of the Sale Motion. Specifically, the KEIP Participants assumed the following additional responsibilities: (a) assisting the Debtor's professional advisors in understanding the Debtor's businesses; (b) interacting with the Debtor's lenders, creditors, and potential purchasers, including responding to extensive requests and attending in-person and telephonic meetings; and (c) assisting with the general preparation of the Chapter 11 Case, such as by addressing factual inquiries from all of these constituents.

24.     Now that this Chapter 11 Case has commenced, the KEIP Participants will be expected to provide, among other things, extensive and indispensable assistance to the Debtor's counsel and advisors, as well as manage the daily operations and finances of the Debtor. The KEIP Participants will also help maintain good relationships with existing vendors, lenders and other parties so that the Debtor can realize and preserve the highest possible value of the business.

25.     The Debtor believes that the KEIP is appropriately designed to incentivize the KEIP Participants to continue their substantial efforts in operating the Debtor's businesses and assisting with this Chapter 11 Case. Moreover, the KEIP has been tailored as a catalyst and compensates the KEIP Participants for the additional (and time consuming) responsibilities that they will have to continue to perform to reach the bonus benchmarks.

**BASIS FOR RELIEF**

26.      A company's decision to file for chapter 11 necessarily creates difficulties for its employees and can lead to employee retention problems, low morale, and low productivity. Unfortunately, these negative consequences affect the company's ability to continue its normal business operations, and impair the company's ability to maximize sale values and achieve the highest possible recovery for its stakeholders. For this reason, bankruptcy courts have long authorized thoughtful incentive and retention plans designed to reduce disruption to employees while improving morale and incentivizing job performance. Courts have routinely approved payments under these plans pursuant to Bankruptcy Code section 363(b) as an exercise of the chapter 11 debtor's business judgment. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") has not eliminated the use of these plans, and continues to permit payments and added protections that are offered to employees.

27.      The Debtor's employees are necessary to continue its operations in the Chapter 11 Case that is intended to result in the sale of its business over a several month period during which the Debtor's operations must be maintained, financial condition preserved and new debtor-in-possession duties performed. None of this can be achieved without the continuing support of the employees. Further, as previously described, the continued employment of Debtor's employees for a period of time is an integral part of the sale to the Proposed Purchaser which is the subject of the Sale Motion. The Proposed Purchaser seeks to maintain the continuity of Debtor's business for a period of time following the closing of the proposed sale and the Debtor's employees are necessary for the Debtor to provide the Seller Services during the Seller Service Period.

28.      The Debtor seeks authority to implement the KERP and KEIP under section 503(c)(3) of the Bankruptcy Code. The KERP and KEIP satisfy the business judgment rule as (a)

they are closely related to the Debtor's goal, (b) their costs are reasonable in light of the Debtor's assets, liabilities, and projected earnings, (c) they are fair, nondiscriminatory and customary in the chapter 11 context, particularly those related to the retail industry, and (d) they were fully vetted internally and externally by the Debtor's board of directors with assistance from outside professionals.

## A.    **Introduction**

29.    Traditionally, compensation plans were analyzed and approved under section 363 of the Bankruptcy Code, which authorizes the debtor to use, sell or lease the property of the estate. *See*, *e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153-55 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program; stating that "[i]n determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions"); *In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment"); *In re Nobex Corp.*, 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (approving incentive pay outside of ordinary course where it was "an appropriate exercise of the Debtor's business judgment"). If such use, sale or lease is conducted outside the ordinary course of business, the debtor's transaction must satisfy the business judgment rule. *See In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (the "sound business purpose" test has been adopted by courts to evaluate motions brought pursuant to section 363(b)).

30.    In 2005, Congress enacted BAPCPA, which inserted section 503(c) into the Bankruptcy Code and restricted retention-based payments to corporate insiders. See S. 256, 109th Cong. (2005); H.R. 685, 109th Cong. (2005); *see also Global Home Prods.*, 369 B.R. at 784 (recounting purpose of BAPCPA). Thus, if a proposed compensation plan is purely

motivated by retaining a corporate insider, it will have to comply with the rigid requirements of

section 503(c)(1). *See In re Neilson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr D. Del. 2007)

(finding that section 503(c)(1) applies only to retention programs with "the primary purpose of

inducing [an employee] to remain with the debtor's business"). On the other hand, incentive-

based compensation plans made to such insiders (or other payments made to non-insiders),

outside the ordinary course, are approved under section 503(c)(3) if they satisfy the business

judgment rule. *See id.* at 803-804; *see also In re Dana Corp.*, 358 B.R. 567, 574 (Bankr.

S.D.N.Y. 2006).

