**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

In re:

REED AND BARTON CORPORATION,

                Debtor.

Chapter 11

Case No. _____ (___)

**DECLARATION OF TIMOTHY K. RIDDLE IN SUPPORT OF FIRST**
**DAY MOTIONS AND APPLICATIONS**

I, Timothy K. Riddle, hereby declare under penalty of perjury:

1. I am the President and a Director of Reed and Barton Corporation ("Reed and Barton" or the "Company"), a privately-held corporation organized under the laws of Massachusetts and the above-captioned debtor and debtor-in-possession. I am familiar with Debtor's day-to-day operations, business, and financial affairs.

2. On or about February 17, 2015 (the "Petition Date"), Reed and Barton filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") commencing the above captioned case. The Debtor continues to operate its business and manage its assets as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. No trustee or examiner has been appointed in the Debtor's chapter 11 case, and no committees have been appointed or designated.

4. In order to enable the Debtor to operate effectively and minimize certain of the potential adverse effects of the commencement of this chapter 11 case on its business operations, the Debtor has requested various types of relief in certain "first day" motions and applications (each, a "First Day Pleading" and collectively, the "First Day Pleadings"). The First Day

Pleadings, described in detail below, seek, among other things, to ensure the continuation of the Debtor's business operations without interruption, preserve vendor and customer relationships, maintain employee morale and confidence, and establish certain other administrative procedures designed to ease the Debtor's transition into bankruptcy.

5.     I submit this declaration (the "Declaration") in support of the First Day Pleadings as well as to provide background regarding the Company, and to support certain additional motions that, while not to be decided immediately, are being filed on the Petition Date and that the Company will request be brought before the Court for consideration in due course. Any capitalized terms not expressly defined herein have the meanings set forth in the relevant First Day Pleading. I am familiar with the contents of each First Day Pleading, and I believe that the relief sought in each First Day Pleading (i) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption or loss of productivity or value, (ii) constitutes a critical element in achieving a successful reorganization of Debtor, and (iii) is in the best interests of the Debtor, its estate and creditors.

6.     Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, on information supplied to me by other members of the Debtor's management team and/or professionals retained by the Debtor, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtor's operations, financial condition and present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtor.

## I.    **Background**

7.     Reed and Barton is a historic and iconic designer and marketer of fine tableware and giftware products including flatware, crystal drinkware, picture frames, Christmas ornaments and baby giftware. Reed and Barton's products have been mentioned in movies, used in United States Embassies, draped over necks of Olympic champions and, most importantly, used on tables around the world for over 190 years. Its brands through the years, either owned or in some instances produced in accordance with inbound license agreements, include not only Reed & Barton, but also Lunt, R&B EveryDay, and Williamsburg.

8.     Founded in 1824, Reed and Barton is one of the nation's oldest privately-held companies. Its stock is owned by 28 record shareholders who either are descendants of Henry Reed or trusts for their benefit.

9.     The company's headquarters has been in the same complex of buildings in Taunton, Massachusetts since 1830. The buildings are a testament to a bygone era. The campus is a classic New England manufacturing facility. Its main office building includes silver handrails on staircases, a large boardroom and a main lobby with wall-length glass cases displaying ornate silver products produced by the company. The primary building at the facility is 150,000 square feet and serves as the Company's only distribution center. The corporate office and a Clearance Center are located on site, adjacent to the warehouse. A factory store is also located in Taunton, on property next door to the main facility.

10.    For most of its history, the Company manufactured its products at the Taunton plant and at another location that it continues to own in Norton, Massachusetts. The Company began phasing out Massachusetts-based manufacturing in 1980, a process that was completed when production of sterling flatware was ceased in Taunton in 2009. Currently, manufacturing is

conducted in multiple locations around the globe, with the bulk of the manufacturing conducted by subcontract manufacturers in Asia.

11.     Sales are mainly undertaken through three distribution channels. Most of Reed and Barton's revenues are generated through wholesale sales to retailers, primarily department stores and specialty gift shops. For fiscal year ended February 1, 2014 approximately forty percent (40%) of Reed and Barton's total net sales were to three retailers, Costco, QVC and Federated Department Stores (Macy's plus Bloomingdales), with the Company's top ten customers generating approximately fifty-six percent (56%) of total sales. The Company also conducts direct retail sales at its factory store located in Taunton. Finally, the Company operates an e-commerce site that generated approximately three percent (3%) of total sales for the fiscal year ending February 1, 2014. The Company also had, in the year prior to the Petition Date, four leased locations located in Atlanta, Georgia, Kittery, Maine, New York City, and Dallas, Texas.

12.     Sales in fiscal year ended February 1, 2014 totaled $37,457,473, generating a net loss of $1,529,574. Although 2014 operations generated a loss, they also indicated the continuation of a positive trend since what at least one industry expert termed a "dismal recession period" starting in 2009. For the fiscal year ended February 2, 2013, sales were $31,887,529 and generated a loss of $3,076,245. Unfortunately, the positive operational trending came to an abrupt end in fiscal year ending January 31, 2015 when sales for the nine month period ending November 1, 2014 generated only $18,392,665 in sales, suggesting annualized sales of approximately $24.5 million, and a loss for that nine month period of $2,011,765, or an annualized loss of approximately $2.68 million. The dramatic downward shift in revenues was driven primarily by an unanticipated decline in orders from the very customers that had largely driven an eighteen percent (18%) increase in revenues from 2013 to 2014, with orders from QVC

and Costco in fiscal year 2014 of $11.8 million decreasing to a projected $740,000 in fiscal year 2015.

13.     The precipitous drop in revenues, if the only point of pressure, would alone not likely have driven Reed and Barton to conclude that there was a necessity to seek the protections of chapter 11. The management team that I head had demonstrated considerable agility in preserving value in the face of such pressures as: (i) ever-shifting consumer tastes resulting in waning demand for silver flatware products; (ii) an attendant waning willingness of retailers to dedicate shelf space to companies like Reed and Barton; (iii) cost fluctuation of raw materials such as silver; and (iv) pricing pressure caused by foreign competition. The Company's efforts to meet all of its obligations have included shifting manufacturing offshore, changing its product mix to meet contemporary demand, the strategic acquisition of Lunt in 2010 through a section 363 acquisition during Lunt's chapter 11 case before the United States Bankruptcy Court for the District of Massachusetts and a shift in customer base to expand beyond the traditional high-end retailers to include big box retailers, warehouse clubs, and internet accounts. Although dramatic and unpredictable shifts in order levels with their impact on top line revenues and in costs of sales with the attendant impact on bottom line profitability have rendered managing both inventory control and cash flow challenging, those challenges have been met. In the second half of calendar year 2014, however, it became clear that Reed and Barton was not only faced with an unanticipated decrease in revenues, but it was also going to be faced with an unanticipated major degradation of its balance sheet resulting from an increase in a long-standing liability resulting from the underfunding of its defined benefit pension plan. That increase, along with the contingent burden imposed by other legacy debt, when coupled with the dramatic decrease in sales, caused management to conclude that long-term viability of the Company was suspect, and

that the Company should explore the options available to deal with its then-existing and projected financial challenges.

**II. Debt Obligations**

14.      The chapter 11 is necessitated by a combination of on and off-balance sheet liabilities as well as an evolution of the brick and mortar retailers that traditionally carried Reed and Barton's products for sale to consumers. The funded debt and trade debt balance sheet entries are not problematic. There is both a term loan and a working capital line of credit with Rockland Trust or its affiliates with aggregate balances as of the Petition Date of approximately $4.7 million. As of the Petition Date, trade debt was approximately $1.74 million total, mainly current and spread among approximately seventy-five (75) holders.

