## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | |
| REED AND BARTON CORPORATION, | Chapter 11 |
| Debtor. | Case No. 15-10534(HJB) |

## INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (1) AUTHORIZING POSTPETITION FINANCING, (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (3) AUTHORIZING USE OF CASH COLLATERAL AND PROVIDING FOR ADEQUATE PROTECTION, (4) MODIFYING THE AUTOMATIC STAY AND (5) SCHEDULING A FINAL HEARING

Upon the motion (the *"Motion"*),[1] dated February 17, 2015 [D.R. No. 10], of Reed & Barton Corporation, as debtor and debtor-in-possession (the *"Debtor"*), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the *"Bankruptcy Code"*) and in accordance with Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) and Rule 4001-2 of the Local Bankruptcy Rules for the District of Massachusetts (the *"MLBR"*), in the above captioned chapter 11 Case (the *"Chapter 11 Case"*), for entry of an interim order (this *"Interim Order"*), granting the following relief on an interim basis:

    (I)    **Interim DIP Financing**

        (A)    Authorizing the Debtor to obtain $2,000,000 in postpetition financing, pursuant to that certain *Senior Secured, Super-Priority Debtor-in-*

---

[1]     Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreements (as defined below).

*Possession Credit Agreement* (as may be amended, modified, or supplemented, the *"DIP Credit Agreement"*), substantially in the form attached here to as *Exhibit "1,"* by and between the Debtor, as borrower, and Rockland Trust Company, as lender (the *"DIP Lender"*), which may be used by the Debtor to fund the Debtor's day-to-day operations and working capital needs.

(B)    Approval of the DIP Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lender, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code (*"UCC"*) financing statements, and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, the *"DIP Financing Agreements"*); and the postpetition credit facility represented in the DIP Financing Agreements shall sometimes be referred to herein as the *"DIP Facility"*);

(C)    Granting the DIP Lender, the following Liens (as defined in section 101(37) of the Bankruptcy Code) and claims:

(i)    First priority priming, valid, perfected, and enforceable Liens (as defined below), subject only to the Professional Expense Carve Out (as defined below) and the Permitted Prior Liens (as defined below), upon substantially all of the Debtor's real and personal property as provided in and as contemplated by this Interim Order and the DIP Financing Agreements; *This provision varies from the requirements of MLBR 4001-2(c).*

(ii)    A superpriority administrative claim in respect of all obligations under the DIP Financing Agreements (collectively, the *"DIP Obligations"*), subject to the Professional Expense Carve Out (as defined herein); *This provision varies from the requirements of MLBR 4001-2(c).*

**(II)    Interim Use of Cash Collateral**

(A)    Authorizing the Debtor's use of "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (*"Cash Collateral"*), in which the Prepetition Lender (as defined below) has an interest;

(B)    Granting the Prepetition Lender certain adequate protection, including, among other things, Adequate Protection Replacement Liens and Adequate Protection Superpriority Claims (each as defined below) and certain other adequate protection as described in this Interim Order, to the extent of any diminution in the value of the Prepetition Lender's interest in

2

the Prepetition Collateral (as defined below) having the priority set forth in this Interim Order, as adequate protection for the granting of the DIP Liens (as defined below) to the DIP Lender, the Debtor's use of Cash Collateral, and for the imposition of the automatic stay; *This provision varies from the requirements of MLBR 4001-2(c).*

(III)    **Modifying the Automatic Stay** – Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Interim Order;

(IV)    **Final Hearing** – Scheduling a final hearing (the *"Final Hearing"*) to consider entry of an order (the *"Final Order"*) granting the relief requested in the DIP Motion on a final basis and approve the form of notice with respect to the Final Hearing;

and upon consideration of the *Declaration of Timothy K. Riddle in Support of the Debtor's Chapter 11 Petition and Request for First Day Relief,* dated February 17, 2015 (the *"Riddle Declaration"*), and the Court having reviewed the Motion and held a hearing with respect to the Motion on February 19, 2015 (the *"Interim Hearing"*); upon the Motion, the Riddle Declaration, and the record of the Interim Hearing, and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

I.    Procedural Findings of Fact

A.    **Petition Date.** On February 17, 2015 (the *"Petition Date"*), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Massachusetts, Eastern Division (the *"Court"*). The Debtor has continued in the management and operation of its businesses and properties as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case.

#34787327_v2

B.     **Jurisdiction and Venue.**  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the Motion constitutes a "core" proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Case and proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Committee Formation.**  No official committee (a "*Committee*") of unsecured creditors, equity interest holders, or other parties in interests has been appointed in the Chapter 11 Case.

D.     **Notice.**  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014, and the MLBR.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtor, to certain parties in interest, including: (i) the United States Trustee for Region 1; (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estates; (iii) the Prepetition Lender; (iv) the DIP Lender; (v) the attorneys for the Prepetition Lender and the DIP Lender; and (vi) all secured creditors of record.  Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2.

II.    **Debtor's Acknowledgements and Agreements**

E.     Without prejudice to the rights of parties in interest as set forth in Paragraphs 22-23 below, the Debtor admits, stipulates, acknowledges, and agrees that (collectively, Paragraphs E (1) through E (6) hereof shall be referred to herein as the "*Debtor's Stipulations*"):

(1)     **Prepetition Credit Agreements.**  Prior to the commencement of the Chapter 11 Case, the Debtor was party to the following agreements:

(a)     that certain *Revolving Credit Agreement* dated as of July 3, 2012 (as amended and in effect, the "*Prepetition Credit Agreement*")

4

with Rockland Trust Company, as Lender and secured party (the *"Prepetition Lender"*);

(b)    that certain *Security Agreement* dated as of July 3, 2012 (as amended and in effect, the *"Prepetition Security Agreement"*) with the Prepetition Lender;

(c)    all other documents, agreements, notes, and instruments executed and/or delivered with, to, or in favor of the Prepetition Lender in connection with the Prepetition Credit Agreement prior to the Petition Date, including without limitation, security agreements, UCC financing statements, and all other related documents, instruments, and agreements;

(collectively, as amended, modified, or supplemented and in effect, the *"Prepetition Financing Agreements"*).

(2)    **Prepetition Debt Amounts.** As of the Petition Date, the Debtor was indebted to the Prepetition Lender under the Prepetition Financing Agreements, on account of extensions of credit in the approximate principal amount of approximately $4,600,000, plus interest accrued and accruing (at the rates set forth in the Prepetition Financing Agreements) and, to the extent set forth in the Prepetition Financing Agreements, costs, expenses, fees (including reasonable attorneys' fees and legal expenses) other charges and other obligations, including, without limitation, on account of cash management, credit card, depository, investment, hedging and other banking or financial services which are secured by the Prepetition Financing Agreements (collectively the *"Prepetition Debt"*)[2]; and *This provision varies from the requirements of MLBR 4001-2(c).*

(3)    **Prepetition Collateral.** To secure the Prepetition Debt, the Debtor granted security interests and Liens (collectively, the *"Prepetition Liens"*) to the Prepetition Lender, in, to, and upon substantially all of its personal property, comprised of the "Collateral" as defined in the Prepetition Security Agreement (collectively, the *"Prepetition Collateral"*). The Prepetition Liens have priority over all other Liens, except any Liens which are valid, properly perfected, unavoidable, and senior to the Prepetition Liens or set forth in Section 7.01 of the DIP Credit Agreement (collectively, the *"Permitted Prior Liens"*). *This provision varies from the requirements of MLBR 4001-2(c).*

---

[2]    The acknowledgments and agreements by the Debtor of the Prepetition Debt and the related liens, rights, priorities, and protections granted to or in favor of the Prepetition Lender, as set forth herein and in the Prepetition Financing Agreements, shall constitute a proof of claim on behalf of the Prepetition Lender in this Case in respect of the Prepetition Debt.

(4)   **Prepetition Liens.**

(a)   As of the Petition Date, the Debtor maintains that:

(i)   the Prepetition Liens are valid, binding, enforceable, and perfected first-priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(ii)   the Prepetition Debt constitutes legal, valid, and binding obligations of the Debtor, enforceable in accordance with the terms of the Prepetition Financing Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code),

(iii)   excluding any matters relating to the obligations of the Prepetition Lender and the DIP Lender in providing deposit accounts and cash management services to the Debtor, no offsets, defenses, or counterclaims to any of the Prepetition Debt exists,

(iv)   no portion of the Prepetition Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and

(v)   the Prepetition Debt constitutes an allowable secured claim.

*This provision varies from the requirements of MLBR 4001-2(c).*

(b)   On the date that this Interim Order is entered, the Debtor shall have waived, discharged, and released the Prepetition Lender, together with its affiliates, agents, attorneys, officers, directors, and employees, of any right the Debtor may have:

(i)   to challenge or object to any of the Prepetition Debt,

(ii)   to challenge or object to the security for the Prepetition Debt, and

(iii)   to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Agreements or otherwise.

*This provision varies from the requirements of MLBR 4001-2(c).*

(c)   Other than matters relating to the obligations of the Prepetition Lender and the DIP Lender in providing deposit accounts and cash

6

management services to the Debtor, the Debtor does not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition Debt, the Prepetition Financing Agreements, or the Prepetition Liens, or any claim of the Prepetition Lender pursuant to the Prepetition Financing Agreements or otherwise. ***This provision varies from the requirements of MLBR 4001-2(c).***

(5) **Cash Collateral.** The Prepetition Lender has a security interest in and Lien on certain Cash Collateral, including all amounts on deposit in the Debtor's banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral, to secure the Prepetition Debt. ***This provision varies from the requirements of MLBR 4001-2(c).***

(6) **Priming of DIP Facility.** In entering into the DIP Financing Agreements, and as consideration therefor, the Debtor hereby agrees that until such time as all DIP Obligations have been paid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lender in its reasonable discretion have been made) and the DIP Lender no longer is obligated to extend financial accommodations under the DIP Credit Agreement, the Debtor shall not in any way prime or seek to prime the security interests and DIP Liens (as defined below) provided to the DIP Lender under this Interim Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise. ***This provision varies from the requirements of MLBR 4001-2(c).***

## III.   Findings Regarding the Postpetition Financing.

F.   **Need for Postpetition Financing.** An immediate need exists for the Debtor to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of its estate. The ability of the Debtor to finance its operations, to preserve and maintain the value of the Debtor's assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, creditors, equity holders, and the possibility for a successful reorganization or sale of the Debtor's assets.

G.   **No Credit Available on More Favorable Terms.** The Debtor has been unable to obtain any of the following:

#34787327_v2

(1) unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3) credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, or

(4) credit for money borrowed secured by a junior Lien on property of the estates which is subject to a Lien, in each case, on more favorable terms and conditions than those provided in the DIP Financing Agreements and this Interim Order.

The Debtor is unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (as defined below).

H. **Prior Liens.** Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Liens or Prepetition Liens are valid, senior, perfected, or unavoidable. Moreover, nothing shall prejudice the following:

(1) the rights of any party-in-interest, including, but not limited to, the Debtor and/or the DIP Lender, and any Committee appointed pursuant to section 1102 of the Bankruptcy Code, to challenge the validity, priority, perfection, and extent of any such Permitted Prior Liens, or

(2) the rights of any Committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection, and extent of the Prepetition Liens as set forth in this Interim Order.

I. **Adequate Protection for Prepetition Lender.** As a result of the grant of the DIP Liens, subordination to the Professional Expense Carve Out, the use of Cash Collateral authorized herein, and the imposition of the automatic stay, the Prepetition Lender is entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code for any decrease in the value of its interests in the Prepetition Collateral (including Cash Collateral) resulting from the automatic stay or the Debtor's use, sale, or lease of the Prepetition Collateral (including Cash Collateral) during the Chapter 11 Case. As adequate protection, the Prepetition Lender will receive the Adequate Protection (as defined below) described in

Paragraph 14 of this Interim Order. In light of such Adequate Protection, the Prepetition Lender:
(1) has consented to the Debtor's use of Cash Collateral, on the terms set forth in this Interim
Order, (2) agrees that the Adequate Protection adequately protects the Prepetition Lender, subject
to the Prepetition Lender's rights to seek additional adequate protection of its interest in
accordance with Paragraph 15 below, and (3) subject to Paragraphs, 15, 35, and 36, no further
adequate protection is necessary at this time.

J.     **Prepetition Lender's Consent to Priming.** The Prepetition Lender has
consented to the priming of the Prepetition Liens by the DIP Liens.

K.     **Adequacy of the Budget.** The Budget (as defined below) is adequate,
considering all the available assets, to pay the administrative expenses due and accruing during
the period covered by this Interim Order.

L.     **Section 552 of the Bankruptcy Code.** In light of their agreement to subordinate
their Liens and superpriority claims (1) only to the Professional Expense Carve Out, in the case
of the DIP Lender, and (2) only to the Professional Expense Carve Out and the DIP Liens, in the
case of the Prepetition Lender, the DIP Lender and the Prepetition Lender are each entitled to:
(a) upon entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy
Code, and (b) all rights and benefits of section 552(b) of the Bankruptcy Code and, upon entry of
the Final Order, the Debtor shall not assert that the "equities of the case" exception shall apply.
*This provision varies from the requirements of MLBR 4001-2(c).*

M.     **Conditions Precedent to DIP Lender's Extension of Financing.** The DIP
Lender has indicated a willingness to provide financing to the Debtor in accordance with the DIP
Credit Agreement and the other DIP Financing Agreements and subject to the following:

(1)     the entry of this Interim Order, and

9

(2)     findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, superpriority claims, security interests, and Liens and other protections granted pursuant to this Interim Order (and the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacation, or amendment of this Interim Order (or the Final Order) or any other order, as provided in section 364(e) of the Bankruptcy Code.

N.     **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.** The terms and conditions of the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and the fees paid and to be paid thereunder (i) are fair, reasonable, and the best available under the circumstances, (ii) reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and (iii) are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated in good faith and at arms' length between the Debtor and the DIP Lender, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender are entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

O.     **Relief Essential; Best Interest.** The relief requested in the Motion (and as provided in this Interim Order) is necessary, essential, and appropriate for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and personal property. It is in the best interest of Debtor's estate that the Debtor be allowed to establish the DIP Facility contemplated by the DIP Financing Agreements. The Debtor has demonstrated good and sufficient cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1.      The Motion is granted in accordance with the terms and conditions set forth in this Interim Order, the DIP Credit Agreement, and the other DIP Financing Agreements.

## I.      DIP FINANCING

**A.      Approval of Entry into the DIP Financing Agreements**

2.      The Debtor is expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreements. The Debtor is hereby authorized and directed to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as such become due, including, without limitation, a closing fee, an unused line fee, and reasonable attorneys', financial advisors', and accountants' fees, and disbursements as provided for in the DIP Credit Agreement, which amounts, subject to the provisions of Paragraph 44 below, shall not otherwise be subject to approval of this Court. Upon execution and delivery, the DIP Financing Agreements shall represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms. ***Portions of this provision vary from the requirements of MLBR 4001-2(c).***

**B.      Authorization to Borrow**

3.      In order to enable it to continue to operate its business during the period between the entry of this Interim Order and the conduct of the Final Hearing (the "***Interim Period***") and subject to the terms and conditions of this Interim Order, including without limitation paragraph 14(c)(iii) below,

11

#34787327_v2

the DIP Credit Agreement, and the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), the Debtor is hereby authorized under the DIP Facility to borrow up to a total committed amount of $2,000,000 (including the issuance of Letters of Credit) in accordance with the terms and conditions of the DIP Credit Agreement.

### C.    Application of DIP Facility Proceeds

4.    The proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with and as may be limited by the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), solely as follows:

(a)    to pay costs, expenses, and fees in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements; and

(b)    for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Case, and other proper corporate purposes of the Debtor not otherwise prohibited by the terms hereof for working capital, capital expenditures, and other lawful corporate purposes of the Debtor.

### D.    Conditions Precedent

5.    The DIP Lender shall not have any obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived, as determined by the DIP Lender, as may be applicable, in its reasonable discretion, in accordance with the DIP Credit Agreement.

### E.    The DIP Liens

6.    Effective immediately upon the entry of this Interim Order, the DIP Lender is hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, priming first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests and Liens (collectively, the *"DIP Liens"*) senior and superior

12

in priority to all other secured and unsecured creditors of the Debtor's estate except as otherwise provided in this Interim Order, upon and to all of the following (collectively, the *"DIP Collateral"*):

      (a)    The Collateral, as defined in the DIP Financing Documents, including:

          (i)    all Accounts;

          (ii)    all Goods, including Equipment, Inventory and Fixtures;

          (iii)    all Documents, Instruments and Chattel Paper;

          (iv)    all Letters of Credit and Letter-of-Credit Rights;

          (v)    all Securities Collateral;

          (vi)    all Investment Property;

          (vii)    all Intellectual Property Collateral;

          (viii)    all Commercial Tort Claims (including any causes of action against the Debtor's officers and directors);

          (ix)    all General Intangibles (including all amounts payable to the Debtor under the "Asset Purchase Agreement" as contemplated in the Sale Motion (as defined in the DIP Credit Agreement));

          (x)    all Deposit Accounts, including the Ch. 11 Cash Collateral Account;

          (xi)    all Supporting Obligations;

          (xii)    all books and records relating to the Collateral; and

          (xiii)    to the extent not covered by clauses (i) through (xii), all other personal property of the Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

      (b)    Upon entry of the Final Order, Bankruptcy Recoveries (as defined below), <u>but only</u>: (1) the full amount of any such recovery or settlement thereof to the extent arising under Section 549 of the Bankruptcy Code and (2) subject to entry of the Final Order, all amounts necessary to reimburse the DIP Lender for the amount of the Professional Expense Carve Out, if any, actually funded or used in the Chapter 11 Case with respect to all other Bankruptcy Recoveries (the foregoing Bankruptcy Recoveries in (1) and (2) being referred to collectively as the *"Specified Bankruptcy Recoveries"*). As used herein, *"Bankruptcy Recoveries"* shall mean any claims and causes of action to

13

which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtor or the estate of the Debtor under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof. *This provision varies from the requirements of MLBR 4001-2(c).*

(c)    All owned real estate of the Debtor, all proceeds from the disposition of real estate, and all proceeds from the disposition of real estate leases; provided that, with respect to the Debtor's non-residential real property leases, and notwithstanding anything to the contrary in this Interim Order or any financing agreements or documents, no liens or encumbrances shall be granted on or extend to the Debtor's real property leases themselves, but rather, any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such real property lease(s).

F.    **DIP Lien Priority**

7.    The DIP Liens to be created and granted to the DIP Lender as provided herein, are:

(a)    created pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code,

(b)    first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and

(c)    subject only (i) and subordinate to the Professional Expense Carve Out, and (ii) to the Permitted Prior Liens.

The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the DIP Financing Agreements. The DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Case and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to Case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "*Successor Case*", and collectively the "*Successor Case*"), and/or upon the dismissal of the Chapter 11 Case. The DIP Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or the assertion by the Debtor of the "equities of the case" exception of section 552 of the Bankruptcy Code, and, upon entry of the Final Order, shall not be subject to section 506(c) of the Bankruptcy Code.

#34787327_v2

## G.    Enforceable Obligations

8.    The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtor, and shall be enforceable against the Debtor, its estate, and any successors thereto, and their creditors in accordance with their terms.

## H.    Protection of the DIP Lender and Other Rights

9.    From and after the Petition Date, the Debtor shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Interim Order, and in compliance with the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

## I.    Superpriority Administrative Claim Status

10.    Subject and subordinate to the Professional Expense Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "*DIP Superpriority Claim*" and, together with the DIP Liens, collectively, the "*DIP Protections*") with priority in the Chapter 11 Case (and any Successor Case) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of a Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; provided, however, that the DIP Protections shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries. *This provision varies from the requirements of MLBR 4001-2(c).*

15

11.   Other than the Professional Expense Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

## II.   USE OF CASH COLLATERAL

### A.   Authorization to Use Cash Collateral

12.   Pursuant to the terms and conditions of this Interim Order, the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and in accordance with and as may be limited by the budget attached hereto and made a part hereof as Exhibit "2" (as the same may be modified, supplemented, or updated from time to time consistent with the terms of the DIP Credit Agreement, the "*Budget*"), the Debtor is authorized to use Cash Collateral (including all cash in the Ch. 11 Cash Collateral Account (as defined below)) and to use the advances under the DIP Facility during the period commencing immediately after the entry of this Interim Order and terminating upon notice being provided by the DIP Lender to the Debtor that a DIP Order Event of Default (as defined below) has occurred and is continuing.

13.   Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business or other proceeds resulting therefrom, except (x) with respect to the sale of assets as contemplated in the Sale Motion, and (y) as otherwise permitted in the DIP Facility under the DIP Credit Agreement and the other DIP Financing Agreements, and in accordance with and as may be limited by the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

#34787327_v2

### B.   Adequate Protection for Prepetition Lender

14.   As adequate protection for the interest of the Prepetition Lender in the Prepetition

Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordination to the

Professional Expense Carve Out, the Debtor's use of Cash Collateral, and other decline in value

arising out of the automatic stay or the Debtor's use, sale, depreciation, or disposition of the

Prepetition Collateral, including the disposition of assets as contemplated in the Sale Motion, the

Prepetition Lender shall each receive adequate protection as follows (collectively, *"Adequate*

*Protection"*):

      (a)   **Adequate Protection Replacement Liens.** Solely to the extent of the
diminution in the value of the interest of the Prepetition Lender in the Prepetition
Collateral, the Prepetition Lender shall have, subject to the terms and conditions set forth
below, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code additional
and replacement security interests and Liens in the DIP Collateral (the *"Adequate
Protection Replacement Liens"*) which shall be subject and subordinate only to the
Professional Expense Carve Out, the DIP Liens securing the DIP Facility, and Permitted
Prior Liens.

