UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| REED AND BARTON CORPORATION, | ) | |
| | ) | Case No. 15-10534 |
| Debtor | ) | Chapter 11 |
| | ) | |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTOR'S
MOTION FOR ORDER APPROVING SALE PROCEDURES
(WITH CERTIFICATE OF SERVICE)**

TO THE HONORABLE HENRY J. BOROFF
UNITED STATES BANKRUPTCY JUDGE:

William K. Harrington, the United States Trustee for Region 1, objects to the February 17, 2015 motion ("Motion") *(Docket #12)* for order approving sale procedures in connection with its sale of substantially all of its assets to Lifetime Brands ("Lifetime") under their pre-petition asset purchase agreement ("APA") *(Docket #12-1)*, because:

- the Debtor has not met its burden of demonstrating that Lifetime's $750,000 break-up fee is an actual, necessary cost of preserving the estate under 11 U.S.C. § 503(b); and

- given its size, the break-up fee chills potential higher and better offers by unnecessarily increasing the amount of an opening counterbid.

In support, the United States Trustee states:

**JURISDICTION, VENUE AND BASIS FOR RELIEF**

1. The Court has jurisdiction over this matter under 28 U.S.C. 157 and 1334.

2. This is a core proceeding under 28 U.S.C. 157(b)(2)(A).

1

3. Venue is proper in this court under 28 U.S.C. 1408 and 1409.

4. The basis for relief includes 28 U.S.C. 586(a)(3)(B), 11 U.S.C. 307 and 363(b), Fed. R. Bankr. P. 6004 and MLBR 6004-1.

**FACTS**

5. The Debtor filed its voluntary chapter 11 petition on February 17, 2015. To date, the United States Trustee has been unable to appoint an official unsecured creditors' committee consisting of at least three creditors willing to serve.

6. The Debtor's bankruptcy strategy is to sell its non-real estate assets and certain assumed executory contracts free and clear of liens to Lifetime consistent with the APA on or before May 2, 2015; to terminate its operations and employees upon closing; to terminate its employee defined benefit pension plan; to liquidate the PBGC's unsecured claims; to sell or to abandon all of its other assets; to liquidate its environmental and other claims; and to distribute the proceeds of asset sales in partial satisfaction of allowed unsecured claims. *Riddle Affidavit; Budget; Borrowing Motion; Borrowing Order; Bid Procedures Motion*.[1]

7. Under the APA, Lifetime will purchase the Debtor's assets for total consideration of $15,000,0000, consisting of $10,000,000 in cash and the balance in the form of a seven year promissory note that will bear interest at 4.25%. The note will be payable interest only for the first two years. *Bid Procedures Motion* at 4-5 of 29.

8. Purchase price adjustments will be reflected in the note, not the cash component. The principal balance will increase or decrease based upon whether the Debtor's working capital

---

[1] Defined terms here have the same meaning as in the United States Trustee's objection to the Debtor's motion for authorization to approve KEIP and KERP plans, which is filed herewith.

at closing is greater or less than $10,000,000. *Id.*

9. The APA defines "working capital" as receivables plus inventory less "payables."[2] APA at *Docket #12-1*, A, Part 1, 17 of 50. The promissory note will be increased (or decreased) dollar for dollar by the amount that the Debtor's working capital exceeds (or falls below) $10,000,000. *Id.*; *Bid Procedures Motion* at 4-5 of 29.

10. The Budget contains no line item for accrued liabilities other than the LOC, and it is unclear what liabilities Lifetime will assume under the APA. Thus, anticipating what the Debtor's working capital will be at May 2, 2015 (and whether the principal balance of the promissory note will have to be adjusted up or down from its $5,000,000 original balance) is inexact.

11. But assuming that the Budget is accurate, the Debtor's accounts receivable plus inventory plus cash at May 2, 2015, exclusive of "payables," will equal approximately $12,645,000 ($4,712,000 + 7,657,000 + $276,000 = $12,465,000), or $2,645,000 more than the $10,000,000 working capital minimum required by the APA. *Budget*.

