**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| In re: <br><br> REED AND BARTON CORPORATION, <br><br> Debtor. | Chapter 11 <br><br> Case No. 15-10534 |

**DEBTOR'S REPLY TO UNITED STATES TRUSTEE'S OBJECTION TO DEBTOR'S
MOTION FOR ORDER APPROVING SALE PROCEDURES**

Reed and Barton Corporation ("Reed and Barton" or the "Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case, respectfully submits this reply to the United States Trustee's Objection To Debtor's Motion For Order Approving Sale Procedures (the "Objection") and in further support of its Motion Pursuant To Sections 105, 363 And 365 Of Title 11 Of The United States Code And Rules 2002, 6003 And 6004 Of The Federal Rules Of Bankruptcy Procedure For Entry Of (I) An Order (A) Approving Sale Procedures In Connection With Sale Of Substantially All Of The Debtor's Assets, (B) Approving The Break-Up Fee, (C) Scheduling An Auction And Hearing To Approve The Transaction And The Form And Manner Of Notice Thereof, And (D) Establishing Procedures Relating To The Assumption And Assignment Of Executory Contracts; And (II) An Order (A) Approving The Proposed Sale, (B) Authorizing The Assumption And Assignment Of Certain Executory Contacts And Unexpired Leases, And (C) Granting Certain Related Relief (the "Motion"). The Objection, and therefore this Debtor's Reply To United States Trustee' Objection To Debtor's Motion For Order Approving Sale Procedures (the "Reply") relate solely to the provisions in the Motion seeking approval of a $750,000 break-up fee (the "Break-Up Fee"). As more fully set forth below, and as supported by the Declaration of Laurence Winoker In Support Of Debtor's Motion To Approve

#34981160_v2

Bidding Procedures And Break-Up Fee filed with this Court on March 13, 2015 [Docket No. 102] (the "Winoker Declaration"),[1] the Break-Up Fee, equal to five percent (5%) of the proposed purchase price, is appropriate under the law of this Federal Circuit, is even consistent with the more stringent restriction on break-up under Third Circuit law the U.S. Trustee apparently seeks to import to this jurisdiction, will spur rather than chill bidding its being proposed is a sound exercise of the Debtor's business judgment.

**Preliminary Statement**

1.	Despite its storied history and many famous designs and brands, Reed and Barton came into this chapter 11 case faced with severe liquidity constraints that made a near term sale under 363 the best and possibly only option for maximizing estate value and creditor recoveries. Yet, the complexity of the Debtor's business, involving manufacturing partners, shippers, warehousemen and customers in locations around the world, and the fact that its primary assets consist of thousands of individual copyrights, trademarks and patents, make it likely that buyers would have a difficult time completing the significant amount of diligence that would be required to make the sale process a success given the Debtor's time constraints. For this reason, it was imperative that Reed and Barton enter chapter 11 and the sale process with the necessary diligence complete and a fully negotiated transaction in place that, in and of itself, would produce significant value for its creditors but also could be adapted by interested potential overbidders without requiring a lot of additional time and effort. In short, Reed and Barton needed a stalking horse buyer.

2.	Under the circumstances, Reed and Barton was fortunate to enter this chapter 11 case with a fully negotiated Asset Purchase Agreement with the Proposed Purchaser. Lifetime

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

Brands, Inc. ("Lifetime") has expended hundreds of thousands of dollars on legal and accounting fees as well as countless hours of employee time to fully document Reed and Barton's assets for purposes of the proposed sale. The significant time, fees and expenses expended by the Proposed Purchaser on diligence and negotiation lowered Reed and Barton's own costs related to the sale, and will make it possible for other potential buyers to submit a bid for Reed and Barton's assets without making a similar expenditure and within the time frame that is necessary in this case.

3. It is well accepted that the presence of a stalking horse bid substantially enhances the prospects for a successful bankruptcy auction process. By setting a floor, stalking horse bids typically generate higher values for the estate and also bring order to the sale process. It also is well accepted that, part and parcel of having a stalking horse bid, is providing that stalking horse with a break-up fee in the event that the deal it spent considerable time and funds exploring and documenting goes to another party, and for the purpose of avoiding the sort of marginal bidding that would come with an implicit invitation to submit insubstantial incremental overbids. For its part, Lifetime would not have agreed to expend the time and resources to complete the diligence, fully negotiate the Asset Purchase Agreement and serve as stalking horse bidder without the negotiated break-up fee.