31.    In assessing whether a proposed compensation plan satisfies section 503(c)(3) and

the business judgment rule, courts consider the following factors:

- Is there a reasonable relationship between the plan proposed and the results to be obtained?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable, such that it does not discriminate unfairly?

- Is the KEIP/KERP consistent with industry standards and practices?

- What due diligence did the debtor conduct in determining that there is a need for a KEIP/KERP and in selecting the employees eligible under the proposed KEIP/KERP, in light of what is available and applicable in the industry?

- Did the debtor receive independent counsel in performing this due diligence, and in crafting and authorizing the KEIP/KERP?

*In re Dana Corp.*, 358 B.R. at 574. Turning away from focusing on the importance of any

particular factor, Judge Lifland noted that courts generally take a "holistic" view of and measure

of compensation packages. *Id.* at 571. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d

Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment

concerning use of property under section 363(b) when there is legitimate business justification).

**B.     The KERP Is Authorized Under Section 503(c)(3) Because It Does not Confer Any Benefits to Corporate Insiders and Satisfies the Business Judgment Rule**

32.     The KERP is not subject to section 503(c)(1) or (2) of the Bankruptcy Code. Sections 503(c)(1) and (2) of the Bankruptcy Code apply only to insiders. Section 101(31)(B) of the Bankruptcy Code defines an insider as any director, officer, person in control of the debtor, partnership where the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control of the debtor. *See* 11 U.S.C. § 101(31)(B). None of the KERP Participants meet this definition of "insider".

33.     The United States Bankruptcy Court for the District of Delaware has held that any person holding an officer's title is presumptively an officer and, thus, an insider. *In re Foothills Texas, Inc.*, 408 B.R. 573, 574 (Bankr. D. Del. 2009). The court held in the *Foothills* case that "[a] party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, i.e., he or she is not taking part in the management of the debtor." *Id.* at 574-75; *cf. Tomsic v. Sales Consultant of Boston, Inc. (In re Salience Assocs.)*, 371 B.R. 578, 585-87 (Bankr. D. Mass. 2007) (denying summary judgment as to whether president was in control of debtor and therefore an insider).

34.     As explained above, the KERP Participants do not report to the Debtor's board of directors; rather they report to intermediate managers. Courts have declined to find insider status when the scope of the employee's authority is limited. *See In re Global Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of board, participated in corporate governance, attended board meetings or reported to board); *In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (employees in KERP plan were not insiders because none of them had

14

authority to implement company policy, did not report to board of directors, and were subordinate to actual officers). The titles of several of the KERP Participants have been given to reflect the employees' individual functions and roles, and for marketing purposes and are officers in name only. *See In re NMI Systems, Inc.*, 179 B.R. 357, 370 (Bankr. D. D.C. 1995) (finding that vice president was not insider because he was conferred title "for purposes of marketing" only and was not "in the inner circle making the company's critical financial decisions").

35.    Accordingly, the Debtor submits that those KERP Participants with officer's titles are officers in name only, do not take part in the management of the Debtor, and, therefore, are not "insiders."[5]

36.    Further, the Court should approve the KERP because it satisfies the business judgment test of section 503(c)(3) of the Bankruptcy Code. Applying the business judgment test factors recounted above, the KERP should be approved because it is reasonably related and necessary to the operational and financial stability of the Debtor's business. The KERP facilitates the Debtor's sale processes by incentivizing, retaining and protecting crucial employees to ensure that regular business operations continue and sale proceeds are maximized and by ensuring that the condition to closing the sale to Lifetime Brands that all employees be made available to render post-closing transition services is met. The KERP provides non-insider employees with a measure of security and a reward for remaining loyal to the Debtor during this critical period.

37.    Moreover, the cost of funding the KERP is reasonable when considering the losses that the Debtor would suffer without the KERP Participants.[6] Even if the KERP

---

[5] The Debtor is prepared to submit at the hearing on the Motion additional evidence necessary to rebut any presumption of insider status conferred by the KERP Participants' titles. Should the Court find that any presumption of insider status has not been overcome, the Debtor reserves the right to move any such KERP Participant from the KERP to the KEIP.

Participants can be replaced, the Debtor would incur substantial hiring and training costs which it can ill afford.

38.    Additionally, the KERP will be administered fairly among, without discriminating against any of, the KERP Participants.

39.    Furthermore, the KERP underwent a thorough vetting process and its implementation was guided by outside financial and legal professionals.

40.    More significantly, the relief requested with respect to the KERP is similar to the relief granted by other bankruptcy courts. *See In re Furniture Brands Int'l, Inc.*, Case No. 13-12329 (CSS) (Bankr. D. Del. Oct. 11, 2013); *In re Drug Fair Grp., Inc.*, Case No. 09-10897 (BLS) (Bankr D. Del. May 4, 2009).