15.      The term loan component of the Rockland Trust credit facilities is governed by a Term Loan Agreement dated July 3, 2012 executed by Reed and Barton and Rockland Trust Community Development III, LLC. The term loan is in the principal amount of $977,000. It matures on July 2, 2015. Interest only is paid with advances under the line of credit at a rate equal to fifty percent (50%) of the aggregate of Rockland Trust's prime rate plus 1.25%. Thirty-five consecutive monthly principal payments of $27,138 with a balloon payment in the thirty-sixth month are called for, provided that the first thirty-five payments may be made through reduction in the availability under the line of credit for as long as an event of default does not occur. During the week of February 8, 2014, the term loan was satisfied with a draw from the working capital line of credit. Prior to the term loan's satisfaction, Reed and Barton's obligations under the Term Loan were secured by substantially all of its non-real estate assets.

16.      The revolving line of credit component of the Rockland Trust credit facilities is governed by a Revolving Credit Agreement dated as of July 2, 2012 between Reed and Barton

and Rockland Trust Company. The credit agreement provided initially for advances up to the lesser of $12 million (increasing to $15 million from October 1 through November 30 of each year) or the sum of (i) 85% of eligible accounts receivable; (ii) 80% of the cost of eligible inventory multiplied by 60%; (iii) 80% of eligible in-transit inventory capped at $1 million; less (iv) the aggregate amount of reserves established by the bank. The lending cap was subsequently reduced to $5 million. The outstanding advances accrue interest at prime plus .50%. There is an unused line fee of .375% on the committed amount above the total outstanding borrowings. The Company projected that the outstanding balance of the line of credit as of the Petition Date would be $3.476 million. The line of credit is secured by substantially all non-real estate assets of the Company and matures on July 2, 2015.

17.     The executed asset purchase agreement for substantially all of the Company's non-real estate assets discussed in greater detail below suggests that Rockland Trust's loan to value ratio is between 250% and 500%, indicating a substantial degree of oversecurity.

18.     As previously stated, trade liabilities are largely current with a present outstanding amount of approximately $1.74 million. Certain insiders and non-insider employees have employment agreement provided rights to severance and change of control payments that aggregate approximately $2.8 million. Unsecured liabilities will be increased in the chapter 11 case through contemplated lease and contract rejections, the likely assertion of claims asserted as a result of disputes regarding Reed and Barton's alleged production of product after license expiration or in the asserted absence of a license, and a non-qualified SERP that will not be funded further.

### III.      The Legacy Debt

19.     The primary liability facing the company arises from an underfunded defined benefit pension plan. Reed and Barton's auditors in the audit report as of February 1, 2014 reported a current portion of pension liability of $2.176 million and a pension liability net of the current portion of $7.486 million for a total pension liability of $9.662 million. Subsequent events suggest that the actual liability may be considerably higher.

20.     The Company's defined benefit pension plan covers substantially all of its employees. Although Reed and Barton has long been party to collective bargaining agreements governing its relationship with its union work force, it is not a participant in a multi-employer pension plan. The Reed and Barton plan provided that full time salaried and commissioned employees are to receive pension benefits based on their five highest consecutive years of compensation during the ten years preceding retirement. Hourly employees' pension benefits are calculated based on years of credited service. The plan was frozen, but not terminated, as to non-union employees effective June 1, 2004. Under a collective bargaining agreement dated March 8, 2004, pension benefits to the Company's union employees were frozen, but not terminated, effective March 8, 2006.

21.     The Company has been making quarterly payments into the pension plan for several years in accordance with ERISA statutory requirements relating to underfunded pension plans. The amounts of those payments were calculated based on the Company's ERISA professionals' calculations of the amount of the underfunding and the regulatorily mandated mortality and discount rate tables then in effect.

22.      Those quarterly payment obligations have placed a degree of financial strain on the Company, but that strain has recently been exacerbated by ongoing decreases in interest rates

and changes in the mortality tables prescribed by U.S. GAAP accounting standards as well as ERISA minimum funding requirements for actuarially calculating the underfunding status of the plan. The underfunding obligation is likely further exacerbated by the discovery during the fourth quarter of calendar year 2014 that the ERISA professionals engaged by the Company may have understated the amount of the underfunding. The due diligence undertaken in connection with the sale process more fully described below revealed, for the first time, that the pension plan was never advised to and, as a result, did not provide notices of suspension of benefits to employees who continued in employment past their 65th birthdays, which requires the accrual of additional benefits that the plan had not previously accounted for. The extent to which the convergence of the newly imposed interest rate and mortality table obligations when added to the previously unaccounted for benefit entitlement of certain plan participants increases Reed and Barton's underfunding liability remains under investigation by the Company's ERISA counsel and actuaries. Current estimates suggest that the total liability may exceed $18 million. Whatever the amount is ultimately calculated to be, it is clear that Reed and Barton's current and reasonably projectable future revenues will be insufficient to meet the quarterly payment demands of its underfunded defined benefit plan.

23.    The other as yet unquantified off-balance sheet liability relates to the potential environmental contamination of Reed and Barton-owned real property. The company owns two properties, the headquarters located in Taunton, Massachusetts, and a site once also used for manufacturing in Norton, Massachusetts. Both may have certain environmental liabilities associated with them due to historic operations.

24.    The Taunton property is located at 144 West Britannia Street. It was identified in 1990 as a known contamination site as Mass. DEP Release Tracking Number, RTN 4-0883.

Since 1990 the site has been monitored with various remediation activities conducted. As documented in a March 14, 2014 Phase V Status Report and Remedy Operation Status (ROS) Submittal, there remains soil and groundwater contamination associated with the former plating operations in Building 39 at the headquarters property. Although the contaminant plumes are stable, the concentrations are such that any future use would require additional evaluation and possible remediation.

25.    The Norton property is located at 47 Elm Street. Reed and Barton is one of a number of unrelated successive owners of the site who conducted manufacturing operations there, with wastewater generated during manufacturing treated and disposed through the use of on-site lagoons. Reed and Barton's documentation indicates that the Norton lagoons were closed with permission of the Massachusetts Department of Environmental Protection ("DEP") in July 1981. Neither the lagoons the nor the mill section of the property have undergone a comprehensive environmental site assessment to determine what, if any, soil or groundwater contamination may exist.

26.    Reed and Barton may also be the subject of a contribution claim by Ashland, Inc. relating to the Davis Superfund site in Smithfield, R.I. That claim is premised on an allocation of each party's proportionate share.

**IV.    The Proposed Sale of Non-Real Estate Assets**

27.    Faced with mounting legacy debt and upcoming credit facility maturities, Reed and Barton decided to undertake a process for the sale of the Company or its assets, or alternatively, for debt or equity based long-term funding. It engaged Financo, LLC ("Financo"), an investment banker experienced in the wholesale and retail industries, to conduct that process.

28.     Financo conducted an extensive marketing process including contacting ninety-one (91) potentially interested parties, consisting of approximately fifty potential financial investors and forty-one potential strategic investors. Forty-two (42) of the contacted parties, consisting of eighteen (18) strategic investors and twenty-four (24) financial investors, responded and were sent teasers. Twenty-five (25) of those parties--nine (9) strategic and sixteen (16) financial investors-- executed non-disclosure agreements and undertook due diligence. Six bids for various forms of potential transactions were received. The six bids were presented to the board of directors by Financo in October, 2014, and ultimately the board determined that a bid submitted by Lifetime Brands, Inc. ("Lifetime") was the most advantageous to the company and its creditors.