      (b)   **Adequate Protection Superpriority Claim.** Solely to the extent of the
diminution in the value of the interests of the Prepetition Lender in the Prepetition
Collateral, the Prepetition Lender shall have an allowed superpriority administrative
expense claim (the *"Adequate Protection Superpriority Claim"*) which shall have
priority (except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claim, and
(iii) the Professional Expense Carve Out, in respect of which it shall be subject and
subordinate), in the Chapter 11 Case under sections 364(c)(1), 503(b), and 507(b) of the
Bankruptcy Code and otherwise over all administrative expense claims and unsecured
claims against the Debtor and its estate, now existing or hereafter arising, of any kind or
nature whatsoever including, without limitation, administrative expenses of the kinds
specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b),
507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and,
upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not
such expenses or claims may become secured by a judgment Lien or other non-
consensual Lien, levy, or attachment; provided, however, that the Adequate Protection
Superpriority Claim shall not attach to any Bankruptcy Recoveries other than the
Specified Bankruptcy Recoveries.

Other than the DIP Liens, the DIP Superpriority Claim, and the Professional Expense
Carve Out, no costs or expenses of administration, including, without limitation,
professional fees allowed and payable under sections 328, 330, and 331 of the
Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11

17

Case, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claim.

(c)   **Adequate Protection Payments.** The Prepetition Lender shall receive additional adequate protection in the form of the following:

(i)   subject to the provisions of paragraph 43, the current payment of the reasonable documented out-of-pocket costs and expenses of its financial advisors and attorneys,

(ii)   on the first day of each calendar month, commencing March 1, 2015, cash interest at the rates as provided in the Prepetition Financing Agreements, and

(iii)   all products and proceeds of the Prepetition Collateral and the DIP Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions thereof, whether or not in the ordinary course, including all proceeds incidental to the Debtor's Sale Motion) regardless of whether such collateral came into existence prior to the Petition Date, shall be applied as follows: (x) first, to reduce the DIP Obligations until paid in full, and (y) second, to be held in a segregated account (the "*Ch. 11 Cash Collateral Account*") in the name of the Debtor maintained with Rockland Trust Company.  Notwithstanding anything in the DIP Credit Agreement to the contrary, the Debtor (x) must expend all funds in the Ch. 11 Cash Collateral Account (in accordance with and as limited by, the Budget) before borrowing under the DIP Facility on any business day, and (y) may not borrow under the DIP Facility unless the balance in the Ch. 11 Cash Collateral Account is $0.00;

provided, however, that all rights of any party-in-interest (including any Committee, but excluding the Debtor) with requisite standing that has been sought and granted by this Court are hereby reserved through and including the Challenge Period Termination Date (as defined below) to assert that any of the foregoing payments should instead be recharacterized as principal repayments on account of the obligations due and owing under the Prepetition Financing Agreements; provided, further, however, the Prepetition Lender reserves any and all rights, claims, and defenses as to any such recharacterization request.

*Portions of this provision vary from the requirements of MLBR 4001-2(c).*

(d)   **Adequate Protection Upon Approval of Sale Motion.** The sale process to be implemented under section 363 of the Bankruptcy Code as provided in the Sale

18

Motion, including the timeline and milestones contained therein, shall not be modified without the prior written consent of the Prepetition Lender and the DIP Lender. Upon the disposition of Prepetition Collateral as contemplated in the Sale Motion, any such Prepetition Collateral shall be sold free and clear of the Prepetition Liens, the Adequate Protection Replacement Liens, and the DIP Liens; *provided that*, that (x) such Prepetition Liens, Adequate Protection Replacement Liens, and DIP Liens shall attach to the proceeds of any such sale, and (y) those proceeds shall be paid to the Prepetition Lender and the DIP Lender at the closing on such sale in the order and priority set forth in this Interim Order without the necessity of further order of the Court. *This provision varies from the requirements of MLBR 4001-2(c).*

(e)    **Access to Records.**  In addition to, and without limiting, whatever rights to access the Prepetition Lender has under the Prepetition Financing Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtor shall permit representatives, agents, and employees of the Prepetition Lender: (i) to have access to and inspect the Debtor's properties, (ii) to examine the Debtor's books and records, and (iii) to discuss the Debtor's affairs, finances, and condition with the Debtor's officers and financial advisors.

(f)    **Prepetition Indemnity Account.**    Upon the closing of the transaction contemplated in the Sale Motion, in the event and to the extent that either (i) a Challenge Proceeding (as defined below) has been commenced, or (ii) the Challenge Period Termination Date has not yet occurred, the Debtor shall establish an account with the proceeds of such sale in the control of the Prepetition Lender (the *"Prepetition Indemnity Account"*), into which the sum of $50,000 of the sale proceeds shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtor in favor of the Prepetition Lender under the Prepetition Financing Agreements (including without limitation, the provisions of Sections 9.04(a) and (b) of the Prepetition Credit Agreement) pertaining to the reasonable costs and expenses of the Prepetition Lender in respect of (i) responses by the Prepetition Lender to discovery, including any Bankruptcy Rule 2004 examination, in connection with a challenge or possible challenge against the Prepetition Lender related to the Prepetition Debt, and (ii) any Challenge Proceeding in respect of which the Prepetition Lender prevails as evidenced by a Final Order (as defined in the DIP Credit Agreement) (the *"Prepetition Indemnity Obligations"*).

(i)    Upon the Challenge Period Termination Date if, as of such date, no party has filed (x) an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraph 22 hereof, or (y) an adversary proceeding, cause of action, objection, claim, defense, or other challenge against the Prepetition Lender related to the Prepetition Debt, whether in the Chapter 11 Case or independently in another forum, court, or venue (together, a *"Challenge Proceeding"*), and so long as all other Prepetition Debt and DIP Obligations have been paid in full, then all amounts then remaining and being held in the Prepetition Indemnity Account shall be released to the Debtor.

#34787327_v2

(ii)    The Prepetition Indemnity Obligations shall be secured by a first priority lien on the Prepetition Indemnity Account, and the Prepetition Indemnity Account shall also secure the Adequate Protection Superpriority Claim.

(iii)    The Prepetition Lender may apply amounts in the Prepetition Indemnity Account against the Prepetition Indemnity Obligations as and when they arise, without further notice to or consent from the Debtor, any Committee or any other parties in interest and without further order of this Court, upon compliance with the provisions of Paragraph 44 below.

(iv)    The Prepetition Indemnity Account shall be maintained until the final resolution of all Challenge Proceedings. The Debtor shall remain liable to the Prepetition Lender for all unpaid Prepetition Indemnity Obligations to the extent that the funds in the Prepetition Indemnity Account are insufficient to satisfy them in full.

*This provision varies from the requirements of MLBR 4001-2(c).*

C.    **Section 507(b) Reservation for the DIP Lender to Seek Further Adequate Protection**

15.    Nothing herein shall impair or modify the Prepetition Lender's rights under section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Lender hereunder is insufficient to compensate for the diminution in value of the interest of the Prepetition Lender in the Prepetition Collateral during the Chapter 11 Case or any Successor Case; provided, however, that any section 507(b) claim granted in the Chapter 11 Case to the Prepetition Lender shall be in right of payment to all DIP Obligations and subject and subordinate to the Professional Expense Carve Out.

## III.    POSTPETITION LIEN PERFECTION

16.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Replacement Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any

#34787327_v2

deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens and the Adequate Protection Replacement Liens or to entitle the DIP Liens and the Adequate Protection Replacement Liens to the priorities granted herein.

17.   Notwithstanding the foregoing, the DIP Lender may, in its discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Case.

18.   The Debtor shall execute and deliver to the DIP Lender all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto.

19.   The DIP Lender, in its discretion, may file a photocopy of this Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Interim Order.

20.   The DIP Lender shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be the successor-in-interest to, and hold co-equal rights with the Prepetition Lender with respect to all third party notifications in connection with the Prepetition Financing Agreements, all prepetition letters of credit, all prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or

21

credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtor and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements.

21.   The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Financing Agreements as necessary to

      (a)     permit the Debtor to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Lender under the DIP Financing Agreements, the DIP Facility, and this Interim Order, and

      (b)     authorize the DIP Lender and the Prepetition Lender to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Interim Order.

## IV.   RESERVATION OF CERTAIN THIRD PARTY RIGHTS AND BAR OF CHALLENGES AND CLAIMS

22.   Nothing in this Interim Order or the DIP Credit Agreement shall prejudice whatever rights any Committee(s) or any other party-in-interest (other than the Debtor) with requisite standing that has been sought and granted by this Court may have to commence and prosecute a Challenge Proceeding:

      (a)     to object to or challenge the Debtor's Stipulations, including (i) the validity, extent, perfection, or priority of the security interests and Liens of the Prepetition Lender in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Debt, or

      (b)     to bring suit against the Prepetition Lender in connection with or related to the Prepetition Debt, or the actions or inactions of the Prepetition Lender arising out of or related to the Prepetition Debt;

provided, however, that unless any official Committee(s) or any other party-in-interest with requisite standing commences a contested matter or adversary proceeding raising such objection or challenge (each, a *"Challenge Proceeding"*), including, without limitation, any claim against the Prepetition Lender in the nature of a setoff, counterclaim, or defense to the Prepetition Debt

22

(including but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against the Prepetition Lender), by the later of (x) ninety (90) days following the appointment of the first official Committee, or (y) if no official Committee is appointed, ninety (90) days following entry of this Interim Order (the "*Challenge Period*"; and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "*Challenge Period Termination Date*"), any and all such challenges and objections by any party (including, without limitation, any official Committee(s), any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party-in-interest) **shall be deemed to be forever waived and barred,** and the Prepetition Debt shall be deemed to be allowed in full and shall be deemed to be allowed as a fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Chapter 11 Case and the Debtor's Stipulations shall be binding on all creditors, interest holders, and parties-in-interest. *This provision varies from the requirements of MLBR 4001-2(c).*

23.   To the extent any such Challenge Proceeding is filed, the Prepetition Lender shall each be entitled to include the costs and expenses, including but not limited to reasonable attorneys' fees and disbursements, incurred in defending the objection or complaint as part of the Prepetition Debt to the extent permitted pursuant to the relevant Prepetition Financing Documents. To the extent any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the Prepetition Lender shall be entitled to include such costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending the objection or complaint as part of the Prepetition Debt which shall be reimbursed by the Debtor, including (x) each month as provided for in Paragraph 43, below, and (y) as part of the Adequate Protection Superpriority Claim.

## V.   CARVE OUT AND PAYMENT OF PROFESSIONALS.

24.   Subject to the terms and conditions contained in Paragraphs 24-27, the DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Replacement Liens, and the Adequate Protection Superpriority Claim are subordinate only to the ***Professional Expense Carve Out*** (as defined in the DIP Credit Agreement).  The Professional Expense Carve Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals (as defined in the DIP Credit Agreement).

25.   For the avoidance of doubt, the Professional Expense Carve Out shall be senior to the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Replacement Liens, and the Adequate Protection Superpriority Claim, and any and all other forms of adequate protection, Liens, or claims securing the DIP Obligations and/or the Prepetition Debt granted or recognized as valid. Further, the Professional Expense Carve Out shall exclude and shall not be used to pay any fees and expenses (x) incurred in connection with any Challenge Proceeding or the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the DIP Lender' Liens in the DIP Collateral, (iii) the Prepetition Debt, (iv) the Prepetition Lender's Liens in the Prepetition Collateral, (v) the Adequate Protection Replacement Liens, or (B) preventing, hindering, or delaying, whether directly or indirectly, the DIP Lender's or the Prepetition Lender's assertion or enforcement of their Liens and security interests, or their efforts to realize upon any DIP Collateral, Prepetition Collateral, the Adequate Protection Replacement Liens, or the Prepetition Indemnity Account; provided, however, that such exclusion does not encompass any investigative work conducted by the Case Professionals retained by the Committee.

24

26. Notwithstanding anything to the contrary contained herein, so long as no Carve Out Trigger Notice (as defined in the DIP Credit Agreement) shall have been delivered, the Debtor shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable and allowed by the Court, but always as provided in and as may be limited by the Budget. Further, nothing contained herein shall limit payment of compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable and allowed by the Court even if they exceed the amounts contained in the Budget or the Professional Expense Carve Out, out of funds other than the Professional Expense Carve Out after the outstanding Prepetition Debt and DIP Obligations have been paid in full.

27. Nothing herein, including the inclusion of line items in the Budget for Case Professionals, shall be construed as consent to the allowance of any professional fees or expenses of the Debtor, of any Committee, or of any person or shall affect the right of the DIP Lender or the Prepetition Lender to object to the allowance and payment of such fees and expenses or to permit the Debtor to pay any such amounts not set forth in the Budget.

## VI.    COMMITMENT TERMINATION DATE, DIP EVENT OF DEFAULT, AND REMEDIES

### A.    Commitment Termination Date

28. All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (the "*Commitment Termination Date*"):

(a)    May 15, 2015;

(b)    the date on which the maturity of the DIP Obligations is accelerated and the commitments under the DIP Facility (the "*DIP Commitments*") have been terminated as a result of the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement and notice thereof has been

provided to (i) the Debtor, (ii) counsel to the Debtor, (iii) counsel to any Committee(s) (or if no Committee have been appointed, the Debtor's twenty (20) largest unsecured creditors), and (iv) the Office of the United States Trustee;

(c)    the failure of the Debtor to obtain entry of the Final Order on or before the date which is thirty (30) days after the date this Interim Order is entered; or

(d)    the closing date of a sale of all or substantially all of the assets of the Debtor as contemplated in the Sale Motion following entry of an order by the Bankruptcy Court authorizing the sale of all or substantially all of the assets of the Debtor pursuant to the provisions of section 363 of the Bankruptcy Code.

## B.    DIP Events of Default

29.    The occurrence of the Commitment Termination Date shall constitute a *"DIP Order Event of Default."*

30.    Unless and until the Prepetition Debt and the DIP Obligations have been repaid in full in cash (or other arrangements for payment of the Prepetition Debt and the DIP Obligations satisfactory to the DIP Lender and the Prepetition Lender, respectively, in their reasonable discretion have been made) and all DIP Commitments have been terminated, the protections afforded to the Prepetition Lender and the DIP Lender pursuant to this Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming one or more plan(s) of reorganization or liquidation pursuant to Chapter 11 of the Bankruptcy Code in the Debtor's Chapter 11 Case (a *"Plan"*) or converting the Chapter 11 Case into Successor Case, and the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Replacement Liens, and the Adequate Protection Superpriority Claim shall continue in the Chapter 11 Case and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, Adequate Protection Replacement Liens, and Adequate Protection Superpriority Claim shall maintain their respective priorities as provided by this Interim Order.

26

C.   **Rights and Remedies Upon DIP Order Event of Default**

31. Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that (i) after the occurrence of any DIP Order Event of Default, the DIP Lender may, in its discretion, immediately provide written notice thereof to each of (i) the Debtor, (ii) counsel to the Debtor, (iii) counsel for any Committee(s) (or if no Committee has been appointed, the Debtor's thirty (30) largest unsecured creditors), and (iv) the Office of the United States Trustee, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Agreements.

32. Following the giving of written notice by the DIP Lender of the occurrence of any DIP Order Event of Default as set forth above and provided that such DIP Order Event of Default is still continuing:

> (a)    the Debtor shall continue to deliver and cause the delivery of the proceeds of DIP Collateral to the DIP Lender as provided in the DIP Financing Agreements and this Interim Order;

> (b)    the DIP Lender shall continue to apply such proceeds in accordance with the provisions of the DIP Financing Agreements and this Interim Order;

> (c)    absent an order of this Court to the contrary, the Debtor shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Professional Expense Carve Out; and

> (d)    any obligation otherwise imposed on the DIP Lender to provide any loan or advance to the Debtor pursuant to the DIP Facility shall be suspended.

33. Following the giving of written notice by the DIP Lender of the occurrence of a DIP Order Event of Default as set forth above, upon the filing of a motion pursuant to Section 362(d) of the Bankruptcy Code seeking relief from the automatic stay to exercise its rights under the DIP Financing Agreements, the DIP Lender shall be entitled to an emergency hearing on such motion before this Court.

34. Subject to the provisions of Paragraphs 31-33 above, upon the occurrence of a DIP Order Event of Default, the DIP Lender is authorized to exercise its remedies and proceed under or pursuant

27

to the DIP Financing Agreements and applicable law; except that, with respect to any of the Debtor's leasehold locations, the DIP Lender's rights shall be limited to such rights (i) as may be ordered by the Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Lender; or (iii) which the DIP Lender has under applicable non-bankruptcy law. All proceeds realized from any of the foregoing shall be turned over to the DIP Lender, for application to the Professional Expense Carve Out, the DIP Obligations, and the Prepetition Debt under, and in accordance with the provisions of, the DIP Financing Agreements, the Prepetition Credit Agreement, and this Interim Order. *This provision varies from the requirements of MLBR 4001-2(c).*

35.      Nothing included herein shall prejudice, impair, or otherwise affect the Prepetition Lender's or the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtor, nor the DIP Lender's rights, as provided in the DIP Credit Agreement, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

**D.    No Waiver of Remedies**

36.   The delay in or the failure of the Prepetition Lender or the DIP Lender to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the Prepetition Lender's or the DIP Lender's rights and remedies. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights and remedies of the Prepetition Lender or the DIP Lender under the Bankruptcy Code or under non-bankruptcy law.

28

## VII.    CERTAIN LIMITING PROVISIONS

### A.    Section 506(c) Claims and Waiver

37.    Nothing contained in this Interim Order shall be deemed a consent by the Prepetition Lender or the DIP Lender to any charge, Lien, assessment, or claim against the DIP Collateral, the DIP Liens, the Prepetition Collateral, or the Adequate Protection Replacement Liens under section 506(c) of the Bankruptcy Code or otherwise; provided, however, that during the Interim Period there shall be no waiver of section 506(c) of the Bankruptcy Code.

38.    As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Financing Agreements, upon entry of the Final Order, the Debtor (and any successor thereto or any representative thereof, including any trustees appointed in the Chapter 11 Case or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code. *This provision varies from the requirements of MLBR 4001-2(c).*

### B.    Proceeds of Subsequent Financing

39.    Without limiting the provisions and protections of Paragraph 40 below, if at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Lender's obligations to make loans and advances under the DIP Facility, including subsequent to the confirmation of any Plan with respect to the Debtor, the Debtor's estate, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Agreements, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Lender and applied in reduction of the DIP Obligations.

29

## C.    Prohibited Orders

40.    Unless the DIP Lender, as may be applicable, has provided its prior written consent or all DIP Obligations have been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in Paragraph 39 above, or other arrangements for the payment of the DIP Obligations satisfactory to the DIP Lender in its sole and exclusive discretion have been made) and all DIP Commitments have terminated, there shall not be entered in the Chapter 11 Case, or in any Successor Case, any order which authorizes any of the following:

(a)    Any modification, stay, vacation or amendment to the DIP Orders to which the DIP Lender has not consented;

(b)    A priority claim or administrative expense or unsecured claim against the Debtor (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the DIP Lender in respect of the DIP Obligations, except with respect to the Professional Expense Carve Out;

(c)    Any Lien on any DIP Collateral having a priority equal or superior to the Lien securing the DIP Obligations, except (a) with respect to the Professional Expense Carve Out, or (b) for the Permitted Prior Liens;

(d)    Any order which authorizes the return of any of the Debtor's property pursuant to section 546(h) of the Bankruptcy Code; or

(e)    Any order which authorizes the payment of any Indebtedness (other than those under the Existing Credit Facility, Indebtedness reflected in the Budget, and other Indebtedness approved by the DIP Lender, in each case incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien other than as set forth in the DIP Orders).

## D.    Restrictions on Disposition of Collateral

41.    The Debtor shall not do the following:

(a)    sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the requisite DIP Lender required under the DIP Financing Agreements (and no such consent shall be implied from any

30

other action, inaction, or acquiescence by the DIP Lender or an order of this Court),
except for the following:

    (i)     sales of the Debtor's Inventory in the ordinary course of business;

    (ii)    as part of the disposition of assets as contemplated in the Sale Motion; or

    (iii)   except as otherwise provided for in the DIP Financing Agreements and this Interim Order and approved by the Court; or

assume, reject, or assign any Lease without the prior consultation with the DIP Lender, except as
contemplated in the Sale Motion, a Plan, or as otherwise provided for in the DIP Financing
Agreements.

## VIII.   OTHER RIGHTS AND OBLIGATIONS

### A.   Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order

42. Based on the findings set forth in this Interim Order and in accordance with section
364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim
Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended,
or vacated by a subsequent order of this or any other court, the DIP Lender is entitled to the
protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification,
amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or
the Liens or priority authorized or created hereby.

43. Notwithstanding any such modification, amendment, or vacation, any claim granted to
the DIP Lender hereunder arising prior to the effective date of such modification, amendment, or
vacation of any DIP Protections granted to the DIP Lender shall be governed in all respects by the
original provisions of this Interim Order, and the Lender shall be entitled to all of the rights, remedies,
privileges, and benefits, including the DIP Protections granted herein, with respect to any such claim.
Since the loans made pursuant to the DIP Facility are made in reliance on this Interim Order, the
obligations owed the DIP Lender prior to the effective date of any stay, modification, or vacation of

31

this Interim Order shall not, as a result of any subsequent order in the Chapter 11 Case or in any Successor Case, be subordinated, lose their Lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the Liens and claims granted to the DIP Lender under this Interim Order and/or the DIP Financing Agreements.

**B.    Prepetition Lender and DIP Lender Expenses**

44.    As provided in the Prepetition Financing Agreements and the DIP Financing Agreements, all reasonable out-of-pocket costs and expenses of the Prepetition Lender and the DIP Lender, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses will be paid by the Debtor, whether or not the transactions contemplated hereby are consummated. Payment of such fees shall not be subject to allowance by the Court but shall be subject to the Debtor's receipt of reasonably detailed invoices; provided, however, the Debtor may seek a determination by the Court whether such fees and expenses are reasonable.  Under no circumstances shall professionals for the Prepetition Lender or the DIP Lender be required to comply with the U.S. Trustee fee guidelines; provided, however, after the expiry of the Interim Period, the Prepetition Lender and the DIP Lender shall provide to each of (i) the Debtor, (ii) counsel to the Debtor, (iii) counsel for any Committee(s) (or if no Committee has been appointed, the Debtor's thirty (30) largest unsecured creditors), and (iv) the Office of the United States Trustee, a copy of each invoice for professional fees and expenses provided to the Debtor during the pendency of the Debtor's Chapter 11 Case; and the Debtor shall reimburse the Prepetition Lender and the DIP Lender for all such fees in expenses within ten (10) days of receipt of a copy of each invoice, in the absence of a specific written objection as to the reasonableness of the amounts contained in the subject invoice. *This provision varies from the requirements of MLBR 4001-2(c).*

32

### C.     Binding Effect

45.    The provisions of this Interim Order shall be binding upon and inure to the benefit of the

DIP Lender and the Prepetition Lender, the Debtor, and their respective successors and assigns

(including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or

with respect to the property of the estates of the Debtor), any Committee(s) (subject to the provisions

of Paragraphs 22-23 above), whether in the Chapter 11 Case, in any Successor Case, or upon dismissal

of any such chapter 11 or chapter 7 Case.