12. The APA contains two conditions that affect the Debtor's management and non-management employees. First, the APA requires that the Debtor's non-management employees must go to work for Lifetime for 90 days after closing. *Riddle Affidavit* at 3-14; *Bid Procedures Motion* at 6 of 29;[3] *APA; TSA*.

---

[2] The APA defines "payables" as including "indebtedness to trade creditors . . . [pertaining to] good received but not invoiced or . . . in transit as of the Closing Date . . ." and assumed liabilities. *APA* at *Docket #12-1*, A, Part 1 at 14 of 50.

[3] The Bid Procedures Motion states that the "Proposed Purchaser will pay the Debtor the 'fully burdened' cost of providing [employee TSA services], including all salary, benefits, insurance, stay put incentives for Debtor's work force, and overhead. The expected consideration for the

13. Second, it requires that two of the KEIP participants, Mr. Riddle and Mr. Charles F. Daly, the Debtor's chief financial officer, must go to work for Lifetime under "consulting agreements" for three and two years, respectively, after closing. *APA*, *Docket #12-2*, A, Part 2, 47-50; *Docket #12-2*, A, Part 3 1-15. Lifetime will pay Mr. Riddle $200,000 per year and Mr. Daly $100,000 per year, in quarterly installments, under their consulting agreements. *Id*.

14. Section 11.3 of the APA provides that Lifetime "shall be entitled" to a $750,000 break-up fee from the estate if the Debtor closes a sale with a bidder other than Lifetime. *Id*. at A, Part 2, 8 of 50. It adds that the break-up fee is "In consideration for [its] having expended considerable time and expense in connection with . . . ." the APA. A true and correct excerpt of the APA containing section 11.3 is attached hereto for all purposes as *Exhibit 1*.

15. The Motion offers that the break-up fee is justified, because Lifetime will integrate information about the Debtor's assets and systems to facilitate review by potential counterbidders, provide "transition services" at "its sole cost and expense" and fund $150,000 of costs associated with the Debtor's April, 2015 NY Tabletop show. *Motion* at 14-15 of 29.

16. Any qualifying counterbid will have to top Lifetime's bid by at least $950,000, consisting of the $750,000 break-up fee, the $150,000 Tabletop show costs and $50,000 bid increment ($750,000+150,000+50,000=$950,000). *Motion* at 9 of 29.

---

first 4 weeks of the TSA is expected to be $460,206.56 . . . ." *Bid Procedures Motion* at 6 of 29.

**ARGUMENT**

**THE COURT SHOULD DENY LIFETIME'S $750,000 BREAK-UP FEE**

**A.   The Debtor has not demonstrated that the break-up fee is an actual, necessary cost of preserving the estate under 11 U.S.C. § 503(b).**

17.   A debtor-in-possession assumes the rights and powers of a trustee per 11 U.S.C. 323(a) and 1107(a) and, therefore, is a fiduciary of "the estate and its constituents," including creditors. *In re DN Associates*, 144 B.R. 195, 198-199 (Bankr. D. Me. 1992), *aff'd*, 3 F.3d 512, 514 - 515 (1st Cir. 1993); *see Commodity Futures Trading Com'n v. Weintraub*, 473 U.S. 343, 354 (1985); *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994). Its fiduciary duties include maximizing the value of the estate for creditors. *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573  (3d Cir.2003) *(en banc)* (holding that a bankruptcy court may grant a creditors' committee derivative standing to bring fraudulent transfer actions on behalf of the estate, where the chapter 11 debtor's management unreasonably refuses to do so). *See In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (stating "When a debtor desires to sell an asset, its main responsibility, and the primary concern of the court, is the maximization of the value of the asset sold . . . .").