4. Rather than acknowledge the clear benefit to the estate that Lifetime has brought to the estate by serving as stalking horse bidder and, in that capacity, by negotiating and documenting a multi-hundred page asset purchase agreement inclusive of schedules that list every single tangible assets, all major contracts and identify scores of proprietary intellectual property rights, and has agreed to provide pre-closing transition services that will assist any successful purchaser to rapidly integrate the Debtor's assets into the purchaser's operations, the

U.S. Trustee argues that Debtor has not met its burden of showing that the proposed break-up fee is an "actual, necessary cost of preserving the estate" under 11 U.S.C. § 503(b) and that it is too high. The U.S. Trustee is wrong on a number of fronts: the standard he cites for approval of a break-up fee is not applicable in this district but in any case has been met here, and his suggestion that the minimum overbid required here will chill bidding is nothing more than conjecture that flies in the face of the ongoing due diligence being undertaken by certain well-known strategic purchasers who have been fully apprised of all aspects of Lifetime's stalking horse bid—including the Break-Up Fee. Under the circumstances, the Break-Up Fee should be approved.

## Argument

### The U.S. Trustee's Objection to the Break-Up Fee Should Be Overruled

5.    Reed and Barton's Motion describes the Bidding Procedures, including the Break-Up Fee, and demonstrates the various ways in which the proposed Procedures are designed to maximize value for the Debtor's estate. The Motion also explains that the Break-Up Fee and other proposed Bid Procedures were necessary to induce Lifetime to expend the time, energy and resources necessary to submit a stalking horse bid. The amount of the Break-Up Fee was based on the Proposed Purchaser's projected cost to conduct a complete diligence process and develop a fully negotiated Asset Purchase Agreement on which other bidders can rely, and reflect the true expense of evaluating a complex manufacturing business like that operated by Debtor. *See* Declaration of Laurence Winoker dated March 13, 2015 at ¶¶ 10-11.

6.    In addition to the detailed diligence completed by the Proposed Purchaser and the fully negotiated Asset Purchase Agreement, any successful bidder also will benefit from the work that the Proposed Purchaser is doing to integrate information about Debtor's assets. The efficient

integration of the Debtor's assets into a buyer's platform enabled by Lifetime's pre-closing transition services will be crucial to the post-closing success of any bid. The fact that the Debtor's complex array of intellectual property, inventory systems and other business data already has been processed for integration is likely to be a key factor in attracting additional bidders, thereby maximizing the value of Debtor's estate.

7. It is well settled that incentives for the initial "stalking horse" bidder are viewed as "be[ing] legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (*quoting Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 624 (S.D.N.Y. 1987)); *see also re Integrated Res., Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) ("the usual rule is that if break-up fees encourage bidding, they are enforceable" and, in some instances, may be so integral to encouraging bidding that they "can be *necessary* to discharge the director's duties to maximize value.").

8. The amount of the proposed Break-Up Fee is $750,000, or 5% of the cash consideration that will be paid under the Asset Purchase Agreement. In the Motion, Reed and Barton demonstrated that courts considering the propriety of a proposed break-up fee have approved a range of fees that, calculated as a percentage of the purchase price, are similar to the percentage being provided here as appropriate under the facts and circumstances of the case. *See In re Lake Burton Development, LLC,* No. 09–22830 (Bankr. N.D. Ga. Apr. 1, 2010) (break-up fee of 4.75% permitted); *In re Great Northern Paper, Inc.*, Case No. 03-10048 (Bankr. D. Me. Feb. 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); *In re Dan River, Inc.,* No. 04–10990 (Bankr. N.D. Ga. Dec. 17, 2004) (break-up fee of 5.3% permitted).

9. To date, the Proposed Purchaser has incurred actual out-of-pocket fees and expenses of $530,000 plus approximately $240,000 worth of time expended by Lifetime employees in connection with diligence and negotiating the terms of the proposed sale, and expects to incur additional expenses before the process is complete. See Winker Declaration. As such, there is no doubt that the amount of the Break-Up Fee is reasonably calculated to compensate the Proposed Purchaser for the costs and expenses it already has and expects to incur in connection with the proposed sale, and will not overcompensate Lifetime or result in any windfall to it if is not ultimately selected as the buyer for Debtor's assets. *Cf.*, *In re American Shipyard Corp.*, 229 B.R. 551, 552 (Bankr. D.R.I. 1998) (directing payment of previously approved break-up fee despite the fact that amount of fee was higher than actual expenses incurred by unsuccessful stalking horse buyer).