41.    Therefore, the Court should approve the KERP under section 503(c)(3) of the Bankruptcy Code because it satisfies the business judgment rule.

**C.      The KEIP Is Authorized Under Section 503(c)(3) as an Incentive-Based Compensation Plan That Satisfies the Business Judgment Rule**

42.    The Court should also approve the proposed KEIP because it is purely an incentive-based compensation plan, and its implementation falls squarely within the Debtor's sound business judgment and satisfies section 503(c)(3) of the Bankruptcy Code.

43.    Although a byproduct of the KEIP may be that the KEIP Participants are encouraged to remain with Debtor, that effect does not convert the KEIP into a retention-driven plan. *See Global Home Prods.*, 369 B.R. at 786 (finding that proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "[t]he fact . . . that all compensation has a retention element [did] not reduce the Court's conviction" that the debtor's

---

[6] In fact, loss of these employees may even jeopardize the proposed sale presented to this Court in the Sale Motion. *See* footnote 3, *supra*.

primary goal in approving the incentive plans was "to create value by motivating performance"). A plan that indirectly causes its participants to remain employed does not detract from the KEIP's primary purpose, which is to motivate the KEIP Participants to maximize value to the Debtor's estate and, in turn, motivate the workforce at large to ensure recoveries are maximized.

44.    Here, the KEIP meets the above-listed criteria of the business judgment rule as applied under a section 503(c)(3) analysis. First, the KEIP is directly related to the Debtor's goal of selling the business during this Chapter 11 Case because it incentivizes the KEIP Participants to maximize revenue, minimize costs, and preserve liquidity.  Any payment at all under the KEIP is conditioned on, and therefore provides incentive to, increase the purchase price realized for the Debtor's assets by either managing to increase the Working Capital so that there is an upward adjustment above the Threshold Amount, or by producing a sale to an overbidder for an increased amount. Payments from the incentive pool are directly linked to clear sales and liquidity goals.

45.    Second, the cost of the KEIP is reasonable and can be properly supported by the Debtor in light of its assets, liabilities and earning potential. The KEIP will only cost a small fraction of the projected sale price. A threshold level must be met in order for the participants to receive anything at all.

46.    Third, the KEIP is reasonable in scope because it only applies to three officers and executives. The Debtor must rely on the efforts of those three KEIP Participants, and their performance will have the greatest impact on the sales value that the Debtor achieves during the sale processes and on the Debtor's ultimate liquidity.

47.    Fourth, the relief requested herein with respect to the proposed KEIP is consistent with targeted incentive programs that have been recognized and approved by other courts. *See,*

*e.g., In re Furniture Brands Int'l, Inc.*, Case No. 13- 12329 (CSS) (Bankr. D. Del. Oct. 11, 2013); *In re THQ, Inc.*, Case No. 12-13398 (MFW) (Bankr. D. Del. May 29, 2013); *In re Eddie Bauer, Inc.*, Case No. 09-12099 (MFW) (Bankr D. Del. July 22, 2009); *In re Drug Fair Grp., Inc.*, Case No. 09-10897 (BLS) (Bankr D. Del. May 4, 2009).

48.     Fifth, as with the KERP, the KEIP underwent a thorough vetting process and its implementation was guided by outside financial and legal professionals.

49.     Additionally, the KEIP is not a retention-based compensation plan and is thus not subject to the restrictions of section 503(c)(1) of the Bankruptcy Code. The KEIP is an incentive-based plan that rewards its beneficiaries for achieving operational and financial results that will preserve and maximize the value of the Debtor's business for the benefit of all the stakeholders. The KEIP does not compensate the KEIP Participants simply to remain in the Debtor's employ through this Chapter 11 Case. Accordingly, section 503(c)(1) does not apply.

50.     Therefore, the Debtor believes that the KEIP satisfies the business judgment rule and should be approved under section 503(c)(3) of the Bankruptcy Code.

## NOTICE

51.     Notice of this Motion has been served on (i) the Office of the United States Trustee for the District of Massachusetts; (ii) each of the Debtor's twenty largest unsecured creditors and/or their counsel; (iii) all holders of liens of record or their counsel if known; (iv) the Internal Revenue Service; (v) all relevant state and local taxing jurisdictions; (vi) the United States Environmental Protection Agency; (vii) the Massachusetts Department of Environmental Protection; and (viii) all parties that have requested special notice pursuant to Bankruptcy Rule 2002.  In light of the nature of relief requested in this Motion, the Debtor respectfully submits that no further notice is necessary.