29.     Lifetime is actually one of Reed and Barton's top competitors. Lifetime distributes food preparation, tabletop, home décor and lifestyle products under such well-known brand names as Farberware, KitchenAid, Mikasa, Pfaltzgraff and Cuisinart. It distributes its products to specialty stores, department stores, national chains, mass merchants, warehouse clubs, home centers, supermarkets and off-price retailers as well as directly to consumers through the internet.

30.     After substantial negotiations, Lifetime increased the consideration appearing in an initial offer that it had made to an offer with total consideration approaching $25 million payable in part in cash, in part through a four-year royalty on future sales of Reed and Barton products and in part through the assumption by Lifetime of Reed and Barton's underfunded defined benefit pension plan. Lifetime's subsequent actuarial diligence however, suggested that the defined benefit plan's underfunding liability was more than they had anticipated when they initially agreed to assume the pension plan, and more than the Company had understood to be the

underfunding amount. Although transaction documentation was near final, upon reaching its conclusion as to the underfunding liability, Lifetime notified the company that it was no longer interested in the transaction.

31.     Following Lifetime's termination of the originally contemplated transaction, Financo re-approached various interested parties, including Lifetime. Those discussions once again revealed Lifetime to be the party with the most beneficial combination of amount of consideration it was willing to provide, transaction speed and degree of closing risk associated with proceeding. Negotiations were undertaken, resulting in the execution of a Letter of Intent ("LOI"). Lifetime and the Company later negotiated and executed an Asset Purchase Agreement (the "APA") and associated documents that will be brought before the Court for consideration.

32.     Under the APA, Reed and Barton has agreed to sell, and Lifetime has agreed to buy, substantially all non-real estate assets of the Company in a sale conducted under the provisions of section 363 of the Bankruptcy Code. The sale price for the assets is $15 million, subject to adjustment based on working capital at closing and amount of cure costs arising under assumed contracts, plus assumption of certain liabilities. The $15 million in consideration to be paid by Lifetime will consist of a $250,000 deposit paid when the APA was executed, $9.75 million in additional cash and $5 million in a promissory note to be delivered at closing, subject to adjustment.

33.     The APA contemplated adjustments to the consideration cannot reduce the cash portion of the purchase price, but can only adjust the principal amount of the promissory note. There are two potential sources of adjustment.

34.     The APA establishes $10 million as the "Target Working Capital." Working Capital is defined as the sum of accounts receivable net of applicable reserves plus inventory net

of applicable reserves (provided that the inventory must comprise at least $7 million of the Working Capital and cannot comprise more than $10 million of the Working Capital) less assumed accounts payable. To the extent that formula yields a Working Capital total of less than the $10 million Target Working Capital, the promissory note adjusts downward dollar for dollar. To the extent the formula yields Working Capital of greater than $10 million the promissory note adjusts upward by as much as $1 million. The promissory note is also subject to a dollar for dollar downward adjustment equal to the amount of cure payments associated with assumption and assignment of executory contracts.

35.     As of the Petition Date, the Company projects that its Working Capital calculated in accordance with the APA dictated formula will be approximately $9 million. In order to assure that the Company's inventory balance does not slip below the $7 million minimum balance established in the APA as a condition to closing, and, more importantly, that the downward adjustment in the purchase price resulting from having less than $10 million in Working Capital at closing is not triggered, it will be necessary for the Company to receive delivery of inventory and to deliver that inventory to customers in order to create accounts receivable.

36.     The proposed sale to Lifetime is expressly subject to the solicitation of overbids pursuant to negotiated bid procedures that will be brought before this Court for consideration. Among other aspects of the bid procedures, approval is sought to afford Lifetime a $750,000 break-up fee payable only in the event of, and from the proceeds of, a sale to a party other than Lifetime.

37.     The Lifetime transaction is contingent on two conditions worth particular mention. First, Lifetime requires that the two top managers of Reed and Barton, Charles Daly-- Reed and Barton's chief financial officer, and me—the president and chief executive officer of

the Company—enter consulting agreements in order to assist Lifetime with integrating the Reed and Barton lines. Lifetime has offered me a three year agreement for consideration of $200,000 per year. Mr. Daly has been offered a two year deal for consideration of $100,000 per year. No agreement has yet been reached as to the consulting agreements.

38.     Second, Lifetime has required that Reed and Barton maintain substantially all of its employees and continue to operate for up to ninety (90) days post-closing in order to assist with transitioning Reed and Barton's brand and operations to Lifetime under the terms of a Transition Services Agreement. The costs of rendering the transition services are to be borne by Lifetime.

## V. Contemplated Stages Of The Chapter 11 Case

39.     Reed and Barton envisions three partially overlapping stages to its chapter 11 case. Initially the primary goal is to invoke the applicable provisions of the Bankruptcy Code to sell the non-real estate assets of the Company to Lifetime or the highest bidder identified in a bid solicitation process. As previously stated, the sale price in that transaction is $15 million before adjustment, of which $10 million is cash.  That cash consideration is projected to be sufficient to provide for full payment to the Company's sole holder of a perfected secured claim—Rockland Trust—and to leave sufficient funds and additional consideration to carry out the next stages of the chapter 11 case and to provide for a distribution to unsecured creditors.

40.     Because the sale proceeds will not be received until the conclusion of a post-petition sale process, and because Reed and Barton has and generates insufficient cash to sustain operations, the Company requires debtor in possession financing. The Company has arranged for funding through debtor-in-possession financing from Reed and Barton's prepetition lender,

Rockland Trust. Approval of that financing will be sought, first on an interim basis, and later on a final basis, during this first stage of the Company's chapter 11 case.

41.     Overlapping the conduct of the sale process and likely continuing after its completion, Reed and Barton intends to work with the Pension Benefit Guaranty Corporation ("PBGC") toward a voluntary distress termination of the Company's defined benefit pension plan. Although Reed and Barton made quarterly payments for a number of years in an attempt to address the plan's underfunding, at one time granting to the PBGC a now-expired lien on Reed and Barton's real estate, and also attempted to undertake a sale transaction in which the pension plan would be assumed by a purchaser, it has become evident that Reed and Barton can no longer fund its obligations under the pension plan. After substantially all of its assets are sold the Company will have no resources available to fund those obligations and, while Lifetime initially indicated a willingness to assume the pension plan, as a result of its due diligence it determined that it would not do so and no other prospective purchaser has yet expressed a willingness to assume the pension plan as part of a sale transaction.

42.     The Company, therefore, intends to invoke the first of four tests for a distress termination that I am informed are found in 29 U.S.C. §1341(c)(2)(B)(i), which provides for voluntary distress termination of a pension plan in the event of a liquidation in a bankruptcy or insolvency proceeding, by providing to the PBGC a notice of intent to terminate along with the statutorily and regulatorily required information that must accompany that notice.

43.     During that same phase of the case, the Company intends to bring about a disposition of those assets of the Company that Lifetime, or any overbidder, does not acquire. Under the APA, Lifetime has excluded the Company's real property from the scope of assets it is acquiring. The audit report indicates a value of Reed and Barton's land and buildings as of

February 1, 2014 to be $6,950,546, which is the cost without regard to depreciation. The actual

book value of the land and buildings as of February 1, 2014 was approximately $1,337,890. The

Company does not have an estimate of its current fair market value. The real property will be

sold, assigned to a plan appointed trustee for later sale or abandoned. Because sale of the real

property before the transition of the Company's assets and operations to a purchaser is unlikely,

some amount of the sale proceeds may have to dedicated to undertake a responsible shut down of

the property.  There is also personalty located within the Reed and Barton headquarters building

that is not being acquired by Lifetime regarding which there may be competing claims of

ownership. Ownership of those assets will have to be determined and, if they constitute property

of the estate, some disposition of those assets may be appropriate.