### D.     No Third Party Rights

46.    Except as explicitly provided for herein, this Interim Order does not create any rights for

the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

### E.     No Marshaling

47.    Neither the DIP Lender nor the Prepetition Lender shall be subject to the equitable

doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or

Prepetition Collateral, as applicable.

### F.     Section 552(b) of the Bankruptcy Code

48.    Upon entry of a Final Order, the DIP Lender and the Prepetition Lender shall each be

entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the Debtor shall

not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall

apply to the DIP Lender or the Prepetition Lender with respect to proceeds, product, offspring or

profits of any of the Prepetition Collateral or the DIP Collateral. *This provision varies from the*

*requirements of MLBR 4001-2(c).*

### G.     Amendments

49.    The Debtor and the DIP Lender, as applicable, may amend, modify, supplement, or waive

any provision of the DIP Financing Agreements without further approval of the Court unless such

amendment, modification, supplement, or waiver (i) increases the interest rate (other than as a result of

the imposition of the Default Rate), (ii) increases the DIP Commitments, or (iii) changes the maturity

date of the DIP Facility.  Except as set forth above, all waivers, modifications, or amendments of any

of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the

Debtor and the DIP Lender and approved by the Court.

**H.    Survival of Interim Order**

50.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive

entry of any order which may be entered:

      (a)    confirming any Plan in the Chapter 11 Case,

      (b)    converting the Chapter 11 Case to a Case under chapter 7 of the Bankruptcy Code,

      (c)    to the extent authorized by applicable law, dismissing the Chapter 11 Case,

      (d)    withdrawing of the reference of the Chapter 11 Case from this Court, or

      (e)    providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in this Court.

51.    The terms and provisions of this Interim Order including the DIP Protections granted

pursuant to this Interim Order and the DIP Financing Agreements and any protections granted the

Prepetition Lender shall continue in full force and effect notwithstanding the entry of such order, and

such DIP Protections and protections for the Prepetition Lender shall maintain their priority as

provided by this Interim Order until all of the outstanding Prepetition Debt and DIP Obligations have

been paid in full (such payment being without prejudice to any terms or provisions contained in the

DIP Facility which survive such discharge by their terms).

34

### I.    Inconsistency

52.   In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Interim Order, the provisions of this Interim Order shall govern and control.

### J.    Enforceability

53.   This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

### K.    Objections Overruled

54.   All objections to the Motion to the extent not withdrawn or resolved, are hereby overruled.

### L.    Waiver of Any Applicable Stay

55.   Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

### M.    Proofs of Claim

56.   Neither the Prepetition Lender nor the DIP Lender will be required to file proofs of claim in the Chapter 11 Case or in any Successor Case.

### N.    Headings

57.   The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

### O.    Retention of Jurisdiction

58.   The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

#34787327_v2

## IX.   FINAL HEARING

59.   The Final Hearing on the Motion shall be heard before this Court on March 18, 2015 at 9:30 a.m. (Prevailing Eastern Time) at the United States Bankruptcy Court for the District of Massachusetts, Eastern Division, located at the John W. McCormack Post Office and Court House, 5 Post Office Square, Boston, MA 02109-3945, Courtroom [_____].

60.   If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented jointly by the Debtor and by the DIP Lender and entered by this Court.

61.   Any party in interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file same with the Court (with a courtesy copy to chambers) and serve (so as to be received) such objection no later than March 16, 2015 at 4:00 p.m. (Prevailing Eastern Time) on the following parties:

| *Counsel for the Debtor:*<br><br>Holland & Knight, LLP<br>10 St. James Avenue<br>Boston, Massachusetts 02114<br>Attn: John J. Monaghan, Esq.<br>E-mail: john.monaghan@hklaw.com | *Office of the U.S. Trustee:*<br><br>Office of the United States Trustee<br>John W. McCormack Post Office and Court House<br>5 Post Office Square<br>Boston, Massachusetts 02109-3945<br>Attn: Eric K. Bradford<br>E-mail: Eric.K.Bradford@USDOJ.gov |
| --- | --- |
| *Counsel for the DIP Lender and the Prepetition Lender:*<br><br>Riemer & Braunstein LLP<br>Three Center Plaza<br>Boston, Massachusetts 02108<br>Attn: Donald E. Rothman, Esq.<br>E-mail: drothman@riemerlaw.com | |

36

#34787327_v2

*Reed and Barton Corporation*

*Chapter 11 Case No. 15-10534-HJB*

*Interim Order*

*March 2*

Dated: ~~February~~ ___, 2015

*effective a/o 2/23/15*

Henry J. Boroff
UNITED STATES BANKRUPTCY JUDGE

#34787327_v2

## Exhibit "1"

### DIP Credit Agreement

#34787327_v2

# SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of February ___, 2015

Between

## REED AND BARTON CORPORATION,
as the Borrower

and

## ROCKLAND TRUST COMPANY,
as the Lender

## TABLE OF CONTENTS

Section                                                                                          Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS.............................................................1

    1.01   Defined Terms ..................................................................................................1
    1.02   Other Interpretive Provisions...........................................................................30
    1.03   Accounting Terms.............................................................................................31
    1.04   Rounding...........................................................................................................31
    1.05   Times of Day ....................................................................................................31
    1.06   Letter of Credit Amounts .................................................................................31

ARTICLE II THE COMMITMENT AND CREDIT EXTENSIONS ........................................31

    2.01   Committed Loans; Reserves ............................................................................31
    2.02   Committed Borrowings, Conversions and Continuations of Committed Loans...............32
    2.03   Letters of Credit................................................................................................33
    2.04   Prepayments.....................................................................................................39
    2.05   Termination of Commitment. ..........................................................................40
    2.06   Repayment of Obligations. ..............................................................................40
    2.07   Interest. ............................................................................................................40
    2.08   Fees...................................................................................................................40
    2.09   RESERVED......................................................................................................41
    2.10   Computation of Interest and Fees ...................................................................41
    2.11   Evidence of Debt. ............................................................................................41
    2.12   Payments Generally. .......................................................................................41

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ......................................42

    3.01   Taxes................................................................................................................42
    3.02   Increased Costs. ...............................................................................................44
    3.03   INTENTIONALLY OMITTED .......................................................................45
    3.04   Survival............................................................................................................45

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ............................45

    4.01   Conditions of Initial Credit Extension ...........................................................45
    4.02   Conditions to all Credit Extensions ...............................................................47

ARTICLE V REPRESENTATIONS AND WARRANTIES .....................................................48

    5.01   Existence, Qualification and Power.................................................................48
    5.02   Authorization; No Contravention ....................................................................49
    5.03   Governmental Authorization; Other Consents................................................49
    5.04   Binding Effect..................................................................................................49
    5.05   Financial Statements; No Material Adverse Effect. ........................................49
    5.06   Litigation..........................................................................................................49
    5.07   No Default ........................................................................................................49
    5.08   Ownership of Property; Liens...........................................................................50
    5.09   Environmental Compliance. ............................................................................50
    5.10   Insurance..........................................................................................................50
    5.11   Taxes................................................................................................................50
    5.12   ERISA Compliance..........................................................................................51
    5.13   Subsidiaries; Equity Interests...........................................................................51

| 5.14 | Margin Regulations; Investment Company Act. | 52 |
| 5.15 | Disclosure | 52 |
| 5.16 | Compliance with Laws | 52 |
| 5.17 | Intellectual Property; Licenses, Etc. | 52 |
| 5.18 | Labor Matters | 52 |
| 5.19 | Security Documents. | 53 |
| 5.20 | RESERVED | 53 |
| 5.21 | Deposit Accounts. | 53 |
| 5.22 | Brokers | 54 |
| 5.23 | Customer and Trade Relations | 54 |
| 5.24 | Material Contracts. | 54 |
| 5.25 | Casualty | 54 |

ARTICLE VI AFFIRMATIVE COVENANTS ................................................................. 54

| 6.01 | Financial Statements | 54 |
| 6.02 | Certificates; Other Information. | 55 |
| 6.03 | Notices | 56 |
| 6.04 | Payment of Obligations | 56 |
| 6.05 | Preservation of Existence, Etc. | 57 |
| 6.06 | Maintenance of Properties | 57 |
| 6.07 | Maintenance of Insurance | 57 |
| 6.08 | Compliance with Laws | 58 |
| 6.09 | Books and Records; Accountants. | 58 |
| 6.10 | Inspection Rights. | 59 |
| 6.11 | Cash Management. | 59 |
| 6.12 | Information Regarding the Collateral. | 60 |
| 6.13 | Physical Inventories. | 61 |
| 6.14 | Environmental Laws. | 61 |
| 6.15 | Further Assurances. | 62 |
| 6.16 | Compliance with Terms of Leaseholds | 62 |
| 6.17 | Third Party Consultant. | 62 |
| 6.18 | Bankruptcy Related Covenants. | 62 |

ARTICLE VII NEGATIVE COVENANTS .................................................................... 63

| 7.01 | Liens | 63 |
| 7.02 | Investments | 63 |
| 7.03 | Indebtedness; Equity Issuances. | 63 |
| 7.04 | Fundamental Changes | 63 |
| 7.05 | Dispositions | 64 |
| 7.06 | Restricted Payments | 64 |
| 7.07 | RESERVED | 64 |
| 7.08 | Change in Nature of Business | 64 |
| 7.09 | Transactions with Affiliates | 64 |
| 7.10 | RESERVED | 64 |
| 7.11 | Use of Proceeds | 64 |
| 7.12 | Amendment of Material Documents | 64 |
| 7.13 | Fiscal Year. | 64 |
| 7.14 | Deposit Accounts. | 65 |
| 7.15 | RESERVED | 65 |
| 7.16 | RESERVED | 65 |
| 7.17 | Budgeted Expenses. | 65 |

7.18    Bankruptcy Covenants............................................................................................65

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ...............................................66

8.01    Events of Default..................................................................................................66
8.02    Remedies Upon Event of Default ........................................................................69
8.03    Application of Funds ............................................................................................70

ARTICLE IX MISCELLANEOUS.........................................................................................71

9.01    Amendments, Etc..................................................................................................71
9.02    Notices; Effectiveness; Electronic Communications...........................................71
9.03    No Waiver; Cumulative Remedies .......................................................................72
9.04    Expenses; Indemnity; Damage Waiver.................................................................72
9.05    Payments Set Aside ..............................................................................................73
9.06    Successors and Assigns. .......................................................................................74
9.07    Treatment of Certain Information; Confidentiality...............................................75
9.08    Right of Setoff .....................................................................................................76
9.09    Interest Rate Limitation........................................................................................76
9.10    Counterparts; Integration; Effectiveness.............................................................76
9.11    Survival.................................................................................................................76
9.12    Severability ..........................................................................................................77
9.13    Governing Law; Jurisdiction; Etc. .......................................................................77
9.14    Waiver of Jury Trial.............................................................................................78
9.15    No Advisory or Fiduciary Responsibility ............................................................78
9.16    USA PATRIOT Act Notice ..................................................................................79
9.17    Foreign Asset Control Regulations ......................................................................79
9.18    Time of the Essence..............................................................................................79
9.19    Press Releases.......................................................................................................79
9.20    No Strict Construction. .........................................................................................80
9.21    Attachments. .........................................................................................................80
9.22    Electronic Execution of Assignments and Certain Other Documents. .................80
9.23    ENTIRE AGREEMENT.......................................................................................80
9.24    Relationship with DIP Orders...............................................................................80

**SCHEDULES**

| | |
|---|---|
| 1.04 | Pre-Petition Letters of Credit |
| 2.01 | Commitment |
| 5.01 | Borrower's Organizational Information |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.12 | ERISA Event |
| 5.13 | Equity Investments |
| 5.17 | Intellectual Property Matters |
| 5.18 | Collective Bargaining Agreements |
| 5.21 | DDAs |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 9.02 | Lender's Office; Certain Addresses for Notices |
| PH | Permitted Holders |
| FM | Fiscal Month |
| FQ | Fiscal Quarter |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Revolving Note |
| C | INTENTIONALLY OMITTED |
| D | Compliance Certificate |
| E | Borrowing Base Certificate |
| F | Assignment and Assumption |

## SENIOR SECURED, SUPERPRIORITY, DEBTOR-IN-POSSESSION
## CREDIT AGREEMENT

This SENIOR SECURED, SUPERPRIORITY, DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("Agreement") is entered into as of February ___, 2015 between

Reed and Barton Corporation, a Massachusetts corporation, as Debtor and Debtor-in-Possession (the "Borrower"), and

Rockland Trust Company (the "Lender").

WHEREAS, on February ___, 2015 (the "Petition Date"), the Borrower commenced Chapter 11 Case No. 15-_____ (___) (the "Chapter 11 Case") by filing a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court for the District of Massachusetts, Eastern Division, located at John W. McCormack Post Office and Court House, 5 Post Office Square, Suite 1150, Boston, Massachusetts 02109-3945 (the "Bankruptcy Court"). The Borrower continues to operate its business and manage its properties as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrower has requested that the Lender provide a revolving credit facility, and the Lender has indicated its willingness to lend and the L/C Issuer has indicated its willingness to issue Letters of Credit, in each case on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

1.01    **Defined Terms.**  As used in this Agreement, the following terms shall have the meanings set forth below:

"ACH" means automated clearing house transfers.

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (b) for services rendered or to be rendered.

"Acquisition" means, with respect to any Person (a) a purchase of a Controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a Controlling interest in the Equity Interests, of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning provided in Section 9.16.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding 10% or more of any class of the Equity

Interests of that Person, and (iv) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agreement" means this Revolving Credit Agreement.

"Applicable Margin" means one half of one percent (.50%).

"Applicable Rate" means, at any time of calculation, with respect to Commercial Letters of Credit, a per annum rate equal to three and one quarter of one percent (3.25%).

"Appraised Value" means with respect to Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Borrower, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Lender.

"Approved Budget" has the meaning specified in Section 7.17.

"Approved Fund" means any Fund that is administered or managed by (a) the Lender, (b) an Affiliate of the Lender (c) an entity or an Affiliate of an entity that administers or manages the Lender, or (d) the same investment advisor or an advisor under common control with the Lender, Affiliate or advisor, as applicable.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by the Lender and an Eligible Assignee (with the consent of the Borrower to the extent required by Section 9.06(b)), in substantially the form of Exhibit F.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Availability" means, as of any date of determination thereof by the Lender, the result, if a positive number, of:

      (a)    The Loan Cap

<div align="center">Minus</div>

      (b)    The Total Outstandings

In calculating Availability at any time and for any purpose under this Agreement, the Borrower shall certify to the Lender that all post-petition accounts payable and Taxes are being paid on a timely basis.

<div align="center">-2-</div>

"Availability Period" means the period from and including the Effective Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Commitment pursuant to Section 2.05, and (c) the date of termination of the commitment of the Lender to make Committed Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Lender from time to time determines in its discretion as being appropriate (a) to reflect the impediments to the Lender's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Lender determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Lender's discretion, (but are not limited to) reserves based on: (i) rent; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Lender in the Collateral; (iv) salaries, wages and benefits due to employees of the Borrower, (v) customer deposits, (vi) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals, (vii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Lender in the Collateral, (viii) amounts due to vendors on account of consigned goods, (x) Cash Management Reserves, and (ix) Bank Products Reserves.

"Bank Products" means any services of facilities provided to the Borrower by the Lender or any of its Affiliates, including, without limitation, on account of (a) Swap Contracts, (b) purchase cards, (c) leasing, (d) factoring, and (e) supply chain finance services (including, without limitation, trade payable services and supplier accounts receivable purchases), but excluding Cash Management Services.

"Bank Product Reserves" means such reserves as the Lender from time to time determine in its discretion as being appropriate to reflect the liabilities and obligations of the Borrower with respect to Bank Products then provided or outstanding.

"Banker's Acceptance" means a time draft or bill of exchange or other deferred payment obligation relating to a Commercial Letter of Credit which has been accepted by the L/C Issuer.

"Bankruptcy Code" means title 11, United States Code.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Recoveries" means any claims and causes of action to which the Borrower may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Borrower or the estate of the Borrower under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof.

"BBB" means Bed Bath & Beyond Inc., a New York corporation.

"Blocked Account" means, collectively, the accounts identified on Schedule 5.21 that are maintained with the Blocked Account Bank as of the Effective Date, and any additional accounts that may become subject to a Blocked Account Agreement after the Effective Date.

"Blocked Account Agreement" means, collectively, any agreement, in form and substance satisfactory to the Lender, establishing control (as defined in the UCC) by the Lender and whereby the Blocked Account Bank maintaining such account agrees, to comply only with the instructions originated by the Lender without the further consent of the Borrower.

"Blocked Account Bank" means, collectively, Bank of America, N.A., and any other bank that may become subject to a Blocked Account Agreement after the Effective Date.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)    the lesser of (i) the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by 80% the Appraised Value of Eligible Inventory, or (ii) the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by the Inventory Advance Rate;

plus

(b)    85% multiplied by the face amount of Eligible Trade Receivables (net of Receivables Reserves applicable thereto).

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit E hereto (with such changes therein as may be required by the Lender to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Lender.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Lender's Office is located.

"Capital Expenditures" means, with respect to any Person for any period, (a) all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by a Person during such period.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out Trigger Notice" means written notice from the Lender to the Borrower, its lead counsel, the U.S. Trustee and lead counsel to the Creditors' Committee of the occurrence and during the continuance of an Event of Default.

"Case Professionals" means Persons or firms retained by the Borrower or the Creditors' Committee or other statutory committee appointed in the Chapter 11 Case pursuant to Sections 327 and 1103 of the Bankruptcy Code.

-4-

"Cash Collateral Account" means a non-interest bearing account established by the Borrower with Rockland Trust Company, and in the name of, the Lender (or as the Lender shall otherwise direct) and under the sole and exclusive dominion and control of the Lender, in which deposits are required to be made in accordance with this Agreement.

"Cash Collateralize" means to deposit in the Cash Collateral Account or to pledge and deposit with or deliver to the Lender, for the benefit of one or more of the Lender or the L/C Issuer, as collateral for L/C Obligations or obligations of the Lender to fund participations in respect thereof (as the context may require), L/C Obligations, cash or deposit account balances or, if the Lender and the L/C Issuer shall agree in their sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to the Lender and the L/C Issuer. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Cash Management Reserves" means such reserves as the Lender, from time to time, determines in its discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Borrower with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any cash management services provided to the Borrower by the Lender or any of its Affiliates, including, without limitation, (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) credit card processing services, and (d) credit or debit cards.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     Permitted Holders fail to own and control directly or indirectly, greater than 50% of the Equity Interests of the Borrower for the election of members of the board of directors of the Borrower, or

(b)     any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Securities Exchange of 1934), other than Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act of 1934), directly or indirectly, of 25% (or 20% in the case of an individual Person), or more, of the Equity Interests of the Borrower having the right to vote for the election of members of such board of directors, or

-5-

(c) a majority of the members of such board of directors do not constitute Continuing Directors; or

(b)    any "change in control" or "sale" or "disposition" or similar event as defined in any Organizational Document of the Borrower.

"Chapter 11 Case" has the meaning provided in the recitals to this Agreement.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and DIP Orders and all other property that is or is intended under the terms of the Security Documents or DIP Orders to be subject to Liens in favor of the Lender. Notwithstanding anything to the contrary contained in this definition, the term "Collateral" shall not, except as expressly provided in the DIP Orders, include Bankruptcy Recoveries.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Lender executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate leased by the Borrower, pursuant to which such Person (i) acknowledges the Lender's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Lender with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Lender with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Lender as the Lender may reasonably require.

"Collection Account" has the meaning provided in Section 6.11(b).

"Commercial Letter of Credit" means any letter of credit or similar instrument (including, without limitation, Bankers' Acceptances) issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by the Borrower in the ordinary course of its business.

"Commitment" means the Lender's obligation to (a) make Committed Loans to the Borrower pursuant to Section 2.01, and (b) purchase participations in L/C Obligations in an aggregate principal amount at any one time outstanding not to exceed the amount set forth on Schedule 2.01, as such amount may be adjusted from time to time in accordance with this Agreement. As of the Effective Date, the Commitment is $7,000,000.

"Committed Borrowing" means a borrowing consisting of simultaneous Committed Loans.

"Committed Loan" has the meaning specified in Section 2.01.

"Committed Loan Notice" means a notice of a Committed Borrowing, which shall be substantially in the form of Exhibit A.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Continuing Director" means (a) any member of the board of directors of the Borrower who was a director of the Borrower on the Effective Date, and (b) any individual who becomes a member of such board of directors after the Effective Date if such individual was appointed or nominated for election to

such board of directors by a majority of the Continuing Directors, but excluding any such individual originally proposed for election in opposition to such board of directors in office at the Effective Date in an actual or threatened election contest relating to the election of the directors of the Borrower and whose initial assumption of office resulted from such contest or the settlement thereof.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrower's accounting practices, known to the Lender, which practices are in effect on the Effective Date as such calculated cost is determined from invoices received by the Borrower, the Borrower's purchase journals or the Borrower's stock ledger.

"Costco" means Costco Wholesale Corporation, a Washington corporation.