18.   Bankruptcy courts independently review a chapter 11 debtor's decision to sell substantially all of its assets outside of a plan of reorganization under the business judgment standard.  11 U.S.C. § 363(b). 3 Alan N. Resnick & Henry J. Sommer (eds.), *Collier on Bankruptcy* ¶ 363[4] (15th ed. rev. 2013). Debtors must demonstrate that such a sale, which denies creditors the rights normally accorded to them under the plan confirmation process, is necessitated by a compelling business justification. *Id*.

19. In general, break-up fees, topping fees and overbid requirements, either individually or in combination, are intended to do the same thing - protect a stalking horse bidder from counter-bidders, who take advantage of the stalking horse's due diligence but, ultimately, offer only nominally higher bids. *See In re App Plus, Inc.*, 223 B.R. 870, 874 - 875 (Bankr. E.D.N.Y. 1998), *citing In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Courts review these protections in light of whether they will "encourage rather than discourage the bidding, and whether [they will] enhance rather than detract from the ultimate maximum recovery to the estate . . . ." *App Plus, Inc.* at 874 - 875. Courts "carefully scrutinize the use of break-up fees and topping fees." *Id.*

20. Because break-up fees are paid by the estate as administrative expenses after closing, parties requesting them must demonstrate that they are "actual, necessary costs . . . of preserving the estate . . . ." 11 U.S.C. 503(b). *In re Reliant Energy Channelview LP*, 594 F.3d 200, 205-206 (3d Cir. 2010) (affirming orders denying break-up fee equaling approximately 3% of unsuccessful purchaser's stalking horse bid, because there was no proof that it preserved the value of the debtors' estate), *citing Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F3d 527 (3d Cir. 1999).

21. Massachusetts Local Bankruptcy Rule 6004-1(2), which governs bankruptcy sales under section 363 in this district, requires prior Court approval of proposed sale terms "protecting the initial proposed purchaser, including the amount of a break-up fee . . . [greater than the lesser of $50,000 or 5% of initial bid] and the minimum increase required for a higher offer . . . exceed[ing] 5% of the proposed original purchase price . . . ." MLBR 6004-1.

22. Lifetime's $750,000 break-up fee and its $950,000 opening counterbid

6

requirement represent 5% and 6.3% of its original $15,000,000 bid for the Debtor's non-real estate assets, respectively, exclusive of any adjustments to the promissory note for working capital at closing.  *Motion; APA*.  To be paid by the estate as an administrative expense, these terms must first be approved by the Court in the exercise of its discretion.  11 U.S.C. 503(b); MLBR 6004-1; *Reliant Energy Channelview LP*.

23. Lifetime understood this.  At the time that it negotiated the APA, it required the Debtor to " acknowledge[] and agree[] that . . . approval of the Break-up Fee is an integral part of the transactions contemplated by this Agreement . . . .").  APA § 11.3(c).  The Debtor's remaining acknowledgments – that, absent the break-up fee, Lifetime would not have submitted a bid, that the APA itself is "necessary for preservation of the estate . . . and is beneficial to the [Debtor] . . ." and that "the Break-Up Fee is reasonable in relation to [Lifetime's] efforts and to the magnitude of Contemplated Transactions . . ." *(Id.)* - are not binding upon the Court.  11 U.S.C. 503(b); MLBR 6004-1; *Reliant Energy Channelview LP*.

24. But the APA does not provide that the Court's denial of the break-up fee constitutes a default under the APA.  *APA*

25. Nor does it say that Lifetime will either refuse to submit a bid or withdraw its bid unless the Court approves the break-up fee.  *Compare* APA *with Reliant Energy Channelview LP* (acknowledging that while a stalking horse bidder might be "motivated in part to submit its bid by the possibility that it will receive a break-up fee, it does not follow from that motivation that the bidder will withdraw its bid, pass up on the opportunity to acquire the asset to be sold, and nullify its work in preparing its bid if a court, when ordering that there be an auction of assets, declines to authorize a break-up fee to be paid to the initial bidder . . . .").  *Id*. at 207.