10. The U.S. Trustee does not dispute that courts have approved break-up fees in the range at issue here or that the break-up fee was a necessary precondition to the Proposed Purchaser's agreement to enter into the Asset Purchase Agreement and become the stalking horse. The U.S. Trustee instead argues that Reed and Barton has failed to show that the Break-Up Fee is an "actual, necessary cost" of preserving the estate, relying solely on two Third Circuit cases, *In re Reliant Energy Channelview LP*, 594 F.3d 200, 205-206 (3d Cir. 2010) and *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) as authority for the proposition that break-up fees must be evaluated under the standard used to assess requests for approval of section 503(b) administrative expenses.

11. *O'Brien* may be the standard used by courts in the Third Circuit,[2] but it is not applied in this district. The most recent evaluation of break-up fees in this district based that analysis on the business judgment standard. *See, e.g., In re Charles Street African Methodist Episcopal Church of Boston*, 2014 WL 1883803, *1 (Bankr. D. Mass. May 9, 2014) (overruling objections and approving proposed break-up fee as a "defensible exercise of the debtor's business judgment"). When applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See In re Trans World Airlines*, 2001 Bankr. LEXIS 267 at *45-50 (Bankr. D. Del. 2001) (describing business judgment rule as "very deferential standard"); *In re First Wellington Canyon Assocs.*, 1989 U.S. Dist. LEXIS 10687 at *8-9 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankruptcy's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

12. As in *Charles Street*, there is no doubt that the Reed and Barton board's[3] approval of the proposed sale and Bid Procedures, including the proposed Break-Up Fee, is a proper exercise of its business judgment. The Debtor's budget shows that it will not have sufficient funds to continue operating without a sale in the near term. The Debtor also does not have funds necessary to appear at the New York Tabletop Show and would be unable to do so absent the Proposed Purchaser's agreement to advance such funds. Failure to attend this crucial event could

---

[2] Notwithstanding *O'Brien*, bankruptcy courts in the Third Circuit routinely approve break-up fees as a necessary and appropriate component of bid procedures in the context of 363 sales. *See, e.g., In re Nortel Networks Inc.,* 2011 WL 1661524 (Bankr. D. Del. May 2, 2011) (approving bid procedures, including break-up fee, as being an actual and necessary cost of preserving the debtor's estate); *In re Magic Brands, LLC*, 2010 WL 3493041 (Bankr. D. Del. May 18, 2010) (same); *In re Verasun Energy Corp.*, 2009 WL 7215671 (Bankr. D. Del. Feb. 19, 2009) (same); *In re Holley Performance Products, Inc.*, 2009 WL 7215691 (Bankr. D. Del. Dec. 9, 2009) (same).

[3] The U.S. Trustee suggests that the Debtor may not be able to object to the Break-Up Fee because the Proposed Purchaser seeks to enter into consulting agreements with the Debtor's president and chief financial officer post-closing. This suggestion is belied by the fact that the sale was approved by the Debtor's full board of directors, the body with ultimate authority to control the Debtor's actions.

diminish the value of the Reed and Barton name and its brands, thereby reducing the potential return to creditors.

13. Given the constraints on Debtor's liquidity and its ability to continue to operate, combined with the complexity of its business, a near term sale with a stalking horse bid to establish a floor and attract other buyers represents the Debtor's best chance to maximize the value of its assets for the benefit of its creditors and the estate. The work that the Proposed Purchaser has done to integrate information about the Debtor's assets likely will encourage other buyers to submit bids, all to the benefit of the estate. So too, the amount of the Break-Up Fee tracks the Proposed Purchaser's actual costs and expenses and will not result in a windfall to the Proposed Purchaser if it ultimately is not the successful purchaser. As such, this Court should approve the Break-Up Fee as a proper exercise of business judgment.

14. The facts set forth in the Winoker Declaration likewise demonstrate that the Break-Up Fee is an "actual and necessary" cost of preserving the estate. Indeed, the Debtor's ability to continue to shop its business for a higher or better offer, or even to market test the Proposed Purchaser's offer, would be eliminated if the Debtor could not secure the Asset Purchase Agreement, inclusive of the Break-Up Fee. Even if *O'Brien* applied, the Debtor also has met that standard here.