## NO PRIOR REQUEST

52.     No prior motion for the relief requested herein has been filed in this or any other court.

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtor respectfully requests that this Court enter an order, substantially in the form of the proposed order attached hereto, (a) authorizing the Debtor to (i) implement the KERP and the KEIP, and (ii) make payments to related to the KERP and KEIP, and (b) granting such other and further relief as is just and proper.

Respectfully submitted,

REED AND BARTON CORPORATION

By its proposed counsel,

HOLLAND & KNIGHT LLP

/s/ John J. Monaghan_____
John J. Monaghan (Mass Bar #546454)
Lynne B. Xerras (Mass Bar #632441)
Kathleen St. John (Mass Bar #681565)
10 St. James Avenue
Boston, MA 02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850

Dated: February 17, 2015

**EXHIBIT 1**
**Summary Description of the Key Employee Incentive Plan ("KEIP")**
**and the Key Employee Retention Plan ("KERP")**
**for Reed and Barton Corporation ("Reed and Barton")**

The following is a summary of the material terms and conditions of a KEIP Plan and the KERP Plan adopted by Reed and Barton on February 15, 2015. The Reed and Barton Board of Directors has determined to pursue a sale of substantially all of the company's assets (which will likely culminate in an "Asset Sale" as defined below). To ensure that certain key employees are retained by Reed and Barton while certain higher level employees are properly motivated to achieve important and well defined strategic objectives, the Board has approved a KEIP Plan for three senior executives and a KERP Plan for other personnel.

If the Asset Sale contemplated by Reed and Barton occurs in the context of a Chapter 11 bankruptcy case, either by motion under section 363 of the Bankruptcy Code or through a plan of reorganization, then the KEIP Plan and the KERP Plan will each be subject to approval by the United States Bankruptcy Court.

**I.    *The KEIP***

  A.  The following is a description of the key terms of the KEIP. A comprehensive copy of the entire KEIP will be provided to all KEIP Participants.

  B.  KEIP Participants.

    i.  KEIP Participants shall consist of three (3) specific individuals, as confirmed by the Board of Directors, and as disclosed to the Bankruptcy Court (if applicable).

  C.  KEIP Term.

    i.  The KEIP shall be effective for all KEIP Participants up to and including the date of the consummation of the Asset Sale. The term "Asset Sale" shall refer to the consummation of a sale of all or substantially all of Reed and Barton's assets (in one or more transactions).

  D.  KEIP Bonus.

    i.  Each KEIP Participant may earn a bonus based on the Asset Sale (the "KEIP Bonus").

    ii.  KEIP Bonus.

      1.  The KEIP Bonus will be determined based upon the gross proceeds received by Reed and Barton in connection with the Asset Sale, whether in the form of cash, note or assumption of debt. In order to receive a KEIP Bonus, the gross sale proceeds must exceed the

purchase price contained in the Asset Purchase Agreement negotiated with Lifetime Brands, Inc. which for purposes of the KEIP is $13,500,000.00 (the "Threshold Value"). The KEIP Bonus for an Asset Sale in which the gross sales proceeds is less than or equal to the Threshold Value is $0.00.

2. The maximum gross sales price for an Asset Sale for which a KEIP Bonus can be earned is $23,000,000.00 (the "Maximum Value"). If the Maximum Value is obtained, the KEIP Bonus is $600,000.00. The amount of the KEIP Bonus cannot exceed $600,000.00 even if the Asset Sale results in gross sales proceeds in excess of the Maximum Value.

3. The KEIP Bonus for an Asset Sale with gross sales proceeds falling between the Threshold Value and the Maximum Value will be determined via linear interpolation.

E. Conditions Related to KEIP Bonuses.

i. Where applicable, KEIP Bonuses will be paid in cash (less required withholdings) as soon as administratively possible following the consummation of the Asset Sale.

ii. If a KEIP Participant resigns, retires, or otherwise voluntarily terminates his/her employment, or is terminated by Reed and Barton for Cause (as defined below) prior to consummation of the Asset Sale, the KEIP Participant will forfeit all KEIP Bonuses. A KEIP Participant whose employment is terminated without Cause, before or after consummation of the Asset Sale, will be eligible to receive the KEIP Bonuses.

iii. Neither the adoption of the KEIP nor the granting of any KEIP Bonus shall be construed as a contract of employment between Reed and Barton and any KEIP Participant nor confer upon any employee any right to continued employment with Reed and Barton, nor shall it interfere in any way with the right of the Reed and Barton to terminate the employment of any of its employees at any time, with or without Cause.