44.    Finally, Reed and Barton intends to file and seek confirmation of a liquidating

plan of reorganization in order to provide for the distribution of remaining cash sale proceeds

and the appointment of a fiduciary to administer and collect the Promissory Note, the liquidation

and recovery of any unadministered assets and the finalization and closing of the chapter 11 case.

## SUMMARY OF FIRST DAY PLEADINGS

a.    **Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (1) Authorizing Post-Petition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (4) Modifying the Automatic Stay, and (5) Scheduling a Final Hearing (the "Financing Motion").**

45.    Through the Financing Motion the Debtor seeks entry of an interim order (i)

authorizing it to, among other things, incur post-petition secured indebtedness on an interim

basis in accordance with the Senior Secured, Superpriority Debtor-In-Possession Credit

Agreement (the "DIP Financing Agreement") first on an interim basis and later on a final basis.

46.     Since at least July 2012, when the Company entered into its most recent lending arrangement with Rockland Trust, substantially all receipts were deposited in a lock box controlled by Rockland Trust. Reed and Barton, therefore, has no substantial cash with which to conduct operations. Even if afforded access to its accounts receivable collections, the Company does not project receipt of sufficient cash with which to conduct operations.

47.     Reed and Barton has, therefore, requested, and Rockland Trust has agreed, to provide the Company with debtor-in-possession financing for the purpose of conducting post-petition operations in accordance with a budget, subject to certain variances described more fully below. A copy of that budget is attached hereto as Exhibit A (the "Budget").

48.     Initially, the Company seeks entry of an interim order (i) granting leave to borrow up to $1,500,000 through March 1, 2014 on in interim basis to be used to the extent provided and for the purposes set forth in the Budget, (ii) granting security interests for and superpriority administrative claim priority to the claims arising from the borrowing in the form provided in the DIP Financing Agreement, and (iii) scheduling a final hearing, after which the Company requests entry of a final order, which among other things, (a) authorizes the Company to obtain debtor in possession financing in accordance with the terms of the DIP Financing Agreement in accordance with the Budget up to maximum principal amount provided in the DIP Financing Agreement; (b) provides pursuant to sections 364(c)(3) of the Bankruptcy Code, that the obligations of the Debtor under the DIP Loan Documents are (i) granted superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code, and (ii) secured under section 364(d)(1) of the Bankruptcy Code by valid and fully perfected, first priority liens on and security interests in the "Collateral," as that term is defined in the DIP Financing Agreement.

49.    The general terms of that financing are nearly identical to the terms of Reed and Barton's prepetition working capital line of credit with Rockland Trust. Rockland Trust has agreed to provide up to $7 million, less the balance due on both the prepetition term loan and the prepetition line of credit, in working capital financing to the Company on a senior secured superpriority administrative expense. Availability will be determined under the same formula as it was determined under the prepetition working capital line of credit-- (i) 85% of eligible accounts receivable; (ii) 80% of the cost of eligible inventory multiplied by 60%; (iii) 80% of eligible in-transit inventory capped at $1 million; less (iv) the aggregate amount of reserves established by the bank.  A fee of fifty thousand dollars ($50,000) is charged, but otherwise the cost of funds is the same as the prepetition cost—prime plus .50% and an unused line fee of .375% on the committed amount above the total outstanding borrowings. Expenditures are to be made in accordance with the Budget with an allowed variance such that receipts must be within 85% of budget and expenses within 110% of budget. There is a carve out for statutory fees, U.S. Trustee fees and budgeted professional fees.

50.    Financo, the investment banker engaged by Reed and Barton prepetition and that the Company has sought authority to engage post-petition, was tasked prepetition with locating any available transaction, including equity sale, equity investment, asset sale or debt funding. As stated above, ninety-one (91) parties were contacted, twenty-five (25) undertook diligence and six (6) made offers. None of the offers received would have provided post-petition financing on terms more favorable than those provided in the Rockland Trust DIP financing.

51.    Approval of the Financing Motion is crucial to the success of this chapter 11 and to the ability of the Company to conduct a sale process and close a sale that will pay the Rockland Trust debt in full, provide funds to complete the tasks contemplated in this chapter 11

18

case and fund a dividend to unsecured creditors. Absent approval of the DIP Facility, Reed and

Barton would be forced to cease operations immediately and the sale process could not be

undertaken.

52.    As a result, approval of the Financing Motion is necessary and in the best interests

of the Company's creditors.

**b.    Motion for an Order (I) Authorizing, But Not Directing, Debtor to (A) Pay Certain Prepetition Wages, Commissions, Payroll Taxes, and Related Obligations, (B) Pay and Honor Employee Medical and Other Benefit Expenses, and (C) Continue Employee Benefit Programs, and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Wages Motion").**

53.    Through the Wages Motion, the Company requests, pursuant to 11 U.S.C. §§

105(a) and 363(b) of the Bankruptcy Code, that this Court (i) authorize, but not require, the

Debtor to (a) pay, in its sole discretion, all obligations incurred constituting or related to

Employee Benefits as defined in the motion up to the amount authorized by 11 U.S.C. §

507(a)(5) and all costs incident to the foregoing with regard to services provided by its

employees during the prepetition period (each as defined, and collectively, the "Employee

Obligations") and (b) maintain and continue to honor its practices, programs, and policies for its

employees as they were in effect as of the filing of this case and as such may be modified,

amended, or supplemented from time to time in the ordinary course; and (ii) authorize Rockland

Trust to receive, honor, process, and pay any and all checks drawn on the Debtor's general

disbursement accounts to the extent that such checks or transfers relate to any of the foregoing.

54.    The Company's regular staff is comprised of approximately 75 employees. The

continued operation of the Company's business and its successful reorganization depends largely

upon the retention of the services of these employees and the maintenance of employee morale

and cooperation. Consequently, it is critical that the Company be authorized to satisfy its

employee-related obligations and continue its ordinary course employee plans, policies, and programs in effect as of the Petition Date.

55.     I believe that the authority to pay all employee obligations in accordance with the Company's prepetition business practices is in the best interests of the Company and its estate and will enable the Company to continue to operate its business in chapter 11 without disruption. I submit that the benefit to be gained from allowance of this Motion far outweighs the associated cost, which is contemplated in the Budget and provided for under the DIP Financing Agreement.

**c.  Motion of Debtor for Order Authorizing Debtor (A) Continue Using Certain Existing Bank Accounts, Business Forms, and Cash Management System; and (B) for Limited Waiver of the Requirements of Section 345(b) (the "Cash Management Motion").**

56.     Through the Cash Management Motion, the Company requests that the Court enter an order waiving of certain of the local operating guidelines imposed by the Office of the United States Trustee in chapter 11 cases in this District to permit the Debtor to continue and maintain certain bank accounts with Rockland Trust and also to generally continue using its existing business forms.