"Credit Extensions" mean each of the following: (a) a Committed Borrowing and (b) an L/C Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) the Lender and its Affiliates, (ii) the L/C Issuer, (iii) each beneficiary of each indemnification obligation undertaken by the Borrower under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means (a) all reasonable out-of-pocket expenses incurred by the Lender and its Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Lender, (B) outside consultants for the Lender, (C) appraisers, (D) commercial finance examiners, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, and (F) environmental site assessments, solely to the extent that any Mortgage is granted by the Borrower in favor of the Lender pursuant to a mutual agreement between the Borrower and the Lender after the Effective Date, and an Event of Default occurred and/or is continuing, and (ii) in connection with (A) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (B) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with any proceeding under the Chapter 11 Case, or (C) any workout, restructuring or negotiations in respect of any Obligations, and (iii) all customary fees and charges (as adjusted from time to time) of the Lender with respect to the disbursement of funds (or the receipt of funds) to or for the account of the Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, and (b) with respect to the L/C Issuer, and its Affiliates, all reasonable out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder. Notwithstanding anything to the contrary contained herein, in no event shall Credit Party Expenses include costs and expenses relating to environmental site assessments that are not conducted pursuant to subclause (F) directly above.

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Chapter 11 Case pursuant to the Bankruptcy Code.

-7-

"Customs Broker/Carrier Agreement" means an agreement in form and substance satisfactory to the Lender among the Borrower, a customs broker, freight forwarder, consolidator, or carrier, and the Lender, in which the customs broker, freight forwarder, consolidator, or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Lender and agrees, upon notice from the Lender, to hold and dispose of the subject Inventory solely as directed by the Lender.

"DDA" means each checking, savings or other demand deposit account maintained by the Borrower. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Lender shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Committed Loans, an interest rate equal to the interest rate (including the Applicable Margin) otherwise applicable to such Committed Loan plus two percent (2%) per annum, (b) when used with respect to Letter of Credit Fees, a rate equal to the Applicable Rate for Standby Letters of Credit or Commercial Letters of Credit, as applicable, plus two percent (2%) per annum, and (c) with respect to all other Obligations, an interest rate equal to the Prime Rate, plus the then Applicable Margin, plus two percent (2%) per annum.

"Dilution" means, as of any date of determination, with respect to a time period of at least the immediately preceding ninety (90) days as determined by the Lender, the a percentage that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, deductions, or other dilutive items as determined by the Lender with respect to the Borrower's Accounts, by (b) Borrower's billings with respect to Accounts.

"Dilution Reserve" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Trade Receivables by one (1) percentage point for each percentage point by which Dilution is in excess of five percent (5%).

"DIP Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Dollars" and "$" mean lawful money of the United States.

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract or agreement to which the Borrower is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Case (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under any applicable Governmental Authority.

"Effective Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 9.01.

"Eligible Assignee" means (a) any Affiliate of the Lender; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom the Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of the Lender's rights in and to a material portion of the Lender's portfolio of asset based credit facilities, and (e) any other Person (other than a natural Person) satisfying the requirements of Section 9.06(b) hereof.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, items of Inventory of the Borrower that are either (x) raw materials or (y) finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrower's business, deemed by the Lender in its discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Lender, (A) complies with each of the representations and warranties respecting Inventory made by the Borrower in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below. Except as otherwise agreed by the Lender, in its discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)     Inventory that is not solely owned by the Borrower or the Borrower does not have good and valid title thereto free and clear of any Lien (other than Liens granted to the Lender pursuant to the Security Documents, third party carrier's liens or customs broker liens arising in the ordinary course of business, or Liens under the Pre-Petition Loan Documents);

(b)     Inventory that is leased by or is on consignment to the Borrower;

(c)     Inventory that is not located in the United States of America (excluding territories or possessions of the United States) at a location that is owned or leased by the Borrower, except (i) Inventory in transit between such owned or leased locations, or (ii) to the extent that the Borrower has furnished the Lender with (A) any UCC financing statements or other documents that the Lender may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location;

(d)     After the Effective Date, Inventory that is located in a distribution center leased by the Borrower unless the applicable lessor has delivered to the Lender a Collateral Access Agreement;

(e)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work-in-process, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in the Borrower's business, (iv) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, (v) are bill and hold goods, or (vi) are work in process;

(f)     Inventory that is not subject to a perfected first-priority security interest in favor of the Lender, excluding third party carrier's liens or customs broker liens arising in the ordinary course of business;

(g)     Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(h)     Inventory that has been sold but not yet delivered or as to which the Borrower has accepted a deposit;

(i)     Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which the Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement.

"Eligible Trade Receivables" means Accounts arising from the sale of the Borrower's Inventory that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Account (i) has been earned by performance and represents the bona fide amounts due to the Borrower from an account debtor, and in each case is originated in the ordinary course of business of the Borrower, and (ii) in each case is acceptable to the Lender in its discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (s) below.  Without limiting the foregoing, to qualify as an Eligible Trade Receivable, an Account shall indicate no Person other than the Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrower to reduce the amount of such Eligible Trade Receivable.  Except as otherwise agreed by the Lender, any Account included within any of the following categories shall not constitute an Eligible Trade Receivable:

(a)     Accounts that are not evidenced by an invoice;

(b)     Accounts that have been outstanding for more than ninety (90) days from the date of sale or more than sixty (60) days past the due date, or Extended Term Accounts that are more than twenty (20) days past the due date;

(c)     Accounts due from any account debtor where 50% or more of all Accounts owed by that Account Debtor are deemed ineligible under clause (b), above.

(d)     Accounts with respect to an account debtor (other than QVC, Federated, Costco or BBB) whose total obligations owing to Borrower exceed 10%, or in the case of QVC, 40%, or in the case of Federated, 20%, or in the case of Costco, 40%, or in the case of BBB, 15%, of all Eligible Accounts, to the extent of the obligations owing by such account debtor in excess of such percentage; provided, that, in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentage shall be determined by the Lender based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limits;

(e)     Accounts (i) that are not subject to a perfected first-priority security interest in favor of the Lender, or (ii) with respect to which the Borrower does not have good and valid title thereto, free and clear of any Lien (other than Liens granted to the Lender pursuant to the Security Documents and Liens under the Pre-Petition Loan Documents);

(f)     Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

-10-

(g)    Accounts which arise out of any sale (i) not made in the ordinary course of business, (ii) made on a basis other than upon credit terms usual to the business of the Borrower or (iii) are not payable in Dollars;

(h)    Accounts which are owed by any account debtor whose principal place of business is not within the continental United States or Canada;

(i)    Accounts which are owed by any Affiliate or any employee of the Borrower;

(j)    Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Lender have been duly obtained, effected or given and are in full force and effect;

(k)    Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(l)    Accounts due from any Governmental Authority except to the extent that (x) the subject account debtor is the federal government of the United States of America, and (y) either the aggregate of such Accounts due from such account debtor does not exceed $75,000 or the Borrower has complied with the Federal Assignment of Claims Act of 1940;

(m)    Accounts (i) owing from any Person that is also a supplier to or creditor of the Borrower unless such Person has waived any right of setoff in a manner acceptable to the Lender or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling the Borrower to discounts on future purchase therefrom;

(n)    Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis;

(o)    Accounts arising out of sales to account debtors outside the United States or Canada unless such Accounts are fully backed by an irrevocable letter of credit on terms, and issued by a financial institution, acceptable to the Lender and such irrevocable letter of credit is in the possession of the Lender;

(p)    Accounts evidenced by a promissory note or other instrument;

(q)    Accounts consisting of amounts due from vendors as rebates or allowances;

(r)    Accounts which are in excess of $25,000.00 above the credit limit for such account debtor established by the Borrower in the ordinary course of business and consistent with past practices; or

(s)    Accounts which include extended payment terms (datings) beyond those generally furnished to other account debtors in the ordinary course of business, other than Extended Term Accounts.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises,

licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 9.01 hereof.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Lender with respect to an applicable interest in a Committed Loan or Commitment pursuant to a law in effect on the date on which (i) the Lender acquires such interest in the Committed Loan or Commitment or (ii) the Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01(a)(ii) or (c), amounts with respect to such Taxes were payable either to the Lender immediately before it changed its Lending Office, and (c) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Executive Order" has the meaning set forth in Section 9.17.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments.

"Extended Term Account Debtors" means all account debtors who are granted Extended Term Accounts terms by the Borrower; provided, however, QVC, Federated, Costco or BBB shall expressly be excluded from the definition of Extended Term Account Debtors.

"Extended Term Accounts" means Accounts due from account debtors that have selling terms of more than sixty (60) days but less than one-hundred twenty (120) days; provided, however, any and all accounts due from QVC, Federated, Costco or BBB shall expressly be barred the definition of Extended Term Accounts.

"Family Member" means, with respect to any individual Permitted Holder, any descendant of the individual's grandparents and any spouse of any such descendant.

"Family Trusts" means, with respect to any individual Permitted Holder or any beneficiary of a trust in respect of which the trustee therefor is a Permitted Holder, trusts or other estate planning vehicles established for the benefit of such individual or beneficiary or Family Members of such individual or beneficiary.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Rockland Trust Company on such day on such transactions as determined by the Lender.

"Federated" means Federated Department Stores, Inc., a Delaware corporation.

"Final Borrowing Order" means an order of the Bankruptcy Court which order shall be in form, scope and substance reasonably acceptable to the Lender, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents, and the DIP Orders, and provides for the super priority of the Lender's claims, which order is a Final Order.

"Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Fiscal Month" means each fiscal month set forth on Schedule FM.

"Fiscal Quarter" means each fiscal quarter set forth on Schedule FQ.

"Fiscal Year" means any period of twelve consecutive months ending on the Saturday closest to January 31 of any calendar year.

"Foreign Asset Control Regulations" has the meaning set forth in Section 9.17.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or

-14-

level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof. The term "Guarantee" as a verb has a corresponding meaning.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     All Attributable Indebtedness of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability

-15-

company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 9.04(b).

"Information" has the meaning specified in Section 9.07.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means the first Business Day of each month and the Maturity Date.

"Interim Borrowing Order" means an order entered by the Bankruptcy Court, in form, scope and substance as may be reasonably acceptable to the Lender, authorizing, on an interim basis, inter alia, the Borrower to obtain credit and incur (or guaranty) Obligations, granting Liens to secure the Obligations, and providing for the super priority of the Lender's Liens and granting the Lender under the Pre-Petition Credit Agreement adequate protection of its interests.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Borrower's internal controls over financial reporting.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Advance Rate" means 60%.

"Inventory Reserves" means such reserves as may be established from time to time by the Lender in its discretion with respect to the determination of the saleability of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Lender determines will need to be satisfied in connection with the realization upon the

-16-

Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Lender's discretion, include (but are not limited to) reserves based on:

> (a)   Obsolescence; and

> (b)   Shrink.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return.   For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IRS**" means the United States Internal Revenue Service.

"**ISP**" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"**Issuer Documents**" means with respect to any Letter of Credit, the Letter Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrower or in favor the L/C Issuer and relating to any such Letter of Credit.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law, including, but not limited to, the Bankruptcy Code.

"**L/C Advance**" means the Lender's funding of a participation in any L/C Borrowing.

"**L/C Borrowing**" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Committed Borrowing.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"**L/C Issuer**" means Rockland Trust Company in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder (which successor may only be selected by the Lender in its discretion).   The L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the L/C Issuer, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"**L/C Obligations**" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate amount of all Unreimbursed Amounts, including all L/C Borrowings.   For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06.   For all

purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which the Borrower is entitled to the use or occupancy of any real property for any period of time.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lender's Office" means the Lender's address and, as appropriate, account as set forth on Schedule 9.02, or such other address or account as the Lender may from time to time notify the Borrower.

"Letter of Credit" means each Banker's Acceptance, each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder. Without limiting the foregoing, all Pre-Petition Letters of Credit shall be deemed to have been issued hereunder and shall for all purposes be deemed to be "Letters of Credit" hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Expiration Date" means the day that is seven days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 2.03(i).

"Letter of Credit Sublimit" means an amount equal to $1,000,000. The Letter of Credit Sublimit is part of, and not in addition to, the Commitment. A permanent reduction of the Commitment shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Commitment is reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Borrower's option, less than) the Commitment.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention arrangement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities, which, except as to any Lien held by the Lender, shall not include any Lien that is not (i) of record, (ii) properly perfected and (iii) enforceable in Chapter 11 case.

"Loan Account" has the meaning assigned to such term in Section 2.11.

"Loan Cap" means, at any time of determination, the lesser of (a) the Commitment and (b) the Borrowing Base, minus, in each case, the then outstanding Pre-Petition Liabilities.

"Loan Documents" means this Agreement, each Note, each Issuer Document, all Borrowing Base Certificates, the Blocked Account Agreement, the Security Documents, the DIP Orders, and any other instrument or agreement in favor of or with the Lender now or hereafter executed and delivered in connection herewith to which the Borrower is a party, or in connection with any transaction arising out of

any Cash Management Services and Bank Products provided by the Lender or any of its Affiliates, each as amended and in effect from time to time.

"Lockbox" means "Lockbox" as defined in the Lockbox Agreement.

"Lockbox Agreement" means the Lockbox Service Agreement, dated as of the date hereof, by and between the Borrower and the Lender.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), or condition (financial or otherwise) of the Borrower; (b) a material impairment of the ability of the Borrower to perform its obligations under any Loan Document; or (c) a material impairment of the rights and remedies of the Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of any Loan Document. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events would result in a Material Adverse Effect; provided that a "Material Adverse Effect shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person.

"Material Indebtedness" means Indebtedness incurred subsequent to the commencement of the Chapter 11 Case (other than the Obligations) of the Borrower in an aggregate principal amount exceeding $500,000.00. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn committed or available amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means March 22, 2015 unless the Final Borrowing Order shall have been entered on or before such date, in which case the Maturity Date shall mean May 15, 2015.

"Maximum Rate" has the meaning provided therefor in Section 9.09.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means each and every fee and leasehold mortgage or deed of trust or the like by the Borrower in favor of the Lender.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Proceeds" means (a) with respect to any Disposition by the Borrower, or any Extraordinary Receipt received or paid to the account of the Borrower, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received

-19-

by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Lender's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), and (B) the reasonable and customary out-of-pocket expenses incurred by the Borrower in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by the Borrower to third parties (other than Affiliates)); and

(b)     with respect to the sale or issuance of any Equity Interest by the Borrower, or the incurrence or issuance of any Indebtedness by the Borrower, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by the Borrower in connection therewith.

"Note" means a revolving promissory note made by the Borrower in favor of the Lender evidencing Committed Loans made by the Lender, substantially in the form of Exhibit B, as amended, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, the Borrower arising under any Loan Document with respect to any Committed Loan, or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Committed Loan or Loan Document).

"Other Liabilities" means any obligation on account of (a) any Cash Management Services furnished to the Borrower and/or (b) any Bank Product furnished to the Borrower.

-20-

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Outstanding Amount" means (i) with respect to Committed Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Committed Loans occurring on such date; and (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrower of Unreimbursed Amounts.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Participant" has the meaning specified in Section 9.06(c).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by the Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Permitted Disposition" means any of the following:

      (a)     dispositions of inventory in the ordinary course of business;

      (b)     non-exclusive licenses of Intellectual Property of the Borrower in the ordinary course of business;

      (c)     dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of the Borrower, no longer useful or necessary in its business;

      (d)     the use or transfer of money or cash equivalents in the ordinary course of business in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents; or

      (e)     the disposition of assets in connection with the Sale Motion.

"Permitted Encumbrances" means any of the following:

(a)     Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Laws, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 6.04;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)     easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially interfere with the ordinary conduct of business of the Borrower and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)     Liens existing on the Effective Date listed on Schedule 7.01 and Liens to secure any Permitted Refinancings of the Indebtedness with respect thereto;

(h)     Liens on fixed or capital assets or on Real Estate of the Borrower which secure Indebtedness permitted under clauses (c) and/or (d) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of the applicable assets, and (iii) such Liens shall attach only to the assets or Real Estate acquired, improved or refinanced with such Indebtedness and shall not extend to any other property or assets of the Borrower;

(i)     landlords' and lessors' statutory Liens in respect of rent not in default;

(j)     Liens securing the Pre-Petition Liabilities;

(k)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, Liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(l)     Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to the Borrower; and

-22-

(m)      Liens in favor of customs and revenues authorities imposed by applicable Laws arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than thirty (30) days, or (ii)(A) that are being contested in good faith by appropriate proceedings, (B) the Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation.

"Permitted Holder" (i) those Persons listed on Schedule PH, (ii) any successors in trust of any trustee Permitted Holder, (iii) beneficiaries of any Family Trust, (iv) any Family Member and legatees of any individual Permitted Holder, and (v) any legal representative of any of the foregoing.

"Permitted Indebtedness" means each of the following:

(a)      Indebtedness outstanding on the Effective Date listed on Schedule 7.03 and any Permitted Refinancing thereof;

(b)      the Pre-Petition Liabilities;

(c)      contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business; and

(d)      the Obligations.

"Permitted Investments" means each of the following:

(a)      readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)      commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)      time deposits with, or insured certificates of deposit or bankers' acceptances of, (i) the Lender or (ii) any commercial bank that (A) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (B) issues (or the parent of which issues) commercial paper rated as described in clause (b) of this definition and (C) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)      fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

-23-

(e)    Investments, classified in accordance with GAAP as current assets of the Borrower, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above;

(f)    Investments existing on the Effective Date set forth on Schedule 7.02, but not any increase in the amount thereof or any other modification of the terms thereof;

(g)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors;

(h)    Guarantees constituting Permitted Indebtedness;

(i)    so long as no Default or Event of Default has occurred and is continuing or would result from such Investment, Investments by the Borrower in Swap Contracts permitted hereunder; and

(j)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business.

"Permitted Overadvance" means an Overadvance made by the Lender, in its discretion, which:

(a)    is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)    is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; or

(c)    is made to pay any other amount chargeable to the Borrower hereunder.

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting a Permitted Refinancing); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premiums thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the weighted average life to maturity of such Permitted Refinancing is greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced (c) such Permitted Refinancing shall not require any scheduled principal payments due prior to the Maturity Date in excess of, or prior to, the scheduled principal payments due prior to such Maturity Date for the Indebtedness being Refinanced, (d) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Credit Parties as those contained in the documentation governing the Indebtedness being Refinanced, (e) no Permitted Refinancing shall have direct or indirect obligors who were not also obligors

of the Indebtedness being Refinanced, or greater guarantees or security, than the Indebtedness being Refinanced, (f) such Permitted Refinancing shall be otherwise on terms not materially less favorable to the Borrower than those contained in the documentation governing the Indebtedness being Refinanced, including, without limitation, with respect to financial and other covenants and events of default, (g) the interest rate applicable to any such Permitted Refinancing shall not exceed the then applicable market interest rate, and (h) at the time thereof, no Default or Event of Default shall have occurred and be continuing.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning provided in the recitals to this Agreement.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Borrower or any ERISA Affiliate or any such Plan to which the Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Plan of Reorganization" means a plan filed in the Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code.

"Pre-Petition Credit Agreement" means that certain Credit Agreement dated as of July 3, 2012 by and among the Borrower, as borrower and the Lender, as amended, restated, replaced and/or modified from time to time

"Pre-Petition Letters of Credit" means each of the Letters of Credit issued under the Pre-Petition Credit Agreement and outstanding on the Effective Date, as listed on Schedule 1.04 hereto.

"Pre-Petition Liabilities" means the "Secured Obligations" as defined in the Security Agreement executed and delivered in connection with the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Professional Expense Carve Out" shall mean a carve out for the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); (iii) all accrued and unpaid fees, disbursements, costs and expenses incurred by Case Professionals to the extent allowed at any time, through the date of service by the Lender of a Carve Out Trigger Notice, as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice less the amount of pre-petition retainers received by such Case Professionals; and (iv) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $50,000 less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (iii) above. The Professional Expense Carve-Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals.

"Professional Expense Carve Out Reserve" means a Reserve equal to the maximum possible amount of the Professional Expense Carve Out.

"Professional Fees and Expenses" means, subject to any limitations contained in the DIP Orders, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6), and (b) professional fees of, and costs and expenses incurred by, Case Professionals.

"Prepayment Event" means:

 (a) any Disposition of any property or asset of the Borrower of the type not included in the Borrowing Base;

 (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of the Borrower, unless (i) the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Lender or (ii) the proceeds therefrom are deposited into a segregated account and utilized for purposes of replacing or repairing the assets in respect of which such proceeds, awards or payments were received within 180 days of the occurrence of the damage to or loss of the assets being repaired or replaced;

 (c) the issuance by the Borrower of any Equity Interests, other than any such issuance of Equity Interests as a compensatory issuance to any employee, director, or consultant (including under any option plan);

 (d) the incurrence by the Borrower of any Indebtedness for borrowed money other than Permitted Indebtedness; or

 (e) the receipt by the Borrower of any Extraordinary Receipts.

"Prime Rate" means the rate of interest in effect for such day published in the "Money Rates" section of *The Wall Street Journal* as the "prime rate." Any change the Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

"Prime Rate Loan" means a Committed Loan that bears interest based at the Prime Rate.

"QVC" means QVC, Inc., a Delaware corporation.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by the Borrower, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receivables Reserves" means such Reserves as may be established from time to time by the Lender in the Lender's discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables, including, without limitation, Dilution Reserves.

"Recipient" means the Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder.

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Borrower as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

-26-

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Request for Credit Extension" means (a) with respect to a Committed Borrowing, a Committed Loan Notice, and (b) with respect to an L/C Credit Extension, a Letter of Credit Application.

"Reserves" means the Professional Expense Carve Out Reserve, and all Inventory Reserves, Availability Reserves, and Receivables Reserves. The Lender shall have the right, at any time and from time to time after the Effective Date in its discretion to establish, modify or eliminate Reserves upon one (1) Business Days prior notice to the Borrower, (during which period the Lender shall be available to discuss any such proposed Reserve with the Borrower; provided that no such prior notice shall be required for (1) changes to any Reserves resulting solely by virtue of mathematical calculations of the amount of the Reserve in accordance with the methodology of calculation previously utilized (such as, but not limited to, Rent), or (2) changes to Reserves or establishment of additional Reserves if a Material Adverse Effect has occurred or it would be reasonably likely that a Material Adverse Effect to the Lender would occur were such Reserve not changed or established prior to the expiration of such one (1) Business Day period, or (3) if an Event of Default is continuing.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower or any of the other individuals designated in writing to the Lender by an existing Responsible Officer of the Borrower as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of the Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of the Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale Motion" means that certain motion or series of motions filed by the Borrower in the Chapter 11 Case and reasonably acceptable to the Lender requesting approval for a Section 363 sale process to sell some or all of the Borrower's assets for a cash purchase price payable at the closing not less than the outstanding amount of Pre-Petition Liabilities and all other Obligations, which shall include a motion seeking authority to establish bidding procedures.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of July 3, 2012 between the Borrower and the Lender, as amended, restated, replaced and/or modified from time to time.