26. At bottom, the Motion does not demonstrate that Lifetime's break-up fee is a necessary cost of preserving the Debtor's estate. 11 U.S.C. 503(b). Neither it nor the APA provides information on how the $750,000 figure was calculated, other than to quantify the $150,000 that Lifetime will advance for the New York Tabletop show in April, 2015. *Motion* at 9 of 29. The break-up fee bears no relationship to Lifetime's known costs.[4]

27. The break-up fee is also the largest single component of the $950,000 opening bid requirement. Its size will unnecessarily chill any counterbids for the Debtor's assets. *App Plus, Inc.* at 874 - 875.

28. Because the Debtor has failed to demonstrate that the break-up fee is an actual, necessary cost of preserving its estate under 11 U.S.C. § 503(b), the Court should deny it. 11 U.S.C. § 503(b); MLBR 6004-1; *Reliant Energy Channelview LP*.

**REQUESTED RELIEF**

For these reasons, the United States Trustee requests that the Court enter orders: 1) denying the break-up fee; and 2) granting him all such other and further legal and equitable relief to which he may be entitled.

---

[4] Moreover, it is unclear whether the Debtor is in a position to protest the break-up fee given that Messrs. Riddle and Daly are going to work for Lifetime after the closing. *Motion* at 6-7 of 29. *Compare Reliant Energy Channelview LP* (where the debtors objected to the allowance of the 5% break-up fee, notwithstanding that they had agreed to it in the asset purchase agreement).

        Respectfully submitted,

        WILLIAM K. HARRINGTON
        UNITED STATES TRUSTEE,
        REGION 1

By: */s/ Eric K. Bradford*
   Eric K. Bradford BBO#560231
   United States Department of Justice
   John W. McCormack Post Office & Courthouse
   5 Post Office Square, 10th Floor, Suite 1000
   Boston, MA 02109-3934
   PHONE: (617) 788-0415
   FAX: (617) 565-6368
   Eric.K.Bradford@USDOJ.gov

Dated: March 12, 2015.

## CERTIFICATE OF SERVICE

  I certify that on March 12, 2015, true and correct copies of the foregoing objection were served via CM/ECF upon the individuals who have filed notices of appearance in the Court's CM/ECF database, including the Debtor's counsel, who is listed below.

        WILLIAM K. HARRINGTON
        UNITED STATES TRUSTEE,
        REGION 1

By: */s/ Eric K. Bradford*
   Eric K. Bradford BBO#560231
   United States Department of Justice
   John W. McCormack Post Office & Courthouse
   5 Post Office Square, 10th Floor, Suite 1000
   Boston, MA 02109-3934
   PHONE: (617) 788-0415
   FAX: (617) 565-6368
   Eric.K.Bradford@USDOJ.gov

Dated: March 12, 2015.

Mark N. Berman on behalf of Interested Party Lifetime Brands, Inc.
mberman@nixonpeabody.com, bos.managing.clerk@nixonpeabody.com

Robert N.H. Christmas on behalf of Interested Party Lifetime Brands, Inc.
rchristmas@nixonpeabody.com

Steven A. Ginther on behalf of Creditor Missouri Department of Revenue
maecf@dor.mo.gov

John J. Monaghan on behalf of Debtor Reed and Barton Corporation
bos-bankruptcy@hklaw.com

Alexander G. Rheaume on behalf of Creditor Rockland Trust Company
arheaume@riemerlaw.com

Brad Rogers on behalf of Creditor Pension Benefit Guaranty Corporation
rogers.brad@pbgc.gov, efile@pbgc.gov

Donald E. Rothman on behalf of Creditor Rockland Trust Company
drothman@riemerlaw.com

Lynne B. Xerras on behalf of Debtor Reed and Barton Corporation
bos-bankruptcy@hklaw.com