15. Finally, the U.S. Trustee's concern that the amount of the Break-Up Fee combined with the other elements of the initial overbid requirement will chill bidding is misplaced. The Debtor has been contacted by several interested parties who have been granted access to the data room and scheduled interviews with the Debtor's management. No potential buyers have indicated that the initial overbid requirement will prevent them from submitting a bid. Given that there is no evidence that the minimum overbid requirement has detracted bidders or will

chill the bidding in any way, this Court should overrule the U.S. Trustee's objection and approve the Bidding Procedures, including the Break-Up Fee.

Wherefore, the Debtor respectfully requests that the Court enter orders as follows:

1. Approving the Bid Procedures, including, but not limited to, approval and payment of the Break-Up Fee and the Show Cost reimbursement as a super-priority administrative claim free and clear of all liens, claims and encumbrances from the sale proceeds, the receipt of the transition services, the notice procedures, the contract assumption and cure provisions and such other relief as is set forth in the Bid Procedures Order attached to the Motion as **Exhibit D.**

2. At the conclusion of the sale process as set forth in the Bid Procedures Order, conduct a final hearing regarding the proposed sale, and, at the conclusion of that hearing, enter an order approving the sale of substantially all assets of the Debtor, other than the Excluded Assets, free and clear of all liens, claims and encumbrances with such liens claims and encumbrances to attach to the proceeds of sale, determining the purchaser to be a good faith purchaser entitled to the protections of § 363(m) of the Bankruptcy Code, authorizing the assumption and assignment of the Assigned Contracts and authorizing the provisions for determining and resolving cure claims arising upon such assumption and assignment and containing such other provisions as the Court deems appropriate and as may be reasonably required by the purchaser; and

3. Granting the relief requested herein and such other and further relief as the Court deems just and proper.

Respectfully submitted,

REED AND BARTON CORPORATION

By its proposed counsel,

HOLLAND & KNIGHT LLP

/s/ John J. Monaghan
John J. Monaghan (Mass Bar #546454)
Lynne B. Xerras (Mass Bar #632441)
Kathleen St. John (Mass Bar #681565)
10 St. James Avenue
Boston, MA  02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850

Dated:  March 16, 2015

#34981160_v2

9

## **CERTIFICATE OF SERVICE**

     I, John J. Monaghan, proposed counsel to the Debtor in the above-captioned bankruptcy proceeding, do hereby certify that on March 16, 2015, I served the foregoing *Reply* upon the attached list of interested parties by first-class mail, postage prepaid, and/or by ECF, as indicated.

                                          /s/ John J. Monaghan_____

# SERVICE LIST

**U.S. TRUSTEE**

Eric K. Bradford, Esq.
Office of the U.S. Trustee
John W. McCormack Post Office/Court
 House
5 Post Office Square, Suite 1000
Boston, MA  02109
*By ECF*

**SECURED CREDITORS**

Donald E. Rothman, Esq.
Alexander G. Rheaume, Esq.
Riemer & Braunstein LLP
Three Center Plaza, 6th Floor
Boston, MA  02108
***Counsel to Rockland Trust Company***
*By ECF*

**TAXING AUTHORITIES**

| | |
|---|---|
| Internal Revenue Service | Massachusetts Department of Revenue |
| P.O. Box 7346 | Bankruptcy Unit |
| Philadelphia, PA 19101-7346 | P.O. Box 9564 |
| *By First-Class Mail* | Boston, MA 02114 |
| | *By First-Class Mail* |
| | |
| City of Taunton Treasurer/Collector | Town of Norton Treasurer/Collector |
| 141 Oak Street | 70 East Main Street |
| Taunton, MA 02780 | Norton, MA 02766 |
| *By First-Class Mail* | *By First-Class Mail* |

**ENVIRONMENTAL AGENCIES**

U.S. Environmental Protection Agency
Region 1
5 Post Office Square, Ste. 100
Mail Code: OES04-4
Boston, MA 02109-3912
*By First-Class Mail*

MA Dept. of Environmental Protection
1 Winter Street
Boston, MA 02108
*By First-Class Mail*

RI Dept. of Environmental Management
235 Promenade Street
Providence, RI 02908-5767
*By First-Class Mail*