iv. For the purpose of the KEIP, "Cause" means each of the following, as determined in the discretion of the Reed and Barton's Board of Directors (excluding any KEIP Participant who is a member of the Board) in the exercise of its good faith and reasonable judgment:

1. a material and willful breach of the KEIP Participant's fiduciary duties to Reed and Barton;

2. in connection with the discharge of the KEIP Participant's duties with Reed and Barton, one or more material acts of fraud or dishonesty or gross abuse of authority;

2

3.      the KEIP Participant's willful commission of conduct which would constitute grounds for termination for violation of a material policy of Reed and Barton as in effect at the time;

4.      the KEIP Participant's breach of any material provision of nondisclosure, invention assignment, noncompetition, or other similar agreement; or

5.      the KEIP Participant's habitual and intemperate use of alcohol or drugs to the extent that the same materially interferes with the KEIP Participant's ability to competently, diligently and substantially perform the duties of his/her employment.

## II.    *The KERP.*

A.    The following is a description of the key terms of the KERP. A comprehensive copy of the entire KERP will be provided to all KERP Participants.

B.    KERP Participants.

i.    KERP Participants shall consist of the non-insider employees, roughly seventy three (73) at this time.

C.    KERP Term.

i.    The KERP Plan shall be effective for all KERP Participants up to and including the date of the consummation of the Asset Sale.

D.    KERP Bonuses.

i.    Each KERP Participant may earn four (4) weeks of his/her base salary ("KERP Bonus(es)").

E.    Conditions Related to KERP Bonuses.

i.    Where applicable, KERP Bonuses will be paid in cash (less required withholdings) as soon as administratively possible following the consummation of the Asset Sale.

ii.    If a KERP Participant resigns, retires, or otherwise voluntarily terminates his/her employment, or is terminated by Reed and Barton for Cause (as defined below) prior to consummation of the Asset Sale, the KERP Participant will forfeit all KERP Bonuses. A KERP Participant whose employment is terminated without Cause, before or after consummation of the Asset Sale, will be eligible to receive the KERP Bonuses.

iii.    Neither the adoption of the KERP nor the granting of any KERP Bonus shall be construed as a contract of employment between Reed and Barton

3

and any KERP Participant nor confer upon any employee any right to continued employment with reed and Barton, nor shall it interfere in any way with the right of Reed and Barton to terminate the employment of any of its employees at any time, with or without Cause.

iv.   For the purpose of the KERP, "Cause" means each of the following, as determined in the discretion of the Reed and Barton Board of Directors in the exercise of its good faith and reasonable judgment:

1.   in connection with the discharge of the KERP Participant's duties with Reed and Barton one or more material acts of fraud or dishonesty or gross abuse of authority;

2.   the KERP Participant's willful commission of conduct which would constitute grounds for termination for violation of a material policy of Reed and Barton as in effect at the time;

3.   the KERP Participant's breach of any material provision of nondisclosure, invention assignment, noncompetition, or other similar agreement; or

4.   the KERP Participant's habitual and intemperate use of alcohol or drugs to the extent that the same materially interferes with the KERP Participant's ability to competently, diligently and substantially perform the duties of his/her employment.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

In re:

REED AND BARTON CORPORATION,

                   Debtor.

Chapter 11

Case No. _____ (____)

**ORDER GRANTING MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER
AUTHORIZING THE DEBTOR TO IMPLEMENT KEY EMPLOYEE
RETENTION PLAN AND KEY EMPLOYEE INCENTIVE PLAN**

Upon the *Motion of the Debtor for Entry of an Order Authorizing Implementation of Key Employee Retention Plan and Key Employee Incentive Plan* (the "Motion")[1] and upon the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter an order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that sufficient notice of the Motion has been given; and it appearing that the relief requested by the Motion is in the best interests of the Debtor's estate; and sufficient cause appearing therefor;

    a.   IT IS HEREBY ORDERED THAT:

    1.      The Motion is granted.

    2.      The Debtor is hereby authorized to implement and fund the KEIP in its entirety, and make payments thereunder.

---

[1] Capitalized terms not defined herein shall have the same meaning as ascribed to them in the Motion.

3.      The Debtor is hereby authorized to implement and fund the KERP in its entirety, and make payments thereunder.

4.      All amounts earned and payable under the KEIP and the KERP shall have administrative expense priority under Bankruptcy Code sections 503(a) and 507(a)(2) for all purposes in this Chapter 11 Case and in any other cases under the Bankruptcy Code to which such case may be converted.

5.      The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

6.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  Boston, Massachusetts
          _____, 2015


          _____
          UNITED STATES BANKRUPTCY JUDGE