57.     The Reed and Barton Cash Management System comprises ten main accounts (the "Bank Accounts") maintained by the Debtor with Rockland Trust. Those accounts include the following:

a.     Operating Account

The Debtor maintains a central operating account and cash disbursement account ("Operating Account") at Rockland Trust. The Operating Account is funded on an as needed basis by the Commercial Loan Account (as described below).

b.     Concentration Account

The Debtor maintains a concentration account ("Concentration Account") that receives all incoming cash deposits and is tied to the Lockbox

Account (as described below). Other cash coming into this account includes cash that the Debtor receives at its offices that it then deposits directly, incoming wires from customers as well as cash swept from the Company Store Account, Consumer E-Commerce Account, and Card Advances Account (as described below). Cash received in the Concentration Account is swept daily to the Commercial Loan Account (as described below) to pay down the revolver balance.

c.      Lock-Box Account

Accounts receivable payments owing to the Debtor, are mailed or wired into a lockbox bank account ("Lock-Box Account") held at Rockland Trust. The available balance in the Lock-Box Account is swept daily to the Concentration Account.

d.      Company Store Account

This account ("Company Store Account") is used to receive cash transfers from Bank of America and American Express merchant accounts that process credit card payments received for purchases made at the Debtor's retail store in Taunton, Massachusetts. Cash received in the Company Store Account is swept daily to the Concentration Account.

e.      Consumer E-Commerce Account

This account ("Consumer E-Commerce Account") is used to receive cash transfers from Bank of America and American Express merchant accounts that process payments received for website customer purchases. Cash deposited in the Consumer E-Commerce Account is swept daily to the Concentration Account.

f.      Freight Payment Account

This account ("Freight Payment Account") is used to fund the majority of the Debtor's freight bills, and is funded as needed with transfers from the Operating Account.

g.      Card Advances Account

The Debtor maintains this account ("Card Advances Account") to process trade accounts receivable balances paid to the Debtor via credit cards. Cash in the Card Advances Account is swept daily to the Concentration Account.

h.      Controlled Disbursements Account

The Debtor maintains its main checking account ("Controlled Disbursements Account") for cash disbursements made through paper checks. The Controlled Disbursements Account is funded by transfers from the Operating Account.

i.     Commercial Loan Account

The Debtor maintains this account (the "Commercial Loan Account") for purposes of its revolving credit facility. Advances from the Commercial Loan Account are made on a daily basis to the Operating Account to fund the Debtor's daily cash disbursements. The balance of the Commercial Loan Account is paid down daily by cash swept in from the Concentration Account.

j.     Payroll Account

This checking account (the "Payroll Account") is used for payroll checks issued outside of the normal pay cycle, and thus not processed through the ADP payroll system at the time they are generated. The Payroll Account is funded when necessary from the Operating Account (as described below).

58.     The Freight Payment Account and the Controlled Disbursement Account are used for outbound payments. The remainder of the accounts are used to: (i) collect payments from customers, with amounts collected swept daily to create availability under the DIP Financing Facility; (iii) used to process credit card receipts; (iii) used as a temporary holding account of a pass through account for other accounts; (iv) used for depositing payroll and swept by the ADP which then issues payroll checks from its account; or (v) used exclusively in connection with the application of proceeds to, and disbursement of proceeds from, the DIP Financing Facility.

59.     Reed and Barton is not requesting that it be relieved of the obligation to close those accounts from which outbound checks are cut. More specifically, both the Freight Payment Account and the Controlled Disbursement Account will be closed, new accounts that serve the same purposes that those accounts served will be opened, and new check stock will be ordered that contains the debtor-in-possession notation and the case name and number.

60.    The remaining accounts, however, serve limited purposes and are used by the Company to: i) collect payments from customers, with amounts collected swept daily to create availability under the DIP Financing Facility; (ii) process credit card receipts; (iii) provide a temporary holding account or a pass through account for other accounts; (iv) pass payroll through to ADP which then issues payroll checks from its account; or (v) afford the administrative means for the application of proceeds to, and disbursement of proceeds to Reed and Barton from, the DIP Financing Facility. The Credit Card Account is not used by the Company to pay expenses, but rather to receive payments from its customers. All deposits are then transferred to the Operating Account. Any delay in processing and receiving these payments could only serve to disrupt the flow of cash into the estate. Given this, the Company does not believe that there is any valid need to close the Credit Card Account. After the filing, any post-petition credit card receipts will be able to be immediately transferred to the new operating account, once open and active.

61.    Closing existing accounts that have been established to receive payments and opening new account could result in substantial disruption, or at least delay, in cash receipts. Changes in credit card processing and the means by which direct payments from commercial customers could result in delays in payment and impose substantial administrative burdens in the receipt of funds and the reconciliation in accounts.

62.    As the purpose of the Operating Guidelines can still be met even with allowance of the Cash Management Motion, the benefit to be gained from allowance of that Motion warrants the requested relief.

**d. Motion of the Debtor for Entry of an Order Authorizing the Debtor to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business (the "Customer Programs Motion").**

63.     By the Customer Programs Motion, the Company requests, pursuant to sections 105(a), 363, 507, 1107(a) and 1108 of the Bankruptcy Code, authority to continue its prepetition customer programs and to pay its prepetition obligations related to its customer programs in the ordinary course of business. Prepetition and in the ordinary course of business, the Company provided its customers with certain satisfaction, loyalty and discount programs, including returns, refunds, exchanges, substitutions, adjustments, warranties, promotional offers or discount codes, dealer cooperative advertising and defective allowance programs and credit cards and other credit balances relating to goods sold to customers (collectively, "Customer Programs").

64.     A significant portion of the Company's sales are paid with credit cards. To facilitate such transactions, the Company is a party to certain agreements with credit card companies and processors which enables the Company to accept credit and debit card purchases in its retail stores, through catalog mail orders and online retail sites, subject to certain returns, exchanges, substitutions and other credit balances (collectively, the "Credit Card Agreements").

65.     The Company's continued ability to honor and process credit and debit card transactions is essential to continued customer loyalty and to the Company's ability to effect a sale of substantially all of its assets and line of business. Without this ability, the Company would lose its main avenue for conducting sale transactions in the ordinary course of its retail store, catalog and online retail sites. Under the terms of its Credit Card Agreements, the Company is required to pay the credit card companies and processors fees for their services, certain of which have accrued but remain unpaid as of the Petition Date. The Company requests

authority to continue to pay these fees in the ordinary course of its business in order to avoid interruption of these vital credit card processing services. Over the twelve months preceding the Petition Date, the Company generated approximately $7.4 million in credit card sales and paid approximately $213,000.00 in fees to credit card companies and processors. These credit card accounts are therefore important to the Company's business because they facilitate sales, generate revenue, and ensure customer loyalty and repeat business.

66.    The Company's Customer Programs also include its product warranties, its return and refund program, and its discounted promotional code programs offered to its retailer customers through the Company's dealer website.

67.    Also, the Company has negotiated discounts and allowances with certain retail customers on a customer by customer basis. In most instances, the Company's agreement to participate in these programs is a prerequisite of doing business with the customer, or is required to secure placement of a particular sales program with the customer. The Company attempts to negotiate these discount and allowance programs to the lowest possible amount, while still maintaining a good working relationship with the customer.

68.    The different allowances and special discounts agreed to by the Company with certain of its retailer customers, include cooperative advertising allowances or offsets, defective product allowances or offsets, purchase order returns, "Net 60" payment terms, and volume rebates, among others (collectively, the "Credit Allowances"). As of the Petition Date, the Company had negotiated Credit Allowances with over 40 retail clients, including Macy's, QVC, Bloomingdales, Amazon.com, and Costco Wholesale. The Company estimates that as of the January 31, 2015 end of its fiscal year, approximately $108,000.00 could be claimed for cooperative advertising and defective product allowances.

69.     I believe that the Company's continuing the Customer Programs and honoring its obligations related to the Customer Programs in accordance with the Company's prepetition business practices are critically important to the Company continuing its operations, are in the best interests of the Company and its creditors, and will enable the Company to operate its business in its chapter 11 case without disruption.