"Security Documents" means the Security Agreement, the Intellectual Property Security Agreement, the Blocked Account Agreement, and each other security agreement or other instrument or document executed and delivered to the Lender pursuant to this Agreement or the Pre-Petition Credit Agreement or any other Loan Document or Pre-Petition Loan Document granting a Lien to secure any of the Obligations and the DIP Orders.

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Borrower as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by the Borrower, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Lender.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master

agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include the Lender or any Affiliate of the Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any applicable laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated and the Commitments are irrevocably terminated in accordance with Article VIII, (iii) the closing date of the sale in connection with the Sale Motion, or (iv) the termination of the Commitments in accordance with the provisions of Section 2.05 hereof.

"Third Party Consultant" means Verdolino & Lowey, P.C., or another independent, third party consultant engaged by the Borrower and acceptable to the Lender.

"Total Outstandings" means the aggregate Outstanding Amount of all Committed Loans and all L/C Obligations.

"Trading with the Enemy Act" has the meaning set forth in Section 9.17.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Massachusetts; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the Commonwealth of Massachusetts, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce ("ICC") Publication No. 600 (or such later version thereof as may be in effect at the time of issuance).

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning specified in Section 2.03(c)(i).

"Unused Line Fee Percentage" means .375% per annum.

"Variance Report" means a report prepared by the Borrower's management reflecting on a line-item basis the Borrower's actual performance compared to the Approved Budget for the immediately preceding week and on a cumulative basis for the period after the Petition Date and the percentage variance of the Borrower's actual results from those reflected in the then extant Approved Budget, along with management's explanation of such variance.

1.02    **Other Interpretive Provisions.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and Bank Products (other than Swap Contracts), providing Cash Collateralization) of all of the monetary Obligations (including the payment of any termination

amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than (i) unasserted contingent indemnification Obligations, (ii) any Obligations relating to Bank Products (including Swap Contracts) that, at such time, are allowed by the applicable Bank Product provider to remain outstanding without being required to be repaid or Cash Collateralized, and (iii) any Obligations relating to Cash Management Services that, at such time, are allowed by the applicable provider of such Cash Management Services to remain outstanding without being required to be repaid.

**1.03     Accounting Terms.**

(a)     Generally. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Lender shall so request, the Lender and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04     Rounding.** Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05     Times of Day.** Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06     Letter of Credit Amounts.** Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

<div align="center">

**ARTICLE II**
**THE COMMITMENT AND CREDIT EXTENSIONS**

</div>

**2.01     Committed Loans; Reserves.** Subject to the terms and conditions set forth herein, the Lender agrees to make loans (each such loan, a "Committed Loan") to the Borrower from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed the Loan Cap at any time outstanding; provided that the Outstanding Amount of all L/C Obligations shall not at any time

exceed the Letter of Credit Sublimit. Subject to the foregoing and the other terms and conditions hereof, the Borrower may borrow under this Section 2.01, prepay under Section 2.04, and reborrow under this Section 2.01.

> **2.02    Committed Borrowings, Conversions and Continuations of Committed Loans.**

> > (a)    Committed Loans shall be Prime Rate Loans.

> > (b)    Each Committed Borrowing shall be made upon the Borrower's delivery to the Lender of an irrevocable written Committed Loan Notice appropriately completed and signed by a Responsible Officer of the Borrower. Each such written Committed Loan Notice must be received by the Lender not later than 10:00 a.m. on the requested date of any Committed Borrowing of Prime Rate Loans. Each Committed Borrowing of Prime Rate Loans shall be in sum minimum amounts as the Lender may require. Each written Committed Loan Notice shall specify (i) the requested date of the Committed Borrowing (which shall be a Business Day), and (ii) the principal amount of Committed Loans to be borrowed. Following receipt of a Committed Loan Notice, and upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Committed Borrowing is the initial Credit Extension, Section 4.01), the Lender shall use reasonable efforts to make all funds available to the Borrower by no later than 2:00 p.m. on the day of any such requested Committed Borrowing either by (i) crediting the account of the Borrower on the books of Rockland Trust Company with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Lender by the Borrower; provided, however, that if, on the date the Committed Loan Notice with respect to such Committed Borrowing is given by the Borrower, there are L/C Borrowings outstanding, then the proceeds of such Committed Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the Borrower as provided above.

> > (c)    The Lender, without the request of the Borrower, may advance any interest, fee, service charge (including direct wire fees), expenses, or other payment to which any Credit Party is entitled from the Borrower pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Lender shall advise the Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Lender shall not constitute a waiver of the Lender's rights and the Borrower's obligations under Section 2.04(b). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(c) shall bear interest at the interest rate then and thereafter applicable to Prime Rate Loans.

> > (d)    At any time that Prime Rate Loans are outstanding, the Lender shall notify the Borrower of any change in the Prime Rate promptly following the public announcement of such change.

> > (e)    The Lender and the L/C Issuer shall have no obligation to make any Committed Loan or to provide any Letter of Credit if an Overadvance would result. The Lender may, in its discretion, make Permitted Overadvances without the consent of the Borrower and the L/C Issuer and the Borrower and the L/C Issuer shall be bound thereby. A Permitted Overadvance is for the account of the Borrower and shall constitute a Prime Rate Loan and an Obligation and shall be repaid by the Borrower in accordance with the provisions of Section 2.04(b). The making of any such Permitted Overadvance on any one occasion shall not obligate the Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The Lender shall have no liability for, and neither the Borrower nor any Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Lender with respect to any such Overadvance(s).

**2.03    Letters of Credit.**

(a)    <u>The Letter of Credit Commitment.</u>

(i)    Subject to the terms and conditions set forth herein, (A) the L/C Issuer agrees, in reliance upon the agreements of the Lender set forth in this <u>Section 2.03</u>, (1) from time to time on any Business Day during the period from the Effective Date until the Letter of Credit Expiration Date, to issue Letters of Credit for the account of the Borrower, and to amend or extend Letters of Credit previously issued by it, in accordance with <u>Section 2.03(b)</u> below, and (2) to honor drawings under the Letters of Credit; and (B) the Lender agrees to participate in Letters of Credit issued for the account of the Borrower and any drawings thereunder; <u>provided</u> that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Outstandings shall not exceed the Loan Cap, and (y) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)    The L/C Issuer shall not issue any Letter of Credit, if:

(A)    subject to Section 2.03(b)(iii), the expiry date of such requested Standby Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the Lender has approved such expiry date; or

(B)    the expiry date of such requested Commercial Letter of Credit would occur more than 120 days after the date of issuance, unless the Lender has approved such expiry date; or

(C)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Letter of Credit (or such later date as to which the Lender may agree); or.

(D)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the L/C Issuer in good faith deems material to it;

(E)    the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally;

(F)    except as otherwise agreed by the Lender, such Letter of Credit is to be denominated in a currency other than Dollars; <u>provided</u> that if the L/C Issuer, with the

consent of the Lender, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrower of the honoring of any drawing under such Letter of Credit shall be paid in the currency in which such Letter of Credit was denominated; or

(G)    such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder.

(iii)    The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or if the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(b)    Procedures for Issuance and Amendment of Letters of Credit.

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the L/C Issuer (with a copy to the Lender) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower. Such Letter of Credit Application may be sent by facsimile, by United States mail, by overnight courier, by electronic transmission using the system provided by the L/C Issuer, by personal delivery or by any other means acceptable to the L/C Issuer. Such Letter of Credit Application must be received by the L/C Issuer and the Lender not later than 11:00 a.m. at least two Business Days (or such other date and time as the Lender and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the L/C Issuer may require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the L/C Issuer may require. Additionally, the Borrower shall furnish to the L/C Issuer and the Lender such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Lender may reasonably require.

(ii)    Subject to the provisions of Section 2.02(b)(iv) hereof, promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Lender (by telephone or in writing) that the Lender has received a copy of such Letter of Credit Application from the Borrower and, if not, the L/C Issuer will provide the Lender with a copy thereof. Unless the L/C Issuer has received written notice from the Lender or the Borrower, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied or unless the L/C Issuer would not be permitted, or would have no obligation, at such time to issue such Letter of Credit under the terms hereof (by reason of the provisions of Section 2.03(a)(ii) or otherwise), then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices. Immediately upon the issuance or amendment of each Letter of Credit, the Lender shall be deemed to (without any further action), and hereby irrevocably and unconditionally

-34-

agrees to, purchase from the L/C Issuer, without recourse or warranty, a risk participation in such Letter of Credit in an amount equal to the Stated Amount of such Letter of Credit.

(iii)    Any L/C Issuer (other than Rockland Trust Company or any of its Affiliates) shall notify the Lender in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such L/C Issuer, provided that (A) until the Lender advises any such Issuing Bank that the provisions of Section 4.02 are not satisfied, or (B) the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as shall be agreed by the Lender and the L/C Issuer, such L/C Issuer shall be required to so notify the Lender in writing only once each week of the Letters of Credit issued by such L/C Issuer during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as the Lender and such L/C Issuer may agree. The L/C Issuer will also deliver (contemporaneously with the notification set forth in the first sentence hereof) to the Borrower and the Lender a true and complete copy of such Letter of Credit or amendment.

(iv)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Borrower and the Lender a true and complete copy of such Letter of Credit or amendment.

(c)    Drawings and Reimbursements.

(i)    Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify the Borrower and the Lender thereof. Not later than 2:00 p.m. on the date of any payment by the L/C Issuer under a Letter of Credit (each such date, an "Honor Date"), the Borrower shall reimburse the L/C Issuer through the Lender in an amount equal to the amount of such drawing. If the Borrower fails to so reimburse the L/C Issuer by such time, the Borrower shall be deemed to have requested a Committed Borrowing of Prime Rate Loans to be disbursed on the Honor Date in an amount equal to the unreimbursed amount of such drawing (the "Unreimbursed Amount"), without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Prime Rate Loans, but subject to the amount of the unutilized portion of the Loan Cap and the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice). Any notice given by the L/C Issuer pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    With respect to any Unreimbursed Amount that is not fully refinanced by a Committed Borrowing of Prime Rate Loans because the conditions set forth in Section 4.02 cannot be satisfied or for any other reason, the Borrower shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate for Prime Rate Loans. In such event, the Lender shall make a payment for the account of the L/C Issuer, which shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from the Lender in satisfaction of its participation obligation under this Section 2.03.

(iii)    Until the Lender funds its Committed Loan or L/C Advance pursuant to this Section 2.03(c) to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such amount shall be solely for the account of the L/C Issuer.

-35-

(iv)     The Lender's obligation to make Committed Loans or L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which the Lender may have against the L/C Issuer, the Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default or Event of Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that the Lender's obligation to make Committed Loans pursuant to this Section 2.03(c) is subject to the conditions set forth in Section 4.02 (other than delivery by the Borrower of a Committed Loan Notice). No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrower to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(d)     Repayment of Participations.

(i)     At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from the Lender its L/C Advance in respect of such payment in accordance with Section 2.03(c), if the L/C Issuer, or the Lender for the account of the L/C Issuer, receives any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Lender pursuant to Section 2.03(g)), the L/C Issuer shall distribute any payment it receives to the Lender.

(ii)     If any payment received by the L/C Issuer or by Lender for the account of the L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 9.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), the Lender shall make such payment to the L/C Issuer. The obligations of the Lender under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)     Obligations Absolute. Except to the extent of any losses, claims, damages, liabilities or related expenses that are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the L/C Issuer, the obligation of the Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

-36-

(iv)     waiver by the L/C Issuer of any requirement that exists for the L/C Issuer's protection and not the protection of the Borrower or any waiver by the L/C Issuer which does not in fact materially prejudice the Borrower;

(v)     honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi)     any payment made by the L/C Issuer in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(vii)     any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with the Chapter 11 Case;

(viii)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower; or

(ix)     the fact that any Default or Event of Default shall have occurred and be continuing.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of non-compliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the L/C Issuer. The Borrower shall be conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)     Role of L/C Issuer.  The Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuer, the Lender, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to the Borrower for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lender; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document, or (v) for any action, neglect or omission under or in connection with any Letter of Credit or Issuer Documents, including, without limitation, the issuance or amendment of any Letter of Credit, the failure to issue or amend any Letter of Credit, or the honoring or dishonoring of any demand under any Letter of Credit, and such action or neglect or omission will be binding upon the Borrower; provided that the Borrower may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to punitive, consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by the L/C Issuer's willful misconduct or gross negligence. The Borrower hereby assumes all risks of the

-37-

acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the L/C Issuer, the Lender, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.03(e); provided, however, that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason. The L/C Issuer may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(g)   Cash Collateral.  If, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrower shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations. Sections 2.04, 2.06(c) and 8.02(c) set forth certain additional requirements to deliver Cash Collateral hereunder. For purposes of this Section 2.03, Section 2.04, Section 2.06(c) and Section 8.02(c), "Cash Collateralize" means to pledge and deposit with or deliver to the Lender, for the benefit of the Credit Parties, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 105% of the Outstanding Amount of all L/C Obligations, pursuant to documentation in form and substance satisfactory to the Lender and the L/C Issuer. The Borrower hereby grants to the Lender a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing to secure all Obligations. Such cash collateral shall be maintained in blocked, non-interest bearing deposit accounts at Rockland Trust Company. If at any time the Lender determines that any funds held as cash collateral are subject to any right or claim of any Person other than the Lender or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrower will, forthwith upon demand by the Lender, pay to the Lender, as additional funds to be deposited as cash collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as cash collateral that the Lender determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as cash collateral, such funds shall be applied to reimburse the L/C Issuer and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(h)   Applicability of ISP and UCP.  Unless otherwise expressly agreed by the L/C Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit. Notwithstanding the foregoing, the L/C Issuer shall not be responsible to the Borrower for, and the L/C Issuer's rights and remedies against the Borrower shall not be impaired by, any action or inaction of the L/C Issuer required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the L/C Issuer or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade - International Financial Services Association (BAFT-IFSA),

-38-

or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(i)      Letter of Credit Fees. The Borrower shall pay to the Lender a Letter of Credit fee (the "Letter of Credit Fee") for each Letter of Credit equal to the Applicable Rate times the daily Stated Amount under each such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit). For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06. Letter of Credit Fees shall be (i) due and payable on the last Business Day of each month, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand, and (ii) computed on a monthly basis in arrears. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate as provided in Section 2.07 hereof.

(j)      Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

2.04    Prepayments.

(a)      The Borrower may at any time or from time to time voluntarily prepay Committed Loans in whole or in part without premium or penalty.

(b)      If for any reason the Total Outstandings at any time exceed the Loan Cap as then in effect, the Borrower shall immediately prepay the Committed Loans and L/C Borrowings and Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess; provided, however, that the Borrower shall not be required to Cash Collateralize the L/C Obligations (other than L/C Borrowings) pursuant to this Section 2.04(b) unless after the prepayment in full of the Committed Loans the Total Outstandings exceed the Loan Cap as then in effect.

(c)      The Borrower shall prepay the Committed Loans and, after the occurrence and during the continuance of an Event of Default or to the extent required by the provisions of Section 2.06(c), Cash Collateralize the L/C Obligations to the extent required pursuant to the provisions of Section 6.12 hereof.

(d)      The Borrower shall prepay the Committed Loans and, after the occurrence and during the continuance of an Event of Default or to the extent required by the provisions of Section 2.06(c), Cash Collateralize the other L/C Obligations in an amount equal to the Net Proceeds received by the Borrower on account of a Prepayment Event.

(e)      Prepayments made pursuant to Section 2.04(c), (d) and (e) above, first, shall be applied ratably to the L/C Borrowings, second, shall be applied ratably to the outstanding Committed Loans, third, after the occurrence and during the continuance of an Event of Default, shall be used to Cash Collateralize the remaining L/C Obligations; and, fourth, the amount remaining, if any, after the prepayment in full of all L/C Borrowings and Committed Loans outstanding at such time and the Cash Collateralization of the remaining L/C Obligations (to the extent required hereunder) in full shall be deposited by the Lender in a deposit account of the Borrower and may be utilized by the Borrower in the ordinary course of its business to the extent otherwise permitted hereunder. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrower) to reimburse the L/C Issuer or the Lender, as applicable, and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

### 2.05    Termination of Commitment.

The Borrower may, upon delivery of irrevocable notice from the Borrower to the Lender, request to terminate the Commitment; provided that (i) any such notice shall be received by the Lender not later than 11:00 a.m. five (5) Business Days prior to the date of termination, (ii) the Borrower shall not terminate the Commitment if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Commitment, and (iii) the Lender has delivered written notice to the Borrower confirming the occurrence of a Termination Date (which responsive notice by the Lender shall be delivered as promptly as practicable after actual receipt of the aforementioned termination notice from the Borrower), thus requiring the repayment by the Borrower of all Obligations pursuant to the terms and conditions contained in Section 2.06 below.

### 2.06    Repayment of Obligations.

Except as provided in Section 9.11 with respect to the collateralization of the Other Liabilities, the Borrower shall repay to the Lender on the Termination Date all Obligations outstanding on such date (other than contingent indemnification claims for which a claim has not been asserted) and shall cause each Letter of Credit to be returned to the L/C Issuer undrawn or shall Cash Collateralize all L/C Obligations (to the extent not previously Cash Collateralized as required herein).

### 2.07    Interest.

(a)    Subject to the provisions of Section 2.07(b) below, each Prime Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Prime Rate plus the Applicable Margin for Prime Rate Loans.

(b)    (i)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Law.

(ii)    If any other Event of Default exists, then the Lender may notify the Borrower that all outstanding Obligations shall bear interest retroactively from the date such Event of Default arose at a fluctuating interest rate per annum at all times equal to the Default Rate and such Obligations shall bear interest retroactively from the date such Event of Default arose at the Default Rate to the fullest extent permitted by Law.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Committed Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

### 2.08    Fees. In addition to certain fees described in subsection (i) of Section 2.03:

(a)    Unused Line Fee. The Borrower shall pay to the Lender an unused line fee equal to the Unused Line Fee Percentage *multiplied by* the actual daily amount by which the Commitment exceed the Total Outstandings during the immediately preceding month. The unused line fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable monthly in arrears on the first Business

-40-

Day of the next month immediately following the month in which the unused line fee accrued, commencing with the first such date to occur after the Effective Date, and ending on the last day of the Availability Period.

(b)    Closing Fee. The Borrower shall pay to the Lender on the Effective Date a "Closing Fee" in the amount of $50,000. Such Closing Fee shall be fully earned when paid and shall not be refundable for any reason whatsoever.

## 2.09    RESERVED

**2.10    Computation of Interest and Fees**  All computations of interest for Prime Rate Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Committed Loan for the day on which the Committed Loan is made, and shall not accrue on a Committed Loan, or any portion thereof, for the day on which the Committed Loan or such portion is paid, provided that any Committed Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

### 2.11    Evidence of Debt.

The Credit Extensions made by the Lender shall be evidenced by one or more accounts or records maintained by the Lender (the "Loan Account") in the ordinary course of business. The Loan Account shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lender to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. Upon the request of the Lender, the Borrower shall execute and deliver to the Lender a Note, which shall evidence the Lender's Committed Loans in addition to the Loan Account. Upon receipt of an affidavit of the Lender as to the loss, theft, destruction or mutilation of the Lender's Note and upon cancellation of such Note, the Borrower will issue, in lieu thereof, a replacement Note in favor of the Lender, in the same principal amount thereof and otherwise of like tenor.

### 2.12    Payments Generally.

(a)    General. All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Lender, at the Lender's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. All payments received by the Lender after 2:00 p.m. shall, at the option of the Lender, be deemed received on the next succeeding Business Day. In any event, all such payments received by the Lender shall be deemed to have been received on the next following Business Day for the purpose of calculating interest on outstanding Prime Rate Loans and any applicable fee. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    Payments by Borrower; Presumptions by Lender. Unless the Lender shall have received notice from the Borrower prior to the time at which any payment is due to the Lender for the account of the L/C Issuer hereunder that the Borrower will not make such payment, the Lender may assume that the Borrower has made such payment on such date in accordance herewith and may, in

-41-

reliance upon such assumption, distribute to the L/C Issuer the amount due. In such event, if the Borrower has not in fact made such payment, then the L/C Issuer agrees to repay to the Lender forthwith on demand the amount so distributed to the L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Lender, at the greater of the Federal Funds Rate and a rate determined by the Lender in accordance with banking industry rules on interbank compensation. A notice of the Lender to the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Funding Source. Nothing herein shall be deemed to obligate the Lender to obtain the funds for any Committed Loan in any particular place or manner or to constitute a representation by the Lender that it has obtained or will obtain the funds for any Committed Loan in any particular place or manner.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01    Taxes.

(a)     Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)     Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of the Lender) require the deduction or withholding of any Tax from any such payment by the Lender or the Borrower, then the Lender or the Borrower shall be entitled to make such deduction or withholding.

(ii)     If the Borrower or the Lender shall be required by the Code to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) the Lender shall withhold or make such deductions as are determined by the Lender to be required based upon the information and documentation it has received, (B) the Lender shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made. Notwithstanding the foregoing, the Borrower is not required to increase the payment under clause (C) of this Section 3.01(a)(ii) with respect to any Recipient unless such Recipient has provided to the Borrower prior to the payment either (i) if the Recipient is a citizen or resident of the United States of America, a corporation, partnership or other entity created or organized in or under the laws of the United States (or any jurisdiction thereof) (a "United States Person"), a properly completed and duly executed United States Internal Revenue Service Form W-9 claiming complete exemption from United States federal withholding tax or (ii) if the Recipient is not a United States Person, a properly completed and duly executed United States Internal Revenue Service Form W-8BEN, Form W-8IMY or Form W-8ECI, or any subsequent versions thereof or successors thereto, claiming complete exemption from United States federal withholding tax on all payments.