**TOP 20 UNSECURED CREDITORS**

Marc D. Rosenberg
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, NY 10022-7020
***Counsel to 41 Madison L.P.***
*By First-Class Mail*

Brad Q. Rogers, Esq.
Pension Benefit Guaranty Corporation
Office of the Chief Counsel
1200 K Street, N.W.
Washington, DC 20005
*By ECF*

Richard L. Blumenthal, Esq.
Law Offices of Richard L. Blumenthal
51 Winchester Street, Suite 205
Newton, MA 02461
***Counsel to B&J Manufacturing Corp.***
*By ECF*

Rolf Glass
402 East Main Street
Mt. Pleasant, PA 15666
*By First-Class Mail*

CBIZ Tofias
56 Exchange Terrace
Providence, RI 02903
*By First-Class Mail*

Rosse and Associates
230 Spring Street NW
Suite 818
Atlanta, GA 30303
*By First-Class Mail*

Crystal Bohemia, A.S.
Jiraskova 223/19
Podebrady 290 01
CZECH REPUBLIC
*By First-Class Mail*

Seorim Vietnam Company, Ltd.
Plot D14-1, Road No. 5
Long Binh Industrial Zone
Bien Hoa City, Dong Nai Province
VIETNAM
*By First-Class Mail*

#34981160_v2        12

Division of Ecological Restoration
MA Department of Fish and Game
251 Causeway St., Suite 200
Boston, MA  021114
*By First-Class Mail*

G.B.G S.r.l.
Attn: Simone
Via Leonardo da Vinci, 11/13 Loc.
　SAMBUCA
50028 TAVARNELLE VAL DI PESA (FI)
ITALY
*By First-Class Mail*

Key Container Corp.
21 Campbell Street
Pawtucket, RI  02861-2370
*By First-Class Mail*

James B. Heffernan, Esq.
Rich May, P.C.
176 Federal Street, 6th Floor
Boston, MA  02110
***Counsel to Loretta Krebel***
*By ECF*

LeachGarner
49 Pearl Street
Attleboro, MA  02703
*By First-Class Mail*

MA Dept. of Environmental Protection
1 Winter Street
Boston, MA  02108
*By First-Class Mail*

Sung Jin (Hong Kong) Limited
8 Hart Avenue
Tsimshatsui
Kowloon
HONG KONG
*By First-Class Mail*

Terry, Charles
66 Walker St.
North Dighton, MA 02764
*By First-Class Mail*

Wacker Industrial Co. Ltd.
3/F Wacker Industrial Building 11
Mok Cheong Street, Tokwawan
Kowloon
HONG KONG
*By First-Class Mail*

Winko International Products Limited
3/F, Kwai Fong Industrial Building
9-15 Kwai Cheong Road
Kwai Chung N.T.
HONG KONG
*By First-Class Mail*

Woodmax Ky Industries Corp.
Attn: Andrew Chen
3F, No. 91 Ta Shun 1st Road
Kaohsiung City, 813
TAIWAN R.O.C.
*By First-Class Mail*

Wynne, Paula
300 E. 40th Street
New York, NY  10016
*By First-Class Mail*

**ADDITIONAL NOTICE PARTIES**

Mark N. Berman, Esq.
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
***Counsel to Lifetime Brands, Inc.***
*By ECF*

Robert N.H. Christmas, Esq.
Nixon Peabody LLP
437 Madison Avenue
New York, NY 10022
***Counsel to Lifetime Brands, Inc.***
*By ECF*

Missouri Department of Revenue
Bankrupcy Unit
Attn: Steven A. Ginther
P.O. Box 475
Jefferson City MO 65105-0475
*By ECF*

Synchrony Bank
c/o Recovery Management Systems Corp.
25 SE 2nd Avenue, Suite 1120
Miami, FL 33131-605
*By First-Class Mail*

Dallas Market Center Operating, L.P.
2100 Stemmons Freeway,
Dallas, TX 75207
*By First-Class Mail*

Spruce Creek Retail Outlet, LLC,
c/o Neal Shalom
145 Rosemary Street, Suite E
Needham, MA 02494
*By First-Class Mail*

Victor W. Newmark, Esq.
Wiles and Wiles, LLP
800 Kennesaw Avenue
Suite 400
Marietta, GA 30060
***Counsel to AmericasMart Real Estate, LLC***
*By First-Class Mail*