**e.  Motion for Order Pursuant to Sections 105(A), 363(B), 507(A) and 541(D) of the Bankruptcy Code for Authorization to Pay Prepetition Sales Taxes and Related Obligations (the "Sales Tax Motion").**

70.     The Company seeks entry of an order, pursuant to sections 105(a), 363(b), and 541 of the Bankruptcy Code, authorizing it to pay all accrued sales taxes owing to the Commonwealth of Massachusetts Department of Revenue ("DOR") or such other state or local taxing authority to which the Company is responsible for the collection and remittance of sales taxes on account of prepetition sales to the Company's retail customers. Although the Company is current on its sales and use tax payment obligations, it has collected sales taxes from its customers during the prepetition period, that will come due post-petition in the approximate amount of $5,497.97 payable as of the Petition Date, consisting of the following:

      i)      Massachusetts - $1,783.92

      ii)     Maine - $2,143.96

     iii)    Georgia - $383.73

     iv)    California - $1,186.31

71.     The Company holds these funds in trust for the benefit of the DOR and other taxing authorities, such that the funds may be alleged not to constitute property of the Company's estate.

72.     As nonpayment of these obligations may cause the DOR and other taxing authorities to take precipitous action, preventing the Company from conducting business or

imposing interest and penalties on the amount due, allowance of the Sale Tax Motion is appropriate and necessary.

**f.** **Debtor's Motion for Order Pursuant to (I) 11 U.S.C. §§ 105, 363, 1107, and 1108 and Fed. R. Bankr. P. 6003 and 6004 Authorizing Debtor to Pay Prepetition Claims of Certain Foreign Vendors and Carriers; (II) 11 U.S.C. § 105(A), 363(C), and 503(B)(1)(A) and Fed. R. Bankr. P. 6003 Confirming Administrative Expense Priority Status of Debtor's Undisputed Obligations for Post-Petition Delivery of Goods and Services; (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (IV) Granting Related Relief ( the "Critical Foreign Vendor Motion").**

73.    As previously stated, most of Reed and Barton's inventory purchases are from foreign vendors, not subject to the jurisdiction of the Bankruptcy Court. Seven of the Company's top ten vendor creditors are non-domestic companies, including Woodmax Ky Industries of Taiwan, Steklarna Rogaska of Slovenia, Sung Jin of Hong Kong, Seorim Vietnam Company of Vietnam, Winko International Products of Hong Kong, Wing YIP Metal Manufactory of Hong Kong and Wacker Industrial of Hong Kong.

74.    The Company believes that it is current with these vendors, and that most, if not all, of any amounts owing as of the Petition Date would be for goods shipped with twenty days prior to the Petition Date and, therefore, entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code.

75.    At any given time Reed and Barton has inventory in process, in transit on the water in vessels owned and operated by foreign entities or in the hands of warehousemen and in trucks on the way to being "drop shipped" directly from a foreign vendor to a customer. At present, Reed and Barton has approximately $459,599.47 in goods in transit from seven foreign vendors. Those goods, while ordered prepetition, and shipped prepetition, will not be received by Reed and Barton, or by the customers to whom those goods are being "drop shipped" until post-petition.

76.     The bulk of the Company's obligations for that inventory, therefore, would be subject to administrative expense priority either because delivered post-petition or because delivered within twenty days prior to the commencement of this case, and is acquired from suppliers who are not subject to the jurisdiction of this Court and who, could in theory stop the goods in transit and may not ship further if not paid.

77.     Reed and Barton's acquisition of inventory is critical to meeting the APA-established minimum condition to closing and for avoiding a downward adjustment in the APA-provided purchase price. More specifically, closing the Lifetime deal is contingent on Working Capital as of the closing date consisting of at least $7 million in inventory. In order to realize the full $15 million purchase price envisioned in the Lifetime deal, Working Capital must be at least $10 million, otherwise there will be a dollar for dollar reduction in the $5 million in note consideration. In order to realize the upside potential of a $16 million purchase price, Working Capital must be in excess of $10 million, which excess will yield a dollar for dollar increase in the principal amount of the promissory note of up to $1 million.

78.     At present, the inventory level is above the $7 million minimum, but meeting post-petition shipment demands without replenishing inventory will likely result in the inventory level falling below that minimum. In addition, not receiving inventory for subsequent shipment would result in not generating projected accounts receivable, that are also counted in Working Capital and, therefore, are included in the sale price adjuster provisions—both upward and downward.

79.     Because there is no practical means, absent payment, of compelling delivery of that inventory by foreign vendors who comprise seven of the top ten vendors that Reed and Barton relies on Reed and Barton has filed the Critical Foreign Vendor Motion. That motion

seeks to authorize, but not require, payment of foreign critical vendors. The Company intends to use that authority conservatively, as necessary to obtain delivery of inventory to avoid falling below the level necessary to close the deal and to maximize the calculation of Working Capital so as to also maximize the purchase price in the proposed sale.

g. **Motion of the Debtor for Entry of an Order Authorizing Implementation of Key Employee Retention Plan and Key Employee Incentive Plan (the "KERP/KEIP Motion").**

80.     Through the KERP/KEIP Motion, the Company seeks authority to implement a Key Employee Retention Program for its rank and file employees and a Key Employee Incentive Program for three of its executives.

81.     The ability to close the deal with Lifetime at all, as well as to realize the full $16 million in potential purchase price in any closing that does occur, are contingent on careful inventory and cash management in order to attain the requisite Working Capital level and on careful personnel management in order to maintain the employment of personnel required to render post-closing services that is a condition to closing the Lifetime sale transaction.

82.      Closing the Lifetime sale transaction is also conditioned on company executives executing post-closing consulting agreements with Lifetime and on all Reed and Barton's current employees providing transition services in a accordance with a Transition Services Agreement.

83.     Finally, in order to ensure a robust sale process, which the Company hopes will involve at least the five other parties who submitted pre-petition offers and some percentage of the nineteen additional parties who executed prepetition non-disclosure agreements and conducted diligence, both the executives and the rank and file employees are needed to maintain operations, participate in potential bidder due diligence, negotiate and close any alternative transaction that may be proposed by an overbidder.

84.    The Reed and Barton board has determined to implement a Key Employee Incentive Plan and a Key Employee Retention Plan in an effort to achieve the requisite employee delivery and to maximize creditor return.

85.    The management and the board have determined that maintaining existing rank and file employees morale, dedication and presence will require offering financial incentives. After years of dedicated service, the most recent of which have involved a daily struggle to rebound from the impact of the recession, vastly changed consumer demand for Reed and Barton's core products, and constrained cash flow due in part to the necessity of dealing with legacy debt, the employees will be engaging in an exercise that will put an end to their employment after which the pension they may have been counting on will likely be terminated and administered by the PBGC. Indeed, two management level employees gave notice of their intention to terminate their employment on or about February 12, 2015.  Absent that incentive, management and the board have determined that employees will likely leave, putting the Lifetime deal at risk due to an inability of the Company to comply with the Transition Services Agreement.  Those who stay may not provide the level of productivity that they had prior to learning of their employer's imminent cessation of operations. The board of directors, therefore, has approved, and Reed and Barton will seek this Court's approval of a Key Employee Retention Program for the benefit of only the rank and file employees pursuant to which each employee will receive from the proceeds received in any sale of substantially all of the Company's assets a payment equal to four (4) weeks' pay.

86.    The management and the board have also determined that it is necessary and in the best interests of Reed and Barton and of its creditors to provide financial incentives to three executives to assure that conditions to closing are met and to maximize the proceeds to be

received in the Lifetime transaction or in any other sale. As stated above, the APA with Lifetime conditions closing on all personnel rendering post-closing transition services, provides for a downward purchase price adjustment to the extent Working Capital at closing is less than $10 million, and for an upward adjustment of up to $1 million to the extent Working Capital is more than $10 million.