(iii)     If the Borrower or the Lender shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) the Borrower or the

-42-

Lender, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Borrower or the Lender, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     Payment of Other Taxes by the Borrower.  Without limiting the provisions of subsection (a) above, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Lender timely reimburse it for the payment of, any Other Taxes.

(c)     Tax Indemnifications.

(i)     The Borrower shall, and does hereby, indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender or the L/C Issuer shall be conclusive absent manifest error.  The Borrower shall, and does hereby, indemnify the Lender, and shall make payment in respect thereof within 10 days after demand therefor, for any amount which the L/C Issuer for any reason fails to pay indefeasibly to the Lender as required pursuant to Section 3.01(c)(ii) below.  Notwithstanding the foregoing, the Borrower is not required to make any payment pursuant to this Section 3.01(c)(i) with respect to any Recipient unless such Recipient has provided to the Borrower prior to such payment either (i) if the Recipient is a United States Person, a properly completed and duly executed United States Internal Revenue Service Form W-9 claiming complete exemption from United States federal withholding tax or (ii) if the Recipient is not a United States Person, a properly completed and duly executed United States Internal Revenue Service Form W-8BEN, Form W-8IMY or Form W-8ECI, or any subsequent versions thereof or successors thereto, claiming complete exemption from United States federal withholding tax on all payments.

(ii)     The L/C Issuer shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Lender against any Indemnified Taxes attributable to the L/C Issuer (but only to the extent that the Borrower has not already indemnified the Lender for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), and (y) the Lender and the Borrower, as applicable, against any Excluded Taxes attributable to the L/C Issuer, in each case, that are payable or paid by the Lender or the Borrower in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the L/C Issuer by the Lender shall be conclusive absent manifest error.  The L/C Issuer hereby authorizes the Lender to set off and apply any and all amounts at any time owing to the L/C Issuer under this Agreement or any other Loan Document against any amount due to the Lender under this clause (ii).

-43-

(d)     Evidence of Payments.  Upon request by the Borrower or the Lender, as the case may be, after any payment of Taxes by the Borrower or by the Lender to a Governmental Authority as provided in this Section 3.01, the Borrower shall deliver to the Lender or the Lender shall deliver to the Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Lender, as the case may be.

(e)     Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Lender have any obligation to file for or otherwise pursue on behalf of the L/C Issuer, or have any obligation to pay to the L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of the L/C Issuer.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 3.01, it shall notify the Borrower of such refund or credit and it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Recipient, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Borrower pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.  This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(f)     Each party's obligations under this Section 3.01 shall survive any assignment of rights by, or the replacement of, the Lender or the L/C Issuer, the termination of the Commitment and the repayment, satisfaction or discharge of all other Obligations.

**3.02    Increased Costs.**

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Lender or the L/C Issuer;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on the Lender or the L/C Issuer any other condition, cost or expense affecting this Agreement or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to the Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate

-44-

in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by the Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of the Lender or the L/C Issuer, the Borrower will pay to the Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate the Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

        (b)     Capital Requirements. If the Lender or the L/C Issuer determines that any Change in Law affecting the Lender or the L/C Issuer or the Lending Office of the Lender's or the L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the Lender's or the L/C Issuer's capital or on the capital of the Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitment or the Committed Loans made by, or participations in Letters of Credit held by, the Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which the Lender or the L/C Issuer or the Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration the Lender's or the L/C Issuer's policies and the policies of the Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrower will pay to the Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate the Lender or the L/C Issuer or the Lender's or the L/C Issuer's holding company for any such reduction suffered.

        (c)     Certificates for Reimbursement. A certificate of the Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate the Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay the Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

        (d)     Delay in Requests. Failure or delay on the part of the Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of the Lender's or the L/C Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate the Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that the Lender or the L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of the Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.03    INTENTIONALLY OMITTED.

    3.04    Survival. All of the Borrower's obligations under this Article III shall survive termination of the Commitment and repayment of all other Obligations hereunder.

### ARTICLE IV
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

    4.01    Conditions of Initial Credit Extension. The obligation of the L/C Issuer and the Lender to make the initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

        (a)     The Lender's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif " via e-mail) (followed promptly

-45-

by originals) unless otherwise specified, each dated the Effective Date (or, in the case of certificates of governmental officials, a recent date before the Effective Date) and each in form and substance reasonably satisfactory to the Lender:

(i)     counterparts of this Agreement each properly executed by a Responsible Officer of the Borrower and the Lender;

(ii)    a Note executed by the Borrower in favor of the Lender (if requested by the Lender);

(iii)   such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of the Borrower as the Lender may require evidencing (A) the authority of the Borrower to enter into this Agreement and the other Loan Documents and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents;

(iv)    copies of the Borrower's Organization Documents and such other documents and certifications as the Lender may reasonably require to evidence that the Borrower is duly organized or formed, and that the Borrower is validly existing, in good standing, and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)     a certificate of a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.01 and 4.02 have been satisfied, and (B) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by the Borrower and the validity against the Borrower of the Loan Documents, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vi)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Lender required under the Loan Documents have been obtained and are in effect;

(vii)   a Ratification Agreement executed by the Borrower confirming and ratifying (A) the Security Documents and all previously delivered certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, and (B) all other Pre-Petition Loan Documents previously delivered under the Pre-Petition Credit Agreement;

(viii)  a Collateral Assignment of Asset Purchase Agreement executed by the Borrower and Lifetime Brands, Inc., in form and substance satisfactory to the Lender;

(ix)    all other Loan Documents, each duly executed by the Borrower; and

(x)     results of searches or other evidence reasonably satisfactory to the Lender (in each case dated as of a date reasonably satisfactory to the Lender) indicating the absence of Liens on the assets of the Borrower, except for Permitted Encumbrances and Liens for which termination statements and releases, and releases or subordination

agreements satisfactory to the Lender are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Lender for the delivery of such termination statements, releases, satisfactions and discharges and subordinations have been made.

(b)    The Lender shall have received a Borrowing Base Certificate dated the Effective Date, relating to the period ended on February ___, 2015, and executed by a Responsible Officer of the Borrower.

(c)    The Lender shall have received an interim order of the Bankruptcy Court approving and permitting the continuance of the Borrower's current cash management systems.

(d)    The Lender shall have received and reviewed all so-called "first day" motions, declarations, and other pleadings filed in the Chapter 11 Case on the Petition Date, including the Sale Motion, each of which shall be in form and substance satisfactory to the Lender.

(e)    The Lender shall have received and reviewed the Approved Budget, which shall be in form and substance reasonably satisfactory to the Lender.

(f)    All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Orders shall be in form and substance reasonably satisfactory to the Lender. The Interim Borrowing Order shall have been entered, shall be in full force and effect, and it shall not have been reversed, vacated or stayed, or modified without the prior written consent of the Lender, and all other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be reasonably satisfactory to the Lender.

(g)    There shall not be any Indebtedness of the Borrower or its Subsidiaries outstanding immediately after the Effective Date other than Permitted Indebtedness.

(h)    Except as the result of the Effect of Bankruptcy or the events leading up to or resulting therefrom, there shall not have occurred any default under any Material Contract or Lease of the Borrower.

(i)    All fees required to be paid to the Lender on or before the Effective Date shall have been paid in full.

(j)    The Borrower shall have paid all fees, charges and disbursements of counsel to the Lender to the extent invoiced prior to or on the Effective Date.

(k)    The Lender shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(l)    No material changes in governmental regulations or policies affecting the Borrower or any Credit Party shall have occurred prior to the Effective Date.

4.02    **Conditions to all Credit Extensions.** The obligation of the Lender to honor any Request for Credit Extension and of the L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

-47-

(a)     The representations and warranties of the Borrower contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the date of such Credit Extension in all material respects, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, (iii) for changes expressly permitted in this Agreement, and (iv) for purposes of this Section 4.02, the representations and warranties contained in Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clause (b) of Section 6.01.

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)     The Lender and, if applicable, the L/C Issuer shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)     After giving effect to the Credit Extension requested to be made on any such date and the use of proceeds thereof, Availability shall be greater than zero.

(e)     There shall not be proceeding pending or threatened seeking to invalidate or avoid, or any order invalidating or avoiding, the pre-petition claims, security interests and liens securing the Pre-Petition Credit Facility or sustaining any other similar challenge under Chapter 5 of the Bankruptcy Code.

Each Request for Credit Extension submitted by the Lead Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.02(a) and (b) and (d) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Committed Loans and to issue Letters of Credit hereunder, the Borrower represents and warrants to the Lender and the other Credit Parties that:

5.01    **Existence, Qualification and Power.** The Borrower (a) is a corporation, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b) subject to the entry of the DIP Orders, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Effective Date, the Borrower's name as it appears in official filings in its state of incorporation, its state of incorporation, organization type, organization number, if any, issued by its state of incorporation, and its federal employer identification number.

**5.02    Authorization; No Contravention.** Subject to the entry of the DIP Orders, the execution, delivery and performance by the Borrower of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of the Borrower (other than Liens in favor of the Lender under the Security Documents and the DIP Orders); (d) violate any Law.

**5.03    Governmental Authorization; Other Consents.** Subject to the entry of the DIP Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Borrower of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect.** This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by the Borrower. Subject to the entry of the DIP Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, subject to the DIP Orders and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; No Material Adverse Effect.**

To the knowledge of the Borrower, no Internal Control Event exists or has occurred that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Lender, (ii) of the Borrowing Base, (iii) of covenant compliance calculations provided hereunder or (iv) of the assets, liabilities, financial condition or results of operations of the Borrower

**5.06    Litigation.** There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened or contemplated in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in Schedule 5.06, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect, and since the Effective Date, there has been no adverse change in the status, or financial effect on the Borrower, of the matters described on Schedule 5.06, except, in each case, any such actions, suits or proceedings are stayed as an Effect of Bankruptcy.

**5.07    No Default.** The Borrower is not in default under or with respect to, or party to, any Material Contract or any Material Indebtedness, except as an Effect of Bankruptcy. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

5.08    **Ownership of Property; Liens.**

(a)    The Borrower has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Borrower has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business. The property of the Borrower is subject to no Liens, other than Liens permitted by Section 7.01.

(b)    Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate (excluding Leases) that is owned by the Borrower, together with a list of the holders of any mortgage or other Lien thereon as of the Effective Date. The Real Estate is owned by the Borrower, free and clear of all Liens, other than Permitted Encumbrances. Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Borrower, together with the name of each lessor and its contact information with respect to each such Lease as of the Effective Date.

5.09    **Environmental Compliance.**

(a)    Except as disclosed in Schedule 5.09, to the knowledge of the Borrower, it (i) has not failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has not become subject to any Environmental Liability, (iii) has not received notice of any claim with respect to any Environmental Liability or (iv) has not been advised in writing of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by the Borrower is listed or proposed for listing on the NPL or on the CERCLIS or any analogous federal, state or local list.

(c)    Except as otherwise set forth on Schedule 5.09, the Borrower is not undertaking, and has not completed, either individually or together with other potentially responsible parties, any material investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law.

5.10    **Insurance.** The properties of the Borrower are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption, and property damage) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower operates. Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Borrower as of the Effective Date. As of the Effective Date, each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

5.11    **Taxes.** The Borrower has filed all Federal, state and other tax returns and reports required to be filed, and has paid all Federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon it or its properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such

obligation. There is no proposed tax assessment against the Borrower that would, if made, have a Material Adverse Effect.

5.12    **ERISA Compliance.**

Except as disclosed on Schedule 5.12:

(a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state laws. Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, an application for such a letter is currently being processed by the Internal Revenue Service, or the Plan is entitled to rely on a favorable determination letter issued to a prototype or volume submitter plan sponsor. To the best knowledge of the Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)    There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred, and neither the Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan; (ii) the Borrower and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) neither the Borrower nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (iv) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (v) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

5.13    **Subsidiaries; Equity Interests.**  As of the Effective Date, the Borrower has no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by the Borrower in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents and Liens to Secure the Pre-Petition Liabilities. Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary. As of the Effective Date, the Borrower has no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13. All of the outstanding Equity Interests in the Borrower have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents and Liens to Secure the Pre-Petition Liabilities. The copies of the Organization Documents of the Borrower and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14    Margin Regulations; Investment Company Act.**

(a)      The Borrower is not engaged and will not be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)      None of the Borrower, any Person Controlling the Borrower, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure.** The Borrower has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of the Borrower to the Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished), when taken as a whole with all other furnished information, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16    Compliance with Laws.** The Borrower is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted, (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, or (c) as an Effect of Bankruptcy.

**5.17    Intellectual Property; Licenses, Etc.** The Borrower owns, or possesses the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person. To the knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by the Borrower infringes upon any rights held by any other Person. Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened in writing, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters.**

There are no strikes, lockouts, slowdowns or other material labor disputes against the Borrower pending or, to the knowledge of the Borrower, threatened in writing. The hours worked by and payments made to employees of the Borrower comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect. The Borrower has not incurred any

-52-

liability or obligation under the Worker Adjustment and Retraining Act or similar state Law. All payments due from the Borrower, or for which any claim may be made against the Borrower, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of the Borrower. Except as set forth on Schedule 5.18, the Borrower is not party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to the Borrower's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of the Borrower has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against the Borrower pending or, to the knowledge of the Borrower, threatened in writing to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of the Borrower. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower is bound.

### 5.19    Security Documents.

(a)    Upon the entry of the DIP Orders, the Security Agreement creates in favor of the Lender, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), to the extent subject to Article 9 of the UCC, the enforceability of which is subject to the DIP Orders and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement. Upon the entry of the DIP Orders, the Lender will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected under the UCC (in effect on the date this representation is made) by filing, recording or registering a financing statement (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, in each case prior and superior in right to any other Person.

(b)    When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified on Schedule II of the Security Agreement, the Lender shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Borrower in copyrights and related assets constituting Intellectual Property Collateral (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office may be necessary to perfect a Lien on copyrights acquired by the Borrower after the Effective Date).

### 5.20    RESERVED

### 5.21    Deposit Accounts.

Annexed hereto as Schedule 5.21 is a list of all DDAs maintained by the Borrower as of the Effective Date, which Schedule includes, with respect to each DDA (i) the name and address of the

depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of the Blocked Account Bank, as applicable.

**5.22    Brokers.** No broker or finder brought about the obtaining, making or closing of the Committed Loans or transactions contemplated by the Loan Documents, and neither the Borrower nor any Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23    Customer and Trade Relations.** There exists no actual or, to the knowledge of the Borrower, threatened in writing, termination or cancellation of, or any material adverse modification or change in the business relationship of the Borrower with any supplier material to its operations.

**5.24    Material Contracts.** Schedule 5.24 sets forth all Material Contracts to which the Borrower is a party or is bound as of the Effective Date. The Borrower has delivered true, correct and complete copies of such Material Contracts to the Lender on or before the Effective Date. Except as an Effect of Bankruptcy, the Borrower is not in breach or in default in any material respect of or under any Material Contract and has not received any notice of default under, or of the intention of any other party thereto to terminate, any Material Contract.

**5.25    Casualty.** Neither the businesses nor the properties of the Borrower are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

<div align="center">

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

</div>

So long as the Lender shall have any Commitment hereunder, any Committed Loan or other Obligation hereunder shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, the Borrower shall:

**6.01    Financial Statements.** Deliver to the Lender, in form and detail satisfactory to the Lender:

(a)    RESERVED;

(b)    as soon as available, but in any event within thirty (30) days after the end of each of the Fiscal Months of each fiscal year of the Borrower, a balance sheet of the Borrower as at the end of such Fiscal Month, and the related statement of income or operations, Shareholders' Equity and cash flows for such Fiscal Month, and for the portion of the Borrower's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(c) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous fiscal year, all in reasonable detail, certified by a Responsible Officer of the Borrower;

(c)    RESERVED;

(d)    all pleadings filed by the Borrower as and when filed and provide periodic updates to Lender of all material developments relating to the Borrower, the Chapter 11 Case, the Collateral, an Acquisition or any other occurrence or event that might have a material impact on

<div align="center">

-54-

</div>

any of the foregoing within a reasonable time after becoming aware of any such event or occurrence; and

(e)    as soon as possible (but in any event on the Wednesday of each week) after the end of each calendar week, (i) a rolling 13-week cash flow forecast for the Borrower and its Subsidiaries, reflecting actual results from the prior period compared to budget and projected results for the subsequent 13 week period, and (ii) a Variance Report, in each case in form and substance reasonably acceptable to the Lender and certified as complete and correct a Responsible Officer of the Borrower.

**6.02    Certificates; Other Information.** Deliver to the Lender, in form and detail satisfactory to the Lender:

(a)    concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and 6.01(b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP;

(b)    on each Wednesday of each week (or, if such Wednesday is not a Business Day, on the next succeeding Business Day), and more frequently if requested by the Lender, a Borrowing Base Certificate showing the Borrowing Base as of the close of business on the immediately preceding Wednesday, each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Borrower;

(c)    promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Borrower by its Registered Public Accounting Firm in connection with the accounts or books of the Borrower, or any audit of the Borrower, including, without limitation, specifying any Internal Control Event;

(d)    promptly after the same are available, copies of each annual report, proxy or financial statement or other material written report or communication sent to the stockholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements which the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange;

(e)    the financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

(f)    promptly after the Lender's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness; and

(g)    promptly, such additional information regarding the business affairs, financial condition or operations of the Borrower, or compliance with the terms of the Loan Documents, as the Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a), Section 6.01(b) or Section 6.02(d) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at

the website address listed on Schedule 9.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which the Lender have access (whether a commercial, third-party website or whether sponsored by the Lender); provided that: (i) if requested by the Lender, the Borrower shall deliver paper copies of such documents to the Lender until a written request to cease delivering paper copies is given by the Lender, and (ii) the Borrower shall notify the Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Lender by electronic mail electronic versions (i.e., soft copies) of such documents.

      **6.03   Notices** Promptly notify the Lender:

          (a)     of the occurrence of any Default or Event of Default;

          (b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect,

          (c)     of any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of the Borrower;

          (d)     of any dispute, litigation, investigation, proceeding or suspension between the Borrower and any Governmental Authority; or the commencement of, or any material development in, any litigation or proceeding affecting the Borrower, including pursuant to any applicable Environmental Laws;

          (e)     of the occurrence of any ERISA Event;

          (f)     of any material change in accounting policies or financial reporting practices by the Borrower;

          (g)     of any change in the Borrower's senior executive officers;

          (h)     of the discharge by the Borrower of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

          (i)     of any collective bargaining agreement or other labor contract to which the Borrower becomes a party, or the application for the certification of a collective bargaining agent;

          (j)     of the filing of any Lien for unpaid Taxes against the Borrower; and

          (k)     of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

      **6.04   Payment of Obligations.** Subject to the Effect of Bankruptcy, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders,

-56-

consolidators, and carriers) which, if unpaid, would by Law become a Lien upon its property; and (c) all Material Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (iv) no Lien has been filed with respect thereto and (v) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Lender with respect to determining Reserves pursuant to this Agreement.

6.05    **Preservation of Existence, Etc.** (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent that the failure to preserve or renew such Intellectual Property would not have a Material Adverse Effect.

6.06    **Maintenance of Properties** (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.07    **Maintenance of Insurance**

(a)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Lender, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Lender.

(b)    RESERVED

(c)    Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Lender, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Borrower under the policies directly to the Lender, (ii) a provision to the effect that none of the Borrower, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Lender may reasonably require from time to time to protect the interests of the Credit Parties.

(d)    Cause commercial general liability policies to be endorsed to name the Lender as an additional insured.

(e)    Cause business interruption policies to name the Lender as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Effective Date, the insurer shall pay all proceeds otherwise payable to the Borrower under the policies directly to the Lender, (ii) a

-57-

provision to the effect that none of the Borrower, the Lender or any other party shall be a co-insurer and (iii) such other provisions as the Lender may reasonably require from time to time to protect the interests of the Credit Parties.

(f)    Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Lender (giving the Lender the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Lender.

(g)    Deliver to the Lender, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Lender, including an insurance binder) together with evidence satisfactory to the Lender of payment of the premium therefor.

(h)    Permit any representatives that are designated by the Lender to inspect the insurance policies maintained by or on behalf of the Borrower and to inspect books and records related thereto and any properties covered thereby.

None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. The Borrower shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Borrower hereby agrees, to the extent permitted by law, to waive its right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Borrower or the protection of its properties.

6.08    **Compliance with Laws**  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except (i) as otherwise permitted under the Bankruptcy Code or the DIP Orders, (ii) in such instances in which such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which reasonable reserves have been set aside and maintained by the Borrower in accordance with GAAP, or (iii) in such instances in which the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.09    **Books and Records; Accountants.**

(a)    Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrower; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower.

(b)    at all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Lender and instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Lender or its representatives to discuss the Borrower's financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Lender.

-58-

6.10    **Inspection Rights.**

(a)      Permit representatives and independent contractors of the Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, all at the expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon at least three (3) Business Days advance written notice to the Borrower; provided, however, that when a Default or an Event of Default exists the Lender (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and without advance notice.

(b)      Upon the request of the Lender after reasonable prior notice, permit the Lender or professionals (including investment bankers, consultants, and accountants) retained by the Lender to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Borrower's practices in the computation of the Borrowing Base (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Borrower's business plan, forecasts and cash flows. The Borrower shall pay the fees and expenses of the Lender and such professionals with respect to such examinations and evaluations.

(c)      Upon the request of the Lender after reasonable prior notice, permit the Lender or professionals (including appraisers) retained by the Lender to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base. The Borrower shall pay the fees and expenses of the Lender and such professionals with respect to such appraisals.