87.     Reed and Barton projects that Working Capital as of the Petition Date will be considerably below $10 million, but that through careful cash and inventory management the Working Capital by the projected closing date could meet or exceed $10 million.  The board of directors has determined that it is necessary and appropriate to provide those responsible for the management of personnel, cash flow and inventory control with financial incentives to attain the conditions to closing and to maximize the purchase price to be received in any transaction, and in particular in a transaction with Lifetime. The board has, therefore, approved, and Reed and Barton will seek this Court's approval of a Key Employee Incentive Program.

88.     Under the proposed program, the purchase price that would be realized in the deal with Lifetime based on the Working Capital in place as of the date of that agreement would be established as the "Threshold Value." That Threshold Value has been preliminarily calculated based on a projected $8.5 million Working Capital level to be $13.5 million. If the transaction closes at a $13.5 million sale price, no incentive payments will be made.

89.     The program then goes on to establish a " Maximum Value" based on an estimate derived through prepetition marketing efforts of the highest reasonably attainable consideration of $23 million, and establishes a $600,000 bonus pool to be allocated *pro rata* among the three participating executives—CFO Charles Daly, Human Resources head Karen Cataldo and me as president and Chief Executive Officer based on the respective base salaries of the three program

participants in the event that the $9.5 million increase in the estimated agreement date purchase price is achieved. The program then provides for a linear interpolation to determine the amount of net closing proceeds to be allocated among the three program participants of between no funds at a purchase price of $13.5 million and $600,000 at a purchase price at or above $23 million.

90.    The board has determined that the KEIP is reasonable and necessary to maximize the ability to close the creditor-beneficial Lifetime sale transaction as the highest attainable price, or to locate and close an even more creditor-beneficial transaction with an overbidder.

I declare under the pains and penalty of perjury that this Declaration is true and correct.

  _/s/ Timothy K. Riddle_____
Timothy K. Riddle
President of Reed and Barton Corporation

Dated: February 17, 2015

#34723112_v1

**Exhibit A**

**Budget**

**REED and BARTON CORP**
**13-Week Cash Flow Projection**

| | Actual | Proj 1 | Proj 2 | Proj 3 | Proj 4 | Proj 5 | Proj 6 | Proj 7 | Proj 8 | Proj 9 | Proj 10 | Proj 11 | Proj 12 | Proj 13 | Proj |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week ending / CASH FLOWS - W/E** | 02/07/15 | 02/14/15 | 02/21/15 | 02/28/15 | 03/07/15 | 03/14/15 | 03/21/15 | 03/28/15 | 04/04/15 | 04/11/15 | 04/18/15 | 04/25/15 | 05/02/15 | 05/09/15 | 05/16/15 |
| **Cash Sources** | | | | | | | | | | | | | | | |
| A/R Cash Receipts (Incl CC) | 221 | 306 | 360 | 272 | 407 | 233 | 170 | 220 | 370 | 370 | 370 | 495 | 470 | - | - |
| Retail Outlet Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Retail Outlet Credit Cards | - | - | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | - | - |
| Consumer Website Credit Cards | 13 | 20 | 20 | 20 | 20 | 20 | 25 | 25 | 25 | 25 | 25 | 25 | 30 | - | - |
| Credit Card Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Cash Receipts | 1 | - | - | - | - | - | - | - | - | - | - | - | 10,000 | - | - |
| **TOTAL CASH SOURCES** | $ 235 | $ 330 | $ 384 | $ 296 | $ 431 | $ 257 | $ 199 | $ 249 | $ 399 | $ 399 | $ 399 | $ 524 | $ 10,504 | $ - | $ - |
| **Cash Uses** | | | | | | | | | | | | | | | |
| Payroll & Benefits | 18 | 145 | 18 | 15 | 18 | 145 | 18 | 15 | 18 | 15 | 148 | 15 | 118 | - | - |
| Payroll Taxes | 11 | 89 | 11 | 7 | 11 | 89 | 11 | 7 | 11 | 7 | 93 | 7 | 61 | - | - |
| 401K | 11 | 10 | 2 | 1 | 2 | 10 | 2 | 1 | 2 | 1 | 10 | 2 | 1 | - | - |
| Tufts | 56 | - | - | - | 56 | - | - | - | 56 | - | - | - | 56 | - | - |
| Inventory Purchases | 388 | 242 | 186 | 125 | 450 | 1,013 | 126 | 110 | 326 | 150 | 50 | 101 | 60 | - | - |
| Freight In | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | - | - |
| Duty | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Precious Metal | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Operating Lease Payments | 1 | - | - | 1 | 1 | - | - | 1 | 1 | - | - | 1 | - | - | - |
| Selling & Administrative | 80 | 15 | 60 | 90 | 80 | 30 | 60 | 90 | 90 | 90 | 30 | 70 | 90 | - | - |
| External Commissions | - | 42 | - | - | - | 42 | - | - | - | - | 42 | - | - | - | - |
| Trade Shows | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales Taxes | - | 9 | - | - | - | 9 | - | - | - | - | 9 | - | - | - | - |
| Pension | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Expenditures | - | - | - | 5 | - | 5 | - | - | 5 | - | - | 5 | - | - | - |
| Insurance | - | 145 | - | - | - | 15 | - | - | - | - | 15 | - | - | - | - |
| Repairs & Maintenance | 2 | - | - | 5 | - | - | 5 | - | - | 5 | - | - | 5 | - | - |
| Electricity & Gas | - | - | - | - | - | 33 | 2 | - | - | - | - | 26 | 2 | - | - |
| Property Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Fees & Expenses | - | 21 | 50 | - | - | - | 20 | - | - | - | 20 | - | - | - | - |
| Shipping Supplies | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | - | - |
| New York Showroom rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Atlanta Showroom rent | 6 | - | - | - | 6 | - | - | - | 6 | - | - | - | 6 | - | - |
| Dallas Showroom rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Kittery Company Store rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Professional fees** | | | | | | | | | | | | | | | |
| I Banker | 50 | - | - | - | 50 | - | - | - | 50 | - | - | 525 | - | - | - |
| H&K | - | 436 | - | - | - | - | - | - | - | 75 | - | - | - | - | 75 |
| V&L | - | 75 | - | - | - | - | - | - | - | 38 | - | - | - | - | 37 |
| ERISA Attorney | - | 16 | - | - | - | - | - | - | - | 50 | - | - | - | - | 50 |
| ERISA Actuary | - | - | - | - | - | - | - | - | - | 20 | - | - | - | - | 20 |
| Rockland Trust Attorney | - | - | - | 50 | - | - | - | - | - | 25 | - | - | - | - | 25 |
| Creditors Comm Attorney | - | - | - | - | - | - | - | - | - | 75 | - | - | - | - | 75 |
| US Trustee fees | - | - | - | - | - | - | - | - | - | - | 10 | - | - | - | - |
| Contingency | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | - | - |
| **Total Cash Uses** | $ 675 | $ 1,307 | $ 444 | $ 306 | $ 736 | $ 1,420 | $ 337 | $ 288 | $ 627 | $ 330 | $ 762 | $ 298 | $ 987 | $ - | $ 282 |
| | 675 | 1,160 | 344 | 306 | 736 | 1,420 | 337 | 288 | 627 | 330 | 762 | 298 | 987 | 0 | 282 |
| **NET CASH - Weekly Change** | $ (440) | $ (977) | $ (60) | $ (10) | $ (305) | $ (1,163) | $ (138) | $ (39) | $ (228) | $ 69 | $ (363) | $ 226 | $ 9,517 | $ - | $ (282) |
| **NET CASH - Cumulative Change** | $ (440) | $ (1,417) | $ (1,477) | $ (1,487) | $ (1,792) | $ (2,955) | $ (3,093) | $ (3,132) | $ (3,360) | $ (3,291) | $ (3,654) | $ (3,428) | $ 6,089 | $ 6,089 | $ 5,807 |