6.11    **Cash Management.**

(a)      On or prior to July 13, 2012, deliver to the Lender copies of notifications (each, a "Lockbox Notification") reasonably satisfactory in form and substance to the Lender which have been executed on behalf of the Borrower and delivered to all account debtors directing such account debtors to pay all Accounts directly to the Lockbox; and

(b)      Cause the ACH or wire transfer to the collection account maintained by the Lender at Rockland Trust Company (the "Collection Account"), no less frequently than daily (except with regard to subclause (iv) directly below) (and whether or not there are then any outstanding Obligations), all cash receipts and collections received by the Borrower from all sources, including, without limitation, the following:

(i)      all available cash receipts from the sale of Inventory and other assets (whether or not constituting Collateral);

(ii)      all proceeds of collections of Accounts;

(iii)      all Net Proceeds, and all other cash payments received by the Borrower from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event;

(iv)      the then contents of each DDA (other than the Blocked Account) (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained), if each such DDA has an

-59-

aggregate balance of $15,000.00 or more after accounting for the aforementioned minimum balance requirements; provided, however, the contents of each DDA shall additionally be transferred on the last Business Day of each calendar month, less the aforementioned minimum balance requirements;

(v)     the then entire ledger balance of the Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the Blocked Account by the Blocked Account Bank), provided that, by no later than July 12, 2012, the Borrower must deliver to the Lender a copy of a written notice executed by the Blocked Account Bank acknowledging that the contents of the Blocked Account will be automatically transferred by the Blocked Account Bank to the Collection Account on a daily basis, less the aforementioned minimum balance requirements.

(c)     The Collection Account shall at all times be under the sole dominion and control of the Lender.  The Borrower hereby acknowledges and agrees that (i) the Borrower has no right of withdrawal from the Collection Account, (ii) the funds on deposit in the Collection Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Collection Account shall be applied to the Obligations as provided in this Agreement.  In the event that, notwithstanding the provisions of this Section 6.11, the Borrower receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by the Borrower for the Lender, shall not be commingled with any of the Borrower's other funds or deposited in any account of the Borrower and shall, not later than the Business Day after receipt thereof, be deposited into the Collection Account or dealt with in such other fashion as the Borrower may be instructed by the Lender.

(d)     Upon the request of the Lender, cause bank statements and/or other reports to be delivered to the Lender not less often than monthly, accurately setting forth all amounts deposited in the Blocked Account and each DDA to ensure the proper transfer of funds as set forth above.

(e)     Notwithstanding the foregoing, by no later than August 31, 2012, the Borrower agrees to take all actions necessary to close, or cause to be closed, the Blocked Account, and to further take all actions necessary to ensure that all deposits and transfers that have previously been made into the Blocked Account are thereafter only made into the Collection Account.

(f)     Notwithstanding the foregoing or anything to the contrary set forth herein, at no time shall the amount held by the Borrower in its disbursement account exceed the Responsible Officer's good faith estimate of cash expenditures and disbursements for the following two (2) day period as set forth in the Approved Budget for the applicable week.

6.12   **Information Regarding the Collateral.**

(a)     Furnish to the Lender at least thirty (30) days prior written notice of any change in: (i) the Borrower's name; (ii) the location of the Borrower's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) the Borrower's organizational structure or jurisdiction of incorporation or formation; or (iv) the Borrower's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.  The Borrower shall not effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Lender to continue at all times following such change to have a valid, legal

and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b)     Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Effective Date, at least every six (6) months, advise the Lender in writing of such revisions or updates as may be necessary or appropriate to update or correct the same.  From time to time as may be reasonably requested by the Lender, the Borrower shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Effective Date that, if existing or occurring on the Effective Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Borrower to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

### 6.13   Physical Inventories.

(a)     Cause not less than one (1) physical inventories to be undertaken, at the expense of the Borrower, in each Fiscal Year  consistent with past practices, conducted by such inventory takers as are satisfactory to the Lender and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Lender. The Lender, at the expense of the Borrower, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of the Borrower.   The Borrower, within thirty (30) days following the completion of such inventory, shall provide the Lender with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by the Borrower) and shall post such results to the Borrower's stock ledger or general ledger, as applicable.

(b)     Permit the Lender, in its discretion, if any Event of Default exists, to cause additional such inventories to be taken as the Lender determines (each, at the expense of the Borrower).

### 6.14   Environmental Laws.

(a)     Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate from and after the Effective Date, provided, however, that the Borrower shall not be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Borrower with respect to such circumstances in accordance with GAAP.

-61-

**6.15    Further Assurances.**

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any Law, or which the Lender may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Borrower. The Borrower also agrees to provide to the Lender, from time to time upon request, evidence satisfactory to the Lender as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets are acquired by the Borrower after the Effective Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents and the DIP Orders upon acquisition thereof), notify the Lender thereof, and the Borrower will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Lender to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.15, all at the expense of the Borrower. In no event shall compliance with this Section 6.15(b) waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.15(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    Upon the request of the Lender, cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Lender covering such matters and in such form as the Lender may reasonably require.

**6.16    Compliance with Terms of Leaseholds.**

Except as otherwise expressly permitted hereunder or as otherwise permitted under the Bankruptcy Code or the DIP Orders, make all payments and otherwise perform all obligations in respect of all Leases to which the Borrower is a party.

**6.17    Third Party Consultant.**

The Borrower shall retain the Third Party Consultant pursuant to terms acceptable to the Lender for the purpose of: (i) assisting in the preparation of such 13-week cash flow forecast; (ii) advising the Borrower with regard to its liquidity and working capital management, budgets and forecasts, and interactions with the Lender; and (iii) being available to the Lender to discuss in detail the 13-week cash flow forecast, the Borrower's operating and financial performance, and the reports and other materials and matters as set forth above. Without limiting the foregoing, the Borrower acknowledges and agrees that (i) the Lender retains the right, in its sole and exclusive discretion, to continue to engage its own consultant, (ii) the Borrower and its representatives will cooperate fully with any such consultant and (iii) any such consultant shall be granted full and complete access to the Borrower's books and records as reasonably required by Lender; provided that in no event shall any such consultant have access to attorney-client work product or information which is subject to the attorney-client privilege or a confidentiality provision or agreement with a third party.

**6.18    Bankruptcy Related Covenants.**

(a)    On the Petition Date, the Borrower shall have filed a motion to approve this Agreement and the revolving credit facility as provided herein.

(b)    On the Petition Date, the Borrower shall have filed the Sale Motion in the Chapter 11 Case. Incidental to the filing of such Sale Motion:

(i)    On the Petition Date, the Borrower shall have selected Lifetime Brands, Inc. as the "stalking horse" bidder, and the Borrower shall have executed a purchase agreement with such "stalking horse" bidder in form and substance acceptable to the Lender.

(ii)    From and after the Petition Date, the Borrower shall establish and maintain an electronic data room with current information to facilitate diligence by any potential bidders with respect to such sale.

(iv)    On or before May 1, 2015, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale and the Borrower shall have obtained an order of the Bankruptcy Court approving the Sale Motion. Unless the Lender otherwise agrees, the sale shall be for cash proceeds sufficient to pay in full all of the Obligations and the outstanding Pre-Petition Liabilities (including the Pre-Petition Indemnity Account, as defined in the DIP Orders) and the proceeds shall be so utilized at the closing of such sale without further order of the Bankruptcy Court.

### ARTICLE VII
### NEGATIVE COVENANTS

So long as the Lender shall have any Commitment hereunder, any Committed Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), or any Letter of Credit shall remain outstanding, the Borrower shall not, directly or indirectly:

7.01    **Liens.** Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names the Borrower as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

7.02    **Investments.** Make any Investments, except Permitted Investments.

7.03    **Indebtedness; Equity Issuances.**

(a)    Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; or (b) issue and sell any other Equity Interests unless (i) such Equity Interests provide that all dividends and other Restricted Payments in respect thereof shall be made solely in additional shares of such Equity Interests, in lieu of cash, (ii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Borrower and in accordance with the limitations contained in this Agreement, and (iii) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations.

7.04    **Fundamental Changes.** Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing).

**7.05    Dispositions.** Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06    Restricted Payments.** Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

**7.07    RESERVED**

**7.08    Change in Nature of Business.**

Engage in any line of business substantially different from the Business conducted by the Borrower on the Effective Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates.** Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower as would be obtainable by the Borrower at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) transactions otherwise permitted by this Agreement, (b) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (c) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower, and (d) as long as no Change of Control results therefrom, any issuances of securities of the Borrower (other than Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in the Borrower.

**7.10    RESERVED**

**7.11    Use of Proceeds.** Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose, or (b) for any purposes other than (i) for payment of expenses set forth in the Approved Budget (iii) to repay Indebtedness other than under the Pre-Petition Credit Agreement and (iv) for general corporate purposes of the Loan Parties, in each case, to the extent expressly permitted under Law, the DIP Orders, and the Loan Documents.

**7.12    Amendment of Material Documents.**

Amend, modify or waive any of the Borrower's rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, or (b) any Material Contract or Material Indebtedness (other than on account of any Permitted Refinancing thereof), in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties, or otherwise would be reasonably likely to have a Material Adverse Effect.

**7.13    Fiscal Year.**

Change the Fiscal Year of the Borrower, or the accounting policies or reporting practices of the Borrower, except as required by GAAP.

**7.14    Deposit Accounts.**

Open new DDAs.

**7.15    RESERVED**

**7.16    RESERVED**

**7.17    Budgeted Expenses.**

Without the Lender's prior written consent, the Borrower shall not pay any expenses other than those set forth in the budget approved by the Lender prior to the Effective Date (together with any subsequent budget which the Lender may, in its sole discretion, approve, the "Approved Budget"), subject to variance as set forth below. Further, the Borrower shall not use funds allocated to a particular line item in the Approved Budget (including line items denominated "Miscellaneous" or "Other", or words of similar import) to pay any expenses under any other line item(s) in the Approved Budget without the prior express written consent of the Lender, which consent may be conditioned, withheld, or delayed in the Lender's sole and exclusive discretion. The Borrower shall (a) achieve cash receipts of at least 70% of those projected in the Approved Budget, and (b) not permit (i) actual aggregate expenses incurred and disbursements made to exceed 110% of those projected in the Approved Budget or (ii) actual expenses incurred and disbursements made for any line item in the Approved Budget to exceed 110% of those projected in the Approved Budget. Compliance with the covenants set forth in this Section 7.17 shall be tested as of the close of business on Wednesday of each week (x) on a cumulative basis from the Petition Date through [_____], 2015 (the end of the second week after the Petition Date), with the first such test of compliance herewith occurring as of the week ending [_____], 2015 for the prior two week period and (y) thereafter, weekly as of the end of the prior week on a trailing two weeks basis. Compliance with the foregoing shall be reflected in the Variance Report delivered pursuant to Section 6.01(e).

**7.18    Bankruptcy Covenants.**

(a)    The Borrower will not consent to or permit to exist any of the following:

(i)    Any modification, stay, vacation or amendment to the DIP Orders to which the Lender has not consented in writing;

(iii)    A priority claim or administrative expense or unsecured claim against the Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations and the Pre-Petition Liabilities, except with respect to the Professional Fee Carve Out;

(iv)    Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Professional Fee Carve Out and Liens securing the Pre-Petition Liabilities;

(v)    Any order which authorizes the return of any of the Borrower's property pursuant to Section 546(h) of the Bankruptcy Code;

-65-

(vi)    Any order which authorizes the payment of any Indebtedness (other than the Pre-Petition Liabilities, Indebtedness reflected in the Approved Budget (other than so-called critical vendor payments), and other Indebtedness approved by the Lender), in each case incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien other than as set forth in the DIP Orders); or

(b)    Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

8.01    **Events of Default.** Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Borrower fails to pay when and as required to be paid (i) any amount of principal of, or interest on, any Committed Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants. (i) The Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 6.01, 6.02, 6.03, 6.04, 6.05, 6.07, 6.10, 6.11, 6.12, 6.13, 6.17, or 6.18 or Article VII; or

(c)    Other Defaults. The Borrower fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days; or

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by the Borrower herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    Cross-Default. The Borrower (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness, or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)    Judgments. There is entered against the Borrower (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $250,000.00 (to the extent not covered by independent third-party insurance as to

which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(g)     Invalidity of Loan Documents. (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect; or the Borrower or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or the Borrower denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by the Borrower or any other Person not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document; or

(h)     Change of Control. There occurs any Change of Control; or

(i)     Cessation of Business. Other than in connection with the Sale Motion, the Borrower shall take any action to suspend the operation of its business in the ordinary course, liquidate all or a material portion of its assets; or

(j)     Loss of Collateral. There occurs any uninsured loss to any material portion of the Collateral; or

(k)     Indictment. (i) The Borrower is (A) criminally indicted or convicted of a felony for fraud or dishonesty in connection with the Borrower's business, or (B) charged by a Governmental Authority under any law that would reasonably be expected to lead to forfeiture of any material portion of Collateral, or (ii) any director or senior officer of the Borrower is (A) criminally indicted or convicted of a felony for fraud or dishonesty in connection with the Borrower's business, unless such director or senior officer promptly resigns or is removed or replaced or (B) charged by a Governmental Authority under any law that would reasonably be expected to lead to forfeiture of any material portion of Collateral; or

(l)     Subordination. (i) The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness (the "Subordinated Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) the Borrower shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of the Borrower, shall be subject to any of the Subordination Provisions; or

(m)     Modification of DIP Order. The entry of an order in the Chapter 11 Case which stays, modifies or reverses any DIP Order or which otherwise materially adversely affects the effectiveness of any DIP Order without the express written consent of the Lender; or

(n)     Appointment of Trustee or Examiner. Either (i) the appointment in the Chapter 11 Case of a trustee or of any examiner having expanded powers to operate all or any part of the Borrower's business, or (ii) the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or

(o)     Final Borrowing Order. The failure of the Bankruptcy Court to enter a Final Borrowing Order, in form and substance reasonably satisfactory to the Lender, within thirty (30) days after the date on which the Interim Order is entered; or

(p)     Relief from Stay. The entry of any order without the prior written consent of the Lender which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrower or to terminate any license, franchise, or similar agreement, where the exercise of such right or remedy or such realization or termination would reasonably be likely to have a Material Adverse Effect; or

(q)     Superior Claim. The filing of any application by the Borrower without the express prior written consent of the Lender for the approval of any super-priority claim in the Chapter 11 Case which is pari passu with or senior to the priority of the claim of the Lender for the Obligations or the Pre-Petition Liabilities, or there shall arise any such super-priority claim under the Bankruptcy Code (other than the Professional Fee Carve Out); or

(r)     Pre-Petition Indebtedness. The payment or other discharge by the Borrower of any Indebtedness incurred prior to the Petition Date (other than so-called critical vendor payments), except the Pre-Petition Liabilities or otherwise as expressly permitted hereunder, in the Approved Budget or by order in the Chapter 11 Case to which order the Lender has provided its written consent; or

(s)     Critical Vendor Payments. The making or entering into any arrangement to make so-called critical vendor payments except as set forth in the Approved Budget or otherwise consented to by the Lender; or

(t)     Adequate Protection Order. The entry of any order in the Chapter 11 Case which provides adequate protection (other than on account of Liens securing the Pre-Petition Liabilities), or the granting by the Borrower of similar relief in favor of any one or more of its pre-petition creditors, contrary to the terms and conditions of any DIP Order; or

(u)     Breach of Orders. The failure of the Borrower (i) to comply with each and all of the terms and conditions of any DIP Order, or (ii) to materially comply with any other order entered in the Chapter 11 Case if such failure would reasonably likely result in a Material Adverse Effect; or

(v)     Incurrence of Post-Petition Indebtedness and Liens. The filing of any motion by the Borrower or the entry of any order in the Chapter 11 Case: (i) (A) permitting working capital or other financing (other than ordinary course trade credit or unsecured debt) for the Borrower from any Person other than the Lender (unless the proceeds of such financing are used to pay in full of all Pre-Petition Liabilities, all Obligations, cash collateralization of all Letters of Credit, and all Obligations then due and owing in connection with any Swap Agreement, cash management, depository or similar Bank Products (collectively, the "Unliquidated Claims"), and the establishment of a reserve account for all indemnification obligations hereunder), (B) granting a Lien on, or security interest in any of the Collateral, other than with respect to this Agreement

-68-

or as otherwise permitted herein (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Pre-Petition Liabilities, all Obligations and the cash collateralization of all Letters of Credit, other Unliquidated Claims and indemnification obligations hereunder), (C) except as permitted by this Agreement, permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (E) dismissing any of the Chapter 11 Case or (ii) the filing of any motion by the Borrower (or by any party in interest or any Creditors' Committee appointed in the Chapter 11 Case) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within thirty (30) days of the date of the filing of such motion (or such later date agreed to in writing by the Lender); or

(w)    Plan of Reorganization.  The filing of a motion by the Borrower seeking approval of a disclosure statement and a Plan of Reorganization, or the entry of an order confirming a Plan of Reorganization, that does not require repayment in full in cash of all Pre-Petition Liabilities and all Obligations on the effective date of such Plan of Reorganization or such Plan of Reorganization is defeated by the creditors of the Borrower; or

(x)    Challenges.  The filing of any pleading by the Borrower or any Affiliate thereof challenging the validity, priority, perfection, or enforceability of the Loan Documents (as defined in the Pre-Petition Credit Agreement), the Pre-Petition Liabilities, or any Lien granted pursuant to the Pre-Petition Loan Documents, or (b) any Lien granted pursuant to the Pre-Petition Loan Documents is determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Chapter 11 Case, including, without limitation, the Creditors' Committee.

8.02    Remedies Upon Event of Default.  Subject to the terms of the DIP Orders, if any Event of Default occurs and is continuing, the Lender may take any or all of the following actions:

(a)    by notice to the Borrower, declare the Commitment of the Lender to make Committed Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitment and obligations shall be terminated;

(b)    by notice to the Borrower, declare the unpaid principal amount of all outstanding Committed Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)    require that the Borrower Cash Collateralize the L/C Obligations; and

(d)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

8.03     **Application of Funds**  After the exercise of remedies provided for in Section 8.02 (or after the Obligations have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Lender in the following order:

> First, to the payment of all accrued and unpaid Professional Fees and Expenses up to an aggregate amount not to exceed the Professional Fees Carve-Out;

> Second, to pay all outstanding Pre-Petition Liabilities (including the Pre-Petition Indemnity Account as defined in the DIP Orders);

> Third, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Lender and amounts payable under Article III) payable to the Lender;

> Fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Loans, L/C Borrowings and other Obligations (other than Other Liabilities), and fees (including Letter of Credit Fees), ratably among the Lender and the L/C Issuer in proportion to the respective amounts described in this clause Fourth payable to them;

> Fifth, to payment of that portion of the Obligations constituting unpaid principal of the Committed Loans and L/C Borrowings and Swap Contracts, ratably among the Lender and the L/C Issuer in proportion to the respective amounts described in this clause Seventh held by them;

> Sixth, to the Lender for the account of the L/C Issuer, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

> Seventh, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations as provided in Section 9.04, but excluding any Other Liabilities), ratably among the Credit Parties in proportion to the respective amounts described in this clause Seventh held by them;

> Eighth, to payment of that portion of the Obligations arising from Cash Management Services, ratably among the Credit Parties in proportion to the respective amounts described in this clause Eighth held by them;

> Ninth, to payment of all other Obligations arising from Bank Products, ratably among the Credit Parties in proportion to the respective amounts described in this clause Seventh held by them; and

> Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Sixth above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as Cash Collateral after all Letters of Credit have either

been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

<div align="center">

**ARTICLE IX**
**MISCELLANEOUS**

</div>

**9.01    Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower therefrom, shall be effective unless in writing signed by the Lender and the Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, provided, that no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuer in addition to the Lender, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in its capacity as the Lender, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or the Borrower.

**9.02    Notices; Effectiveness; Electronic Communications.**

(a)    Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, if to the Borrower, the Lender, or the L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 9.02. Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications.  Notices and other communications to the Lender and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Lender, provided that the foregoing shall not apply to notices to the L/C Issuer pursuant to Article II if the L/C Issuer has notified the Lender that it is incapable of receiving notices under such Article by electronic communication.  The Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.  Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed

<div align="center">-71-</div>

receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii), if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    Change of Address, Etc.  Each of the Borrower, the Lender and the L/C Issuer may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.

(d)    Reliance by Lender and L/C Issuer.  The Lender and the L/C Issuer shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Lender, the L/C Issuer, and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Lender may be recorded by the Lender, and each of the parties hereto hereby consents to such recording.

9.03    No Waiver; Cumulative Remedies.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Committed Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

9.04    Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses.  The Borrower shall pay all Credit Party Expenses.

(b)    Indemnification by the Borrower.  The Borrower shall indemnify the Lender (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other Loan Documents, (ii) any Committed Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit and any other Person seeking to enforce the rights of the Borrower, beneficiary, transferee, or assignee or Letter of Credit proceeds or the holder of an instrument or document related to any Letter of Credit),

-72-

(iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower, or any Environmental Liability related in any way to the Borrower, (iv) any claims of, or amounts paid by any Credit Party to, the Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any of the Borrower's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the indemnitee; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the provisions of Section 3.01(c), this Section 9.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)      <u>Waiver of Consequential Damages, Etc.</u>  To the fullest extent permitted by Law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Committed Loan or Letter of Credit or the use of the proceeds thereof.

(d)      <u>Payments</u>.  All amounts due under this Section shall be payable on demand therefor.

(e)      <u>Limitation of Liability</u>.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(f)      <u>Survival</u>.  The agreements in this Section shall survive the resignation of the L/C Issuer, the assignment of any Commitment or Committed Loan by the Lender, the termination of the Commitment and the repayment, satisfaction or discharge of all the other Obligations.

9.05      **Payments Set Aside.**  To the extent that any payment by the Borrower is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with the Chapter 11 Case or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) the L/C Issuer agrees to pay to the Lender upon demand any amount so recovered from or repaid by the Lender, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the L/C Issuer under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

-73-

**9.06    Successors and Assigns.**

(a)    <u>Successors and Assigns Generally.</u>  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Lender, and the Lender may assign or otherwise transfer any of its rights or obligations hereunder (i) to an Eligible Assignee in accordance with the provisions of Section 9.06(b), (ii) by way of participation in accordance with the provisions of subsection Section 9.06(c), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 9.06(e). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (c) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lender.</u>  Any assignment by the Lender under clause (a) hereof shall require the consent of the Borrower (such consent not to be unreasonably withheld or delayed) unless (1) a Default or Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is an Affiliate of the Lender or an Approved Fund with respect to the Lender. The parties to each assignment shall execute an Assignment and Assumption. From and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of the Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.02</u>, and <u>9.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by the Lender of a participation in such rights and obligations in accordance with Section 9.06(c).