**REED and BARTON CORP**

**13-Week Cash Flow Projection**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Excess Cash on Hand | $ 43 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 3,157 | $ 3,157 |
| Advances from Revolver | $ 586 | $ 1,307 | $ 444 | $ 306 | $ 736 | $ 1,420 | $ 337 | $ 288 | $ 627 | $ 330 | $ 762 | $ 298 | $ - | $ - | $ - |
| Incoming Cash Week of Sales | | | | | | | | | | | | $ 10,504 | | |
| Outgoing cash Week of Sale | | | | | | | | | | | | $ (987) | | |
| Revolver Payoff | | | | | | | | | | | | $ (6,636) | | |
| Net Excess Cash on Hand | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 276 | $ 3,157 | $ 3,157 | $ 2,875 |

2/17/2015

**REED and BARTON CORP**
**13-Week Cash Flow Projection**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **LOAN AND AVAILABILITY-W/E** | 02/07/15 | 02/14/15 | 02/21/15 | 02/28/15 | 03/07/15 | 03/14/15 | 03/21/15 | 03/28/15 | 04/04/15 | 04/11/15 | 04/18/15 | 04/25/15 | 05/02/15 | 05/09/15 | 05/16/15 |
| **AR Collateral** | | | | | | | | | | | | | | | |
| Prior Week Beginning AR | 2,723 | 2,779 | 3,110 | 3,456 | 3,563 | 3 758 | 3 818 | 4,052 | 4,314 | 4,526 | 4,588 | 4,650 | 4,712 | | |
| Prior Week Sales | 449 | 550 | 650 | 465 | 465 | 465 | 465 | 430 | 430 | 430 | 430 | 430 | 430 | | |
| Prior Week AR Cash Receipts | (366) | (221) | (306) | (360) | (272) | (407) | (233) | (170) | (220) | (370) | (370) | (370) | (495) | | |
| Prior Week Writeoffs | - | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | | |
| Prior Week Adjustments | (27) | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | | |
| Ending AR | 2,779 | 3,110 | 3,456 | 3,563 | 3,758 | 3,818 | 4,052 | 4,314 | 4,526 | 4,588 | 4,650 | 4,712 | 4,649 | - | - |
| Ineligible AR | (396) | (175) | (175) | (175) | (175) | (175) | (175) | (175) | (175) | (175) | (175) | (175) | (175) | | |
| Concentrations | | | | | | | | | | | | | | | |
| Available AR | 2,383 | 2,935 | 3,281 | 3,388 | 3,583 | 3,643 | 3,877 | 4,139 | 4,351 | 4,413 | 4,475 | 4,537 | 4,474 | | |
| Available AR @ 85% | 2,026 | 2,495 | 2,789 | 2,880 | 3,046 | 3,097 | 3,295 | 3,518 | 3,698 | 3,751 | 3,804 | 3,856 | 3,803 | - | - |
| AR Reserves | | | | | | | | | | | | | | | |
| Net Available AR | 2,026 | 2,495 | 2,789 | 2,880 | 3,046 | 3,097 | 3,295 | 3,518 | 3,698 | 3,751 | 3,804 | 3,856 | 3,803 | - | - |
| | 73% | 80% | 81% | 81% | 81% | 81% | 81% | 82% | 82% | 87% | 87% | 82% | 82% | #DIV/0! | #DIV/0! |
| **Inventory Collateral** | | | | | | | | | | | | | | | |
| Inventory | 7,120 | 7,120 | 8,447 | 8,047 | 7,767 | 7,823 | 7,729 | 7,633 | 7,737 | 7,692 | 7,697 | 7,677 | 7,657 | | |
| Ineligible Inventory | (963) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | | |
| Available Inventory | 6,157 | 5,870 | 7,197 | 6,797 | 6,517 | 6,573 | 6,479 | 6,383 | 6,487 | 6,442 | 6,447 | 6,427 | 6,407 | - | - |
| Available Inventory @ 52% | 3,162 | 3,052 | 3,742 | 3,534 | 3,389 | 3,418 | 3,369 | 3,319 | 3,373 | 3,350 | 3,352 | 3,342 | 3,332 | | |
| Inventory Reserves | (988) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | | |
| Net Available Inventory | 2,174 | 3,040 | 3,730 | 3,522 | 3,377 | 3,406 | 3,357 | 3,307 | 3,361 | 3,338 | 3,340 | 3,330 | 3,320 | | |
| | 31% | 43% | 44% | 44% | 43% | 44% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | #DIV/0! | #DIV/0! |
| **Total Net Availability** | 4,200 | 5,535 | 6,519 | 6,402 | 6,422 | 6,503 | 6,653 | 6,825 | 7,060 | 7,089 | 7,144 | 7,186 | 7,123 | - | - |
| **Total Excess Cash on Hand** | 43 | 276 | 276 | 276 | 276 | 276 | 276 | 276 | 276 | 276 | 276 | 276 | 276 | 3,157 | 3,157 |
| **Total Liquidity** | 4,243 | 5,811 | 6,795 | 6,678 | 6,698 | 6,779 | 6,929 | 7,101 | 7,336 | 7,365 | 7,420 | 7,462 | 7,399 | 3,157 | 3,157 |
| Beginning Revolver Balance | 2,301 | 2,671 | 4,625 | 4,685 | 4,695 | 5,000 | 6 163 | 6,301 | 6,340 | 6,568 | 6,499 | 6,862 | 6 636 | | |
| Advances | 586 | 1,307 | 444 | 306 | 736 | 1,420 | 337 | 288 | 627 | 330 | 762 | 298 | - | | |
| Cash Paydown | (216) | (330) | (384) | (296) | (431) | (257) | (199) | (249) | (399) | (399) | (399) | (524) | (6,636) | | |
| **Ending Revolver Balance** | 2,671 | 4,625 | 4,685 | 4,695 | 5,000 | 6,163 | 6,301 | 6,340 | 6,568 | 6,499 | 6,862 | 6,636 | - | - | - |
| | 64% | 84% | 77% | 73% | 78% | 95% | 95% | 93% | 93% | 92% | 96% | 92% | 0% | #DIV/0! | #DIV/0! |
| Letters of Credit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Revolver Excess Availability** | $ 1,529 | $ 910 | $ 1,834 | $ 1,707 | $ 1,422 | $ 340 | $ 352 | $ 485 | $ 492 | $ 590 | $ 282 | $ 550 | $ - | $ - | $ - |
| AP > 60 days Past Due | - | - | - | - | - | - | - | - | - | - | - | - | | | |
| Checks in Transit | - | - | - | - | - | - | - | - | - | - | - | - | | | |
| **NET LOAN - Weekly Change** | 370 | 1,954 | 60 | 10 | 305 | 1,163 | 138 | 39 | 228 | (69) | 363 | (226) | (6,636) | | |
| **NET LOAN - Cumulative Change** | $ 827 | $ 2,781 | $ 2,841 | $ 2,851 | $ 3,156 | $ 4,319 | $ 4,457 | $ 4,496 | $ 4,724 | $ 4,655 | $ 5,018 | $ 4,792 | $ (1,844) | | |

2/17/2015