(c)    <u>Participations.</u>  The Lender may at any time, without the consent of, or notice to, the Borrower, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates) (each, a "<u>Participant</u>") in all or a portion of the Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Committed Loans (including the Lender's participations in L/C Obligations) owing to it); <u>provided</u> that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower and the L/C Issuer shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement.    Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 9.07 as if such Participant was the Lender hereunder.

Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that the Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that the Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 9.01 that affects such Participant. Subject to subsection (d) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Section 3.01</u>, <u>3.02</u>, and <u>9.04</u> to the same extent as if it were the Lender and had acquired its

interest by assignment pursuant to Section 9.06(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were the Lender.

(d)    Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.02 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(e)    Certain Pledges.  The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of the Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

(f)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

9.07    Treatment of Certain Information; Confidentiality.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, Approved Funds, and to its and its Affiliates' and Approved Funds' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Swap Contract relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower.

For purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Borrower.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Borrower, (b) it has developed compliance procedures regarding the use of

material non-public information and (c) it will handle such material non-public information in accordance with Law, including Federal and state securities Laws.

**9.08 Right of Setoff.** Subject to the terms of the DIP Orders, if an Event of Default shall have occurred and be continuing or if the Lender shall have been served with a trustee process or similar attachment relating to property of the Borrower, the Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other property at any time held and other obligations (in whatever currency) at any time owing by the Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to the Lender or the L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not the Lender or the L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower may be contingent or unmatured or are owed to a branch or office of the Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness. The rights of the Lender, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the Lender, the L/C Issuer or their respective Affiliates may have. The Lender and the L/C Issuer agrees to notify the Borrower promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**9.09 Interest Rate Limitation.** Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Law (the "Maximum Rate"). If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Committed Loans and other Obligations (other than Other Liabilities not then due and owing) or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**9.10 Counterparts; Integration; Effectiveness.** This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**9.11 Survival.** All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect

as long as any Committed Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. Further, the provisions of Sections 3.01, 3.02, 3.04 and 9.04 shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitment or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Lender may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities, and (z) any Obligations that may thereafter arise under Section 9.04 hereof.

9.12  **Severability.** If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.13  **Governing Law; Jurisdiction; Etc.**

(a)   GOVERNING LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAW OF THE COMMONWEALTH OF MASSACHUSETTS, WITHOUT REGARDS TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.

(b)   SUBMISSION TO JURISDICTION.  THE BORROWER IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE LENDER, THE L/C ISSUER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS, EASTERN DIVISION (LOCATED AT JOHN W. MCCORMACK POST OFFICE AND COURT HOUSE, 5 POST OFFICE SQUARE, SUITE 1150, BOSTON, MASSACHUSETTS 02109-3945) AND THE COURTS OF THE COMMONWEALTH OF MASSACHUSETTS SITTING IN SUFFOLK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF MASSACHUSETTS, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH MASSACHUSETTS STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. THE BORROWER AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER

MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c) WAIVER OF VENUE. THE BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d) SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

9.14   **Waiver of Jury Trial.** EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

9.15   **No Advisory or Fiduciary Responsibility.** In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledges and agrees that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower, on the one hand, and the Credit Parties, on the other hand, and the Borrower is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower or any of its Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising the Borrower or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a

-78-

broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

9.16   **USA PATRIOT Act Notice.** The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act. The Borrower is in compliance, in all material respects, with the Act. No part of the proceeds of the Committed Loans will be used by the Borrower, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Borrower shall, promptly following a request by the Lender, provide all documentation and other information that the Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

9.17   **Foreign Asset Control Regulations.** Neither of the advance of the Committed Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Borrower or its Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

9.18   **Time of the Essence.** Time is of the essence of the Loan Documents.

9.19   **Press Releases.**

(a)   Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Lender or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Lender and without the prior written consent of the Lender unless (and only to the extent that) such Credit Party or Affiliate is required to do so under Law and then, in any event, such Credit Party or Affiliate will consult with the Lender before issuing such press release or other public disclosure.

      (b)    The Borrower consents to the publication by the Lender of advertising material relating to the financing transactions contemplated by this Agreement using the Borrower's name, product photographs, logo or trademark. The Lender shall provide a draft reasonably in advance of any advertising material to the Borrower prior to the publication thereof. The Lender reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

### 9.20    No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

### 9.21    Attachments.

The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

### 9.22    Electronic Execution of Assignments and Certain Other Documents.

The words "execute," "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Lender, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

### 9.23    ENTIRE AGREEMENT.

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

### 9.24    Relationship with DIP Orders.

In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control and the representations, warranties, covenants, agreements or events of default made herein and in the other Loan Documents shall be subject to the terms of the DIP Orders.

*[SIGNATURE PAGES TO FOLLOW]*

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as an instrument under seal as of the date first above written.

**REED AND BARTON CORPORATION,** as Borrower

By: _____

Name: _____

Title:_____

**ROCKLAND TRUST COMPANY**, as Lender

By: _____

Name: _____

Title: _____

**ROCKLAND TRUST COMPANY**, as L/C
Issuer

By: _____

Name: _____

Title: _____

1797941 6

**Schedule 1.04**

**Pre-Petition Letters of Credit**

None

**<u>Schedule 2.01</u>**

**Commitment**

$7,000,000.00

## Schedule 5.01

### Borrower's Organizational Information

**Borrower/Subsidiary**

**Jurisdiction of Organization**

Reed and Barton Corporation

Massachusetts

## Schedule 5.06

### Litigation

None.

## Schedule 5.08(b)(1)

### Owned Real Estate

144 West Britannia Street

Taunton, Bristol, MA 02780

47 Elm Street

Norton, Bristol, MA 02766

### Schedule 5.08(b)(2)

### Leased Real Estate

| Leased Property Address | Lessor Contact Information |
|---|---|
| 41 Madison Avenue<br>Seventh Floor<br>New York, New York County, NY 10010 | 41 Madison L.P<br>345 Park Avenue<br>New York, NY 10154 |
| AmericasMart<br>230 Spring Street NW<br>Suite 911<br>Atlanta, Fulton County, GA 30303 | AmericasMart Real Estate, LLC<br>240 Peachtree Street, NW<br>Suite 2200<br>Atlanta, GA 30303 |
| Dallas Trade Mart<br>2100 Stemmons Freeway<br>Suite 1204<br>Dallas, Dallas County, TX 75207 | Dallas Market Center<br>2100 Stemmons Freeway<br>Dallas, TX 75207 |
| Kittery Outlet Center<br>340 US Route 1<br>Kittery, York County, ME 03904 | Spruce Creek Retail Outlet, LLC<br>145 Rosemary Street, Suite E<br>Needham, MA 02494 |

### Schedule 5.09
### Environmental Matters

Taunton, MA Property

In 1989, Borrower self-reported to the Massachusetts Department of Environmental Protection
("MADEP") the existence of ground water and soil contamination Borrower had discovered
under the Department 25 (in the Holloware Plating Line area) of Building 39 location at its
Taunton, Massachusetts property. The contaminants identified were metals, cyanide and
solvents. Site assessments and required investigations were conducted from 1989 through 1998.

Remediation activities commenced following the submittal of remedial plans to the MADEP.
Remediation and decommissioning activities for the plating line located in Department 25,
including the decontamination of the flooring and walls with conduct of treatment for
unsaturated soils and groundwater commenced in 2000. These activities were completed in 2001.
Initial groundwater treatments via oxidant addition were also conducted through 2003. Upon
completion of these remedial activities, site soils now meet the MADEP cleanup standards (for
metals, cyanide and solvents) and the groundwater has been sufficiently remediated for metals
and cyanide to meet MADEP cleanup standards. Current remediation activities are directed at a
residual groundwater source area of solvents which is located in an area of dense clay/silt
beneath Department 25 (beneath the former degreaser location). The area covers approximately
40 feet in diameter and is currently being remediated and controlled by an oxidant addition
program. No downgradient migration of the solvent plume has been observed. Solvent
concentrations have been reduced, but additional remediation work is necessary.

The current program consists of quarterly sampling of key wells, semi-annual reports to MADEP
(Remedy Operation Status) and periodic additions of oxidant to the subsurface with an average
estimated annual expenditure of $18,900 per year. Expected costs to complete the remediation
over the next 10 years have been accrued by Borrower as of January 28, 2012.

Norton, MA Property

Borrower's Norton, MA property contains four lagoons that have been closed and capped under
the supervision of the Massachusetts Department of Environmental Protection (MADEP). These
lagoons had been utilized by the Borrower and also by prior owners of that property for
wastewater treatment for many years until replaced by a waste treatment facility at that property.
As part of the closure activity, Borrower is required to submit to MADEP annual groundwater
monitoring results conducted by a licensed environmental engineer. The most recent annual test
results were submitted to MADEP on February 1, 2012 and reported groundwater contamination
levels that were within acceptable limits.

Cranston, RI Landfill Matter

In 2007, Borrower received notice from the Rhode Island Department of Environmental
Management (RIDEM) that it had been identified as a small-volume Potentially Responsible
Party (PRP) for alleged hazardous substance contamination conditions at the Cranston Sanitary
Landfill in Cranston, Rhode Island. Borrower is a party to a Consent Decree that was approved

by the US District Court for the District of Rhode Island on July 29, 2011 under which
Borrower's potential liability in this matter was discharged in return for a $33,950.16 Settlement
Payment made on August 3, 2011.

See Disclosure Schedules for Asset Purchase Agreement for additional matter described as Item
1 in Section 5.1(n).

**Schedule 5.10**

**Insurance**

Taunton Property Coverage
Verland Fire Insurance Co.
Policy # M003692-14

Domestic Package Policy—Property, General Liability, Employee Benefits Liability
Travelers Corp.
Policy # Y-630-4210L588-COF-14

Automobile Liability
Travelers Corp.
Policy # BA-6257M23A-14-CAG

Umbrella Liability
Travelers Corp.
Policy # YSM-CUP-5712B07A – TIL – 18

Workers Comp.—Massachusetts
Arrow Mutual
Policy # 1789A

Workers Comp.—Multi-State
Travelers Corp.
Policy # YTMUB-1022A77-7-14

Corporate Liability, Directors' & Officers' Liability, Employment Practices Liability, Fiduciary
Liability, Crime
Federal Insurance Company (Chubb)
Policy # 8156-1019

Excess Directors' & Officers' Liability
Zurich American Insurance
Policy # DOC 6737869 01

Flood—General Property
Hartford Insurance Company of the Midwest
Policy # 99013148562014

Ocean Cargo
CNA Insurance Companies
Policy # OC 247078

## Schedule 5.12

### ERISA Compliance

Pension Benefit Guaranty Corporation Settlement

In connection with the Borrower's closure of its Norton, MA manufacturing facility in June
2007, the Pension Benefit Guaranty Corporation (PBGC) asserted the position that the Borrower
was required to provide security for a period of five years from the plant closure date to secure
the underfunded portion of its defined benefit pension obligation to the employees whose
employment was terminated as a result of the plant closure. After extended negotiations directly
between the Borrower and the PBGC as well as through the Borrower's counsel, the Borrower
reached a Settlement Agreement with the PBGC which provides such security. In order to secure
this portion of the liability, which is estimated to be $3 million, and which had already been
recorded in the Borrower's financial records as part of its overall Pension Liability, the Borrower
granted a Mortgage on its Taunton, MA Real Estate, as well as a Lien on the Borrower's other
assets. The Settlement Agreement and related liens were terminated as of June 29, 2012.

Missed Minimum Funding Contributions and Related Reportable Event Filings

The Borrower has not made a number of minimum funding payments to the Reed and Barton
Corporation Retirement Plan (the "Plan"), and has filed a number of reportable event notices
with the PBGC regarding those missed payments.

Suspension of Benefit Notice Issues

It was recently discovered by the Borrower that the suspension of benefits notices to employees
working past their normal retirement date, as required by Section 6.05 of the Plan, have not been
provided. As a result, certain participants who commenced benefits after their normal retirement
date may be entitled to an actuarial increase in their benefits for the period from their normal
retirement date to their benefit commencement date. However, this actuarial increase has not
been taken into account for various purposes by the Plan or by the Borrower. The Borrower is
evaluating the consequences associated with these circumstances and the appropriate steps to
take to address these circumstances and those consequences.

## Schedule 5.13

### Equity Investments

None

## Schedule 5.17

### Intellectual Property Matters

No Intellectual Property Claims or Litigation

## Schedule 5.18

### Collective Bargaining Agreements

Labor Agreement between Reed and Barton Corporation and Local 593, United Steel Workers Union, March 8, 2010 – March 8, 2013

Executive Employment Agreement of 2007 between Reed and Barton Corporation and Tim K. Riddle (President and Chief Executive Officer)

Change of Control Agreement between Reed and Barton Corporation and Charles F. Daly (Treasurer and Chief Financial Officer) dated December 17, 2008

Supplementary Retirement Income Agreement between Reed and Barton Corporation and Albert D. Krebel (Retired Chairman, President and Chief Executive Officer) dated April 28, 1993

Supplementary Retirement Income Agreement between Reed and Barton Corporation and Charles P. Terry (Retired Chief Financial Officer) dated October 12, 1994

Reed and Barton Corporation 1995 Performance Unit/Equity Appreciation Plan As Amended October 29,2003 and Further Amended November 14, 2007

### Schedule 5.21

### DDAs

All DDA accounts are with the Lender.

## Schedule 5.24

### Material Contracts

The Colonial Williamsburg Foundation Williamsburg Products Program Agreement, dated November 1, 2011 (License Agreement between Reed and Barton Corporation (Licensee) and The Colonial Williamsburg Foundation (Licensor))

Amended and Restated License Agreement between Reed and Barton Corporation (Licensee) and TOB International Marketing Corp. (Licensor) dated January 24, 2011

Design Agreement between Reed and Barton Corporation and TOB International Marketing Corp. (Designer) dated January 24, 2011

Manufacturing Agreement between Reed and Barton Corporation (Contractor) and B&J Manufacturing Corporation (Manufacturer) dated December 24, 2008.

## Schedule 6.02

### Financial and Collateral Reporting

To be determined by Lender

## Schedule 7.01

### Existing Liens

Dell Financial Services L.L.C.
(Equipment Lease)

## Schedule 7.02

### Permitted Investments

Commercial Promissory Note made by John D. Strausberg to Reed and Barton Corporation, dated January 18, 2011, in the original principal amount of $464,531.75.

## Schedule 7.03

### Permitted Indebtedness

None

## Schedule 9.02

### Lender's Office; Certain Addresses for Notices

**Lender:**

Rockland Trust Company
120 Liberty Street, 2nd Floor
Brockton, MA 02301
Attn: Andrew Wierman
Fax: 508-732-7623
E-mail: andrew.wierman@rocklandtrust.com

**L/C Issuer:**

Same as Lender

**Borrower:**

Reed and Barton Corporation
144 West Britannia Street
Taunton, MA 02780
Attn: Charles Daly
Fax: 508-824-0276
E-mail: cdaly@reedbarton.com

## Schedule PH

### Permitted Holders

(See Attached)

Reed & Barton Corporation
Shareholder Roster
As of June 15, 2017

| Name of Shareholder | Shares Owned | Amount to be % of Shares | TIN |
|---|---|---|---|
| William B.H. Dowse Trust for John W. Weeks | 795.5 | 7.44710725% | 04-6500767 |
| William B.H. Dowse Trust for Martha W. Sherrill | 795.5 | 7.44710725% | 04-6500766 |
| William B.H. Dowse Trust for William D. Weeks | 795.5 | 7.44710725% | 04-6500764 |
| William B.H. Dowse Trust for Roger H. Hallowell, Jr. | 264.8333333 | 2.47924656% | 26-5165441 |
| William B.H. Dowse Trust for Beatrice H. Edgar | 264.8333333 | 2.47924656% | 26-5165377 |
| William B.H. Dowse Trust for Christian Hallowell | 264.0333333 | 2.47924653% | 26-5165410 |
| William B.H. Dowse Trust for Sinclair Weeks Jr. | 794.5 | 7.43774574% | 04-6500765 |
| William B.H. Dowse Trust for Beatrice W. Best | 794.5 | 7.43774574% | 04-6500763 |
| Fannie R. Dowse Trust for Roger H. Hallowell, Jr. | 257.3333333 | 2.40903701% | 26-5165633 |
| Fannie R. Dowse Trust for Beatrice H. Edgar | 257.3333333 | 2.40903701% | 26-5165476 |
| Fannie R. Dowse Trust for Christian Hallowell | 257.3333333 | 2.40903701% | 26-5165504 |
| Fannie R. Dowse Trust for John W. Weeks | 772 | 7.22711103% | 04-6500751 |
| Fannie R. Dowse Trust for Martha W. Sherrill | 772 | 7.22711103% | 04-6500750 |
| Fannie R. Dowse Trust for Sinclair Weeks Jr. | 772 | 7.22711103% | 04-6500748 |
| Fannie R. Dowse Trust for William D. Weeks | 772 | 7.22711103% | 04-6500747 |
| Fannie R. Dowse Trust for Beatrice W. Best | 772 | 7.22711103% | 04-6500746 |
| Beatrice D. Weeks Trust for Sinclair Weeks Jr. | 145 | 1.35742370% | 04-6093872 |
| Beatrice D. Weeks Trust for Martha W. Sherrill | 144 | 1.34806216% | 04-6093389 |
| Beatrice D. Weeks Trust for John Wingate Weeks 2nd | 144 | 1.34806216% | 04-6093876 |
| Beatrice D. Weeks Trust for William D. Weeks | 144 | 1.34806216% | 04-6031650 |
| Beatrice D. Weeks Trust for Beatrice W. Best | 144 | 1.34806216% | 04-0031661 |
| John W. Weeks | 144 | 1.34806216% | 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 |
| William D. Weeks | 144 | 1.34806216% | 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 |
| Beatrice W. Best | 145 | 1.35742370% | 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 |
| Nathaniel S. Weeks | 36 | 0.33701554% | 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 |
| Stuart D. Weeks | 18 | 0.16850777% | 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 |
| Beatrice D. W. Birch | 36 | 0.33701554% | 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 |
| Dr. Bradford S. Weeks | 36 | 0.33701554% | 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 |
| Totals | 10,682 | 100.00000000% | |

## Exhibit "2"

## Budget

**REED and BARTON CORP**

**13-Week Cash Flow Projection**

| Week ending: | Actual | Actual | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02/07/15 | 02/14/15 | 2/14-5/21 | 2/18-5/25 | 02/28/15 | 03/07/15 | 03/14/15 | 03/21/15 | 03/28/15 | 04/04/15 | 04/11/15 | 04/18/15 | 04/25/15 | 05/02/15 | 05/16/15 |
| **Cash Sources** | | | | | | | | | | | | | | | |
| A/R Cash Receipts (incl CC) | | | | | | | | | | | | | | | |
| Retail Outlet Cash Receipts | | | | | | | | | | | | | | | |
| Retail Outlet Credit Cards | | | | | | | | | | | | | | | |
| Consumer Website Credit Cards | | | | | | | | | | | | | | | |
| Credit Card Cash Receipts | | | | | | | | | | | | | | | |
| Other Cash Receipts | | | | | | | | | | | | | | | |
| **TOTAL CASH SOURCES** | | | | | | | | | | | | | | | |
| **Cash Uses** | | | | | | | | | | | | | | | |
| Payroll & Benefits | | | | | | | | | | | | | | | |
| Payroll Taxes | | | | | | | | | | | | | | | |
| 401K | | | | | | | | | | | | | | | |
| Tariffs | | | | | | | | | | | | | | | |
| Inventory Purchases | | | | | | | | | | | | | | | |
| Freight In | | | | | | | | | | | | | | | |
| Duty | | | | | | | | | | | | | | | |
| Precious Metal | | | | | | | | | | | | | | | |
| Operating Lease Payments | | | | | | | | | | | | | | | |
| Selling & Administrative | | | | | | | | | | | | | | | |
| External Commissions | | | | | | | | | | | | | | | |
| Trade Shows | | | | | | | | | | | | | | | |
| Sales Taxes | | | | | | | | | | | | | | | |
| Pension | | | | | | | | | | | | | | | |
| Capital Expenditures | | | | | | | | | | | | | | | |
| Insurance | | | | | | | | | | | | | | | |
| Repairs & Maintenance | | | | | | | | | | | | | | | |
| Electricity & Gas | | | | | | | | | | | | | | | |
| Property Taxes | | | | | | | | | | | | | | | |
| Interest, Fees & Expenses | | | | | | | | | | | | | | | |
| Shipping Supplies | | | | | | | | | | | | | | | |
| New York Showroom rent | | | | | | | | | | | | | | | |
| Atlanta Showroom rent | | | | | | | | | | | | | | | |
| Dallas Showroom rent | | | | | | | | | | | | | | | |
| Kittery Company Store rent | | | | | | | | | | | | | | | |
| Professional fees: | | | | | | | | | | | | | | | |
| US Banker | | | | | | | | | | | | | | | |
| H&K | | | | | | | | | | | | | | | |
| V&L | | | | | | | | | | | | | | | |
| ERISA Attorney | | | | | | | | | | | | | | | |
| ERISA Actuary | | | | | | | | | | | | | | | |
| Rockland Trust Attorney | | | | | | | | | | | | | | | |
| Creditors Comm. Attorney | | | | | | | | | | | | | | | |
| US Trustee fees | | | | | | | | | | | | | | | |
| Contingency | | | | | | | | | | | | | | | |
| **Total Cash Uses** | | | | | | | | | | | | | | | |
| **NET CASH - Weekly Change** | | | | | | | | | | | | | | | |
| **NET CASH - Cumulative Change** | | | | | | | | | | | | | | | |
| Beginning Excess Cash on Hand | | | | | | | | | | | | | | | |
| Add: net cash from above | | | | | | | | | | | | | | | |
| Incoming Cash Week of Sales | | | | | | | | | | | | | | | |
| Outgoing cash Week of Sale | | | | | | | | | | | | | | | |
| Revolver Payoff | | | | | | | | | | | | | | | |
| Net Excess Cash on Hand | | | | | | | | | | | | | | | |